# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| SARAH M. KAVIANPOUR, MD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action File No.: |
| | : | |
| BOARD OF REGENTS OF THE | : | 1:20-cv-00152-MLB-RGV |
| UNIVERSITY SYSTEM OF | : | |
| GEORGIA: d/b/a AUGUSTA | : | |
| UNIVERSITY; MEDICAL | : | |
| COLLEGE OF GEORGIA HEALTH, | : | |
| INC. d/b/a AUGUSTA UNIVERSITY: | | |
| MEDICAL CENTER, INC.; | : | |
| BROOKS KEEL, in his individual | : | |
| capacity; | : | |
| PHILLIP COULE, in his individual | : | |
| and official capacity; | : | |
| CLAY SPROUSE, in his individual | : | |
| and official capacity; | : | |
| WALTER MOORE, in his individual | : | |
| capacity; | : | |
| SUSAN NORTON, in her individual | : | |
| and official capacity; and | : | |
| DEBRA ARNOLD, in her individual | : | |
| capacity, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S AMENDED COMPLAINT

COMES NOW Plaintiff, Sarah Kavianpour, by and through undersigned

counsel, and, in Response to Defendants Augusta University Medical Center f/k/a

MCG Health, Inc.'s ("AUMC") and Phillip Coule's Motions for a More Definite Statement [Docs. 4-5], hereby files her Amended Complaint, showing the Court as follows:

PARTIES

1.    Plaintiff Sarah D. Kavianpour ("Plaintiff") is a female United States citizen and, at all times relevant to this complaint was a resident of South Carolina and a resident physician within the Neurosurgery residency program at Defendant Augusta University's medical school, the Medical College of Georgia ("MCG"), and teaching hospital, AUMC,  is a fiduciary obliged to pay Centers for Medicare and Medicaid Services ("CMS") funds for Graduate Medical Education ("GME") resident salaries and associated administrative costs to train residents like Plaintiff in their respective specialty. The Sponsoring Institutions, like AU and AUMC, and the Residency Programs, officials have signed agreements to comply with the requirements of the Accreditation Council of Graduate Medical Education ("ACGME") that are designed to protect residents and their educational environment. These requirements are incorporated into the resident physician's written contracts and policies.

2.    Defendant Augusta University ("AU") is a member institution of the University System of Georgia ("USG") of the Defendant Board of Regents

("BOR") which pursuant to O.C.G.A § 20-3-51 is vested with the governance, control, and management of the USG and all its institutions, including AU.  BOR is headquartered in Fulton County, Georgia and may be sued through its Chair Sachin Shailendra, in his official capacity, under color of law, for prospective injunctive relief

3.    AU's GME and Neurosurgery Residency is a program as defined by 20 U.S.C. § 1687 for Title IX.   AU and AUMC receive federal funding through grants from CMS for  medical education and payment for resident medical treatment of Medicare patients via Direct Graduate Medical Education ("DGME") and  Indirect  Medical  Education  ("IME")  payments;  whereby  AUMC's participation in the residency program allows  AUMC to bill CMS a premium for procedures performed by the resident physicians, used to teach residents to be well-trained, certified specialists, in the public interest of improved health care, fulfilling the goals of the CMS grants for specialty training.

4.    Defendant Augusta University Medical Center, Inc. f/k/a MCG Health, Inc. ("AUMC"), which  is referred to as a component unit of AU in their financial documents,  is designated as a not-for-profit with the purpose "to further the health science education missions and other tax-exempt functions and purposes of the Medical College of Georgia," according to its articles of incorporation, and

pursuant to a Master Affiliation Agreement in which AUMC "shall be responsible for monitoring and facilitation of MCG Hospital and Clinics institutional compliance with ACGME and LCMS standards and requirements with respect to [AU] training programs, including (a) any ACGME requirements for participating institutions, and (b) applicable requirements for undergraduate and graduate clinical teaching facilities. [AUMC] shall cooperate with [AU]'s activities in maintaining and accreditation... and shall notify [AU] of any matters to its knowledge that may compromise such accreditation." (Master Affiliation Agreement FY 14, p. 16-17).

5.    Defendants BOR, AU, and AUMC are employers subject to suit under Title VII, as they have 15 or more employees, are engaged in interstate commerce, and acted as a single, integrated employer or enterprise, and/or joint employer, as an agent of BOR.

6.    Defendant Brooks Keel ("Dr. Keel") is President of AU and CEO of AU Health Systems and, upon information and belief, a resident of Richmond County, Georgia, who is sued individually for action taken under color of law, and, upon information and belief is a resident of Richmond County, Georgia.

7.    Defendant Phillip Coule ("Dr. Coule") is AUMC's Chief Medical Officer ("CMO"), who is sued individually for action taken under color of law, and

in his official capacity as the policy maker for decisions about the process and reasons for suspending resident hospital privileges of the enterprise of AU and AUMC,   and, upon information and belief, is a resident of Richmond County.

8.    Defendant Clay Sprouse ("Sprouse") is AU's and AUMC's Vice President ("VP") for Audit, Compliance, Ethics and Risk Management  who is sued individually for action taken under color of law and, upon information and belief, is a resident of Richmond County, Georgia

9.    Defendant Walter Moore ("Dr. Moore") is the Senior Associate Dean for Graduate Medical Education ("GME") and VA Affairs, Chair of the Graduate Medical Educational Committee, and Designated Institutional Officer ("DIO") for residency grants for AU and AUMC, who is sued individually for actions taken under color of law, and, upon information and belief, is a resident of Richmond County, Georgia.

10.    Defendant Susan Norton ("Norton") is AU's VP for Human Resources ("HR"), Chief HR Officer, who is sued individually for actions taken under color of law, and, upon information and belief, is a resident of Richmond County, Georgia.

11.    Defendant Debra Arnold ("Arnold") is AU's Director of Employee Relations for HR, who is sued individually for action taken under color of law and

as a policy maker for AU, implementation of drug testing after the pre-employment test, and, upon information and belief, is a resident of Richmond County, Georgia.

<u>JURISDICTION AND VENUE</u>

12.     This Court has federal question jurisdiction pursuant to <u>28 U.S.C. § 1331</u> over Counts V-XV of this Complaint, which arise out of Title VII of the Civil Rights Act of 1964, <u>42 U.S.C. § 2000e</u> *et seq*. ("Title VII"), Title I and III of the Americans with Disabilities Act, <u>42 U.S.C. § 12111</u>, *et seq*. ("ADA"), Section 504 of the Rehabilitation Act of 1973, <u>29 U.S.C. § 794</u> (the "RA"), Title IX of the Educational Amendments Act of 1972, 20 U.S. § 1681(a) ("Title IX"), <u>42 U.S.C. § 1983</u>, and the United States Constitution's 4th and 14th Amendments.

13.     This Court has supplemental jurisdiction pursuant to <u>28 U.S.C. § 1367</u> over Counts I-IV and XVI, which arise under Georgia state law and were originally brought by Plaintiff in Georgia's state courts, prior to Defendants' removal of the case to this Court.

14.     Venue is proper in this Court because the education and employment practices described herein occurred within the Atlanta Division of the Northern District of Georgia.

15.     On July 30, 2019, Plaintiff filed her charge naming AU and AUMC at the Equal Employment Opportunity Commission ("EEOC").

16.    On September 11, 2019, the EEOC issued her a notice of right to sue which she received on September 19, 2019.

17.    Plaintiff filed her complaint in the Fulton County Superior Court on December 12, 2019.

18.    Defendant removed the case to this Court on January 10, 2020.

<u>STATEMENT OF FACTS</u>

<u>Plaintiff's Employment Contract</u>

19.    On March 22, 2018, Plaintiff signed an acceptance letter or offer of employment from AU's Neurosurgery Department ("the Department") after matching there on March 16, 2018 and on July 12, 2019, Plaintiff signed a House Officer Notice of Appointment for Post Graduate Year One in AU's Neurosurgery Department ("the Department"), beginning July 10, 2018 through July 9, 2019.

20.    The Notice explicitly stated that it was "made subject to the policies and procedure and regulations of [AU and BOR]".

21.    Plaintiff and Dr. Samuel Macomson, the new Residency Program Director, signed the contract.

22.    At all relevant times, Plaintiff was the only female resident in the Department.

## Plaintiff's Pre-Employment Drug Test

23.    On June 25, 2018, Plaintiff submitted a pre-employment drug test and, on June 28, 2018, was informed that it was positive for THC 19 ng/ml, that is, above the 15 ng/ml threshold.

24.    On June 29, 2019, Dr. Moore notified Plaintiff that Defendants were rescinding Plaintiff's offer of employment, so that no residency contract would be issued to her.

25.    Plaintiff appealed this decision on July 3, 2018.

26.    On July 5, 2018, the confirmatory testing result of the first pre-employment test at an outside laboratory, MedTox, was 11 ng/ml, under the 15 ng/ml limit.

27.    On July 5, 2019, Plaintiff submitted a petition for retest to Dr. Moore, who granted a retest or a second pre-employment test later that day, after meeting with administrative decision-makers.

28.    The retest or a second pre-employment drug test results were negative.

29.    On July 11, 2018, Plaintiff was offered an employment contract, which she signed ("Plaintiff's Contract") without any special provisions or modifications agreeing to subsequent testing. [Doc. 3-2].

Purported "Random" Drug Testing of Plaintiff

30.    On August 21, 2018, Plaintiff received a Random Drug Testing Notification ("Testing Notification") from Defendant Norton that explained that she would "be subject to random drug testing beginning now until July 31, 2019. per policy under the section titled Random Drug Testing."

31.    It appears that this letter quoted the AU Substance Abuse Policy No. 685, then available at https://www.augusta.edu/hr/training/documents/gssubstanceabusepolicy.pdf.

32.    The Testing Notification explained that Plaintiff would be subject to this testing because she performed "duties considered high risk."

33.    The Testing Notification explained that Plaintiff "will be contacted randomly" by Defendant Arnold "and requested to appear at Employee Health within the hour you are contacted for testing."

34.    Employee Health is in a different building from Plaintiff's Department and, as a result, when Plaintiff left her Department to drug test, it often took 45 minutes away from her job.

35.    Plaintiff did not sign this notification for monthly drug tests.

Defendant Moore Orders Plaintiff to Undergo Substance Abuse Treatment

36.    On August 29, 2018, Dr. Macomson, without any prior warning,

invited Plaintiff into his office to address a rumor that Plaintiff used marijuana for stress.

37.    Later that same day, Plaintiff met with Drs. Macomson and Moore to address Dr. Moore's contention that he heard a rumor that Plaintiff was prescribed marijuana while she resided in Chicago, regularly used it for stress, and had cried in the Neuro-ICU one afternoon.

38.    Plaintiff explained that the rumors concerning her marijuana usage were false and that she had cried in the ICU due to a migraine exacerbation, which was subsequently treated with prescription medication the next month.

39.    Dr. Moore insisted Plaintiff report to the Georgia Professional Health Program ("GA PHP") in Atlanta and his office manager, Candice Henderson, subsequently emailed Plaintiff characterizing GA PHP reporting as a "requirement."

40.    When Plaintiff obtained an application for the GA PHP, it stated that participation in the program is voluntary and designed for physicians with substance abuse disorders.

41.    Dr. Moore was requiring her to participate in GA PHP although she did not have a substance abuse disorder. Plaintiff emailed Drs. Moore and Macomson asking for clarification and any documentation that she was required to

apply.

42.    Plaintiff never received a response and assumed the issue was abandoned.

## Plaintiff Tests Negative on Monthly Drug Tests

43.    On September 17, 2018, Plaintiff was given one hour's notice for a drug test[1] while she was off-duty and out on a sick day.  She tested negative.

44.    On October 17, 2018, Plaintiff, after again being given one hour's notice for a drug test while she was off-duty, tested negative.

45.    On October 19, 2018, a retest was demanded because Plaintiff had "dilute" results.

46.    Plaintiff explained that her result were dilute because she has chronic kidney disease for which she receives treatment and has written doctor's instructions from September 2018 to drink three liters of water daily.

47.    The retest was negative.

48.    On November 13, 2018, another off-duty drug test was requested but, because Plaintiff was on vacation, she was not aware of this request.

49.    On November 14, 2018, another drug test was requested, which Plaintiff completed within one hour and tested negative.

_____

[1] All of the drug tests Plaintiff was required to take involved giving urine samples.

<u>Monthly Drug Tests Interfered with Plaintiff's Patient Care Duties</u>

50.    Early on in her tenure at AUMC, Plaintiff shared on-call pager duty with another Department resident while she was familiarized with the Neurosurgery service responsibilities and transitioning into an independent role for when she would be on-call overnight by herself beginning January 2019.

51.    One resident is assigned to the on-call pager that receives emergent notices about changes in patients' neurological status, amongst other responsibilities of the service at the adult and children's hospital at AUMC.

52.    Because patients' neurological status can be life-threatening and require immediate response and evaluation to determine the need for emergency surgery, residents with on-call pager duty must respond to pages as soon as possible, but in no event within more than 10 minutes.

53.    Due to patient care priorities, Plaintiff could not always present for testing while working or, especially, while she had on-call pager duty.

54.    On December 5, 2018, Defendant Arnold requested that Plaintiff present for a drug test while she was on pager duty.

55.    When Plaintiff responded that she had pager duty and there were no neurosurgery residents to cover for her, Defendant Arnold contacted the GME, which contacted Dr. Rahimi, the Department's Assistant Program Director, who

offered his physician assistant for coverage.

56.     Plaintiff completed the test that day and it was negative.

Plaintiff Opposes Testing Because It Endangers Patient Health, Is Against
Applicable Laws and Policies, and Discriminates Against Her

57.     On December 13, 2018, and pursuant to the August 2018 Testing
Notification, Plaintiff met with Dr. Moore, to express concern that her drug tests
(particularly their timing) interfered with departmental operations, threatened
patient care and safety, subjected her to adverse and disparate treatment, and took a
toll on her work relationships with other residents asked to provide pager coverage
while she was testing.

58.     At this meeting, Plaintiff told Dr. Moore that policy prohibits adverse
treatment for a possible personnel matter where patient care and residency activity
cause interference with the personnel matter.

59.     Plaintiff offered to be available for voluntary daily drug testing if: (1)
it was at a set time in the afternoon that did not interfere with her clinical/patient
responsibilities; and (2) she could coordinate pager-patient hand-off to a co-
resident.

60.     Plaintiff assumed sole on-call pager duties in January 2019.

61.     On January 17, 2019, Plaintiff was asked to submit to another drug
test but, because she was off-duty and resting after a 28-hour hospital shift, she did

not receive this request with sufficient time to arrive at the testing site before it closed.

62.    On January 22, 2019, Plaintiff emailed Dr. Macomson, Ms. Arnold and others, asking to meet with Defendants Norton and Arnold "again to discuss the inappropriate timing of calls/testing, the lack of flexibility and justification per MCG policy (and stated federal laws)."

63.    On January 31, 2019, Defendant Arnold responded that Plaintiff was "subject to the AU and AUMC policies related to drug testing" and "refusal to participate or a failure to complete any step of testing process results in discharge" and that  "academic and clinical activity assigned by [the] department, will not be an excuse," even though Defendant Arnold previously accommodated Plaintiff's patient care.

64.    The letter conceded that Plaintiff would not be subject to testing on her days off and that they would notify her Residency Program Director (who was Dr. Macomson) when a test was needed to receive confirmation that Plaintiff was available to test, which did not occur on the subsequent test day, February 13th, 2019.

65.    Plaintiff responded by emailing Defendants Arnold and Norton stating:

14

Instead of facilitating a conversation for more reasonable arrangements, you decide to buckle down with a list of demands … this forces me to question the legality of these practices you are imposing on me in the first place. It is clearly not random and quite frankly discriminatory. This is harassment … you can come up with arbitrary rules and memorandums all you'd like but that does not make them legal and it furthers the point that I am making which is that you have singled me out and subjected me to prejudice. I hope you reconsider and mitigate this. Again, I am not refusing the testing. I have been cooperative and have completed what I consider to be an intrusive and excessive amount of testing in a setting of undue suspicions – all of which have been negative.

66.    Norton and Arnold did not respond.

67.    On February 1, 2019, Plaintiff forwarded this email thread to Dr. Macomson requesting that they meet to discuss patient coverage so she could present for testing within the timeframes Norton and Arnold gave her or prioritize hospital operations and patient care.

68.    Dr. Macomson never responded.

69.    On the morning of February 14, 2019, at a prescheduled meeting with the new Neurosurgery Chairman, Dr. Fernando Vale, wherein he asked residents about issues within the Department, Plaintiff brought up the "random" drug testing practice and stated that she was expected to present immediately even when she had pager duty, and explained the patient safety risks it was creating..

70.     Dr. Vale offered to take the neurosurgery service pager when there was no patient coverage available.

<u>Defendant Continues To Order Plaintiff To Submit To Tests In a Manner that Endangers Patient Safety and Violates Plaintiff's Rights</u>

71.     On the morning of February 13, 2019, Defendant Arnold instructed Plaintiff to present for drug testing within four hours.

72.     When Plaintiff explained that she might not be able to because she was on sole pager duty and all the other neurosurgery residents were in the operating room and unable to cover for her, Defendant Arnold replied to Plaintiff that she had four hours to present for testing.

73.     Plaintiff asked Dr. Tyler Sparks ("Dr. Sparks") if he would cover for her, but he yelled that it was not his job, although he had previously covered for Dr. Chris Banerjee ("Dr. Banerjee") so that the male residents could later drink together at prospective applicant interview dinners.

74.     As a result, Plaintiff's patient care duties precluded her from presenting for testing on February 13, 2019.

75.     The Department's patient coverage practice deviated from standards of care by not having a service pager or backup policy in place for such situations, like Plaintiff's drug testing, as mandated by University House Staff Policy 10.0 and ACGME core requirements:

16

Each program must have policies and procedures in place that ensure coverage of patient care in the event that a resident may be unable to perform their patient care responsibilities. These policies must be implemented without fear of negative consequences for the resident who is unable to provide the clinical work.

76.    At the March 2019 hearing, Dr. Macomson attested to the absence of said policy and to having ignored Plaintiff's request in early February to meet with him, and even though these were contractual obligations that were not met, the grievance panel ignored the Department's deficiencies that directly lead to Plaintiff dismissal.

77.    On February 14, 2019, Plaintiff presented to Employee Health when it opened at 7:30 a.m., but Defendants Arnold and Norton directed Employee Health not to test Plaintiff.

78.    Plaintiff called HR so she could be allowed to test before returning to work, but was directed to Dr. Macomson.

79.    When Plaintiff called Dr. Macomson, he indicated he was unaware that Defendants Norton and Arnold had asked Plaintiff to test the previous day or that they prevented Plaintiff from testing that day.

80.    During that day and for the next week, Plaintiff continued to engage in patient care without any restrictions.

Defendants Suspend Plaintiff's Clinical Privileges and Terminate Her Residency

81.    On February 21, 2019, Defendants Arnold and Norton drafted a letter to Dr. Coule recommending Plaintiff's termination due to her failure to appear for testing.

82.    There was no independent investigation of the allegations contained in Defendant Arnold's letter nor was there an opportunity for Plaintiff to participate in the same.

83.    On that same date, pursuant to Norton and Arnold's direction, Defendant Coule drafted a letter immediately suspending Plaintiff from all AU and AUMC clinical activities.

84.    Also on this same day, Dr. Macomson immediately terminated Plaintiff's residency employment because of Dr. Coule's suspension, and the notification stated that she had five days to submit to an appeal to Dr. Vale, and then ten days to appeal to HR.

85.    Dr. Macomson disclosed to Plaintiff that the termination decision "did not come from the Department" but was "HR-driven and out of his control."

Plaintiff Internally Appeals Suspension of Her Clinical Privileges and Termination

86.    On February 25, Plaintiff submitted her appeal to Dr. Vale.

87.    On March 1, 2019, Dr. Vale upheld the suspension and termination

decisions and told Plaintiff that she could appeal this decision by submitting a statement of grievance to HR within 10 days.

88.    Like Dr. Macomson, Dr. Vale claimed he had not been part of the decision and wanted Plaintiff to return to work as soon as possible, but was powerless to overturn an AUMC decision, and therefore had no choice but to uphold Plaintiff's termination because without privileges at AUMC, she could not participate in the residency program.

89.    Plaintiff submitted her statement of grievance on March 4, 2019 to HR as directed in her termination paperwork, but this directive was in contravention of her contract that required the GME office to handle "procedures for discipline and redress of grievances."

90.    On March 5, 2019, Plaintiff emailed Defendant Coule and those copied on her suspension letter stating that his decision was a prohibited adverse employment action and asking to meet.

91.    On March 13, 2019, Plaintiff filed an urgent retaliation claim with Defendant Sprouse asking him to take over the grievance process under AU's Non-Retaliation Policy and resolve any conflicts of interest.  He did not suspend HR's hearing to investigate the matter, let alone take any corrective measures per AU policy.

92.     On that same day, Plaintiff forwarded this email, as well as her March 5, 2019 email to Defendants Coule, Keel and others, stating that the testing procedures, as applied by Defendants Norton and Arnold, created patient safety concerns that she had tried to raise with HR to no avail.

93.     Between March 13 and 15 Plaintiff emailed HR and Defendants Coule and Moore seeking clarification on the grievance process, noting HR's conflict of interest, and lack of due process for the suspension, which were contractual obligations and that made the appeal process futile, and that she believed the grievance process violated laws concerning her rights and the safety of patients. She received no response.

94.     On March 15, 2019, Plaintiff emailed Defendant Sprouse asking if she should raise issues of retaliation and unlawful HR practices in her grievance statement, although she did not initially because she feared further retaliation from Defendants Arnold and Norton.  He responded that he would "collect additional information" and "be back in touch," but never did.

95.     Plaintiff also sought mediation with her Department, HR, or Defendant Coule, which Defendant Norton denied, even though the Department was agreeable.

Plaintiff's Grievance Hearing and Decision

96.    On March 19, 2019 at the pre-hearing briefing, Plaintiff submitted witness lists to the grievance hearing officer and other HR personnel so that they could, per AU policy, arrange witness attendance. They did not do so and they admitted to not knowing or caring about ACGME and GME policies as required by Plaintiff's House Officer contract.

97.    On March 22, 2019 the grievance hearing was conducted and run by Rebecca Williams, Assistant VP of HR, who is Defendant Norton's subordinate.

98.    Information was brought up at this hearing for the first time that had not previously been shared with Plaintiff, despite her prior requests for meaningful notice and opportunity to prepare.

99.    Dr. Vale offered to be Plaintiff's spokesperson for her grievance hearing, but Defendant Arnold informed him that he could not because it was a conflict of interest.

100.    However, Dr. Vale testified at the grievance hearing that he upheld Plaintiff's termination because Defendant Coule had revoked her privileges and that the Department shared her concerns about patient safety.

101.    At the hearing, Defendant Coule and multiple other physicians testified that Plaintiff never had any performance issues or displayed signs of

impairment and that other providers with DUIs were neither suspended nor terminated.

102.  At the hearing, the hearing officer did not allow Plaintiff to raise pertinent evidence, perform re-direct or cross-examinations, or discuss discrimination or harassment by HR.

103.  On March 26, the grievance panel recommended upholding Plaintiff's termination based on a "pattern of passive unwillingness," and supported their decision from a letter written by an adverse witness, who was not present at the hearing so Plaintiff was unable to cross examine and the hearing officer prevented her from raising credibility issues.

104.  In the recommendation, the panel falsely alleged that the drug testing was a condition of Plaintiff's hiring, even though Plaintiff had explained at the hearing that it was not, and this misinformation was directly forwarded to the University Provost and President without providing Plaintiff the opportunity to clarify and resolve it.

<u>Finalization of the Grievance Panel's Decision</u>

105.  Before Plaintiff could submit any appeal to the BOR, the grievance panel's decision was passed to AU's Provost and President.

106.  On April 2, 2019, the Provost upheld the grievance panel decision.

107.  On April 4, 2019, Defendant Keel issued a letter to Plaintiff reiterating the grievance panel's decision and stating that she could apply to the BOR for discretionary review.

108.  Neither conducted any independent investigation to determine the merits of the allegations against Plaintiff, or whether there was any violation of law, discriminatory motive or retaliatory motive.

<u>The Compliance Investigation</u>

109.  On May 8, 2019, AU's Chief Compliance Officer ("CCO"), Ms. Marti Arvin, contacted Plaintiff to investigate compliance issues.

110.  On June 6, 2019, Mr. John Lott, a third-party contractor, took over this investigation as AU's new CCO.

111.  On July 2, 2019, Plaintiff met with Mr. Lott as well as Michele Reed (AU's Title IX Coordinator) and Benjamin Hutton (a compliance analyst).

112.  On July 14, 2019, Mr. Lott emailed Defendant Sprouse recommending that their office make the University President Keel aware that Defendant Arnold admitted to violating AU's Random Drug Testing Policy as applied to Plaintiff.

113.  On July 15, Defendant Sprouse and Mr. Lott conducted investigative interviews of Defendants Norton, and AU's legal advisors, Clark Speese, and Greg

Bryan, and determined that AU and Georgia's Random Drug Testing Policy were not adhered to with respect to Plaintiff.

114. Specifically, Mr. Lott found that HR violated Plaintiff's contract, AU and AUMC's polices, and allowed unsubstantiated rumors to professionally and personally damage Plaintiff.

115. Mr. Lott advised Defendant Sprouse that this information needed to be forwarded to Defendant Keel immediately and that Defendant Sprouse was implicated in the issue and needed to separate himself from the investigation.

116. Ms. Marti Arvin, who had assumed an advisory role, had contacted the President's Chief of Staff, Russell Keen, after she had been brought up to speed by John Lott about the investigative findings.

117. On July 12, 2019, Mr. Keen sent a text message to Defendant Sprouse asking, "Is there an open investigation on retaliation of a resident targeted for drug screening?"

118. On July 16, 2019, Mr. Lott was summoned to Defendant Sprouse's office where he expressed concern that Defendants Sprouse, Norton, Arnold, as well as Bryan had all violated policies and not informed Defendant Keel.

119. Mr. Lott was immediately terminated.

120. In July 26, 2019, Mr. Lott asked Plaintiff if she had returned to work

because he had sent his investigation report and recommendation that she be reinstated to Defendant Keel on July 17, 2019.

121.  In this communication, Mr. Lott related the findings of his investigation, including, but not limited to, the following:

> Debra Arnold and Susan Norton both admitted that they did not adhere to AU and AUHS policies.
> a. While negligence nor intent have not been determined, there is a clear failure to cite the proper policy, adhere to an applicable AU or AUHS policy, and that failure to adhere to policy was complained about to Debra Arnold on January 22, 2019 and Clay Sprouse in March of 2019.
> b. This complaint of a hostile work environment should have triggered an independent investigation of the claims of hostile work environment.
> c. Instead, Dr. Kavianpour's January 22, 2019 claim of a hostile work environment was answered by stricter guidelines for random drug testing on January 31, 2019 in which her clinical duties could no longer interfere with drug testing, another immediate drug test, and the extension of her "random drug testing" period from July 31, 2019 to August of 2019.
> d. Two weeks after the January 31, 2019 drug test, Dr. Kavianpour was summoned for testing again. There is testimony both for and against her assertion that she could not comply due to her being "on-call". Dr. Kavianpour showed up for testing with 15 hours but not the stipulated 4-hour testing window due to Employee Health closing for the day. USG policy gives 48 hours. The next morning Dr. Kavianpour was "blocked" from taking the drug test she had been summoned for. This failure to test was used against her.
> 6. Besides the successfully appealed false positive test taken in June of 2018, between July 2018 and April 2019, Dr. Sarah Kavianpour was tested 7 times for

marijuana use. She passed all 7 tests including a hair follicle test.

7. Dr. Kavianpour has been cited for violating a policy that she did not violate because it was not properly applied nor adhered to.

8. No other resident in her department was random selected for drug testing. Policy states that the Vice President of Human Resources must create a methodology for random drug testing that includes the entire employee population. When questioned on this, it was admitted that no other resident nor clinical employees were tested besides Dr. Kavianpour.

9. Dr. Kavianpour made complaints about a hostile work environment during her employment (January 2019) and they were not investigated timely or reported to an outside neutral 3rd party to investigate.

10. It is the belief of my staff and I that none of this information was shared with Dr. Keel before he affixed his name to the grievance appeal denial.

122.   Mr. Lott further stated that he was removed from his position by Defendant Sprouse because he expressed concern about Defendant Sprouse's collaboration with Defendant Norton and ability to independently investigate.

123.   Notwithstanding the content of Mr. Lott's report and his allegation of retaliatory termination, President Keel took no further action.

<u>Defendant Sprouse Takes Over The Compliance Investigation</u>

124.   After Mr. Lott's sudden termination, Defendant Sprouse assumed control of the compliance investigation, falsely telling Plaintiff that Mr. Lott left because he was a temporary contractor even though the contract was not supposed

to end until November 2019 and during Lott's investigation, Sprouse was offering him a permanent position.

125.   Defendant Sprouse made no progress on her investigation.

126.   On October 3, 2019, Plaintiff resubmitted her compliance concerns to AU on Ethics Point and USG BOR on Navex Global, explaining that her original complaint regarding illegal drug testing and retaliation was made on March 13, 2019 to Defendant Sprouse and characterized as urgent but it was ignored for months and subsequently mishandled with the removal of Mr. Lott and concealment of his findings.

127.   The Office of Compliance closed her case without investigation or any input from her so, on October 17, 2019, Plaintiff once again resubmitted her compliance concerns to AU on Ethics Point.

128.   On October 31, Wesley Horne, Director of Ethics and Compliance emailed Defendant Sprouse that, at the time Plaintiff raised her concerns about retaliation in her March 15, 2019 email "it would have been appropriate to direct Dr. Kavianpour to include all concerns in her employment appeal or to suspend the appeals process pending the review of the concerns raised."

129.   Mr. Horne, however, did not address any issue concerning Plaintiff's protected activity, patient safety and care, or application of the Random Drug

27

Testing Policy and asked Defendant Sprouse to provide a summary of actions taken or planned to improve pre-employment screening processes and address candidates who fail drug testing.

130.   On November 4, 2019, Plaintiff emailed Defendant Moore, Dr. Dean Seehusen, Dr. Edward Aguben, and Dr. Vale to request "GME grievance per contract and notice of egregious GME and ACGME violation" but received no response.

131.   On November 5, 2019, Defendant Sprouse telephoned Plaintiff to set up a meeting that day, which she attended, along with her mother, and Mr. Hutton.

132.   In this meeting, Defendant Sprouse  falsely claimed that Plaintiff's complaints were never investigated by Lott, that no meetings with Lott took place other than with Plaintiff and Defendant Arnold, and that he would need an additional three to five weeks to conduct an investigation, the result of which she might not like.

133.   Later that day, Plaintiff contacted Mr. Horne expressing concern about Defendant Sprouse's conflict of interest and disinterest in doing his job by providing a fair investigation.

134.   On November 20, 2019, Plaintiff and her father met with Mr. Horne and Dr. Juanita Hicks, the VP of HR for the BOR, to review her concerns.

135. Horne and Dr. Hicks visited AU on November 25 through 26, 2019 but did not follow up with Plaintiff until after she filed this lawsuit, to assert that Plaintiff would be 'reinstated' and provided a GME hearing on an undisclosed topic, and Dr. Hicks indicated that USG's investigation would be put on hold to allow that process to happen.

Plaintiff's Reinstatement and Review of Suspension and Termination Decisions

136. After, and apparently in response to this lawsuit, Defendants attempted to insulate their illegal and discriminatory drug tests and personnel decisions concerning Plaintiff from judicial review by creating a pretextual paper trail in a December 16, 2019 letter, wherein Dr. Macomson informed Plaintiff that her suspension and termination decisions would be subject to review by a Clinical Competency Committee ("CCC") under House Policy 13.01 on January 7, 2019.

137. The letter explained that, pending this review, Plaintiff would be retroactively "reinstated as an employee" of AU in her previous role and would receive past compensation due from the date of termination, however her suspension would remain in effect and she would not be able to enter AUMC premises.

138. Thereafter, on January 11, 2020, the CCC issued its recommendation of nonrenewal based on alleged repeated violations of "professional conduct",

"hospital policy and procedure" and "failure to uphold standards of interpersonal and communication skills."

139.   On January 16, 2020, Dr. Macomson wrote to Plaintiff that the CCC had recommended non-renewal of her contract and he had accepted their recommendation.

140.   In this same letter, Dr. Macomson notified Plaintiff that she had the right to request a hearing by an Ad Hoc Committee and asked her to sign and return an attached form requesting the same within five days.

141.   On January 27, 2020, Plaintiff responded to Dr. Macomson that her previous contract was breached and had expired and that she could not move forward or be legally obliged to participate in an Ad Hoc proceeding without an existing contract.

142.   On February 13, 2020, Dean Seehusen, the Associate Dean for GME, wrote a letter to Plaintiff informing her that an Ad Hoc Committee had been appointed.

143.   On February 14, 2020, Defendant's counsel informed Plaintiff, through her counsel, that the Ad Hoc meeting was scheduled to meet on February 24, 2020.

144.   The meeting was rescheduled to March 12, but, at the time of writing,

has again been continued and remains pending.

<u>Comparator Conduct and Consequences</u>

145.    Male neurosurgery residents repeatedly admitted to coming to work hungover and at times put the on-call neurosurgery pager status as "at the bar."

146.    On December 7, 2017, during Plaintiff's initial interview, Drs. Sparks, and Banerjee were approximately two hours late and unreachable and admitted to arriving hungover after staying out drinking all night.

147.    During Plaintiff's residency the male residents watched sexually explicit videos and visited pornographic websites in the neurosurgery workroom, the on-call room, and on the work computers.

148.    To Plaintiff's knowledge, the only consequence of this behavior was that Dr. Banerjee's internet access was temporarily blocked by IT for visiting a pornographic site.

149.    Dr. Tyler Sparks would frequently change patient lab finding numbers to include or be some version of "69" and he would not stop or correct the number despite being asked to do so.

150.    Dr. Sparks used the neurosurgery resident on-call room for sexual activity with women.

151.    Dr. Banerjee drew a penis on a nursing station chair using foam

sanitizer that stained and damaged property, but the only disciplinary action he faced was being asked to pay for the damaged chair.

152.  Despite Plaintiff's extreme discomfort and her and Dr. Macomson's requests, the male residents continued to change their clothes in the workroom in Plaintiff's presence.

153.  To Plaintiff's knowledge, male residents have not been disciplined for or suffered any adverse treatment for their drinking habits, insubordination, or sexually lewd or explicit behavior, all of which is unprofessional.

154.  Dr. Macomson covered for male residents, including adjusting and changing departmental operations—such as splitting certain tasks traditionally performed by first or second year residents split between them so that Drs. Banerjee and Dane Jones could carry some of Dr. Sparks' workload—to accommodate and compensate for male residents' needs.

155.  Multiple nurses within the Department complained to Plaintiff about Dr. Sparks' unprofessional demeanor, unresponsiveness to pages about patients, and refusal to clean up after he performed a procedure. Yet Sparks was not disciplined.

156.  Others complained (verbally and in writing) about Dr. Sparks, including Trauma Service (because he waited two hours before going to see a

patient with a gunshot wound to the head when he was on-call) and a patient's family who forbade him from seeing the patient. Yet Sparks was not disciplined.

157.   Although, residents are responsible for keeping their certifications up-to-date and the Program Coordinator is responsible for ensuring they do, Dr. Sparks boasted that he had not completed any Basic Life Support or Advanced Cardiovascular Life Support certification in years.

158.   Dr. Sparks arrived late many mornings, and, if he was assigned to a surgery that went past five p.m., he would often sneak out, leaving the overnight resident on-call to complete the remainder of the surgery.

159.   Plaintiff reported to Dr. Macomson that Dr. Joe Kilianski, another resident, was creating patient safety issues because he rarely signed out when he was on-call overnight and, when he did, his sign-outs were incomplete. Presumably Dr. Macomson ignored her reports because Dr. Kilianski's signouts worsened over time.

<u>Plaintiff's Damages</u>

160.    Had Plaintiff been permitted to complete her first post-graduate year of training at AU, she would have been eligible to obtain her own medical license and work independently or as a contract physician.

161.   Due to Plaintiff's termination, she is unable to work as a

neurosurgeon.

162.   As a result of Defendants' conduct Plaintiff's career has been derailed and delayed her residency training for over a year now. She has and will suffer lost wages.

163.   The conduct of one or more Defendants has caused Plaintiff extraordinary emotional distress, emotional pain and suffering, inconvenience, humiliation and embarrassment which will with reasonable certainty continue into the future, and has rendered it impossible for Plaintiff to be accepted  in any other neurosurgery residency program.

164.   The conduct of one or more individual Defendants has been in willful or wanton disregard of the rights of all for which punitive damages may be assessed by the enlightened conscience of the jury.

165.   As a result of Defendants' conduct, Plaintiff has incurred attorneys' fees and expenses.

### Count I: Breach of Contract
(Against BOR and AUMC)

166.   As set forth in Paragraphs 19-20, Plaintiff's Contract explicitly stated that it was "made subject to the policies and procedure and regulations of [AU and BOR]," ("USG Policies"). [Doc. 3-2 at § 8].

167.   USG Policies require that employees "be provided a specific date and

34

time to report for [drug] testing; such date and time shall be as soon as possible, but not later than two (2) business days following the date the individual receives notification to report." See https://www.usg.edu/hr/manual/drug_testing.

168.   Defendants were contractually bound by Ga. Comp. R. & Regs. r. 478-1.21C because USG Policies expressly adopt the State Merit System of Personnel Administration drug testing procedures.

169.   Ga. Comp. R. & Regs. r. 478-1.21C(b) requires that "Random selection [for drug testing] is made such that each position within a pool has an equal chance of being selected each time."

170.   Ga. Comp. R. & Regs. r. 478-1-.21(6)(c)(1) provides that requiring an employee to undergo substance abuse testing is considered work time, including any travel time to and from the collection or testing facility."

171.   Ga. Comp. R. & Regs. r. 478-1-.21(5)(c) provides that "[t]o accommodate scheduling, workload, or other business needs, the appointing authority may delay issuing the testing directive to an employee until a later date and time when operations will not be unduly disrupted."

172.   Plaintiff's Contract also subjected her to AU's House Staff Policies and Procedures for GME ("House Staff Policies"). [Doc. 3-2 at §8].

173.   The House Staff Policies incorporate the Accreditation Council of

GME            policies            ("ACGME            Policies").            See
https://www.augusta.edu/mcg/residents/hspolicies/ at 10.0 § 5.

174.   Residency programs must be accredited by the ACGME to receive
federal graduate medical education funds from CMS and, to maintain their
accreditation, are bound by ACGME's Sponsoring Institution and Residency
Program Requirements.

175.   The House Staff and ACGME Policies require due process relating to
suspension and dismissal, as well as a policy for submitting and processing
grievances at the program and institutional level that minimizes conflicts of
interest.    Id.    at    House    Staff    Policy    13.0    §    2.    See    also
https://www.acgme.org/Portals/0/PFAssets/ProgramRequirements/CPRs_2017-07-
01.pdf at § II.A.4(l).

176.   ACGME Policies require that "each program must have policies and
procedures in place that ensure coverage of patient care in the event that a resident
may be unable to perform their patient responsibilities.  These policies must be
implemented without fear of negative consequences of the resident who is unable
to provide the clinical work." House Staff Policy 10.0 at § 16, ACGME Policies at
§ VI.C.2.

177.   ACGME Policies require that residency programs and Sponsoring

Institutions "provide a learning and working environment in which residents have the opportunity to raise concerns and provide feedback in a confidential manner as appropriate, without fear of intimidation or retaliation." ACGME Policies at § II.A.4.a)(10).

178.   ACGME Policies require residents and faculty to "demonstrate responsiveness to patient needs that supersedes self-interest." ACGME Policies at § VI.B.5.

179.   Defendants suspended Plaintiff's clinical activities and terminated her from the Neurosurgery residency program for "not adhering to the Medical Center's Substance Abuse policy," where according to said policy "Random testing" is "a drug screen conducted on an employee … selected on an anonymous basis through an established methodology of employee population each year," but Plaintiff had been selectively targeted to drug test every month during peak patient care hours and to present within the hour, which meant potentially leaving the hospital without patient coverage. *See* https://www.augusta.edu/mcg/residents/substanceabusepolicy.pdf.

180.   As set forth in the Paragraphs 28-132 Defendants breached the terms of Plaintiff's Contract by violating House Staff Policies, AU Policies, AUMC Policies, USG Policies, and ACGME Policies, as well as the federal and state laws

and regulations incorporated therein.

181.   Plaintiff repeatedly protested Defendants' breaches but Defendants ignored her protests and continued to breach Plaintiff's Contract.

182.   Ultimately, Defendant illegally terminated Plaintiff's contract.

Count II:  Georgia Whistleblower Protection Act Under O.C.G.A §45-1-4 *et seq.*:
Employee Drug Testing.
(Against BOR and AUMC)

183.   Plaintiff reasserts and incorporates Count V of her original complaint (Doc. 1-1 at ¶¶ 176-189), as well as Paragraphs 19-20, 23-28, 30-35, 43-49, 54-72, 74, 77-79, 81-85 of this Complaint as if fully set forth herein.

184.   Plaintiff was a public employee under O.C.G.A §§ 45-1-4 and 45-23-3.

185.   Defendants BOR and AUMC are public employers under O.C.G.A §§ 45-1-4 45-23-3.

186.   Pursuant to O.C.G.A § 45-23-3, Defendants BOR and AUMC are bound by the due process requirements of the Georgia and United States Constitutions and the administrative procedures outlined in O.C.G.A § 45-20-3.

187.   Under O.C.G.A. § 45-20-111, if an employee offered employment for a position designated as requiring a drug test receives test results indicating the presence of an illegal drug, such test shall be followed by a confirmatory test.

188.    Under <u>O.C.G.A. § 45-20-110</u> pre-employment drug tests must be "administered in a manner equivalent to Mandatory Guidelines for Federal Workplace Drug Testing Programs available at HHS Regulations 53 Fed. Reg. 11979, *et seq*." ("Federal Testing Guidelines").

189.    As set forth in Paragraphs 23-28, 30-35, 43-49, 54-72, 77-79, 81-85, Plaintiff was repeatedly subjected to and opposed drug tests that were not random and did not comply with state or federal law.

190.    As a direct result of opposing drug tests and as set forth in Paragraphs 81-85, Defendants suspended Plaintiff's clinical privileges and terminated her employment,

191.    As set forth in Paragraphs 109-120, an independent CCO, Mr. Lott, opposed Defendants' violation of their own policies and the law, but was terminated for advising Defendant Sprouse to address the same.

<u>Count III:  Georgia Whistleblower Protection Act Under O.C.G.A §45-1-4 *et seq*.:
Patient Safety.</u>
(Against BOR and AUMC)

192.    Plaintiff reasserts and incorporates Paragraphs 19-20, 33-34, 50-79 of this Complaint as if fully set forth herein.

193.    The House Staff and ACGME Policies require that "each program must have policies and procedures in place that ensure coverage of patient care in

the event that a resident may be unable to perform their patient responsibilities. These policies must be implemented without fear of negative consequences of the resident who is unable to provide the clinical work." House Staff Policies at § 16, ACGME Policies at § VI.C.2.

194.   The House Staff and ACGME Policies require residents and faculty to adhere to ethical principles, which includes "demonstrat[ing] responsiveness to patient needs that supersedes self-interest." ACGME Policies at § IV.B.1.a) & VI.B.5.

195.   As set forth in Paragraphs 35, 55, 57-59, 62-65, 67, 69, 72, 74, 76, 79 Plaintiff repeatedly protested that the administration of her drug testing interfered with patient coverage and safety but Defendants dismissed (and continue to dismiss) her concerns.

196.   As a direct result of opposing drug tests that compromised patient safety Defendants suspended Plaintiff's clinical privileges and terminated her employment.

Count IV: Georgia Whistleblower Protection Act Under O.C.G.A §45-1-4 *et seq.*:
Internal Appeals Process.
(Against BOR and AUMC)

197.   Plaintiff reasserts and incorporates Paragraphs 19-20, 81-138 of this Complaint as if fully set forth herein.

198.   The House Staff and ACGME Policies require due process relating to suspension and dismissal, as well as a policy for submitting and processing grievances at the program and institutional level that minimizes conflicts of interest. House Staff Policies at 13.0 § 2, ACGME Policies at § II.A.4(l).

199.   Defendants failed to adhere to ACGME Policies by denying Plaintiff due process in the proceedings related to her suspension and dismissal and by subjecting her to a grievance process at the program and institutional level that had documented conflicts of interest.

200.   As set forth in Paragraphs 86, 89-95, 110, 123-124, 127-131, and 138 Plaintiff repeatedly protested that Defendants subjected her to personnel actions that did not comply with the ACGME and had conflicts of interest.

201.   As a direct result of opposing Defendants' non-compliant personnel actions, and as set forth in Paragraphs 96-99, 102-108, 119-141, Defendants subjected Plaintiff to ever more biased appeals and compliance processes.

Count V:  Discrimination under Title VII
(Against BOR and AUMC)

202.   Plaintiff reasserts and incorporates Paragraphs 1-5 of this Complaint as if fully set forth herein.

203.   Plaintiff is a member of a protected class by virtue of her sex.

204.   Plaintiff suffered the adverse action of monthly drug tests and its

arbitrarily strict protocol that violated her contract, Defendants' AU and AUMC's policies, state and federal law.

205.   Plaintiff suffered the adverse action of heightened surveillance.

206.   Plaintiff suffered the adverse action of having her supervisor require her to attend voluntary GA PHP based on an unsubstantiated malicious rumor.

207.   In February 2019, Plaintiff suffered the adverse action of increased scrutiny, artificially low evaluations without formative feedback or opportunity to cure, and denial of otherwise available informal process or remediation per Policies.

208.   Plaintiff suffered the adverse action of suspension of her clinical privileges and termination.

209.   Similarly-situated male residents were not subject to these illegal and invasive tests, required to go to GA PHP, have the a file built against them, or suspended and/or terminated, despite the fact that their alcohol use and propensity for sexual activity or lewdness at work interfered with their clinical and professional duties and patient safety, was unprofessional, as well as compromised female employees' comfort and destroyed or compromised employer equipment and property.

210.   As a result, Defendant's "random" drug testing policy was not random

at all; rather, only Plaintiff was targeted for testing while her male peers were never subjected to testing and would otherwise cover each others' patients so they could consume alcohol but not Plaintiff for her drug testing.

211.  Discriminatory animus may be inferred from Defendants' more favorable treatment of other similarly situated male neurosurgery residents, as detailed in Paragraphs 142-156 of this Complaint.

212.  Defendants' alleged reason for drug testing Plaintiff is illegitimate and pretextual.

213.  Defendants' alleged reason for terminating Plaintiff is illegitimate and pretextual.

### Count VI:  Hostile Work Environment under Title VII
(Against BOR and AUMC)

214.  Plaintiff reasserts and incorporates Paragraphs 1-5 of this Complaint as if fully set forth herein.

215.  Plaintiff is a member of a protected class by virtue of her sex.

216.  Plaintiff suffered the adverse action of monthly drug tests that were against her contract, Defendants' AU and AUMC policy, state and federal law, were humiliating and intrusive and caused a material interference with the terms and conditions of her employment.

217.  Similarly-situated residents outside Plaintiff's protected class were not

subject to these illegal and invasive tests.

218.   Defendants' behavior towards Plaintiff, as detailed in Paragraphs 24, 30, 36-42, 43-49, 54-55, 61-68, 71-73, 77-79, 81-85, 118-123, 144 of this Complaint, was discriminatory.

219.   Discriminatory animus may be inferred from Defendants' more favorable treatment of other similarly situated male neurosurgery residents, as detailed in Paragraphs 142-156 of this Complaint.

220.   Defendants' alleged reason for drug testing Plaintiff is illegitimate and pretextual, as demonstrated in Paragraphs 78-80, 85-88, 112-114 and 121 of this Complaint.

<u>Count VII: Retaliation Under Title VII</u>
(Against BOR and AUMC)

221.   Plaintiff reasserts and incorporates Paragraphs1-5 of this Complaint as if fully set forth herein.

222.   Plaintiff is a member of a protected class by virtue of her opposition to Defendants' illegal and discriminatory testing that violated Title VII, her rights, Defendants' policies, and state and federal laws.

223.   As a result of opposing Defendants' illegal and discriminatory testing of her, Plaintiff suffered the adverse action of more stringent drug tests and, ultimately, suspension of her clinical privileges and termination of her contract.

224. Plaintiff is a member of a protected class by virtue of her opposition to Defendants' personnel policies towards her.

225. When Plaintiff opposed the illegal and discriminatory personnel actions, she was subjected to a retaliatory hostile work environment up to and including suspension and termination and specifically suffered increased scrutiny with artificially low and negative evaluations in an attempt to build a file on her, was denied House Staff and ACGME Policy protections, did not receive proper appeals or independent compliance investigations but continued to suffer from an appeals process and compliance investigation tainted by conflicts of interest, discriminatory and retaliatory animus.

226. Defendants' retaliatory behavior towards Plaintiff is detailed in Paragraphs 30, 36-39, 43-46, 48-49, 54-55, 61-66, 71-83, 77-78, 81-85, 88-89, 95-99, 102-103, 105 of this Complaint.

227. Retaliatory animus may be inferred from Defendants' treatment of other similarly situated neurosurgery residents who did not engage in protected speech, and were treated more favorably than Plaintiff as detailed in Paragraphs 142-156 of this Complaint.

228. Defendants' alleged reason for subjecting Plaintiff to more stringent drug testing, suspending her clinical privileges, terminating of her contract, is

illegitimate and pretextual.

<u>Count VIII: Disability Discrimination under the ADA Title I</u>
(Against BOR and AUMC)

229.   Plaintiff reasserts and incorporates Paragraphs 1-5of this Complaint as if fully set forth herein.

230.   Plaintiff is a qualified individual who Defendant erroneously regarded her as having the disability of a substance abuse disorder.

231.   Plaintiff suffered the adverse action of selective random drug tests and an arbitrary, illegal and discriminatory testing protocol.

232.   When Plaintiff asked to meet with HR Defendants for drug testing flexibility or accommodation of patient care, Defendants interfered with the exercise and enjoyment of ADA rights by ignoring her request for an otherwise interactive process, thereby denying her the benefits and privileges of employment and education equal to those enjoyed by employees who are not regarded as disabled.

233.   Plaintiff suffered the adverse action of suspension of her clinical privileges and termination for the disability that she was regarded as having and because of Defendants refusal to accommodate.

234.   Discriminatory animus may be inferred from Defendants' behavior towards Plaintiff, as detailed in Paragraphs 24, 30, 36-49, 54-56, 61, 63-64, 71-72,

77, and 81of this Complaint.

235.   Discriminatory animus may be inferred from Defendants' treatment of other similarly situated neurosurgery residents who were not disabled, as detailed in Paragraphs 142-156 of this Complaint.

236.   Defendants' alleged reason for drug testing Plaintiff is discriminatory and pretextual, as demonstrated in Paragraphs 23, 26-28, 59, 65-66 of this Complaint.

237.   Defendants' alleged reason for terminating Plaintiff is discriminatory and pretextual, as demonstrated in Paragraphs 81-85, 136-141 of this Complaint.

<u>Count IX: Retaliation under the ADA Title I</u>
(Against BOR and AUMC)

238.   Plaintiff reasserts and incorporates Paragraphs1-5 of this Complaint as if fully set forth herein.

239.   Plaintiff is a qualified individual who Defendant erroneously regarded her as having the disability of a substance abuse disorder.

240.   When Plaintiff asked to meet with HR Defendants for drug testing flexibility or accommodation of patient care, Defendants refused and responded with  a retaliatory memo that made her objections grounds for dismissal

241.  Plaintiff suffered the adverse action of random drug tests, of suspension of her clinical privileges, and termination.

242.   When Plaintiff objected to the illegal manner in which Defendant performed these tests, her clinical privileges were suspended and she was terminated.

243.   When Plaintiff objected to the illegal and retaliatory suspension of her clinical privileges and termination, she was subject to another illegal and biased internal appeals process.

244.   Retaliatory animus may be inferred from Defendants' behavior towards Plaintiff, as detailed in Paragraphs 30, 36-45, 48-49, 54-55, 61, 63, 71-72, 77-78, 81-85 of this Complaint.

245.   Retaliatory animus may be inferred from Defendants' treatment of other similarly situated neurosurgery residents who did not engage in protected speech under the ADAAA, as detailed in Paragraphs 142-156 of this Complaint.

246.   Defendants' alleged reason for drug testing Plaintiff is illegitimate and pretextual, as demonstrated in Paragraphs 23, 26-28, 59, 65-66 of this Complaint.

247.   Defendants' alleged reason for terminating Plaintiff is illegitimate and pretextual, as demonstrated in Paragraphs 81-85, 136-141 of this Complaint.

## Count X: Disability Discrimination under the ADA Title III
(Against BOR and AUMC)

248.   Plaintiff reasserts and incorporates Paragraphs 1-5 of this Complaint as if fully set forth herein.

48

249.   Defendants are public accommodations under the 42 U.S.C. § 12182(a).

250.   Plaintiff is a qualified individual because Defendant erroneously regarded her as having the disability of a substance abuse disorder.

251.   Plaintiff suffered the adverse action of targeted drug tests.

252.   Plaintiff suffered the adverse action of suspension of her clinical privileges and termination.

253.   Defendants' behavior towards Plaintiff was discriminatory in violation of Title III of the ADAAA, as detailed in Paragraphs 24, 30, 36-49, 54-56, 61, 63-64, 71-72, 77, and 81 of this Complaint.

254.   Discriminatory animus may be inferred from Defendants' behavior towards Plaintiff as compared to other similarly situated neurosurgery residents, as detailed in Paragraphs 142-156 of this Complaint.

255.   Defendants' alleged reason for targeted drug testing of Plaintiff is discriminatory and pretextual, as demonstrated in Paragraphs 23, 26-28, 59, 65-66 of this Complaint.

256.   Defendants' alleged reason for terminating Plaintiff is discriminatory and pretextual, as demonstrated in Paragraphs 81-85, 136-141 of this Complaint.

Count XI: Title IX
(Against BOR and AUMC)

257.   Plaintiff reasserts and incorporates Paragraphs 1-5 of this Complaint as if fully set forth herein.

258.   Title IX prohibits discrimination against any person on the basis of sex in education programs or activities receiving federal financial assistance.  20 U.S. § 1681(a).

259.   Title IX's protection against sex discrimination grants employees a private right of action against a covered institution.

260.   At all times relevant to this Complaint, Defendants were educational institutions that receive federal funding within the meaning of Title IX.

261.   At all times relevant to this Complaint, Plaintiff was an employee of Defendants.

262.   Plaintiff suffered the adverse action of random drug tests.

263.   Plaintiff suffered the adverse action of termination.

264.   Discriminatory animus may be inferred from Defendants behavior towards Plaintiff, as detailed in Paragraphs 24, 30, 36-42, 43-49, 54-55, 61-68, 71-73, 77-79, 81-85, 87, 89, 91, 93-108, 120-127, 129, 133, of this Complaint.

265.   Discriminatory animus may be inferred from Defendants' behavior towards other male neurosurgery residents, as detailed in Paragraphs 142-156 of

this Complaint.

266.   Defendants' alleged reason for placing random drug testing on Plaintiff is illegitimate and pretextual, as demonstrated in Paragraphs 23, 26-28, 59, 65-66 of this Complaint.

267.   Defendants' alleged reason for terminating Plaintiff is illegitimate and pretextual, as demonstrated in Paragraphs 81-85, 136-141 of this Complaint.

### Count XII: Discrimination under The Rehabilitation Act
(Against BOR and AUMC)

268.   Plaintiff reasserts and incorporates Paragraphs 1-5 of this Complaint as if fully set forth herein.

269.   Defendants' programs and activities receive federal financial assistance under 29 U.S.C. § 794(a).

270.   Plaintiff is a qualified individual with the disability of chronic kidney disease, and, at all relevant times, was regarded by Defendants as having the perceived disability of a substance abuse disorder.

271.   Plaintiff suffered the adverse action of targeted drug tests.

272.   Plaintiff suffered the adverse action of suspension of clinical activities and termination.

273.   Discriminatory animus may be inferred from Defendants' behavior towards Plaintiff, as detailed in Paragraphs 24, 30, 36-49, 54-56, 61, 63-64, 71-72,

77, and 81of this Complaint.

274.   Discriminatory animus may be inferred from Defendants' behavior towards other neurosurgery residents, as detailed in Paragraphs 142-156 of this Complaint.

275.   Defendants' alleged reason for placing random drug testing on Plaintiff is illegitimate and pretextual, as demonstrated in Paragraphs 23, 26-28, 59, 65-66 of this Complaint.

276.   Defendants' alleged reason for terminating Plaintiff is illegitimate and pretextual, as demonstrated in Paragraphs 81-85, 136-141 of this Complaint.

Count XIII:  Violation of Constitutional and Civil Rights Pursuant to  42 U.S.C. § 1983 and the Equal Protection Clause
(Against Defendants Arnold, Keel, Norton, and Sprouse in their individual capacities)

277.   Plaintiff reasserts and incorporates Paragraphs 1-5 of this Complaint as if fully set forth herein.

278.   Under the Equal Protection Clause of the Fourteenth amendment to the U.S. Constitution, employees of public institutions have the right to be free of unlawful discrimination on the basis of their sex. This constitutional right is clearly established.

279.   Pursuant to 42 U.S.C. Section 1983, persons who, while acting under color of state law, violate an individual's constitutional rights can be held liable for

52

damages in their individual capacity.

280.   Plaintiff is a member of a protected class by virtue of her sex.

281.   Plaintiff suffered the adverse action of random drug tests.

282.   Plaintiff suffered the adverse action of termination.

283.   Discriminatory animus may be inferred from Defendants behavior towards Plaintiff, as detailed in Paragraphs 24, 30, 36-42, 43-49, 54-55, 61-68, 71-73, 77-79, 81-85, 87, 89, 91, 93-108, 120-127, 129, 133 of this Complaint.

284.   Discriminatory animus may be inferred from the more favorable treatment of comparators, as detailed in Paragraphs 142-156 of this Complaint.

285.   Defendants' alleged reason for drug testing Plaintiff is illegitimate and pretextual, as demonstrated in Paragraphs 23, 26-28, 59, 65-66 of this Complaint.

286.   Defendants' alleged reason for terminating Plaintiff is illegitimate and pretextual, as demonstrated in Paragraphs81-85, 136-141 of this Complaint.

<u>Count XIV:  Violation of Constitutional and Civil Rights Pursuant
to 42 U.S.C. § 1983 and the 4th and 14th Amendment</u>
(Against Defendants Arnold, and Norton, in their
individual capacities and AUMC for the actions of Norton in her official capacity
as a policymaker in evaluating responses to request for testing)

287.   Plaintiff reasserts and incorporates Paragraphs 1 through 165 of this Complaint as if fully set forth herein.

288.   Under the Fourth and Fourteenth Amendments to the U.S.

Constitution, employees of public institutions have the right to be free from arbitrary and objectively unreasonable application of administrative drug testing that causes one or more deprivations of protected interests, including loss of liberty and property interests, like loss of job and career training in a federally funded and regulated medical specialty training program. This constitutional right is clearly established. Pursuant to 42 U.S.C. § 1983, persons who, act under color of state law, and deprive another of one or more federal rights, including those under the Fourth and Fourteenth amendments, and cause injury thereby can be held liable for damages in their individual capacity.

289. Plaintiff suffered the adverse action of random drug tests which prevented her from performing her job duties and jeopardized patient care.

290. Plaintiff suffered the adverse action of termination based on illegal testing and an intentionally and willfully false narrative alleging willful violation of testing procedures that were in fact illegal in and of themselves.

291. Defendants' alleged reason for drug testing Plaintiff was illegitimate and pretextual, as demonstrated in Paragraphs 30-85 of this Complaint.

292. Defendants' alleged reason for terminating Plaintiff was illegitimate and pretextual, as demonstrated in Paragraphs 71-108 and 109-121 of this Complaint.

293.   Defendants' actions were a clear violation of Plaintiff's clearly established Constitutional rights under the Fourth and Fourteenth Amendments and of statutory rights of which a reasonable person would have known.

294.   The illegal drug testing of Plaintiff violated her rights under the Fourth and Fourteenth Amendments to the United States Constitution by depriving her of her liberty and property interests by manipulating the timing of testing and falsely representing that she failed to appear when Defendants blocked the test on February 1, 2019 even though Defendants Arnold and Norton knew Plaintiff would test negative as she had in the five preceding tests.

295.   Defendant Norton, in her official capacity was a policymaker for AUMC and created the so-called "random drug testing" policy in which Plaintiff was targeted and which was used to facilitate her termination.

296.   AUMC is liable for the personal participation of policy maker Norton in the decision to falsely deem Plaintiff as refusing a demand to test and present that as true evidence and fact, causing Plaintiff deprivation of rights and injury caused thereby.

297.   Defendants Norton and Arnold individually acted in willful and wanton disregard of the rights of all in their action and refusals to act that caused the deprivations challenged in this Count for which compensatory and punitive

damages are appropriate and sought.

Count XV:  Violation of 4th and 14th Amendment Pursuant to 42 U.S.C. § 1983
for Failing to Provide Notice of Charges and an Opportunity to Respond Before
Taking Plaintiff's Privileges, Directly and Foreseeably Causing the Termination
(Against Defendants Arnold in her Individual Capacity; and Norton in Her
Individual and Official Capacity as a Policymaker; AUMC for the Actions of Dr.
Coule Individually and In His Official Capacity as a Policymaker; and Sprouse in
His Individual and Official Capacity)

298.  This claim is brought under the 4th and 14th Amendments of the
United States Constitution as actualized by 42 U.S.C. § 1983.

299.  This claim is brought against Defendants Norton and Arnold
individually as a policymaker for actions taken under color of law, or actions taken
in concert with one or more Defendants including Dr. Coule and Defendant
Sprouse also acting under color of law.

300.  This claim is brought against Defendant Norton in her official
capacity as the policy maker of interpreting testing refusal on behalf of AUMC, or
jointly with AU.

301.  This claim is brought against Dr. Coule, the Chief Medical Officer, of
AUMC, individually and in his official capacity as the person and official, who,
under color of law, with and on behalf of Defendant AU, or the joint enterprise of
AU and AUMC, is the final decision maker for the process and decisions to take
medical privileges of medical resident physicians, including Plaintiff.

302. This claim is brought against Compliance Officer Sprouse individually and in his official capacity as the person and official, under color of law, who had the duty to ensure that residency grant conditions are met and residents, like Plaintiff, are protected from arbitrary treatment, by the sponsoring institution, that could arbitrarily end the resident's publicly financed specialty training, by ensuring that the sponsoring institution provides grievance hearing processes that comply with due process and are without conflict of interest, and provide meaningful notice and opportunity to correct, on behalf of Defendant BOR, or the joint enterprise of BOR and AUMC.

303. In the alternative, Dr. Coule was fraudulently misled by Defendants Norton and Arnold to believe that Plaintiff presented a "patient safety concern," in that Norton and Arnold used Dr. Coule as the cat's paw to effect a taking of the privileges, that directly caused the termination, without notice of the charges or opportunity to respond being given to Plaintiff, by Dr. Coule, Norton, and Arnold. Had Dr. Coule followed the long standing dictates of *Cleveland Bd. Of Educ. V. Loudermill*, 470 U.S. 532 (1985) in order to avoid being misled by persons with intent to damage Plaintiff's professional medical reputation, or to avoid making a mistake. Dr. Coule should have given notice to Plaintiff about the nature of the charges and given her an opportunity to respond, but he did not.

304.   Dr. Coule is the sole decision and policy maker of AU, AUMC and the joint enterprise, and in control of the manner and formal process of taking of a resident's privileges, including about whether to provide notice of an intention to take privileges, the reasons or evidence therefore, and to provide or not provide the resident an opportunity to respond.

305.   There was an opportunity to pull Plaintiff out of service to patients in order to give her notice and opportunity to respond to the charges he would level, from Defendants Norton and Arnold, upon which he issues the letter taking the privileges which caused him to conclude that Plaintiff presented a patient safety concern.

306.   Defendants Coule, Norton, and Sprouse knew that a foreseeable consequence of taking the privileges would end employment and cause the end of her residency.

307.   Dr. Coule knew or should have asked about Plaintiff's drug test results, and if told the truth, that all tests were negative, for months, he was reckless in not giving Plaintiff notice and opportunity to respond.

308.   Shifting and inconsistent reasons were ultimately used for the recommended termination of Dr. Kavianpour, based on knowingly falsely created evidence by Defendants Norton and Arnold.

309.   On or before the challenged termination on February 21, 2019, Plaintiff was an employee, physician resident with a good professional reputation as graduate of a medical school and a neurosurgery resident whose true record reflected likely success to move to the second year residency, matched in the class of 2018, and had no reputation as an impaired physician; but for the reputation already created falsely by Defendants Norton and Arnold, individually, and in Norton's capacity as the policy maker for drug testing timing interpretation.

310.   Plaintiff was without any formal notice required under ACGME policies and procedures that she needed any remediation, or that she was on probation, where her performance and professionalism created an objectively sound expectation of progression to the second year's residency, when she was surprised with the news on February 21, 2019, that her privileges had been revoked, by Dr. Coule, and that therefore Dr. Macomson had to terminate her from her residency.

311.   Dr. Kavianpour's clinical privileges were suspended by Dr. Coule, without him or anyone first giving any notice of the charges against Dr. Kavianpour to her, without an explanation of the evidence against her, and she was not provided an opportunity to address the allegations, before he took the privileges.  There has never been a hearing about the taking of the privileges.

312.   Dr. Coule's notice of suspension contained no meaningful notice of the basis for his decision and no notice of opportunity to respond or appeal the decision.

313.   Dr. Kavianpour appealed her termination to Dr. Vale on February 25, 2019, and had a meeting with him in which she learned that HR would not allow Vale, AU Neurosurgery Department Chair, to overturn an action taken by Coule on behalf of AUMC, and without a reinstatement of her privileges she could not be returned to the residency program.

314.   On March 4, 2019, Dr. Kavianpour followed Vale's instructions and submitted a statement of grievance to Human Resources asking for review of both her termination and the suspension of her privileges.

315.   In return, she received a notice of the grievance hearing scheduled for March 19, 2019, with "Dr. Macomson, Program Director, Neurosurgery" as the respondent.

316.   When Dr. Kavianpour attempted to clarify with HR that she sought to appeal both Coule's suspension of her clinical activity and her termination by Dr. Macomson she was told: The suspension of clinical privileges is an action taken by AU Medical Center.  This is not an action by Augusta University therefore it is not an action that Augusta University can reverse.  Your grievance applies only to your

termination of employment and the panel does not have authority to reinstate clinical privileges however, depending on the outcome of the grievance, they can make a recommendation to the Medical Center.

317.   Plaintiff has yet to receive any process for the suspension of her clinical privileges by Defendant Coule and her March 4th and 5th email inquiries to both Coule and Arnold as to what process she needed to pursue to have privileges restored went unanswered.

318.   Under institutional ACGME requirements, as incorporated into Dr. Kavianpour's contract, a resident's dismissal, grievance and due process should be handled by the GME Office pursuant to a policy by the sponsoring institution which "outlines the procedures for submitting/ processing resident/ fellow grievances at the program and institutional level and that minimizes conflicts of interest."

319.   Instead of a GME process, Dr. Kavianpour received a hearing through Human Resources, the same department that had been unlawfully subjecting her to baseless testing for months and retaliated against her for engaging in protected patient activity.

320.   On March 5, 2018, Dr. Kavianpour sent an email to Dr. Coule in which she provided the full story of the February 13th and 14th testing incident

and requested guidance as to what process she should follow to appeal the suspension of privileges, but no corrective action was taken by Defendant Coule.

321.   On March 13 Plaintiff emailed Dr. Keel, MCG Dean Dr. Hess, and CEO Liska about the protected activity without response.

322.   Around March 12th to 15th Dr. Kavianpour complained to Dr. Coule, Chair of the Neurosurgery Department, that the suspension of her clinical activity had been done without notice or due process and the grievance process that was being followed was futile where there is an inherent conflict of interest in HR being charged to investigate and remediate their own conduct, which Kavianpour asserted was unlawful harassment and retaliation.

323.   On March 16, 2019, Plaintiff filed an urgent retaliation claim with Defendant Sprouse, Interim Chief of Office of Compliance and Enterprise Risk Management, whose duty it was to ensure that the institution's residency program compiled with the requirements of the federal grant which funded it, including ACGME policies and procedures.

324.   Sprouse, as the Chief Compliance Officer for an ACGME-accredited teaching hospital, should have recognized that as a resident, Dr. Kavianpour was entitled to a hearing held by the GME Office, with panel members of physicians chosen by the Neurosurgery Program Director and/or Chair, the Senior Associate

Dean of GME, Dr. Moore and/or Dr. Hess, the Dean of MCG.[1]

325.   Had Sprouse provided Dr. Kavianpour with the GME process that her contract and federal law required, she would have received a hearing in which the decision makers were physicians, familiar with the demands of a residency training program and aware of ACGME requirements.

326.   Sprouse had a duty to intervene in the HR process before the March 2019 hearing so that he could complete an investigation into Kavianpour's claims of harassment and retaliation by HR, before allowing HR to pass judgment on Kavianpour's grievance against them.

<u>Count XVI:   Breach of duty to refrain from taking "hospital privileges" on an arbitrary and capricious basis under O.C.G.A. § 51-1-6 (against Defendants BOR and AUMC)</u>

327.   As a matter of the conditions of the federal residency grant to teach and evaluate Dr. Kavianpour to become a neurosurgery medical specialist, which Defendants had to do consistent with the policies and procedures of the ACGME, Defendants BOR and AUMC were required to arrange or provide for Dr. Kavianpour to have "hospital privileges" to practice medicine within the sponsoring institution AU state teaching hospital.

328.   Even if the hospital is deemed private, Plaintiff was given hospital privileges to practice within the private hospital.  "Hospital privileges" in private

hospitals are also subject to due process protections in Georgia.

329.  Dr. Kavianpour's "hospital privileges" could not be taken in an arbitrary or capricious manner, by arbitrary process, or for arbitrary reasons under Georgia law.

330.   From the start of her residency in August 2018, through the date of the challenged taking of her privileges on February 21, 2019, Dr. Kavianpour complied with the applicable laws, rules and regulations of the performance of her residency, and had she not been treated in an arbitrary manner, would have continued on with her residency.

331.  It was not until the retaliatory and pretextual documenting of her record, beginning on February 11, 2019, that any action was taken toward removing her privileges.

332.  The Defendants BOR's and AUMC's taking of Dr. Kavianpour's privileges, and immediate termination, derived from the false characterization of the challenged testing, the challenged testing timing and blocked testing on February 13th and 14th, and the false characterization of events and false labeling of Plaintiff to take the privileges without any process to address the taking of the privileges violated Georgia law.

333.  The taking of the privileges by defendants BOR and AUMC was

arbitrary and capricious. Defendants were required under the conditions of the residency to provide notice of deficiencies and to give opportunity to correct, to give formal notice of probation which also included an opportunity to correct, and to give notice of nonrenewal. None of this was provided as of the taking of the privileges, prior to February 21, 2019.

334. Defendant AUMC or the joint employer of BOR and AUMC had a duty not to take Dr. Kavianpour's privileges on an arbitrary basis.

335. The Defendants BOR and AUMC did not refrain from taking Dr. Kavianpour's "hospital privileges" on an arbitrary and capricious basis, where Georgia law prohibits the taking of "hospital privileges" on an arbitrary and capricious basis.

336. Because Dr. Kavianpour's "hospital privileges" were taken on an arbitrary and capricious basis, she suffered damages, among them the following: loss of residency, loss of past and future income, mental anguish that she suffered in the past and that will with reasonable certainty suffer into the future.

337. The Defendants BOR and AUMC breached the duty of failing to refrain from the taking of "hospital privileges" on an arbitrary basis and caused Dr. Kavianpour damages, and the same is actionable under O.C.G.A. § 51-1-6.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully prays for relief as follows:

A.      For a trial by jury;

B.      For a finding that Defendants violated Plaintiff's rights as set forth herein;

C.      For a judgment in Plaintiff's favor for reinstatement; with full back pay plus interest; reinstatement of full fringe benefits and seniority rights; compensatory damages for emotional distress; compensatory damages for loss of reputation, wages, and benefits; punitive damages against the individually named defendants; attorney fees; and litigation costs or, in the alternative;

D.      Plaintiff is therefore entitled to full front and back pay; compensatory damages for emotional distress; compensatory damages for loss of reputation, wages, and benefits; punitive damages; attorney fees, and litigation costs; and

E.      Any such other and further relief as the Court deems proper and just.

## **JURY DEMAND**

Plaintiff requests a jury trial on all questions of fact raised by this Complaint.

Respectfully submitted, this 3rd day of April, 2020.

BUCKLEY BEAL, LLP

By:  *s/ Edward D. Buckley*
     Edward D. Buckley
     Georgia Bar No. 092750
     edbuckley@buckleybeal.com

600 Peachtree Street, Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101

LAW OFFICE OF JOHN P. BATSON

s/ John P. Batson
Georgia Bar No. 042150
jpbatson@aol.com

Post Office Box 3248
Augusta, GA 30914-3248
Telephone: (706) 737-4040

*Attorneys for Plaintiff*

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that the foregoing has been prepared in the Times

New Roman 14 font as approved by the Court in LR 5.1B.

BUCKLEY BEAL, LLP

By:      *s/ Edward D. Buckley*
         Edward D. Buckley
         Georgia Bar No. 092750

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| SARAH M. KAVIANPOUR, MD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action File No.: |
| | : | |
| BOARD OF REGENTS OF THE | : | 1:20-cv-00152-MLB-RGV |
| UNIVERSITY SYSTEM OF | : | |
| GEORGIA: d/b/a AUGUSTA | : | |
| UNIVERSITY; MEDICAL | : | |
| COLLEGE OF GEORGIA HEALTH, | : | |
| INC. d/b/a AUGUSTA UNIVERSITY | : | |
| MEDICAL CENTER, INC.; | : | |
| BROOKS KEEL, in his individual | : | |
| capacity; | : | |
| PHILLIP COULE, in his individual | : | |
| and official capacity; | : | |
| CLAY SPROUSE, in his individual | : | |
| and official capacity; | : | |
| WALTER MOORE, in his individual | : | |
| capacity; | : | |
| SUSAN NORTON, in her individual | : | |
| and official capacity; and | : | |
| DEBRA ARNOLD, in her individual | : | |
| Capacity, | : | |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2020, I electronically filed the above

**PLAINTIFF'S AMENDED COMPLAINT** with the Clerk of Court using the

CM/ECF system which will automatically send email notification of such filing to

the following attorneys of record:

Bryan K. Webb - bwebb@law.ga.gov
Robert C. Threlkeld - rthrelkeld@mmmlaw.com
Elliott Coward - ecoward@mmmlaw.com

BUCKLEY BEAL, LLP

By:        *s/ Edward D. Buckley*
Edward D. Buckley
Georgia Bar No. 092750