# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

SARAH M. KAVIANPOUR, MD,  :
  :
  Plaintiff,  :
  :  CIVIL CASE NO.
  v.  :  1:20-cv-00152-MLB-RGV
  :
BOARD OF REGENTS OF THE  :
UNIVERSITY SYSTEM OF GEORGIA, :
*doing business as* Augusta University,  :
*et al.*,  :
  :
  Defendants.  :

## <u>MAGISTRATE JUDGE'S NON-FINAL REPORT AND RECOMMENDATION</u>

Plaintiff Sarah M. Kavianpour, M.D. ("Kavianpour"), brings this action against defendants Board of Regents of the University System of Georgia ("BOR"), doing business as Augusta University ("AU"); Medical College of Georgia Health Inc., doing business as August University Medical Center, Inc. ("AUMC"); Brooks Keel, Ph.D. ("Keel"), in his individual capacity; Phillip M. Coule, M.D. ("Coule"), in his individual and official capacity; Clay Sprouse ("Sprouse"), in his individual and official capacity; Walter Moore, M.D. ("Moore"), in his individual capacity; Susan Norton ("Norton"), in her individual and official capacity; and Debra Arnold ("Arnold"), in her individual capacity, collectively referred to as

"defendants,"[1] alleging claims of sex discrimination, harassment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.; sex discrimination, in violation of violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, et seq.; disability discrimination and retaliation, in violation of the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008, 42 U.S.C. §§ 12101 et seq.; disability discrimination, in violation of Section 504 of the Rehabilitation Act ("Rehabilitation Act"); violations of 42 U.S.C. § 1983 ("§ 1983"), the Equal Protection Clause, and the Fourth and Fourteenth Amendments; violations of the Georgia Whistleblower Act ("GWA"), O.C.G.A. § 45-1-4; breach of contract; and breach of a legal duty owed under O.C.G.A. § 51-1-6. [Doc. 29].[2] Defendants have filed separate motions to dismiss, [Doc. 32 (AUMC's motion); Doc. 33 (Coule's motion); Doc. 34 (BOR's motion); Doc. 35 (individual defendants' motion)], all of which Kavianpour opposes, [Docs. 40, 41, 47, & 48]. Defendants have filed replies in support of their respective motions, [Docs. 45, 46, 52, & 53], and for the reasons

---

[1] Keel, Coule, Sprouse, Moore, Norton, and Arnold are also referred to as the "individual defendants."

[2] The listed document and page numbers in citations to the record herein refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

that follow, it is **RECOMMENDED** that the motions to dismiss filed by Coule and the other individual defendants, [Docs. 33 & 35], be **GRANTED** and that AUMC and BOR's motions to dismiss [Docs. 32 & 34], be **GRANTED IN PART** and **DENIED IN PART**.

## I. FACTS AND PROCEDURAL HISTORY

On December 12, 2019, Kavianpour filed her original complaint in the Superior Court of Fulton County, Georgia, [Doc. 1-1], and on January 10, 2020, defendants removed the case to this Court on the basis of federal question jurisdiction, [Doc. 1].  After separate motions to dismiss and a motion for more definite statement were filed, see [Docs. 3, 4, 5, 6, & 7], Kavianpour, with defendants' consent, filed an amended complaint on April 20, 2020, [Doc. 29]; see also [Docs. 22, 27, & 28], rendering moot the pending motions to dismiss and motion for more definite statement directed at her original complaint, see [Doc. 28].[3]

According to her amended complaint, Kavianpour signed an acceptance letter to be a "resident physician within the Neurosurgery residency program at

_____

[3] Kavianpour named Wesley Horne ("Horne"), in his individual and official capacities, and Don L. Waters ("Waters"), in his official capacity, in her original complaint, see [Doc. 1-1]; however, she did not name either of them in her amended complaint, see generally [Doc. 29], so they are no longer defendants in this action, and the Clerk is **DIRECTED** to terminate them as defendants listed on the docket.

[AU's] medical school, the Medical College of Georgia [], and teaching hospital, AUMC" on March 22, 2018, after she "match[ed] there on March 16, 2018," and she also signed a "House Officer Notice of Appointment for Post Graduate Year One in AU's Neurosurgery Department . . ., beginning July 10, 2018 through July 9, 2019." [Doc. 29 ¶¶ 1, 19].[4]  On June 25, 2018, Kavianpour was administered a pre-employment drug test, and on June 28, 2018, she was "informed that it was

---

[4] The factual background is taken from the pleadings and exhibits and does not constitute findings of fact by the Court.  The parties also have attached certain exhibits to their briefs in connection with defendants' pending and previous motions to dismiss.  See [Doc. 3-2; Doc. 33-2; Doc. 33-3; Doc. 40-1; Doc. 40-2; & Doc. 40-3].  Generally, when ruling on motions to dismiss, the Court "may not consider matters outside the pleadings without converting the motion[s] to [] motion[s] for summary judgment[.]"  Redding v. Tuggle, No. 1:05-cv-2899-WSD, 2006 WL 2166726, at *5 (N.D. Ga. July 31, 2006), adopted at *1; see also Johnson v. Unique Vacations, Inc., 498 F. App'x 892, 894 (11th Cir. 2012) (per curiam) (unpublished) (footnote and citations omitted) ("When a court considers matters outside of the pleadings in a Fed.R.Civ.P. 12(b)(6) motion to dismiss, the court converts that motion into a motion for summary judgment.").  However, "conversion is not always required."  Chestnut v. Ethan Allen Retail, Inc., 971 F. Supp. 2d 1223, 1228 (N.D. Ga. 2013); Patterson v. WMW, Inc., Civil Action File No. 1:11-CV-3172-WSD-SSC, 2012 WL 3261290, at *3 (N.D. Ga. June 15, 2012), adopted by 2012 WL 3260619 (N.D. Ga. Aug. 8, 2012).  "In ruling on a motion to dismiss, the district court may consider an extrinsic document if (1) it is central to the plaintiff's claim, and (2) its authenticity is not challenged."  Chestnut, 971 F. Supp. 2d at 1228 (citing Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010)).  The documents at issue here are central to Kavianpour's claims and referenced in her amended complaint, and the parties have not challenged the authenticity of the documents at issue.  Thus, the Court will consider the exhibits submitted by the parties in ruling on the pending motions to dismiss, without converting the motions to motions for summary judgment.

positive for THC 19 ng/ml, that [was ] above the 15 ng/ml threshold." [Id. ¶ 23].

On the following day, Moore, AU's Senior Associate Dean for Graduate Medical

Education and VA Affairs, Chair of the Graduate Medical Educational Committee,

and the Designated Institutional Officer for residency grants for AU and AUMC,

notified Kavianpour that her offer of employment was being rescinded and that

no residency contract would be issued to her based on her positive drug test result.

[Id. ¶¶ 9, 24]. Kavianpour appealed this decision on July 3, 2018, and on July 5,

2018, the confirmatory testing result from an outside laboratory of the first pre-

employment test detected THC at 11 ng/ml, which was below the 15 ng/ml

threshold. [Id. ¶¶ 25-26]. On July 5, Kavianpour submitted a petition for a retest

to Moore, who granted a retest, or a second pre-employment test, later that day

after he met with administrative decisionmakers, and the results of this retest were

negative. [Id. ¶¶ 27-28].

On July 11, 2018, Kavianpour was again offered an employment contract,

which she signed on July 12, 2018. [Id. ¶ 29]; see also [Doc. 3-2 at 2]. The "House

Officer Notice of Appointment" provided, in relevant part:

> Policies and Procedures: This appointment is made subject to the
> policies, procedures and regulations of [AU] and the [BOR], which
> are hereby incorporated into this contract by reference. The House
> Officer agrees to perform satisfactorily and to the best of his/her
> ability the customary services of residency; to conform to applicable
> policies, procedures and regulations; and not to engage in any outside
> remunerative work without the express permission of the

Chairperson of the Department. . . . House Officers also agree to abide by the policies at any institution where they may perform services, including AU Health System, U.S. Veterans' Administration, and others, as applicable. House Officers are required to comply with HS Policy 10.0 House Officer Duty Hours and Work Environment, and must complete One45 duty hour reporting monthly. House Officers are required to complete medical records at all participating institutions in a timely manner as outlined in applicable policies; noncompliance may serve as grounds for loss of privileges and a permanent record in the House Officer file.

The [AU] Policies and procedures for House Officers govern the following conditions of your employment: annual, sick, parental and educational leave, licensure; residency supervision, House Officer responsibilities, duty hours; moonlighting; chemical/substance abuse or dependence; rotation to unaffiliated hospitals; effect of leave for satisfying completion of programs; House Officer eligibility, selection and promotion; procedures for discipline and redress of grievances; and procedures whereby complaints of sexual harassment and exploitation may be addressed in a manner consistent with the law and due process. These policies can be accessed at http://www.augusta.edu/mcg/residents/hspolicies/index.php, are on file in the Graduate Medical Education [("GME")] Office and [are] distributed biannually to Program Directors as part of the web-based Housestaff Manual. . . .

[Doc. 3-2 at 2 (emphasis omitted)]; see also [Doc. 29 ¶ 20].

On August 21, 2018, Norton, AU's Vice-President of Human Resources and Chief Human Resources Officer, sent Kavianpour a "Random Drug Testing Notification," explaining that Kavianpour "would 'be subject to random drug testing beginning now until July 31, 2019[,] per policy under the section titled Random Drug Testing'" as she would be performing "'duties considered high

risk.'"  [Doc. 29 ¶¶ 10, 30, 32].[5]  This notification also advised Kavianpour that she

would be contacted randomly by Arnold, AU's Director of Employee Relations for

---

[5] Kavianpour alleges that the "letter quoted the AU Substance Abuse Policy No. 685," [Doc. 29 ¶ 31 (citation omitted)], which provides, in relevant part:

**Random Drug Testing**
1. The State of Georgia requires all state entities to conduct random testing of employees that (1) are regulated by the US Department of Transportation and its operating authorities, (2) require Peace Officer Standards and Training [] certification, or (3) perform duties considered to be high risk.  The number of such employees to be tested and the scheduling of such testing shall be determined by the Vice President of Human Resources (or designee) in accordance with applicable laws and regulations.
2. All covered employees who are Public Safety Officers or who hold Commercial Drivers Licenses for their official duties shall be subject to random drug testing.
3. Once a month, the Human Resources Division shall randomly pick no fewer than five Public Safety Officers and/or holders of Commercial Drivers Licenses for drug testing.  Human Resources shall provide a list of the chosen employees to the Director of Public Safety (or the Director's designee), who shall ensure that the chosen employees and their supervisors are notified and that the employees submit to the drug test as directed.  In no event shall the employees to be tested receive notice of the test earlier than the day or shift during which they are to be tested.

https://www.augusta.edu/hr/training/documents/gssubstanceabusepolicy.pdf (last visited on Jan. 20, 2021) (hereinafter referred to as "AU's Substance Abuse Policy No. 685").  It also provides that "[e]mployees who refuse[d] to participate in a drug test required under this policy may be discharged."  Id.; see also [Doc. 29 ¶ 31 (citation omitted)].  House Staff Policy 1.0 "regarding chemical/substance abuse dependence of House Officers at [AU]" referenced drug testing in accordance with AU's Substance Abuse Policy, see https://www.augusta.edu/mcg/residents/hspolicies/index.php (last visited on Jan. 20, 2021) (hereinafter referred to as "House Staff Policies"), and additionally,

Human Resources, and "'requested to appear at Employee Health within the hour [she was] contacted for testing.'" [Id. ¶¶ 11, 33].[6]

Kavianpour alleges that on August 29, 2018, Samuel Macomson, M.D. ("Macomson"), AU's Residency Program Director, "invited [her] into his office to address a rumor that [she] used marijuana for stress," and that later that day, she met with Macomson and Moore to "to address [] Moore's contention that he heard a rumor that [she] was prescribed marijuana while she resided in Chicago, regularly used it for stress, and had cried in the Neuro-ICU one afternoon." [Id. ¶¶ 21, 36-37]. Kavianpour denied the rumors regarding her marijuana usage and explained that she had cried in the ICU "due to a migraine exacerbation, which was subsequently treated with prescription medication the next month." [Id. ¶ 38]. Nevertheless, Kavianpour alleges that Moore "insisted [she] report to the

_____

House Staff Policy 35.0 also provides that "[a]ll residents/fellows, as employees of [AU] teaching hospitals [would] be subject to the drug screening guidelines of these institutions" and that those guidelines were "specifically articulated in the employment policies of each affiliated hospital," with "the employing hospital reserve[ing] the right to perform drug screening if a resident/fellow's presence, behavior, or performance suggest[ed] intoxication or illegal drug use," id. AU Health System's Substance Abuse Policy also provides for random and for cause drug testing, among other forms of drug testing. See www.augusta.edu/mcg/residents/substanceabusepolicy (last visited Jan. 20, 2021); see also [Doc. 29 ¶ 179 (citation omitted)].

[6] Kavianpour alleges that "Employee Health [was] in a different building from [her] [d]epartment and, as a result, when [she] left her [d]epartment to drug test, it often took 45 minutes away from her job." [Doc. 29 ¶ 34].

Georgia Professional Health Program ('GA PHP') in Atlanta and his office manager, Candice Henderson, subsequently emailed [her] characterizing [the] GA PHP reporting as a 'requirement.'" [Id. ¶ 39]. Kavianpour asserts that she obtained an application for the GA PHP, but upon review, she observed that it "stated that participation in the program [was] voluntary and designed for physicians with substance abuse disorders" and that she therefore emailed Moore and Macomson to seek clarification as to whether she was required to apply to the program, but she "never received a response and assumed the issue was abandoned." [Id. ¶¶ 40-42].

On September 17, 2018, Kavianpour was given one hour's notice to submit to a urinalysis drug test while she was off-duty and out on a sick day, which came back negative. [Id. ¶ 43]. She was subsequently provided one hour's notice for drug testing by urinalysis while off-duty on October 17, 2018, and again tested negative, but on October 19, 2018, a retest was demanded due to diluted results, which Kavianpour explained was caused by her chronic kidney disease for which she received treatment and had a written doctor's note from September 2018 to drink three liters of water daily. [Id. ¶¶ 44-46]. Kavianpour's retest was negative. [Id. ¶ 47].

On November 13, 2018, another off-duty urinalysis drug test was requested, but because Kavianpour was on vacation, she was not aware of the request and

another request was made the following day, which she completed within one hour and was negative. [Id. ¶¶ 48-49]. Subsequently, on December 5, 2018, Arnold requested that Kavianpour present for a drug test while she was on pager duty,[7] but she advised her that there were no neurosurgery residents to cover for her so Arnold found coverage, and she was able to report for testing that day with negative results. [Id. ¶¶ 54-56].

On December 13, 2018, Kavianpour, who at all relevant times was the only female neurosurgery resident, met with Moore to express her concerns that the drug tests, as well as the timing of the drug tests, "interfered with departmental operations, threatened patient care and safety, subjected her to adverse and disparate treatment, and took a toll on her work relationships with other residents asked to provide coverage while she was testing." [Id. ¶¶ 22, 57]. She alleges that she also "offered to be available for voluntary daily drug testing if: (1) it was at a

_____

[7] Kavianpour alleges that during her residency, she shared on-call pager duty with another resident during which time one resident was assigned to the on-call pager and would receive emergent notifications about any changes in a patient's neurological status, among other responsibilities at the adult and children's hospital at AUMC. [Doc. 29 ¶¶ 50-51]. She explains that because a patient's neurological status could be "life-threatening and require immediate response and evaluation to determine the need for emergency surgery, residents with on-call pager duty must respond to pages as soon as possible, but in no event within more than 10 minutes." [Id. ¶ 52]. She therefore asserts that "[d]ue to patient care priorities, [she] could not always present for testing while working or, especially, while she had on-call pager duty." [Id. ¶ 53].

set time in the afternoon that did not interfere with her clinical/patient responsibilities; and (2) she could coordinate pager-patient hand-off to a co-resident." [Id. ¶ 59].

In January 2019, Kavianpour assumed sole on-call pager duties, and on January 17, 2019, she was asked to submit to a drug test, but was "off-duty and resting after a 28-hour hospital shift" and did not receive the request "with sufficient time to arrive at the testing site before it closed." [Id. ¶¶ 60-61]. She alleges that on January 22, 2019, she emailed Macomson, Arnold, "and others, asking to meet with [] Norton and Arnold 'again to discuss the inappropriate timing of calls/testing[ and] the lack of flexibility and justification per [Medical College of Georgia] policy (and stated federal laws).'" [Id. ¶ 62]. She asserts that Arnold responded to her email on January 31, 2019, that she was "'subject to the AU and AUMC policies related to drug testing' and 'refusal to participate or a failure to complete any step of testing process results in discharge' and that 'academic and clinical activity assigned by [the] department, [would] not be an excuse[.]'" [Id. ¶ 63 (first alteration in original)]. She also asserts that the "letter conceded that [she] would not be subject to testing on her days off and that they would notify her Residency Program Director (who was [] Macomson) when a test was needed to receive confirmation that [she] was available to test[.]" [Id. ¶ 64].

Kavianpour alleges that she replied by emailing Arnold and Norton as follows:

> Instead of facilitating a conversation for more reasonable arrangements, you decide to buckle down with a list of demands . . . this forces me to question the legality of these practices you are imposing on me in the first place. It is clearly not random and quite frankly discriminatory. This is harassment . . . you can come up with arbitrary rules and memorandums all you'd like but that does not make them legal and it furthers the point that I am making which is that you have singled me out and subjected me to prejudice. I hope you reconsider and mitigate this. Again, I am not refusing the testing. I have been cooperative and have completed what I consider to be an intrusive and excessive amount of testing in a setting of undue suspicions — all of which have been negative.

[Id. ¶ 65]. She asserts that Norton and Arnold did not respond. [Id. ¶ 66]. On February 1, 2019, Kavianpour forwarded the email thread to Macomson, requesting a meeting "to discuss patient coverage so she could present for testing within the timeframes Norton and Arnold gave her to prioritize hospital operations and patient care," but Macomson did not respond. [Id. ¶¶ 67-68].

On the morning of February 13, 2019, Arnold instructed Kavianpour to present for drug testing within four hours. [Id. ¶ 71]. Kavianpour responded that "she might not be able to because she was on sole pager duty and all the other neurosurgery residents were in the operating room [('OR')] and unable to cover for her," but Arnold "replied to [her] that she had four hours to present for testing." [Id. ¶ 72]. Kavianpour alleges that she asked another resident if he would

cover for her but he refused, and that "[a]s a result, [her] patient care duties precluded her from presenting for testing on February 13, 2019." [Id. ¶¶ 73-74].[8] She presented to Employee Health at 7:30 a.m. on February 14, 2019, but she alleges that Arnold and Norton directed Employee Health not to test her at that time. [Id. ¶ 77]. Kavianpour contacted Human Resources about being administered the drug test before returning to work, but she was directed to Macomson, who indicated that he was unaware that Norton and Arnold had asked her to test the previous day or that they had prevented her from testing that day. [Id. ¶¶ 78-79]. She alleges that during that day, and for the next week, she continued to perform her responsibilities and engage in patient care without any restrictions. [Id. ¶ 80].

---

[8] Kavianpour asserts that the department's patient care coverage practice deviated from the standards of care for situations like hers and from the Accreditation Council for Graduate Medical Education ("ACGME") policies and AU's House Staff Policy and Procedure 10.0, [Doc. 29 ¶ 75], which provides, in relevant part:

> Each program must have policies and procedures in place that ensure coverage of patient care in the event that a resident may be unable to perform their patient care responsibilities. These policies must be implemented without fear of negative consequences for the resident who is unable to provide the clinical work.

See House Staff Policies. "ACGME is a professional organization responsible for the accreditation of residency education programs," and "ACGME accreditation is required in order for programs to receive graduate medical education funds." McDaniel v. Loyola Univ. Med. Ctr., 317 F.R.D. 72, 75 n.4 (N.D. Ill. 2016) (citation omitted); see also [Doc. 29 ¶ 174].

Thereafter, Arnold sent Coule, AUMC's Chief Medical Officer, a letter dated

February 21, 2019, with the subject, "Kavianpour — Drug Testing," stating:

On Wednesday, February 13, 2019, [Kavianpour], Resident PGY1, did not present herself for a random drug test. [] Kavianpour has failed to adhere to the administrative process related to random drug testing that she was notified of on August 21, 2018.

I contacted [] Kavianpour on Wednesday morning, February 13, 2019, indicating it was a test day. She stated to me she was unable to leave because everyone was in the OR and she had the pager. [] Kavianpour then expressed that mornings were usually not a good time for her to test. I agreed to allow the testing clock to start at 12pm and from that time she would have four hours to present [her]self to Employee Health for testing (this was sent in an email to her as well). At 4:43pm [] Kavianpour emailed me and stated: "[] *Arnold, I just looked at the time clock and I just realized I missed my window. The other junior residents were in the OR til late and I had a procedure and several consults. I will go first thing tomorrow AM. I really do not want to lose my job. I just have a lot of responsibilities. The third year refused to take the pager from me so I will talk to my program director about this.*"

On[] Thursday, February 14, 2019, [] Kavianpour presented herself to Employee Health for testing and was denied because it was not the random testing date.

On January 17, 2019, she repeated the same behavior as described above when notified it was a test day, which led to another memo dated January 31, 2019. [] Kavianpour was sent a letter on January 31, reminding her that she was subject to both University and AU[MC] policies related to drug testing. This was the 2nd communication she had received from Human Resources notifying her that she was subject to random testing. The January 31, 2019 letter outlined clear instructions for her to meet this requirement, established coordination with her department so she could meet the requirement, and informed her that her academic and clinical activity "[would] not be an excuse for her to not appear for testing." The letter also indicated that per the AUMC policy "Refusal to participate or failure

to complete any step of the testing process results in discharge[.]"[] In addition, the letter also instructed [] Kavianpour to provide me a copy of her monthly schedule, no later than the first Monday of each month and February 4, 2019, would be her first submission date. She has failed to submit to me as requested.

In addition, on November 16, 2018, [] Kavianpour was stopped for speeding and subsequently charged and arrested for speeding and [driving under the influence ("DUI")].

[Doc. 33-2 at 2]; see also [Doc. 29 ¶¶ 7, 81].[9]

On the same day he received Arnold's letter, Coule sent Kavianpour a letter stating, "Information has come to our attention that has led to concern for patient safety. Please accept this letter as notice of your **immediate suspension** from all clinical activities within AU Health System, including [AUMC], and all other practice sites." [Doc. 33-3 at 2; Doc. 40-1 at 2]; see also [Doc. 29 ¶ 83]. In addition, on the same day, Macomson provided Kavianpour with a "Notice of Discharge," which provided as follows:

Your employment with [AU] is terminated effective immediately. The reason for this action is:

The Chief Medical Officer for the Health System has exercised his discretion and authority to revoke your ability to practice in the medical center and related facilities. Therefore, you are not able to be trained in the health system, which is a requirement for you to be in our residency program.

---

[9] Kavianpour alleges that there "was no independent investigation of the allegations contained in [] Arnold's letter nor was there an opportunity for [her] to participate in the same." [Doc. 29 ¶ 82].

This decision is prompted by you not adhering to the Medical Center's Substance Abuse policy and the protocol that had been established for you for random drug testing.

Please return to me all [AU] property issued to you, including the identification badge, departmental keys, computer equipment and any other supplies.

Please proceed to Human Resources with the signed clearance form provided to you in order to complete the required clearance process, and to discuss the conversion of your benefits and COBRA coverage.

You have five (5) working days in which to appeal this action to Dr. Fernando Vale [("Vale")], Department Chair, Neurosurgery. Whether you choose to appeal or not, you have the right to file a formal grievance within ten (10) working days from the receipt of this letter with the Human Resources Division.

[Doc. 40-3 at 2 (emphasis omitted)]; see also [Doc. 29 ¶ 84]. Kavianpour

acknowledged receipt of this notice on the same day. [Doc. 40-3 at 2].[10]

On February 25, 2019, Kavianpour appealed her termination to Vale, [Doc.

29 ¶ 86], and Vale subsequently sent Kavianpour a letter dated March 1, 2019,

stating, in pertinent part:

I am in receipt of your request for an appeal of your discharge as PGY-1 Resident in the Department of Neurosurgery. I have reviewed the situation leading to your discharge and the information you provided to me.

On February 21, 2019, the Chief Medical Officer suspended your clinical activities within AU Health System and [AUMC]. His

---

[10] Kavianpour alleges that Macomson advised her that the "termination decision 'did not come from the [d]epartment' but was 'HR-driven and out of his control.'" [Doc. 29 ¶ 85].

decision resulted from your failure to comply with the Substance Abuse policy for the Medical Center.

Based on the suspension of clinical activities, you could no longer continue as a Resident in Neurosurgery and were subsequently discharged from employment on February 21, 2019 by your Program Director.

I uphold the decision to discharge you from the Residency Program in Neurosurgery.

Please be reminded, you may further appeal your discharge through Human Resources as stated in your discharge letter. You must submit your statement of grievance form to Human Resources within 10 working days from the date on your discharge notice, which means you must submit the form by Thursday, March 7, 2019.

[Doc. 40-2 at 2]; see also [Doc. 29 ¶ 87].[11]

On March 4, 2019, Kavianpour submitted her statement of grievance to Human Resources, and on the following day, she emailed Coule, Macomson, Vale, Moore, Norton, and Arnold, "stating that [Coule's] decision was a prohibited adverse employment action and asking to meet." [Doc. 29 ¶¶ 89-90]; see also [Doc. 33-3 at 2]. On March 13, 2019, Kavianpour requested that Sprouse, AU's Vice-President for Audit Compliance, Ethics, and Risk Management, take over the grievance process under AU's Non-Retaliation Policy, but he did not take any

---

[11] Kavianpour alleges that Vale also "claimed that he had not been [a] part of the decision and wanted [her] to return to work as soon as possible, but was powerless to overturn an AUMC decision, and therefore had no choice but to uphold [her] termination because without privileges at AUMC, she could not participate in the residency program." [Doc. 29 ¶ 88].

action.  [Doc. 29 ¶¶ 8, 91].  On the same day, Kavianpour forwarded her email to Sprouse, as well as her March 5, 2019, email to Coule, AU's President Keel, and others, "stating that the testing procedures, as applied by [] Norton and Arnold, created patient safety concerns that she had tried to raise with [Human Resources] to no avail."  [Id. ¶¶ 6, 92].  Kavianpour alleges that between March 13 and March 15, 2019, she emailed Human Resources, Coule, and Moore to seek clarification on the grievance process, including Human Resources' conflict of interest and the lack of due process regarding her suspension; that she emailed Sprouse about whether she should raise issues of retaliation and unlawful Human Resources practices in her grievance statement and that he responded that he would be back in touch but never did get back with her; and that she sought mediation with her department, Human Resources, and Coule, but Norton denied her request even though the department was amenable to it.  [Id. ¶¶ 93-95].

On March 19, 2019, a pre-hearing briefing was held at which time Kavianpour submitted witness lists to the grievance hearing officer and other Human Resources personnel so they could arrange for their attendance, but they did not do so, and on March 22, 2019, the grievance hearing was held and conducted by Rebecca Williams ("Williams"), Assistant Vice-President of Human Resources and Norton's subordinate.  [Id. ¶¶ 96-97].  Kavianpour alleges that "[i]nformation was brought up at this hearing for the first time that had not

previously been shared with [her]" and that although Vale had "offered to be [her] spokesperson for her grievance hearing, . . . Arnold informed him that he could not because it was a conflict of interest," but that Vale testified at the hearing that he "upheld [her] termination because [] Coule had revoked her privileges and that the [d]epartment shared her concerns about patient safety." [Id. ¶¶ 98-100]. She alleges that Coule "and multiple other physicians" also testified that she "never had any performance issues or displayed signs of impairment and that other providers with DUIs were neither suspended nor terminated" and that during the hearing, "the hearing officer did not allow [her] to raise pertinent evidence, perform re-direct or cross-examinations, or discuss discrimination or harassment by [Human Resources]." [Id. ¶¶ 101-02].

On March 26, 2019, the grievance panel recommended upholding Kavianpour's termination "based on a 'pattern of passive unwillingness,' and supported their decision from a letter written by an adverse witness, who was not present at the hearing so [she] was unable to cross examine and the hearing officer prevented her from raising credibility issues," and they also stated that the "drug testing was a condition of [her] hiring, even though [she] had explained at the hearing that it was not[.]" [Id. ¶¶ 103-04]. On April 2, 2019, the Provost adopted the grievance panel's recommendation and upheld Kavianpour's termination, and

on April 4, 2019, Kavianpour was advised that she could apply to the BOR for discretionary review.  [Id. ¶¶ 106-07].

On May 8, 2019, Marti Arvin ("Arvin"), AU's Chief Compliance Officer ("CCO"), contacted Kavianpour about investigating compliance issues, and on June 6, 2019, John Lott ("Lott"), a third-party contractor, took over the investigation as AU's new CCO.  [Id. ¶¶ 109-10].  On July 2, 2019, Kavianpour met with Lott; Michele Reed, AU's Title IX Coordinator; and Benjamin Hutton ("Hutton"), a compliance analyst, and Kavianpour alleges that on July 14, 2019, Lott emailed Sprouse, "recommending that their office make the University President Keel aware that [] Arnold admitted to violating AU's Random Drug Testing Policy as applied to [Kavianpour]."  [Id. ¶¶ 111-12].  Kavianpour alleges that on July 15, 2019, Sprouse and Lott conducted interviews of Norton and two of AU's legal advisors and "determined that AU and Georgia's Random Drug Testing Policy were not adhered to with respect to [Kavianpour]," that Lott specifically concluded that Human Resources had "allowed unsubstantiated rumors to professionally and personally damage [Kavianpour]," and that Lott "advised [] Sprouse that this information needed to be forwarded to [] Keel immediately and that [] Sprouse was implicated in the issue and needed to separate himself from the investigation."  [Id. ¶¶ 113-15].

Thereafter, Arvin, who had assumed an advisory role and had been apprised of the investigation, contacted the University President's Chief of Staff, Russell Keen ("Keen"), and Keen sent Sprouse a text message asking, "Is there an open investigation on retaliation of a resident targeted for drug screening?" [Id. ¶¶ 116-17 (internal marks omitted)]. On July 16, 2019, Sprouse met with Lott at which time Lott expressed concern that Sprouse, Norton, Arnold, and one of AU's legal advisors had "violated policies and not informed [] Keel," and Kavianpour alleges that "Lott was immediately terminated" by Sprouse due to his expressed concerns. [Id. ¶¶ 118-19, 122].[12] Kavianpour also asserts that on July 26, 2019, Lott asked her if she had returned to work because he had submitted his investigation report and recommendation that she be reinstated to Keel on July 17, 2019, which included his findings, among others, that Arnold and Norton admitted that they did not adhere to AU policies; that there was a clear failure to cite to the proper policy, adhere to an applicable policy, and that this failure was complained about to Arnold on January 22, 2019, and to Sprouse in March 2019, though neither negligence nor intent had been determined; Kavianpour's January 22, 2019, complaint of a hostile work environment should have triggered an independent

_____

[12] Kavianpour also alleges that Sprouse advised her that Lott had left because he was a temporary contractor and that he was taking over the investigation, but that he made no progress with the investigation. [Doc. 29 ¶¶ 124-25].

investigation, but instead was met with stricter guidelines for random drug testing on January 31, 2019, in which her clinical duties could no longer interfere with drug testing, another immediate drug test, and an extension of her drug testing period from July 31, 2019, to August 2019; that there was testimony both for and against her assertion that she could not comply in February 2019 with her drug test due to being on pager duty and when she showed up the next day, she was blocked and the failure to test was used against her; and that between July 2018 and April 2019, she was tested seven times for marijuana use and passed all seven tests, including a hair follicle test, but no other resident in her department was randomly selected for drug testing even though policy states that the "Vice President of Human Resources must create a methodology for random drug testing that includes the entire employee population." [Id. ¶¶ 120-21]. Kavianpour asserts that Keel, however, "took no further action." [Id. ¶ 123].

On October 3, 2019, Kavianpour resubmitted her compliance concerns to AU on Ethics Point, and on October 17, 2019, the Officer of Compliance closed her case so she again resubmitted her compliance concerns to AU on Ethics Point. [Id. ¶¶ 126-27]. On October 31, 2019, Wesley Horne ("Horne"), Director of Ethics and Compliance, emailed Sprouse that when Kavianpour raised concerns about retaliation on March 15, 2019, "it would have been appropriate to direct [her] to include all concerns in her employment appeal or to suspend the appeals process

pending the review of the concerns raised."  [Id. ¶ 128 (internal marks omitted)].

On November 4, 2019, Kavianpour emailed Moore and others to request a grievance hearing in compliance with her contract terms, which provided that the GME Office policies and procedures would govern,[13] and on November 5, 2019, Sprouse contacted her to schedule a meeting, which she attended that day with her mother and Hutton.  [Id. ¶¶ 130-31].  Following this meeting, during which Sprouse contradicted information Lott had provided Kavianpour and indicated that he would need an additional three to five weeks to conduct an investigation, Kavianpour contacted Horne and expressed concern about Sprouse's conflict of interest and ability to provide a fair investigation.  [Id. ¶¶ 132-33].  On November 20, 2019, Kavianpour and her father met with Horne and BOR's Vice-President of Human Resources, Dr. Juanita Hicks ("Hicks"), to review Kavianpour's concerns, and Horne and Hicks subsequently visited AU on November 25 and November 26, 2019, and on December 16, 2019, after Kavianpour filed her original complaint in Fulton County Superior Court on December 12, 2019, Macomson sent

---

[13] AU's House Staff Policy and Procedure 13.0 defines "the procedure for Residency Program officials to evaluate the educational progress of House Officers and [to] make recommendations regarding disciplinary actions taken against House Officers that could result in" probation, dismissal, non-renewal of a House Officer, or other actions "that could significantly threaten a House Officer's career development," as well as "[t]o define the due process available to House Officers." See House Staff Policies.

Kavianpour a letter, advising her that her suspension and termination decisions would be subject to review by a CCC under AU's House Staff Policy 13.0 on January 7, 2020,[14] and that pending this review, she would be "retroactively 'reinstated as an employee' of AU in her previous role and would receive past compensation due from the date of termination, however her suspension would remain in effect and she would not be able to enter AUMC premises." [Id. ¶¶ 134-37]; see also [Doc. 1-1 at 4].

On January 11, 2020, the CCC, after conducting a review, issued a recommendation of non-renewal based on Kavianpour's "repeated violations of 'professional conduct', 'hospital policy and procedure' and 'failure to uphold standards of interpersonal and communication skills,'" and on January 16, 2020, Macomson sent Kavianpour a letter, advising her of the CCC's recommendation, that he had accepted it, and that she had the right to request a hearing by the AHC. [Doc. 29 ¶¶ 138-40]. On January 27, 2020, Kavianpour responded to Macomson that her previous contract had been breached and was expired and that she "could not move forward or be legally obliged to participate in an Ad Hoc proceeding without an existing contract," but on February 13, 2020, the Associate Dean sent

_____

[14] Kavianpour alleges that the review by CCC was scheduled for "January 7, 2019," [Doc. 29 ¶ 136], but this appears to be a typographical error considering the chronology of events.

Kavianpour a letter, advising her that an AHC had been appointed and on the following day, she was informed that an AHC meeting was scheduled for February 24, 2010. [Id. ¶¶ 141-43]. The AHC meeting has since been rescheduled and remains pending. [Id. ¶ 144].

Based on these factual allegations, Kavianpour alleges a breach of contract claim against BOR and AUMC in Count I of her amended complaint. [Id. ¶¶ 166-82]. In particular, Kavianpour alleges that her House Officer contract appointment was made subject to AU's policies and procedures, as well as the policies and procedures of the BOR of the University System of the State of Georgia ("USG Policies"); that the USG Policies provided that employees identified for drug testing shall "be provided a specific date and time to report for testing[ and] such date and time shall be as soon as possible, but not later than two [] business days following the date the individual receives notification to report"; and that defendants were also "contractually bound by Ga. Comp. R. & Regs. r. 478-1.21C because USG Policies expressly adopt[ed] the State Merit System of Personnel Administration drug testing procedures," which required that "[r]andom selection [for drug testing be] made such that each position within a pool ha[d] an equal chance of being selected each time" and that the appointing authority may delay testing until a later date in order to avoid disrupting operations. [Id. ¶¶ 166-69, 171 (citation and internal marks omitted)]; see also [Doc. 3-2 at 2];

https://www.usg.edu/hr/manual/drug_testing (last visited on Jan. 20, 2021). She also alleges that her House Officer contract subjected her to AU's House Staff Policies and Procedures, which she asserts incorporated the ACGME Policies, both of which required the residency program to have procedures in place to ensure coverage of patient care in the event that a resident was unable to perform patient care responsibilities. [Doc. 29 ¶¶ 172-76 (citations omitted)]; see also [Doc. 3-2 at 2]; House Staff Policies. Kavianpour asserts that defendants "suspended [her] clinical activities and terminated her from the Neurosurgery residency program for 'not adhering to the Medical Center's Substance Abuse policy,'" but that she was "selectively targeted to drug test every month during peak patient care hours and to present within the hour, which meant potentially leaving the hospital without patient coverage." [Id. ¶ 179 (citation omitted)]. She alleges that defendants BOR and AUMC "breached the terms of [her] contract by violating House Staff Policies, AU Policies, AUMC Policies, USG Policies, and ACGME Policies, as well as the federal and state laws and regulations incorporated therein," that she "repeatedly protested [their] breaches but [they] ignored her protests and continued to breach [her] [c]ontract," and that they ultimately, "illegally terminated [her] contract." [Id. ¶¶ 180-82].

In Count II, Kavianpour asserts a claim against BOR and AUMC for violation of the GWA, alleging that she was a public employee under O.C.G.A. §§

45-1-4 and 45-23-3; that BOR and AUMC are public employers under these statutes and were bound by due process requirements; that BOR and AUMC's actions violated O.C.G.A. §§ 45-20-110 and 45-20-111, as well as HHS Regulation 11979; that she opposed drug testing that was not random and did not comply with state and federal law; and that as a direct result of her opposition, her clinical privileges were suspended and her employment was terminated. [Id. ¶¶ 183-91]. In Counts III and IV, she alleges violations of the GWA against BOR and AUMC based on her complaints about patient safety under House Staff Policies and ACGME Policies and the failure to adhere to the internal appeal process under the House Staff Policy 13.0 and her resulting suspension and termination and being subjected to even "more biased appeals and compliance processes." [Id. ¶¶ 192-201].

In Count V, Kavianpour alleges a sex discrimination claim pursuant to Title VII against BOR and AUMC.[15] [Id. ¶¶ 202-13]. Similarly, in Count XI, she asserts a sex discrimination claim under Title IX against BOR and AUMC. [Id. ¶¶ 257-67]. In particular, she alleges that she is a member of a protected class based on her sex; that she was subjected to the adverse actions "of monthly drug tests and

_____

[15] Kavianpour alleges that "BOR, AU, and AUMC are employers subject to suit under Title VII, . . . are engaged in interstate commerce, and acted as a single, integrated employer or enterprise, and/or joint employer, as an agent of BOR." [Doc. 29 ¶ 5].

its arbitrary strict protocol that violated her contract," heightened surveillance, "having her supervisor require her to attend voluntary GA PHP based on an unsubstantiated malicious rumor," increased scrutiny, artificially low evaluations without feedback or opportunity to cure, suspension of her clinical privileges, and termination; and that "[s]imilarly-situated male residents were not subject to these illegal and invasive tests, required to go to GA PHP, have [] a file built against them, or suspended and/or terminated."[16]  [Id. ¶¶ 203-09].  Kavianpour asserts a

---

[16] Kavianpour alleges that male neurosurgery residents "repeatedly admitted to coming to work hungover and at times put the on-call neurosurgery pager status as 'at the bar'"; that two male residents arrived to her initial interview on December 7, 2017, two hours late and were hungover and had been drinking all night; that male residents watched sexually explicit videos and visited pornographic websites while in the neurosurgery workroom, the on-call room, and on the work computers, but that to her knowledge, the only consequence of this behavior was one of the resident's internet access being temporarily blocked by IT; that one male resident would "frequently change patient lab finding numbers to include or be some version of '69' and he would not stop or correct the number despite being asked to do so" and that this same resident "used the neurosurgery resident on-call room for sexual activity with women"; that another male resident "drew a penis on a nursing station chair using foam sanitizer that stained and damaged property, but the only disciplinary action he faced was being asked to pay for the damaged chair"; that male residents continued to change their clothes in the workroom in Kavianpour's presence despite her discomfort and Macomson's requests for them to stop; that multiple nurses complained to Kavianpour, and others also complained verbally and in writing, about one of the male resident's "unprofessional demeanor, unresponsiveness to pages about patients, and refusal to clean up after he performed a procedure," but he was not disciplined; and that another male resident created patient safety issues by rarely signing out when he was on-call overnight or leaving incomplete sign-outs.  [Doc. 29 ¶¶ 145-59].

claim for hostile work environment under Title VII against BOR and AUMC in Count VI, [id. ¶¶ 214-20], and in Count VII, she asserts a claim against BOR and AUMC for retaliation and a retaliatory hostile work environment under Title VII, [id. ¶¶ 221-28].

In Counts VIII and IX, Kavianpour asserts claims of disability discrimination and retaliation under Title I of the ADA against BOR and AUMC, alleging that she "is a qualified individual who [d]efendant[s] erroneously regarded [] as having the disability of a substance abuse disorder"; that she "suffered the adverse action of selective random drug tests and an arbitrary, illegal and discriminatory testing protocol"; that "[d]efendants interfered with the exercise and enjoyment of ADA rights by ignoring her request for an otherwise interactive  process" when she asked to meet with Human Resources for "drug testing flexibility or accommodation of patient care"; that she also "suffered the adverse action of suspension of her clinical privileges and termination for the disability that she was regarded as having and because of [d]efendants refusal to accommodate"; and that when she objected to defendants' actions, her clinical privileges were suspended and she was terminated, and when she objected to those actions, she was further subjected to more illegal and biased internal appeals processes.  [Id. ¶¶ 229-47].  Kavianpour also asserts a claim of disability discrimination under Title III of the ADA against BOR and AUMC in Count X, [id.

¶¶ 248-56], and she asserts a claim for disability discrimination under the Rehabilitation Act against BOR and AUMC in Count XII, alleging that she is a qualified individual based on her disability of chronic kidney disease, but was regarded as having the perceived disability of a substance abuse disorder, and that she suffered the adverse actions of targeted drug tests, suspension of clinical activities, and termination, [id. ¶¶ 268-76].

In Count XIII, Kavianpour asserts a claim pursuant to § 1983 and the Equal Protection Clause against Arnold, Keel, Norton, and Sprouse in their individual capacities, alleging that they intentionally discriminated against her on the basis of her sex.  [Id. ¶¶ 277-86].  In Count XIV, Kavianpour asserts a due process claim pursuant to § 1983 and the Fourth and Fourteenth Amendments with regard to the drug testing policies against Arnold and Norton in their individual capacities and "AUMC for the actions of Norton in her official capacity as a policymaker[.]"  [Id. ¶¶ 287-97].  She asserts another due process claim pursuant to § 1983 and the Fourth and Fourteenth Amendments against Arnold in her individual capacity, Norton in her individual and official capacities, AUMC "for the [a]ctions of [] Coule [i]ndividually and [i]n [h]is [o]fficial [c]apacity as a [p]olicymaker," and Sprouse in his individual and official capacities for the failure to provide her with notice of the charges against her and an opportunity to respond prior to the suspension of her clinical privileges by Coule in Count XV.  [Id. ¶¶ 298-326].

Finally, in Count XVI, Kavianpour asserts a claim for breach of a duty to refrain from taking her "hospital privileges" in an arbitrary and capricious manner under O.C.G.A. § 51-1-6 against BOR and AUMC. [Id. ¶¶ 327-37].

AUMC, BOR, Coule, and the other individual defendants each have filed separate motions to dismiss Kavianpour's amended complaint in its entirety, [Docs. 32, 33, 34 & 35], all of which Kavianpour opposes, [Docs. 40, 41, 47, & 48]. Defendants have filed replies in support of their respective motions to dismiss, [Docs. 45, 46, 52, & 53], and the pending motions are now ripe for ruling.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of an action if the amended complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss, the Court must accept Kavianpour's allegations as true and construe the amended complaint in her favor. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Duke v. Cleland, 5 F.3d 1399, 1402 (11th Cir. 1993); Tapsoba v. Khiani Alpharetta, LLC, Civil Action No. 1:13–CV–1519–RWS, 2013 WL 4855255, at *1 (N.D. Ga. Sept. 11, 2013).[17] "While a[n

---

[17] "However, the court need not 'accept as true a legal conclusion couched as a factual allegation.'" Smith v. Delta Air Lines, Inc., 422 F. Supp. 2d 1310, 1324 (N.D. Ga. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). Additionally, "when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1206 (11th Cir. 2007) (citations omitted).

amended] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [Kavianpour's] obligation to provide the grounds of [her] entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (last alteration in original) (citations and internal marks omitted); see also Lenbro Holding Inc. v. Falic, 503 F. App'x 906, 909 (11th Cir. 2013) (per curiam) (unpublished) (alterations in original) (citation omitted) ("Allegations entitled to no assumption of truth include '[l]egal conclusions without adequate factual support' or '[f]ormulaic recitations of the elements of a claim.'").

"Factual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555 (footnote and citation omitted), as "a[n amended] complaint must plead 'enough facts to state a claim to relief that is plausible on its face,'" Cisneros v. Petland, Inc., 972 F.3d 1204, 1210 (11th Cir. 2020) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).  The Supreme

Court in Iqbal held:

> Two working principles underlie our decision in Twombly.  First, the
> tenet that a court must accept as true all of the allegations contained
> in a complaint is inapplicable to legal conclusions.  Threadbare
> recitals of the elements of a cause of action, supported by mere
> conclusory statements, do not suffice.  Rule 8 marks a notable and
> generous departure from the hyper-technical, code-pleading regime
> of a prior era, but it does not unlock the doors of discovery for a
> plaintiff armed with nothing more than conclusions.  Second, only a
> complaint that states a plausible claim for relief survives a motion to
> dismiss. . . . [W]here the well-pleaded facts do not permit the court to
> infer more than the mere possibility of misconduct, the complaint has
> alleged–but it has not "show[n]"–"that the pleader is entitled to
> relief."

Id. at 678-79 (last alteration in original) (citations omitted); see also Evans v. Ga.

Dep't of Behavioral Health & Developmental Disabilities, CV 415-103, 2018 WL

4610630, at *3 (S.D. Ga. Sept. 25, 2018) (alterations in original) (citation and internal

marks omitted) ("Although there is no probability requirement at the pleading

stage, something beyond . . . mere possibility . . . must be alleged.").

"While Rule 12(b)(6) does not permit dismissal of a well-pleaded [amended]

complaint simply because 'it strikes a savvy judge that actual proof of those facts

is improbable,'" Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007)

(quoting Twombly, 550 U.S. at 556), "[t]o state a plausible claim for relief,

[Kavianpour] must go beyond merely pleading the 'sheer possibility' of unlawful

activity by [] defendant[s] and so must offer 'factual content that allows the court

to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged,'" Stabb v. GMAC Mortg., LLC, 579 F. App'x 706, 708 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted). "This necessarily requires that [Kavianpour] include factual allegations for each essential element of . . . her claim." GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1254 (11th Cir. 2012) (citations omitted).[18] "Regardless of the alleged facts, however, a court may dismiss a[n amended] complaint on a dispositive issue of law." Moore v. McCalla Raymer, LLC, 916 F. Supp. 2d 1332, 1342 (N.D. Ga. 2013), adopted at 1336 (citations and internal marks omitted); see also Glover v. Liggett Grp., Inc., 459 F.3d 1304, 1308 (11th Cir. 2006) (per curiam) (citation omitted); Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (citations omitted).

### III.  DISCUSSION

Kavianpour has asserted sixteen claims in this case based on the drug testing protocol that led to the suspension of her clinical privileges at AUMC and her

---

[18] Furthermore, "a plaintiff's *post hoc* allegation does not suffice to defeat a motion to dismiss" as the Court "cannot consider . . . allegations missing from [the amended] complaint." Clark v. Ocwen Loan Servicing, CIVIL ACTION FILE NO. 1:14–cv–04021–TCB–AJB, 2015 WL 11438602, at *5 (N.D. Ga. July 30, 2015) (citations and internal marks omitted). Indeed, "[n]otwithstanding the wide latitude given to litigants at the pleading stage, a pleading is not to be used as a constantly moving target that the pleader can reformulate every time the pleading is challenged" and "[s]ooner or later, it must stand or fall on its own." Id. (first alteration in original) (citation and internal marks omitted).

subsequent termination from the neurosurgical residency program at AU. <u>See</u> [Doc. 29]. Defendants contend that they are entitled to dismissal of all of Kavianpour's claims asserted against each of them and offer several arguments in support of their respective motions. <u>See</u> [Docs. 32, 33, 34 & 35]. First, defendant AUMC moves to dismiss all of the claims asserted against it in Kavianpour's amended complaint for failure to state a claim upon which relief can be granted. [Doc. 32]. In particular, AUMC moves to dismiss Count I of Kavianpour's amended complaint for breach of contract because it was not a party to any contract with Kavianpour, [Doc. 32-1 at 23-24], and it moves to dismiss Counts II through X and Count XII, arguing that Kavianpour's amended complaint "fails to include cognizable allegations that [she] was an employee of AUMC" or that AUMC was a joint employer of Kavianpour, [<u>id.</u> at 10-15]. AUMC also moves to dismiss Counts V, VI, VII, and XI of the amended complaint, asserting that she has failed to "state a claim upon which relief [could] be granted based on sex discrimination under Title VII and Title IX because [she] fail[ed] to allege any facts whatsoever connecting her sex to the alleged adverse employment actions," [<u>id.</u> at 7-10], and contends that the Court should dismiss Counts VIII, IX, X, and XII because Kavianpour's "factual allegations show that she was not a protected employee under the ADA" and her claim under the Rehabilitation Act "is not remotely plausible under the *Iqbal* standard," [<u>id.</u> at 15-18 (footnote omitted)].

AUMC also contends that Kavianpour's retaliation and whistleblower claims asserted in Counts II, III, IV, VII, and IX are due to be dismissed because Kavianpour "did not engage in 'protected activity,' nor did she plead facts to show that any employment actions against her had a causal relationship with any 'protected activity.'" [Id. at 18-20]. Finally, AUMC argues that it did not owe Kavianpour due process before suspending her clinical privileges or prior to drug testing her and that Counts XIV and XV are therefore due to be dismissed, [id. at 20-23], and that because she "did not have 'medical staff privileges' to lose," her breach of duty claim under O.C.G.A. § 51-1-6 asserted in Count XVI fails as a matter of law, [id. at 24-25].

Next, BOR has moved for dismissal of Kavianpour's claims, arguing that her discrimination claims under Title IX in Count XI "are preempted by Title VII and should be dismissed," [Doc. 34 at 7 (emphasis omitted)], and that she has failed to state a claim for sex discrimination under Title VII in Count V and under Title IX in Count XI because she failed "to plead actual facts supporting disparate treatment from similarly situated male employees," [id. at 8-10]. BOR also argues that Kavianpour's Title VII retaliation claim asserted in Count VII is due to be dismissed "because she has not plead facts to show that she engaged in statutorily protected expression" and because she "cannot establish causation," [id. at 10-12], and that her retaliatory hostile work environment claims "suffer from the same

36

deficiencies as her general Title VII retaliation claim," [id. at 12-13]. BOR also moves for dismissal of Kavianpour's ADA and Rehabilitation Act claims asserted in Counts VIII, IX, X, and XII, arguing that each claim fails because she "cannot meet her requirement to show that she is a qualified individual with a disability." [Id. at 18-20]. BOR moves for the dismissal of Kavianpour's GWA claims asserted in Counts II, III, and IV for failure to allege "sufficient facts to support a claim that she engaged in protected activity as defined by the GWA," [id. at 14-16], and it asserts that her breach of contract claim in Count I is due to be dismissed for her failure "to plead sufficient facts to establish that any contractual term was breached related to the request to submit to drug testing for a year," because the "failure to adhere to procedures in a personnel manual and policies for termination hearings are not actionable as a breach of contract," and her "allegations that [BOR] did not have in place required policies for patient safety do not give rise to a breach of contract with her," [id. at 16-18 (citation omitted)]. Finally, BOR argues that Kavianpour's claim asserted in Count XVI must be dismissed because "the decision to request monthly drug tests from [her] is the exercise of a discretionary duty which is specifically exempt from the waiver of immunity" and because she has "failed to adhere to the requirements of O.C.G.A. § 50-21-26 by providing notice of her tort claim to the Risk Management Division

of the Department of Administrative Services, within one year of the date of loss."
[Id. at 20-21 (citations omitted)].

The individual defendants also have moved for dismissal of the claims asserted against them in their individual capacities. [Doc. 35]. They contend that Kavianpour's claim against Arnold, Keel, Norton, and Sprouse asserted in Count XIII should be dismissed because she has failed "to state a claim for intentional gender discrimination in violation of the Equal Protection Clause" and because binding circuit precedent dictates that she "must meet a heightened pleading standard" in order to assert her claims pursuant to § 1983 against individuals. [Id. at 4-10 (citation omitted)]. The individual defendants also contend that the claim asserted in Count XIV should be dismissed as to Norton and Arnold because Kavianpour has failed to state a claim for illegal search and seizure against them and "failed to establish a plausible violation of her constitutional rights." [Id. at 10-12]. They similarly argue that her claim asserted in Count XV based on her suspension of clinical privileges "fails to state a claim upon which relief may be granted as she cannot show that she ha[d] a property interest in the medical privileges at issue" and that to the extent she asserts that she was deprived of due process on her termination of employment, she admitted that she was afforded a hearing on her termination and even afforded a second hearing after defendants reinstated her employment, and she therefore "has no claim for a violation of due

process." [Id. at 12-14]. Alternatively, the individual defendants assert that they are entitled to qualified immunity as to each of these claims since Kavianpour's "allegations are insufficient to establish that her constitutional rights were violated or that such rights were clearly established at the time of the alleged violation[.]" [Id. at 15-21].[19]

Finally, defendant Coule has separately moved to dismiss the sole claim asserted against him in Kavianpour's amended complaint, or alternatively, moved for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e). [Doc. 33].[20] Specifically, Coule first argues that Count XV is due to be dismissed because he "did precisely what her [amended c]omplaint suggests he should have done." [Doc. 33-1 at 5-7]. He next contends that this claim is subject to dismissal because as Chief Medical Officer for AUMC, a private medical center, he "was not

_____

[19] The individual defendants also argue that defendant Moore should be dismissed since Kavianpour "has failed to allege any substantive claim against him[.]" [Doc. 35 at 9]. Kavianpour has not addressed this argument, see generally [Doc. 48], and aside from naming Moore in his individual capacity in the caption of the case and as a defendant in the "Parties" section of the amended complaint, Kavianpour has not asserted any claims against him, see generally [Doc. 29]. Accordingly, it is **RECOMMENDED** that Moore be **DISMISSED** as a defendant in this case. See Bohannon v. PHH Mortg. Corp., CIVIL ACTION FILE NO. 1:12-CV-02477-RWS-GGB, 2012 WL 12844753, at *6 (N.D. Ga. Nov. 26, 2012), adopted by 2013 WL 12062835, at *1 (N.D. Ga. Mar. 26, 2013).

[20] Although Coule has separately moved to dismiss Kavianpour's claims against him, [Doc. 33], he also joined the individual defendants' motion "to the extent that he is sued in his capacity as a state actor," [Doc. 35 at 1].

a 'state actor' or acting 'under the color of state law'" and therefore cannot be sued under § 1983 for due process violations.  [Id. at 1, 5, 7-10].  Additionally, he argues that Kavianpour's claim fails because she "was not a member of AUMC's medical staff, but even if she had been, suspension of medical staff privileges does not require pre-suspension notice and an opportunity to respond" and that "medical residents are . . . entitled to only minimal due process, and [she] received such process."  [Id. at 5, 10-16].  He further argues that even if he "were acting as an agent or employee of a state entity as [Kavianpour] asserts, he would be entitled to sovereign immunity."  [Id. at 6, 16-18].

Kavianpour opposes each of the motions to dismiss.  See [Docs. 40, 41, 47, & 48].  Defendants have filed reply briefs in support of their respective motions.  [Docs. 45, 46, 52, & 53].  The Court will now address the merits of Kavianpour' claims and the issues raised in defendants' motions to dismiss.

**A.**  **Preliminary Issue of Integrated and/or Joint Employer or Agency Relationship Between BOR/AU and AUMC**

In her amended complaint, Kavianpour alleges that AU "is a member institution of the University System of Georgia [] of the [d]efendant [BOR] which pursuant to O.C.G.A. § 20-3-51 is vested with the governance, control, and management of the [University System of Georgia] and all of its institutions, including AU" and that AUMC, "which is referred to as a component unit of AU

in [its] financial documents, is designated as a not-for-profit with the purpose 'to further the health science education missions and other tax-exempt functions and purposes of the Medical College of Georgia,' according to its articles of incorporation, and pursuant to a Master Affiliation Agreement in which AUMC 'shall be responsible for monitoring and facilitation of [Medical College of Georgia] Hospital and Clinics institutional compliance with ACGME and LCMS standards and requirements with respect to [AU] training programs[.]'" [Doc. 29 ¶¶ 2, 4 (seventh alteration in original) (citation omitted)]. Kavianpour alleges that BOR, AU, and AUMC "acted as a single, integrated employer or enterprise, and/or joint employer, as an agent of BOR," [id. ¶ 5], and she asserts claims under Title VII, the ADA, the Rehabilitation Act, and the GWA against both BOR and AUMC, see [id. ¶¶ 183-256, 268-76]. AUMC contends that Kavianpour's Title VII, ADA, Rehabilitation Act, and GWA claims are due to be dismissed because her amended complaint "still fails to include cognizable allegations that [she] was an employee of AUMC" and that her "alleged facts do not support [her] argument, even at the pleadings stage," that "AUMC and AU were 'joint employers.'" [Doc. 32-1 at 10-15].

"A Title VII action may only be asserted by an employee against an employer," and "[f]or purposes of Title VII, an 'employer' is a person[33] in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty of more calendar weeks in the current or preceding calendar year[.]" Massengale, 2005 WL 8155075, at *3 (footnote added) (citation and internal marks omitted). Similarly, claims under the ADA and the Rehabilitation Act, which prohibit employers from discriminating based on a disability, may be asserted only against an employer, the definition of which "mirrors the definition of employer under Title VII[.]" Nelson v. Jackson, Civil Action File No. 1:14–CV–02851–ELR–JFK, 2015 WL 13545487, at *4 (N.D. Ga. Mar. 31, 2015), adopted by 2015 WL 13546505, at *1 (N.D. Ga. Apr. 21, 2015) (citation omitted). In addition, claims under the GWA are properly asserted only against a "public employer"[21] under Georgia law. See Blasingim v. Hill, CIVIL ACTION FILE NO. 1:08-CV-2117-JEC-JFK, 2009 WL 10664918, at *13-14 (N.D. Ga. Jan. 16, 2009) (citation omitted). Thus,

---

[33] "A 'person' includes individuals, governments, governmental agencies, [and] political subdivisions[.]" Massengale v. Hill, CIVIL ACTION FILE NO. 1:05-CV-189-TWT, 2005 WL 8155075, at *3 (N.D. Ga. July 25, 2005) (first alteration in original) (citation and internal marks omitted).

[21] A "[p]ublic employer" is defined as "the executive, judicial, or legislative branch of the state; any other department, board, bureau, commission, authority, or other agency of the state which employs or appoints a public employee or public employees; or any local or regional governmental entity that receives any funds from the State of Georgia or any state agency." O.C.G.A. § 45-1-4(a)(4).

the Court first addresses the employer-employee issue because AUMC's status is integral to several of Kavianpour's claims asserted in her amended complaint.

Although Kavianpour invoked the integrated enterprise theory, the joint employer theory, and the agency concept, see [Doc. 29 ¶ 5], her opposition to AUMC's motion to dismiss only asserts that "the Court should consider [AUMC and AU] joint employers or, at the very least, that AUMC was AU's designated agent for purposes of [her] residency," [Doc. 40 at 7], and does not address AUMC's arguments regarding the integrated enterprise theory, [Doc. 32-1 at 12-13], which she appears to have abandoned, see [Doc. 40 at 6-13]; see also Brooks v. Ins. House, Inc., 322 F. App'x 782, 783 n.* (11th Cir. 2009) (per curiam) (unpublished) (citation and internal marks omitted) (A "legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").  The Eleventh Circuit has summarized the joint employment standard as follows:

> The basis of the finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.  Thus the joint employer concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

Kingsley v. Tellworks Commc'ns, LLC, CIVIL ACTION NO. 1:15-CV-4419-TWT-JSA, 2017 WL 2624555, at *16 (N.D. Ga. May 24, 2017), adopted by 2017 WL

2619226, at *1 (N.D. Ga. June 15, 2017) (quoting <u>Virgo v. Riviera Beach Assocs.,</u> <u>Ltd.</u>, 30 F.3d 1350, 1359 (11th Cir. 1994)). "Thus, the ultimate focus of the joint employer inquiry is the degree of control one company exercises over the employees of another company." <u>Id.</u> (citations omitted).

"'While [Kavianpour] is not required to conclusively establish that defendants were [her] joint employers at the pleading stage, [she] must at least allege some facts in support of this legal conclusion.'" <u>Smith v. CH2M HILL, Inc.,</u> CIVIL ACTION NO. 1:10-cv-02936-CC-RGV, 2011 WL 13128411, at *7 (N.D. Ga. Mar. 3, 2011), adopted by 2011 WL 13129749, at *3 (N.D. Ga. Sept. 1, 2011) (emphasis and citation omitted). That is, "merely alleging that defendants are 'joint employers' is insufficient to satisfy Rule 8's pleading requirements[.]" <u>Id.</u> (citation omitted).

The factual allegations of Kavianpour's amended complaint are that AUMC, a "not-for-profit" corporation, is "a component unit of AU," which is "a member institution of the [BOR],"[22] and that pursuant to a "Master Affiliation Agreement," AUMC monitors and facilitates the clinical operations associated with AU's

---

[22] Although AU "exists and operates solely as a unit of the [BOR]," <u>Sholes v.</u> <u>Anesthesia Dep't</u>, CV 119-022, 2020 WL 1492175, at *4 (S.D. Ga. Mar. 23, 2020) (citations omitted), AUMC, an entity under the umbrella of the AU Health System, Inc., has been recognized as a separate corporate entity from AU and the BOR, <u>see</u> <u>id.</u>, at *2, 4.

resident program, accepts federal funding for medical education, and receives payments for procedures performed by resident physicians. [Doc. 29 ¶¶ 2-4]. Kavianpour therefore asserts that she has "pled sufficient facts to show that AUMC: (1) received funds to compensate and/or train her; (2) as a condition for receiving funds, must abide by ACGME requirements; and (3) has organizational documents that make it responsible for training AU residents, including adherence to ACGME standards" and that she has therefore "pled facts showing that AUMC and AU shared funding, responsibility for maintaining accreditation requirements, and general oversight of her residency, and, ultimately, it was an AUMC actor who ended this joint relationship" when Coule suspended her clinical privileges, thereby satisfying her pleading requirements at this stage of the litigation. [Doc. 40 at 10-11 (citation omitted)]. However, according to Kavianpour's amended complaint and employment contract, AU, not AUMC, was responsible for all of the material terms and conditions of her residency and employment. See [Doc. 29 ¶¶ 19-21, 24-31; Doc. 3-2 at 2]. Indeed, the facts alleged indicate that Kavianpour accepted a residency program with AU's Neurosurgery Department for a term of one year; that she failed her pre-employment drug test and her offer of employment and acceptance into the residency program were rescinded by AU; that after she appealed and re-tested, she was eventually offered another employment contract and signed a House Officer Notice of Appointment

45

on July 12, 2018, with AU; that AU notified her on August 21, 2018, that she would be subject to random drug testing per AU's Substance Abuse Policy No. 685; that after AU employees drafted a letter outlining deficiencies that had occurred in relation to Kavianpour's adherence to the drug testing policy, as well as her recent DUI arrest, AUMC suspended her clinical privileges for patient safety; that AU subsequently made the decision to terminate her from AU's residency program; and that AU heard and denied her grievance. [Doc. 29 ¶¶ 19-21, 23-33, 81, 83-84, 86-87, 96-97, 103-06]; see also [Doc. 3-2 at 2; Doc. 40-1 at 2; Doc. 40-2 at 2; Doc. 40-3 at 2].

The assertion in the amended complaint that AU and AUMC jointly employed Kavianpour is a "legal conclusion," not a "factual allegation," and thus, "insufficient to satisfy Rule 8's pleading requirements." Smith, 2011 WL 13128411, at *7 (citation omitted); see also Woldu v. Hotel Equities, Inc., CIVIL ACTION NO. 1:09-CV-0685-HTW-CCH, 2009 WL 10668443, at *11, 13 (N.D. Ga. Sept. 18, 2009), adopted by 2010 WL 11507854, at *2 (N.D. Ga. Mar. 18, 2010) (dismissing plaintiff's "joint employer" theory of liability on a motion to dismiss since plaintiff's amended complaint alleged a "factual scenario [that was] a possible one," but "not plausible without strong factual allegations").[23]  And, while Kavianpour

---

[23] Moreover, even if a joint employer relationship is assumed for purposes of the pending motions, "each individual employer only bears liability for

alternatively alleges that AUMC was AU's agent, [Doc. 29 ¶ 5; Doc. 40 at 11-13],

an agency relationship "exists where an employer delegates sufficient control of

some traditional rights over employees to a third party," but "there is nothing in

the [amended complaint] to even remotely [allege] that [AU] gave [AUMC]

sufficient control of [Kavianpour's] traditional employee rights," <u>Childs v. Macon-</u>

<u>Bibb Cty. Indus. Auth.</u>, CIVIL ACTION NO. 5:18-cv-00328-TES, 2020 WL 3130301,

at *10 (M.D. Ga. June 12, 2020) (citation omitted).  Accordingly, Kavianpour has

not alleged sufficient facts to render it plausible that AU and AUMC jointly

employed her, or that an agency relationship existed.

However, even though it was AU that operated the residency program and

employed Kavianpour, "[t]here are certain limited situations . . . in which Title VII

[and similar statutes] extend[] beyond a direct employment relationship between

the plaintiff and the defendant."  <u>Clark v. Marietta Surgical Ctr., Inc.</u>, No. 1:97-CV-

0790-JOF, 1999 WL 1043772, at *6 (N.D. Ga. Mar. 18, 1999).  The Eleventh Circuit

has held that a defendant who does not directly employ a plaintiff may still be

liable where the defendant has used its control over access to employment

---

discriminatory acts within its control."  <u>Bacon v. Nolte</u>, CIVIL ACTION NO.: 4:19-
cv-299, 2020 WL 5096515, at *1 (S.D. Ga. Aug. 27, 2020) (citations omitted); <u>see also</u>
<u>id.</u> (citation omitted and internal marks omitted) ("[A] finding that two companies
are an employee's joint employers only affect each employer's liability to the
employee for their own actions, not for each other's actions[.]").

opportunities with a third party to deny them to the plaintiff, such as where a defendant hospital engages in such interference by denying a resident privileges based on discrimination that led to plaintiff's dismissal from the residency program by plaintiff's employer. See Zaklama v. Mt. Sinai Med. Ctr., 842 F.2d 291, 294-95 (11th Cir. 1988); see also Pardazi v. Cullman Med. Ctr., 838 F.2d 1155, 1156 (11th Cir. 1988). "Courts have found such relationships most often with cases involving . . . medical residencies[] or other methods of employment where such a person works for someone that places them in a location where their day to day work lives are controlled by someone else," and "courts look at three factors to determine whether a non-employer can be deemed an employer: '[1] whether or not the employment took place on the premises of the alleged employer; [2] how much control did the alleged employer exert on the employees; and, [3] did the alleged employer have the power to fire, hire, or modify the employment condition of the employees[.]" Turner v. Jefferson Cty. Comm'n, Case No.: 2:18-cv-01609-JEO, 2019 WL 2435872, at *4 (N.D. Ala. June 11, 2019) (third, fourth, and fifth alterations in original) (citations and internal marks omitted). Applying these factors to the allegations of Kavianpour's amended complaint, and accepting that her employment took place on the premises of AUMC; that AUMC controlled her day-to-day schedule and the manner and means of her work; and that while AUMC did not have the power to hire or fire her, it had the power to modify her

employment condition by suspending her privileges, <u>see generally</u> [Doc. 29], the

Court will assume for purposes of the pending motions that AUMC can be deemed

Kavianpour's employer at this stage of the litigation and evaluate the merits of her

claims.

**B.** <u>**Kavianpour's Federal Claims**</u>

    **1.** *Kavianpour's Sex Discrimination Claims*

        **a.** **Title VII and Title IX Sex Discrimination Claims**

Kavianpour alleges that BOR and AUMC discriminated against her based

on her sex by requiring her to submit to monthly drug tests, subjecting her to

"heightened surveillance," requiring her to "attend voluntary GA PHP,"

subjecting her to increased scrutiny and "artificially low evaluations," suspending

her clinical privileges, and terminating her from the residency program, in

violation of Title VII, and that they discriminated against her based on sex in

education programs by subjecting her to random drug tests and terminating her

from the residency program, in violation of Title IX. [Doc. 29 ¶¶ 202-13, 257-67].

Title VII prohibits discrimination in employment decisions on the basis of "race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a); <u>see also</u> <u>Blue v.</u>

<u>Dunn Constr. Co.</u>, 453 F. App'x 881, 883 (11th Cir. 2011) (per curiam)

(unpublished) (citation omitted). Title IX also "prohibits sex discrimination by

recipients of federal education funding." <u>Joseph v. Bd. of Regents of Univ. Sys. of</u>

<u>Ga.</u>, CIVIL ACTION FILE NO. 1:20-cv-502-TCB, 2020 WL 6494202, at *4 (N.D. Ga.

May 8, 2020) (citation and internal marks omitted).[24]

---

[24] BOR argues that Kavianpour's Title IX claims asserted in Count XI are preempted by Title VII and should therefore be dismissed. [Doc. 34 at 7-8]. Kavianpour disagrees with BOR's argument and contends that she may "simultaneously bring claims under both Titles VII and IX" for sex discrimination. [Doc. 47 at 6-8]. In particular, Kavianpour contends that the Supreme Court's decision in <u>Jackson v. Birmingham Board of Education</u>, 544 U.S. 167 (2005), dictates that she be allowed to maintain both her Title IX and Title VII employment discrimination claims. [<u>Id.</u> at 6-7]. In <u>Jackson</u>, the plaintiff, a high school girls' basketball coach, complained to his supervisors that they were unfairly discriminating against his basketball team by providing more funding to the boys' team. <u>Jackson</u>, 544 U.S. at 171. After the school board terminated the plaintiff's coaching duties, he filed a lawsuit alleging that the school board retaliated against him for complaining about Title IX violations. <u>Id.</u> at 172. After the district court granted the school board's motion to dismiss and the Eleventh Circuit affirmed, finding that Title IX had no implied private right of action for retaliation, the Supreme Court reversed, finding Title IX extended to retaliation claims. <u>Id.</u> at 172-74. Kavianpour contends that <u>Jackson</u> "implicitly underscores that it is the Supreme Court's view that nothing in Title VII requires it to be the exclusive means of redress for an employee who suffers gender discrimination" and "abrogates the Fifth Circuit's holding in <em>Lakoski v. James</em>, 66 F.3d 751, 755 (5th Cir. 1995), that Congress intended Title VII to exclude a damage remedy under Title IX for individuals alleging employment discrimination," <u>Drisin v. Fla. Int'l Univ. Bd. of Trs.</u>, Case No. 16-cv-24939-CIV-WILLIAMS, 2017 WL 10398209, at *1 (S.D. Fla. Sept. 28, 2017) (emphasis, citations, and internal marks omitted); <u>see also</u> [Doc. 47 at 7-8 (citations omitted)], as relied upon by BOR, [Doc. 34 at 8]. Kavianpour's contention, however, "omits the fact that <em>Jackson</em> was not an employment discrimination case," but instead, the plaintiff there "raised a single cause of action pursuant to Title IX; unlike [Kavianpour], he did not raise a parallel Title VII claim" and indeed, he "could not have raised a Title VII claim because Title VII does not prohibit the underlying discrimination—by the school against its students—about which he complained" and thus, "the school board's retaliation against [him] was not remediable under Title VII." <u>Drisin</u>, 2017 WL 10398209, at *2 (citations omitted). "Although there is a split of authority, courts, including those within this district, have determined that a plaintiff does not have a private

To establish a prima facie case of sex discrimination, Kavianpour must show that: "1) [s]he is a member of a protected class; 2) [s]he was qualified for the position; 3) [s]he suffered an adverse employment action; and 4) [s]he was replaced by someone outside [her] protected class or 'was treated less favorably than a similarly-situated individual outside [her] protected class.'" DeLeon v. ST Mobile Aerospace Eng'g, Inc., 684 F. Supp. 2d 1301, 1327 (S.D. Ala. 2010) (quoting Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003)); see also Wheatfall v. Bd. of Regents of Univ. Sys. of Ga., 9 F. Supp. 3d 1342, 1356 (N.D. Ga. 2014) (citation omitted). However, "[a] complaint in an employment discrimination case need not contain specific facts

_____

right of action to bring employment-based claims under Title IX." Joseph, 2020 WL 6494202, at *4 (citation omitted). "The Court agrees with the reasoning of these courts that Title VII is intended to provide the exclusive remedy for individuals alleging employment discrimination on the basis of sex in federally funded educational institutions," id. (citation and internal marks omitted), and it is therefore **RECOMMENDED** that Kavianpour's Title IX claim asserted against BOR and AUMC in Count XI be **DISMISSED**, see Reese v. Emory Univ., CIVIL ACTION FILE NO. 1:14-CV-2222-SCJ, 2015 WL 13649300, at *4 (N.D. Ga. Jan. 29, 2015) (citations and internal marks omitted) (explaining that "[o]ther courts in the Eleventh Circuit have [] held that Title VII is the exclusive remedy for employment discrimination claims against federally funded programs," since to allow "employment discrimination claims under Title IX would eviscerate Title VII's technical and administrative requirements, thereby giving plaintiffs who work at federally funded educational institutions unfettered ability to bring what are in reality Title VII sexual discrimination claims without adhering to the same rules require[d] of every other employment discrimination plaintiff in the country").

establishing a *prima facie* case under the evidentiary framework for such cases to survive a motion to dismiss." Henderson v. JP Morgan Chase Bank, N.A., 436 F. App'x 935, 937 (11th Cir. 2011) (per curiam) (unpublished) (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 510 (2002)); see also Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1270-71 (11th Cir. 2004) (citation omitted) (reiterating "*McDonnell Douglas*[25] was an *evidentiary* rather than a *pleading* standard" and that "pleading a *McDonnell Douglas prima facie* case was not necessary to survive a motion to dismiss"). "But complaints alleging discrimination still must meet the 'plausibility standard' of *Twombly* and *Iqbal*." Henderson, 436 F. App'x at 937 (citation omitted). "So, [Kavianpour's amended] complaint ha[s] to contain 'sufficient factual matter' to support a reasonable inference that [BOR and AUMC] engaged in [sex] discrimination against [her.]" Id.[26] In fact, "a complaint that

---

[25] See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[26] The "Eleventh Circuit recognize[s] the *Twombly* standard as controlling." Ashmore v. F.A.A., No. 11–CV–60272, 2011 WL 3915752, at *3 (S.D. Fla. Sept. 2, 2011) (alteration in original) (citation and internal marks omitted). "Thus, it appears that a plaintiff establishing a *prima facie* case of discrimination under *McDonnell* likely survives a Rule 12(b)(6) motion." Id. "However, when a plaintiff falls short of such a *prima facie* case the court must determine whether the plaintiff may have nevertheless alleged enough to survive a Rule 12(b)(6) motion." Id. In particular, "factual allegations must not be merely formulaic recitations of elements of a discrimination claim, but must instead provide enough content to suggest there was intentional discrimination based on a protected trait." Baker v. Hafez Corp., Civil Action No. 13–00641–KD–N, 2014 WL 1760976, at *9 (S.D. Ala. May 2, 2014), adopted at *1; see also Henderson, 436 F. App'x at 937 (citation

'provides no . . . detail manifesting any form of [sex-based] animus, discriminatory words, prior incidents or other indications that [the plaintiff's protected class] played a role in [the employer's] decision to dismiss [her]' is insufficient to satisfy the minimum pleading standards of Rule 8(a)(2)."  Jacobs v. Biando, No. 1:12-cv-4432-WSD, 2013 WL 3243625, at *7 (N.D. Ga. June 26, 2013), aff'd, 592 F. App'x 838 (11th Cir. 2014) (per curiam) (unpublished) (first, fourth, and fifth alterations in original) (citation omitted).

BOR and AUMC contend that the allegations of Kavianpour's amended complaint are insufficient to state a plausible claim of sex discrimination under Title VII.  [Doc. 32-1 at 7-10; Doc. 34 at 8-10].  In particular, these defendants argue that Kavianpour has failed "to allege any facts whatsoever connecting her sex to the alleged adverse employment actions"; that she failed to allege any "instances where any of the defendants ever commented on, recognized, or mentioned that she was a female, made any derogatory comments about females, commented that females [were] more likely to use drugs, or any other factual allegations that would indicate that [she] was drug tested because she was a woman"; that she has failed

_____

omitted) (noting plaintiff could meet this standard by "alleging facts showing that similarly-situated [comparators] outside her [protected] class were offered more favorable [] terms").  "If not, the allegations are merely conclusory and not assumed to be true, and the [amended] complaint is subject to dismissal."  Baker, 2014 WL 1760976, at *9 (citation omitted); see also id. ("Moreover, there must be enough facts (taken as true) to make discrimination a more likely explanation.").

to identify any similarly-situated comparators that would even remotely suggest she was treated differently because of her sex; and that her amended complaint indicates "that her employment was terminated not because of her sex but because of a belief that she failed to comply with drug testing policies." [Doc. 32-1 at 7-10]; see also [Doc. 34 at 8-10]. Kavianpour responds that she "need not present a comparator to proceed on her discrimination claims,"[27] and that she has pled sufficient factual allegations to raise an inference of circumstantial sex discrimination. [Doc. 40 at 13-15 (citation and internal marks omitted)]; see also [Doc. 47 at 8-11]. The circumstantial evidence Kavianpour identifies to support her sex discrimination claims consists of her allegations that: (1) she was the only female resident; (2) she was the only resident drug tested; (3) she was subjected to repeated urinalysis drug testing; (4) she was tested in a manner that interfered with the terms and conditions of her employment; (5) she opposed the testing as discriminatory; and (6) she was terminated. [Doc. 40 at 13 (citation omitted)]; see also [Doc. 47 at 8 (citation omitted)].

---

[27] Kavianpour asserts that even though she is not required to identify a comparator at this stage of the litigation, she "alleged the existence of comparators because she alleged that [] Coule testified that other providers with DUIs were neither suspended nor terminated." [Doc. 40 at 13-14 (citations and internal marks omitted)]; see also [Doc. 47 at 10 (citation omitted)].

A review of the allegations of the amended complaint reveals that aside from her allegations that she was the only female resident in her department and she was subjected to disparate treatment, Kavianpour has pleaded no facts indicating any correlation between her sex and any adverse action in this case. See Cooper v. Bd. of Regents of the Univ. of Ga., CIVIL ACTION FILE NO. 1:16-CV-01177-TWT-JFK, 2017 WL 1370769, at *5 (N.D. Ga. Feb. 22, 2017), adopted by 2017 WL 1354819, at *1 (N.D. Ga. Apr. 13, 2017); see also Cushmeer-Muhammad v. Fulton Cty., CIVIL ACTION FILE NO. 1:08-CV-3256-GET-JFK, 2009 WL 10665773, at *14 (N.D. Ga. July 7, 2009), adopted by 2009 WL 10671040, at *2 (N.D. Ga. Aug. 18, 2009) (granting motion to dismiss where plaintiff had "not alleged sufficient facts establishing that she suffered an adverse employment *based on her gender*"). While Kavianpour asserts that "she signed a regular employment contract"; that she "was similarly situated to the other (male) residents who were not drug tested"; "that the drug tests interfered with her employment duties"; "that she passed her drug tests in July, September, October, November, and December"; that "when she objected to the discriminatory manner in which such tests were conducted, [she] was met with more tests"; that her "failure to take drug tests within the time [] specified" was then used to justify her suspension and subsequent termination; and that she has therefore "plead facts to plausibly suggest intentional [sex] discrimination," [Doc. 40 at 14-15 (alteration, footnote,

citations, and internal marks omitted)], she ignores her own factual allegations, as BOR points out, that "she tested positive in a pre-employment drug test," which "distinguishes her from any other male resident within her department who she alleges was treated differently," [Doc. 52 at 4 (citation omitted)].[28] "Perhaps seeing

---

[28] And, while Kavianpour contends that she has alleged the existence of comparators, including that "other providers with DUIs were neither suspended nor terminated," see [Doc. 40 at 14 (citing [Doc. 29 ¶ 101])], and has included a section in her amended complaint entitled, "Comparator Conduct and Consequences," [Doc. 29 at 31 (emphasis omitted)], in which she provides allegations concerning male residents' behavior, including arriving to work hungover or late after drinking all night, watching sexually explicit videos and visiting pornographic websites at work, and engaging in sexual activity at work, among other conduct, [id. ¶¶ 145-59], the Eleventh Circuit has held that the "proper test" for determining whether comparators are similarly situated to the plaintiff is whether she and her "proffered comparators were 'similarly situated in all material respects,'" Lewis v. City of Union City, 918 F.3d 1213, 1218 (11th Cir. 2019) (en banc). Although the sufficiency of Kavianpour's proffered comparators must be "worked out on a case-by-case basis" under this standard, a similarly situated comparator will ordinarily "have engaged in the same basic conduct (or misconduct) as the plaintiff"; "have been subject to the same employment policy, guideline, or rule as the plaintiff"; "have been under the jurisdiction of the same supervisor as the plaintiff"; and "share the plaintiff's employment or disciplinary history[.]" Id. at 1227-28 (footnote and citations omitted). "Though [Kavianpour] relates misdeeds, some quite serious, of male residents in the program, she fails to [allege] that any of these individuals were similarly situated to her[.]" Brown v. Hamot Med. Ctr., Civil Action No. 05-32E, 2008 WL 55999, at *9 (W.D. Pa. Jan. 3, 2008), aff'd, 323 F. App'x 140 (3d Cir. 2009) (unpublished) (citation omitted). Kavianpour has not included any allegations in her amended complaint that identify any male resident from her department that tested positive for drugs in the pre-employment drug screening and her confirmatory testing, though it was under the threshold, and then tested negative on the retest, who was treated differently than her, see [Doc. 29 ¶¶ 23-28], and "courts often dismiss complaints for failing to allege enough factual support on the comparators," Bartholomew v. Lowe's Home Centers, LLC, Case No.: 2:19-cv-695-FtM-38MRM, 2020 WL 321372,

the writing on the wall, [Kavianpour] . . . correctly note[s] a plaintiff may raise a reasonable inference on an employer's discriminatory intent through various forms of circumstantial evidence, even in the absence of a proper comparator, to survive a motion to dismiss," but "[t]o do so, [Kavianpour] must paint a convincing mosaic of circumstantial evidence for an inference of intentional discrimination," yet, "[t]he problem . . . is the [amended c]omplaint doesn't even try to draw a stick figure" and "alleges nothing else to allow an inference of [BOR or AUMC's] discriminatory intent."[29]    Bartholomew, 2020 WL 321372, at *6 (citations and internal marks omitted); see also [Doc. 40 at 13 (citation omitted)].

---

at *6 (M.D. Fla. Jan. 21, 2020) (citations omitted).    In short, Kavianpour's "conclusory allegations are insufficient to state a claim of [sex] discrimination." Hale v. Mingledorff, Civil Action No. 2:13–CV–0228–RWS, 2014 WL 7012772, at *13 (N.D. Ga. Dec. 11, 2014), adopted at *1 (footnote and citations omitted).

[29] Although Kavianpour correctly contends that a discrimination claim may proceed where there is "a convincing mosaic of circumstantial evidence that would allow a jury to infer [] discrimination by the decisionmaker," Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (footnote, citations, and internal marks omitted), as previously explained, her amended complaint "alleging discrimination still must meet the 'plausibility standard' of Twombly and Iqbal," Henderson, 436 F. App'x at 937 (citation omitted), and it has "to contain 'sufficient factual matter' to support a reasonable inference that [BOR and AUMC] engaged in [sex] discrimination against [her]," id.    However, Kavianpour "completely fails to carry this initial burden, as the [a]mended [c]omplaint contains nothing more than conclusory statements that [s]he was subjected to [discrimination based on her sex]," and "the allegations in the [a]mended [c]omplaint [simply do not] present a 'convincing mosaic of circumstantial evidence' that [her sex] was ever a factor[.]" Nurse v. City of Alpharetta, CIVIL ACTION FILE NO. 1:17-CV-1689-TWT, 2018 WL 780613, at *5–6 (N.D. Ga. Feb. 7,

Although Kavianpour alleges that she was the only resident subjected to drug testing and that she complained about the timing of her drug tests and was subjected to more drug testing and subsequently suspended from her clinical privileges and then terminated from the residency program, [Doc. 29 ¶¶ 30-32, 43-49, 54-57, 61-65, 71, 77-79, 81, 83-84, 87, 103, 106-07, 210], these allegations do not show that she was being treated differently because of her sex, see Powell v. Am. Remediation & Env't, Inc., 61 F. Supp. 3d 1244, 1255 (S.D. Ala. 2014), aff'd, 618 F. App'x 974 (11th Cir. 2015) (per curiam) (unpublished) (citation omitted) (dismissing plaintiff's discrimination claim after finding that although defendants "may have acted unfairly," plaintiff "ha[d] shown no evidence of [his protected characteristic] being the motivating factor for his termination, or the presence of any discriminatory intent").  Instead, the amended complaint alleges that she was subjected to the drug tests due to her having tested positive on her pre-employment screening, that there was a belief that she regularly used marijuana for stress, and that she was arrested for a DUI during her tenure as a resident, as well as the fact that she was warned by Arnold that academic and clinical activity would not be an excuse for her not to appear for testing and that failure to abide by the policy could result in discharge, yet, she failed to appear during her next

2018), aff'd, 775 F. App'x 603 (11th Cir. 2019) (per curiam) (unpublished) (footnotes omitted).

scheduled window for testing after being given an accommodation of a later testing window from which the four hours would begin to run and was thereafter suspended and then terminated. [Doc. 29 ¶¶ 23-28, 30, 36-39, 61-64, 71-72, 77, 81-84, 87; Doc. 33-2 at 2]; see Heard v. Hannah, 51 F. Supp. 3d 1129, 1144 (N.D. Ala. 2014), adopted at 1133 (dismissing discrimination claim where the amended complaint "itself supplie[d] more than ample reason to think that [p]laintiff's termination was motivated by reasons that were not []based[ on a protected characteristic] and were lawful"). Indeed, Kavianpour has not alleged any facts to demonstrate that "unlawful [sex] discrimination was the reason for [any adverse action]," or asserted any other facts plausibly "tending to show that [sex-based] animus motivated [these defendants]." Enadeghe v. Ryla Teleservices, Inc., Civil Action File No. 1:08-CV-3551-TWT, 2010 WL 481210, at *7 (N.D. Ga. Feb. 3, 2010), adopted at *1.

"Although [Kavianpour's] allegations . . . may support a 'suspicion' or 'possibility' of misconduct, they do not raise 'a reasonable expectation that discovery would reveal evidence that these [d]efendants acted with [sexually]-discriminatory animus.'" Henley v. Turner Broad. Sys., Inc., 267 F. Supp. 3d 1341, 1354 (N.D. Ga. 2017) (citations omitted); see also Shapiro v. Howard Univ., Civil Action No. 18-cv-2588 (TSC), 2019 WL 4860876, at *13 (D.D.C. Sept. 30, 2019) (citation omitted) (finding plaintiff, a medical resident, failed to allege "facts

supporting an inference of discrimination arising from the employment actions of which she complain[ed]" where she alleged "no facts connecting the warning letters [or subsequent placement on probation] to her race, gender, religion or national origin," but simply relied "solely on her status as the 'only Caucasian, Jewish, American female' in the Family Medicine Residence Program"). Therefore, considering the entirety of allegations in the amended complaint, Kavianpour has not alleged sufficient facts to plausibly suggest that she was discriminated against based on her sex for any of the adverse actions allegedly taken by BOR and/or AUMC. See Mitchell v. City of Northport, 7:18-cv-01825-LSC, 2019 WL 3322634, at *5 (N.D. Ala. July 24, 2019) (citations omitted) (dismissing plaintiffs' discrimination claims because they had "not alleged sufficient facts to plausibly indicate that the alleged discrimination . . . that they allegedly suffered . . . was due to a protected characteristic").  Accordingly, it is **RECOMMENDED** that Kavianpour's Title VII discrimination claim asserted against BOR and AUMC in Count V of her amended complaint be **DISMISSED**.

### b.     § 1983 and Equal Protection Clause Discrimination Claims

In Count XIII of her amended complaint, Kavianpour alleges that defendants Arnold, Keel, Norton, and Sprouse, in their individual capacities, violated § 1983 and the Equal Protection Clause of the Fourteenth Amendment by discriminating against her on the basis of her sex by subjecting her to random drug

tests and terminating her from the residency program. [Doc. 29 ¶¶ 277-86]. These individual defendants "incorporate the arguments made by [] BOR concerning [Kavianpour's] failure to state a claim upon which relief can be granted," and argue that while she "alleges numerous allegations of wrongdoing against her by [them]," "in order for her to maintain them as constitutional violations, she would have to show that those actions were taken because of her gender" and she "fails to meet her burden as she has alleged actions taken, or not taken, related to males who are, as a matter of law, not similarly situated" and has failed "to establish a link between her gender and any of the actions alleged [to have been taken] by the individual defendants[.]" [Doc. 35 at 4-6 (footnote and citations omitted)].

In particular, the individual defendants assert that the "allegations against Norton and Arnold are devoid of any facts supporting the conclusion that their actions were motivated by Kavianpour's gender," that Keel "appears to be sued simply because he is the President of the university" and "issued a letter . . . reiterating the grievance panel's decision" without conducting "an independent investigation" or taking "any further action after receiving communication from [] Lott . . . that [Kavianpour] was subjected to the drug tests improperly," and that "missing are any 'facts' that would support the conclusion that Sprouse was motivated to take or refrain to take any action based on [her] gender." [Id. at 7-8 (citations omitted)]. In response, Kavianpour maintains that she has "satisfied the

pleading standard for her § 1983 claims brought against the institutional individuals responsible for effectuating her discrimination" by alleging that they "subjected her to working conditions to which they did not subject her male co-residents" and that "in undertaking the actions which violated [her] Equal Protection rights, [these d]efendants acted under color of state law." [Doc. 48 at 16-17 (citation omitted)].

"[T]he Equal Protection Clause requires government entities to treat similarly situated people alike," and "[a] violation of the Equal Protection Clause is not just that defendants treated a plaintiff differently than other persons; it requires that the differential treatment was motivated by an intent to discriminate." Whitaker v. Bd. of Regents of Univ. Sys. of Ga., CV 118-141, 2020 WL 4939118, at *6 (S.D. Ga. Aug. 24, 2020) (first alteration in original) (citations and internal marks omitted). "[T]he analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same." Johnson v. Fulton Cty., CIVIL ACTION FILE NO. 1:17-CV-03921-AT-WEJ, 2018 WL 2350172, at *12 (N.D. Ga. Apr. 12, 2018), adopted by 2018 WL 2336929, at *1 (N.D. Ga. May 23, 2018) (citation and internal marks omitted).[30]

---

[30] The individual defendants assert that claims against individuals under § 1983 "must meet a heightened pleading standard," [Doc. 35 at 5 (citation omitted)];

"Just as with [her] Title VII claim, [Kavianpour] makes a discriminatory . . .

claim under the Equal Protection Clause," however, the "[a]mended [c]omplaint

is devoid of any allegations showing that [the individual defendants] held a bias

against . . . [women] and thus discriminated against [Kavianpour] on that basis

with regard to the terms and conditions of [her] employment[ or her discharge]."

Id.  Indeed, as discussed, Kavianpour "has not alleged sufficient facts establishing

that she suffered an adverse employment [action] based on her gender," and "[t]he

Eleventh Circuit has made it clear that the designation of similarly situated

comparators is the preliminary step in Equal Protection analysis" as the "Equal

Protection Clause essentially requires that all similarly situated persons be treated

alike."  Cushmeer-Muhammad, 2009 WL 10665773, at *14 (emphasis, alteration,

citations, and internal marks omitted).  "Hence, to survive a motion to dismiss a §

1983 claim based on the Equal Protection Clause, a[n amended] complaint must

provide the necessary comparators in order to furnish discriminatory intent in the

absence of direct evidence of discriminatory animosity toward a protected class,"[31]

_____

however, "the standard set forth in *Iqbal/Twombly* applies to *all* federal civil
complaints, thus encompassing civil rights actions," and the "Eleventh Circuit has
held that in light of *Iqbal*, there is no heightened pleading requirements for actions
brought pursuant to § 1983," Beavers v. City of Atlanta, Civil Action File No. 1:13–
CV–3487–AJB, 2015 WL 1509485, at *3 (N.D. Ga. Mar. 31, 2015) (citations omitted).
[31] As previously explained, "[a] similarly situated comparator will have engaged
in the same basic conduct (or misconduct) as the plaintiff."  Whitaker, 2020 WL
4939118, at *7 (internal marks omitted) (quoting Lewis, 918 F.3d at 1227).

and here, Kavianpour's amended complaint "does not allege any direct evidence of a discriminatory motive under the standard required by the Eleventh Circuit," and it "does no more than make [] conclusory allegation[s] that she was treated differently from similarly situated employees." Id. at *14-15 (footnotes and citations omitted). "Conclusory assertions concerning bias and discriminatory intent are insufficient to establish gender bias at the pleading stage," but "[r]ather, [Kavianpour] must allege facts that support a plausible inference of bias and causation – for instance statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns or decision-making that also tend to show the influence of gender." Whitaker, 2020 WL 4939118, at *7 (citation and internal marks omitted). Because Kavianpour "points to no alleged facts that tend to show [her] sex motivated any defendants' action," her "Equal Protection Clause claim fails as a matter of law," id., and it is **RECOMMENDED** that Count XIII of her amended complaint asserted against Arnold, Keel, Norton, and Sprouse in their individual capacities be **DISMISSED**.

### 2.  *Kavianpour's Title VII Retaliation Claim*

In Count VII of her amended complaint, Kavianpour asserts a retaliation claim under Title VII against defendants BOR and AUMC. [Doc. 29 ¶¶ 221-28]. Specifically, Kavianpour alleges that she opposed "[d]efendants' illegal and discriminatory testing of her" and that she then "suffered the adverse action of

more stringent drug tests and, ultimately, suspension of her clinical privileges and termination of her contract." [Id. ¶ 223]. AUMC argues that Kavianpour's retaliation claim is due to be dismissed because she "did not complain of any 'protected activity' to AU or AUMC that would have put either entity on notice that she was opposing a practice made unlawful by Title VII." [Doc. 32-1 at 18 (citation omitted)]. Similarly, BOR argues that Kavianpour's "claim for Title VII retaliation [fails] because she has not plead facts to show that she engaged in statutorily protected expression," since she has only generally alleged that the "drug tests 'subjected her to adverse and disparate treatment'" and the email she sent only used "the words 'discriminatory' and 'harassment'" but did "not establish that she attributed any of her allegations to being discriminatory or harassing on the basis of her gender and in violation of Title VII[.]" [Doc. 34 at 10]. In response, Kavianpour contends that Lott's third-party investigation substantiated her internal complaints and put defendants on notice of the alleged discrimination. [Doc. 40 at 19; see also [Doc. 47 at 13-14]. AUMC replies that Kavianpour has failed to allege that any adverse actions occurred because of her sex "or that she complained of this to her employer" and that her "comments about [] Lott do not remedy this because [she] does not allege that [he] found that she was subjected to sex . . . discrimination," but rather, she has only "pled [] that [he] found that AU and/or AUMC did not follow internal policies in order to

substantiate [her] drug use," [Doc. 46 at 8 & n.2 (citation omitted)], and BOR replies that Kavianpour's "argument that she satisfies the protected activity hurdle because she reasonably believed she was being discriminated against is unavailing and does not save her claim," [Doc. 52 at 10].

"Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee 'because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997) (quoting 42 U.S.C. § 2000e-3(a)); see also Ray v. City of Tallahassee, 664 F. App'x 816, 818 (11th Cir. 2016) (per curiam) (unpublished) (citation omitted). "A *prima facie* case of retaliation under Title VII requires [Kavianpour] to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (citing Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001)); see also McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008) (citation omitted). AUMC and BOR argue that Kavianpour has failed to present a prima facie case of retaliation because she cannot show that she had an objectively reasonable belief

that the complained of discrimination actually violated Title VII. [Doc. 32-1 at 18-19; Doc. 34 at 10-12]. Although Kavianpour "need not plead a prima facie case to survive dismissal," the allegations in her amended complaint "must be sufficient to 'raise a right to relief above the speculative level[.]'" McCullough v. Bd. of Regents of Univ. Sys. of Ga., 623 F. App'x 980, 982 (11th Cir. 2015) (per curiam) (unpublished) (citations omitted); see also Woldeab v. DeKalb Cty. Sch. Dist., CIVIL ACTION FILE NO. 1:16-cv-1030-CAP-JKL, 2018 WL 10510815, at *6 (N.D. Ga. Nov. 6, 2018) (citations omitted).

In order to state a claim of retaliation under Title VII, Kavianpour must "show that [] she engaged in statutorily protected expression[.]" McShane v. U.S. Attorney Gen., 144 F. App'x 779, 788 (11th Cir. 2005) (per curiam) (unpublished) (citation omitted). "The Eleventh Circuit recognizes 'two forms of statutorily protected conduct' under Title VII." Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1308 (N.D. Ga. 2001) (quoting Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1350 (11th Cir. 1999)); see also Sherk v. Adesa Atlanta, LLC, 432 F. Supp. 2d 1358, 1369 (N.D. Ga. 2006), adopted at 1361 (citation omitted). "An employee is protected from discrimination if (1) [s]he has opposed any practice made an unlawful employment practice by [Title VII] (the opposition clause) or (2) [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII] (the participation clause)."

Hudson, 209 F. Supp. 2d at 1308 (citation and internal marks omitted); see also

Joseph v. Napolitano, 839 F. Supp. 2d 1324, 1335 (S.D. Fla. 2012) (citations omitted).

"[A] plaintiff must place the employer on notice that [s]he is complaining of

unlawful practices." Gerard v. Bd. of Regents of Ga., CIVIL ACTION NO. 1:07-

CV-00109-CC-RGV, 2008 WL 11407252, at *14 (N.D. Ga. July 31, 2008), adopted by

2008 WL 11407251, at *1 (N.D. Ga. Aug. 21, 2008), aff'd, 324 F. App'x 818 (11th Cir.

2009) (per curiam) (unpublished) (citation omitted). An "employee who seeks

protection under the opposition clause must have a 'good faith, reasonable belief'

that her employer has engaged in unlawful discrimination."[32] Clover, 176 F.3d at

1351 (citation omitted). "In contrast to claims made under the opposition clause,

there is no reasonable good faith belief requirement for claims under the

participation clause." Wesolowski v. Napolitano, 2 F. Supp. 3d 1318, 1345 (S.D.

Ga. 2014) (citation omitted); see also E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d

1171, 1175 (11th Cir. 2000) (citations omitted) (noting the "extreme level of

---

[32] "This means that [Kavianpour] must show that she 'subjectively believed that [the employer] engaged in unlawful discrimination and that h[er] belief was *objectively* reasonable in light of the facts and record present." Taylor v. Cardiovascular Specialists, P.C., 4 F. Supp. 3d 1374, 1378 (N.D. Ga. 2014) (last alteration in original) (citation and internal marks omitted). "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." Anduze v. Fla. Atl. Univ., 151 F. App'x 875, 878 (11th Cir. 2005) (per curiam) (unpublished) (citation and internal marks omitted).

protection" for protected activity under the participation clause, including "false statements," when compared to the protection afforded under the opposition clause). Kavianpour is proceeding under the opposition clause. See [Doc. 29 ¶¶ 57, 63, 65, 222-23].

The facts alleged in Kavianpour's amended complaint, when taken as true and construed in her favor, fail to state a plausible claim of retaliation under Title VII. Although Kavianpour alleges that she engaged in protected activity by complaining to Moore on December 13, 2018, that the drug tests "subjected her to adverse and disparate treatment" and to Arnold and Norton after Arnold's January 31, 2019, email that the drug tests were "clearly not random and quite frankly discriminatory" and constituted "harassment," [id. ¶¶ 57, 63, 65], and that shortly after these complaints, she was subjected to another drug test request that led to her suspension and subsequent termination, [id. ¶¶ 71-72, 74, 77, 81, 83-84], and "the employer's practice, which a plaintiff opposes does not in fact have to be unlawful . . . rather, the employee need only have a reasonable belief that the employer's practices are discriminatory," Danner v. Sumter Cty. Bd. of Educ., No. 7:12–CV–02391–RDP, 2013 WL 754956, at *4 (N.D. Ala. Feb. 26, 2013) (citations and internal marks omitted), Kavianpour's "complaints . . . do not constitute protected expression under Title VII," Cazeau v. Wells Fargo Bank, N.A., CIVIL ACTION FILE NO. 1:13-CV-0260-AT-JFK, 2014 WL 11444089, at *16 (N.D. Ga. May 29, 2014),

adopted by 2014 WL 11444090, at *2 (N.D. Ga. Sept. 25, 2014), aff'd, 614 F. App'x

972 (11th Cir. 2015) (per curiam) (unpublished) (footnote and citation omitted); see

also Mikell v. Marriott Int'l, Inc., 789 F. Supp. 2d 607, 619 (E.D. Pa. 2011) (footnote,

citation, and internal marks omitted) (finding neither of plaintiff's informal

complaints, which included a letter from plaintiff's lawyer referencing "illegal

discrimination in the workplace" constituted "protected activity for purposes of a

prima facie case of retaliation under Title VII" since "there [was] no mention of the

protected class in question"). Indeed, "[t]he onus is on the speaker to clarify to the

employer that [she] is complaining of unfair treatment due to [her] membership

in a protected class and that [she] is not complaining merely of unfair treatment

generally." Hernandez v. Premium Merch. Funding One, LLC, 19cv1727, 2020 WL

3962108, at *14 (S.D.N.Y. July 13, 2020) (alterations in original) (citations and

internal marks omitted) (dismissing plaintiff's retaliation claim where, among

other things, she failed to allege that she engaged in protected activity since "the

only allegation that [her] supervisors were aware of any alleged discriminatory

conduct [was] the conversation with [the] office manager in which [plaintiff]

reported 'on-going disparate treatment'").[33]

---

[33] Kavianpour's assertions regarding Lott's investigation and determination that
her complaints have merit, see [Doc. 40 at 19 (citation omitted)], do not save her
retaliation claim as her allegations in the amended complaint indicate that he
found that Kavianpour "made complaints about a hostile work environment" in

Kavianpour has failed to allege facts plausibly showing that she made any "complaints that suggested a belief that she was being discriminated against on the basis of any trait, protected or otherwise," and the "success of her claim would require [the Court] to endorse not only her belief that the law of Title VII is something other than what it is, but also her apparent belief that the definition of 'discrimination' is something other than what it is." <u>Kelly v. Howard I. Shapiro &</u>

---

January 2019 that were not timely investigated and that the drug testing policy was not properly applied or adhered to and Kavianpour therefore should not have been cited for violating it, [Doc. 29 ¶ 121], not that she complained of discrimination or retaliation under Title VII or attributed any of her allegations to being based on a protected characteristic under Title VII. Additionally, in her response to BOR's arguments, Kavianpour for the first time argues that she actually first opposed AU's drug testing policy in July 2018 when her residency contract was rescinded after she failed her pre-employment drug test and that a month later, she was then "subjected [] to a drug testing protocol that did not comply with applicable laws and policies," [Doc. 47 at 13 (citation omitted)]; however, her amended complaint simply alleges that she appealed Moore's decision to rescind her offer of employment after her positive drug screen in July of 2018 and petitioned for a retest after her confirmatory testing still detected the presence of marijuana but was below the threshold, which she was granted and was negative, and that she was then offered another employment contract, [Doc. 29 ¶¶ 23-29], not that she opposed any policy or "insisted upon proper [] testing procedures" as she contends, [Doc. 47 at 13 (citation omitted)], and she concedes that she "did not explicitly object to these tests as discriminatory until December 13, 2018," [<u>id.</u> (citation omitted)]. Furthermore, she alleges in her amended complaint that she "is a member of a protected class by virtue of her opposition to [d]efendants' illegal and discriminatory testing that violated Tile VII," [Doc. 29 ¶ 222], and to the extent she contends that she engaged in statutorily protected activity by objecting to the drug testing policy, she has failed to explain how such actions constitute protected activity under Title VII.

Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 17 (2d Cir. 2013). That is, "[a]lthough particular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint, neither are they sufficient to do so if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory," and "[n]othing in [Kavianpour's amended] complaint, however — not the accusations of [disparate treatment], nor the . . . [use] of the words 'discrimination' and 'harassment' — suggests that she did so" and "[b]ecause there is no indication that [Kavianpour] believed that her sex had anything to do with her treatment or that defendants could have understood her statements as such, she has failed to [state a claim] for retaliation under Title VII[.]" Id. (citations omitted). Thus, Kavianpour's factual assertions fail to satisfy the pleading standard required to establish that she engaged in statutorily protected activity.[34] See Brown v. City of Cincinnati, Case No. 1:18-cv-412, 2020 WL 3989169,

---

[34] Furthermore, Kavianpour has not shown that any of "the conduct at issue would objectively deter [one] from engaging in statutorily protected activity." Archibald v. United Parcel Serv. Co., 33 F. Supp. 3d 1301, 1321 (N.D. Ala. 2014), aff'd, 620 F. App'x 836 (11th Cir. 2015) (per curiam) (unpublished) (citation omitted). Although it "is an objective standard which does not focus on whether a plaintiff was actually deterred, [] a plaintiff's actions may serve as an example of what a reasonable person would have done." Wall-DeSousa v. Fla. Dep't of Highway Safety & Motor Vehicles, 691 F. App'x 584, 590 (11th Cir. 2017) (unpublished) (citation omitted). The fact that neither BOR nor AUMC's "actions . . . deter[red] [Kavianpour] from engaging in statutorily protected conduct," Archibald, 33 F. Supp. 3d at 1321 (citation omitted), as she alleges that she subsequently filed her charge of discrimination with the Equal Employment Opportunity Commission

at *9 (S.D. Ohio July 15, 2020) (citation and internal marks omitted) (granting defendants' motion to dismiss plaintiffs' retaliation claims under Title VII and other statutes where the allegations in plaintiffs' second amended complaint were insufficient to show that they engaged in protected activity under Title VII since "[c]omplaining about harassment in general terms without indicating a connection to a protected class or providing facts sufficient to create that inference [was] insufficient to constitute statutorily protected activity under Title VII"); see also Schultz v. City of Hapeville, CIVIL ACTION NO. 1:08-cv-3222-WSD-RGV, 2010 WL 11493296, at *11 (N.D. Ga. Jan. 15, 2010), adopted by 2010 WL 11493295, at *3 (N.D. Ga. Feb. 9, 2010). Accordingly, it is **RECOMMENDED** that Kavianpour's Title VII retaliation claim asserted in Count VII be **DISMISSED**.

---

on July 30, 2019, [Doc. 29 ¶ 15], lends support to the conclusion that the actions were not materially adverse as Kavianpour's "own conduct demonstrates that any reaction by [BOR and/or AUMC] to her complaints . . . did not dissuade her," Phillips v. City of Atlanta, CIVIL CASE NO. 1:15-cv-03616-TWT-RGV, 2016 WL 5429668, at *13 (N.D. Ga. July 29, 2016), adopted by 2016 WL 5394116, at *1 (N.D. Ga. Sept. 27, 2016) (second alteration in original) (footnote, citation, and internal marks omitted); see also Bush v. Regis Corp., 257 F. App'x 219, 222 (11th Cir. 2007) (per curiam) (unpublished); Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev., 974 F. Supp. 2d 240, 261 n.16 (S.D.N.Y. 2013), aff'd, 641 F. App'x 60 (2d Cir. 2016) (unpublished); Penn v. USF Holland, Inc., 770 F. Supp. 2d 1211, 1239 (N.D. Ala. 2010). Thus, the Court finds that there are simply "no facts alleged to support an inference that [any actions by BOR and/or AUMC] might have dissuaded a reasonable worker from making or supporting a charge of discrimination," Evans v. Atlanta Pub. Sch., CIVIL ACTION FILE NO. 1:15-cv-3652-TWT-CMS, 2016 WL 6824422, at *5 n.5 (N.D. Ga. Sept. 20, 2016), adopted by 2016 WL 6476826, at *1 (N.D. Ga. Nov. 1, 2016).

### 3.      *Kavianpour's Title VII Hostile Work Environment Claims*

Kavianpour asserts a hostile work environment claim against BOR and AUMC in Count VI of her amended complaint, alleging that she is a member of a protected class based on her sex and that the "adverse action of monthly drug tests . . . were humiliating and intrusive and caused a material interference with the terms and conditions of her employment" that "[s]imilarly-situated residents outside [her] protected class were not subject to[.]"  [Doc. 29 ¶¶ 214-20].  In Count VII, Kavianpour also asserts a retaliatory hostile work environment claim against BOR and AUMC.  [Id. ¶ 225].  AUMC argues that Kavianpour's sexually hostile work environment claim fails for the same reason as her Title VII sex discrimination claim, see [Doc. 32-1 at 7], and BOR argues that Kavianpour has failed to plausibly allege a retaliatory hostile work environment claim, see [Doc. 34 at 12-13].  Specifically, BOR asserts that she has failed to show that she engaged in statutorily protected activity, "failed to allege facts that any action taken . . . was not the continuation of a process that had started long prior to any complaints made by [her]," failed to show that continuing with the drug tests after she complained would dissuade another individual in her position from making a complaint, and failed "to show that her termination of her employment as a resident was causally connected to any alleged complaint."  [Id.].  Kavianpour

responds that she has sufficiently stated a claim for retaliatory hostile work environment. [Doc. 47 at 15-16].

"To establish a hostile work environment claim under . . . [Title VII], an employee (or former employee) must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [her] employment.'" Bryant v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009) (citation omitted). "Although [Kavianpour] need not plead a *prima facie* case of hostile work environment in the [amended] complaint,"[35] McKeithan v. Boarman, 803 F. Supp. 2d 63, 69 (D.D.C. 2011), aff'd in part, No. 11-5247, 2012 WL 1450565 (D.C. Cir. Apr. 12, 2012) (per curiam), and aff'd sub nom. McKeithan v. Vance-Cooks, 498 F. App'x 47 (D.C. Cir. 2013) (per curiam) (unpublished) (citation omitted); see also Henderson, 436 F. App'x at 937 (citation omitted), she must still plead sufficient facts to show that her work environment was "permeated with discriminatory intimidation, ridicule, and insult," that was

---

[35] In order to state a prima facie case of a hostile work environment based on sex, Kavianpour must show: (1) that she belongs to a protected group, (2) that she was subjected to unwelcome harassment, (3) that the harassment was based on her sex, (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) that there is a basis for holding BOR and AUMC liable. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (citation omitted); see also Harper v. ULTA Salon Cosmetics & Fragrance, Inc., Civil Action File No. 1:05-CV-1285-TWT, 2007 WL 528088, at *25 (N.D. Ga. Feb. 13, 2007), adopted at *1 (citation omitted).

"sufficiently severe or pervasive" to have altered the terms, conditions, or privileges of her employment, see Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations and internal marks omitted); Miller, 277 F.3d at 1275 (citation omitted).

Kavianpour has failed to state a plausible claim of hostile work environment based on her sex since, as discussed with respect to her Title VII sex discrimination claim, she has not alleged any facts that reasonably support an inference that BOR or AUMC engaged in any conduct about which she complains on the basis of her sex. "[T]he 'hallmarks' of a sexually hostile work environment claim [include] overt requests for sexual favors, lewd remarks or sexual comments about [the plaintiff's] body or clothing, jokes of a sexual nature, or display of sexually oriented material," Lints v. Graco Fluid Handling (A) Inc., 347 F. Supp. 3d 990, 1003 (D. Utah 2018) (alterations in original) (footnote and internal marks omitted), but the only allegations of harassment in Kavianpour's amended complaint pertain to the monthly drug tests to which she was subjected, [Doc. 29 ¶ 216]. Because her claim that she was harassed "because of her gender is mere speculation based solely upon her own subjective belief that she was treated differently because she was a woman, . . . [her allegations do] not meet the threshold to establish a hostile work environment claim for sexual harassment." Henderson v. Leroy Hill Coffee Co., No. Civ.A. 99–1067CBS, 2001 WL 103147, at *9 (S.D. Ala. Jan. 30, 2001). Thus, it is **RECOMMENDED** that Kavianpour's

sexually hostile work environment claim asserted in Count VI of her amended complaint be **DISMISSED**. See Edwards v. Prime, Inc., 602 F.3d 1276, 1301 (11th Cir. 2010).

"In recent years, the Eleventh Circuit has recognized a cause of action for retaliatory hostile work environment," Monaghan v. WorldPay US, Inc., Civil Action No. 1:16–CV–0760–CC–LTW, 2017 WL 6348640, at *15 (N.D. Ga. Aug. 18, 2017), adopted by 2017 WL 6350597, at *8 (N.D. Ga. Sept. 27, 2017), rev'd, 955 F.3d 855 (11th Cir. 2020) (per curiam) (citation omitted), and in order to state such a claim, Kavianpour must show:

> (1) she engaged in protected activity; (2) after doing so, she was subjected to unwelcome harassment; (3) her protected activity was a but for cause of the harassment; (4) the harassment was such that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination; and (5) a basis exists for holding her employer liable, either directly or vicariously.

Fortner v. Brennan, Case No.: 2:19-cv-01409-JHE, 2020 WL 4904190, at *4 (N.D. Ala. Aug. 20, 2020) (citations omitted); see also Monaghan, 955 F.3d at 862. Kavianpour must also show that "a basis exists for holding her employer liable either directly or vicariously." Windham v. Barr, CIVIL ACTION NO. 5:16-cv-83, 2019 WL 1412119, at *15 (S.D. Ga. Mar. 28, 2019) (citation and internal marks omitted). Although Kavianpour is not required to plead facts that establish a *prima facie* case, her retaliatory hostile work environment allegations, which include that she

"opposed [] illegal and discriminatory personnel actions" and was then subjected

to "suspension and termination and specifically suffered increased scrutiny with

artificially low and negative evaluations in an attempt to build a file on her," [Doc.

29 ¶ 225], viewed objectively, are insufficient to show that the conduct about which

she complains "well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination," Burlington N. & Santa Fe Ry. Co. v. White,

548 U.S. 53, 68 (2006) (citation and internal marks omitted); see also Williams-

Evans v. Advance Auto Parts, No. 20-10746, 2021 WL 61610, at *4 (11th Cir. Jan. 7,

2021) (per curiam) (unpublished). Indeed, Kavianpour's factual allegations show

that after she first complained on December 13, 2018, about the timing of the drug

tests subjecting her to adverse and disparate treatment, among other things, and

offered to be available for "voluntary daily drug testing" if it was in the afternoon

and did not interfere with her responsibilities, she was asked to submit to one

more drug test while she was off-duty, but she failed to appear as she was resting

after a 28-hour hospital shift, and thereafter, she again voiced her alleged

opposition to the manner and means of the drug testing practices in a response to

Arnold's January 31, 2019, email to her explaining that she was subject to AU and

AUMC's drug testing policies, that academic and clinical activities were not an

excuse for her failure to comply, and that refusal to participate or to complete any

step of the testing process would result in discharge, after which she was only

asked to submit to one more drug test, which she again failed to appear for after being accommodated with a later testing window, prior to her suspension and subsequent termination on February 21, 2019. [Doc. 29 ¶¶ 57, 59, 61, 63, 65, 71-74, 81, 83-84; Doc. 33-2 at 2]; see also Thomas v. Securiguard Inc., 412 F. Supp. 3d 62, 92 (D.D.C. 2019) (citation omitted) ("The scope of a . . . retaliatory hostile work environment claim would exclude actions that bear no relation to plaintiff's protected activity."). Despite Kavianpour's contention that she has stated a plausible claim for retaliatory hostile work environment, [Doc. 47 at 15-16], she "does not allege threats, yelling, humiliation or physical intimidation, foul language, or the various other hallmarks of a hostile work environment," Joseph, 2020 WL 6494202, at *7 (citation omitted), but instead, she has simply alleged "a continuation of the harassment to which [s]he had already been subjected" and "[i]n order to support an inference of causation, [she] must show that something changed following [her] complaints—that the harassment was 'ratcheted up after [s]he spoke out," Carter v. Dart, 262 F. Supp. 3d 713, 726 (N.D. Ill. 2017) (citation omitted); see also Batson v. Powell, 912 F. Supp. 565, 576 (D.D.C. 1996), aff'd, 203 F.3d 51 (D.C. Cir. 1999) (unpublished) (dismissing plaintiffs' retaliatory hostile work environment claim since an "inference of causation [was] improper under the[] facts" where the "same alleged 'harassment' and 'hostile work environment' existed prior to plaintiffs' engaging in the protected activity"). That is, "[i]f . . . the

discrimination was just as bad before the employee complained as it was afterwards, then the employee's complaints cannot be said to have led to that discriminatory behavior." Borrello v. Dep't of Corr. & Cmty. Supervision, 17-CV-00919 (JLS)(JJM), 2020 WL 4928312, at *15 (W.D.N.Y. Mar. 11, 2020), adopted by 2020 WL 4926515, at *2 (W.D.N.Y. Aug. 21, 2020) (citation and internal marks omitted).

Moreover, Kavianpour's conclusory allegations of "increased scrutiny with artificially low and negative evaluations in an attempt to build a file on her," [Doc. 29 ¶ 225], without providing any factual support that these "acts occurred with any sort of regularity or were more than a few [discrete and] isolated incidents of harassment," Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1320 (N.D. Ga. 2009), adopted at 1290 (citation and internal marks omitted), are generally insufficient to establish a hostile work environment claim, and she has failed to show that they were "sufficiently continuous and concerted to have altered the conditions of [her] employment" to a point that "might dissuade a reasonable worker from reporting activity," Ley v. Dep't of Corr. & Cmty. Supervision, 17-CV-00918 (JLS) (JJM), 2020 WL 4928208, at *16 (W.D.N.Y. Mar. 11, 2020), adopted by 2020 WL 4926549, at *2 (W.D.N.Y. Aug. 21, 2020) (alteration in original) (citation and internal marks omitted); see also Haggood v. Rubin & Rothman, LLC, No. 14–cv–34L (SJF)(AKT), 2014 WL 6473527, at *20 (E.D.N.Y. Nov. 17, 2014) (citations

omitted) (finding "excessive scrutiny or criticism of the plaintiff's performance" insufficient to support a claim for hostile work environment). In fact, these allegations largely "amount to nothing more than the ordinary tribulation[s] of the workplace that [are] not actionable." Phillips v. City of Atlanta, CIVIL CASE NO. 1:14-cv-00680-TWT-RGV, 2016 WL 5429666, at *16 n.39 (N.D. Ga. July 29, 2016), adopted by 2016 WL 5394089, at *1 (N.D. Ga. Sept. 27, 2016) (second and third alterations in original) (citations and internal marks omitted). Accordingly, even assuming that Kavianpour experienced some incidents of unwelcome harassment, she has failed to allege any facts to plausibly show "that the mistreatment she endured might have dissuaded a reasonable worker from making or supporting a charge," and "in light of the[] context, [these incidents] are not enough to show a retaliatory hostile work environment." Williams-Evans, 2021 WL 61610, at *4 (citation and internal marks omitted). "All in all, the allegations as pled in [Kavianpour's] [a]mended [c]omplaint are simply insufficient to establish . . . a hostile work environment claim." Barreth v. Reyes 1, Inc., CIVIL ACTION NO. 5:19-cv-00320-TES, 2020 WL 4370137, at *7 (M.D. Ga. July 29, 2020). Accordingly, it is **RECOMMENDED** that Kavianpour's Title VII retaliatory hostile work environment claim asserted in Count VII be **DISMISSED**.

### 4. *Kavianpour's ADA & Rehabilitation Act Claims*

The ADA "is comprehensive legislation which addresses discrimination against disabled individuals" in "three sections: Title I regulates discrimination in the workplace; Title II prohibits discrimination by public entities; and Title III prohibits discrimination by private entities in places of public accommodation." Gathright-Dietrich v. Atlanta Landmarks, Inc., 435 F. Supp. 2d 1217, 1223 (N.D. Ga. 2005), aff'd, 452 F.3d 1269 (11th Cir. 2006). In Counts VIII and IX of her amended complaint, Kavianpour asserts claims for disability discrimination and retaliation against BOR and AUMC pursuant to Title I of the ADA, 42 U.S.C. § 12112, alleging that these defendants "erroneously regarding her as having the disability of a substance abuse disorder"; that she suffered the adverse actions of "selective random drug tests and an arbitrary, illegal and discriminatory testing protocol," the "suspension of her clinical privileges and termination for the disability that she was regarded as having and because of [d]efendants refusal to accommodate," and that defendants "interfered with the exercise and enjoyment of [her] ADA rights by ignoring her request for an [] interactive process"; and that she was retaliated against for objecting "to the illegal manner in which [d]efendant[s] performed the[ drug] tests," as well as for objecting "to the illegal and retaliatory suspension of her clinical privileges and termination[.]" [Doc. 29 ¶¶ 229-47]. Kavianpour also asserts a disability discrimination claim against BOR

and AUMC pursuant to Title III of the ADA, 42 U.S.C. § 12182, in Count X of her amended complaint. [Id. ¶¶ 248-56].[36] Finally, Kavianpour asserts a claim under the Rehabilitation Act against BOR and AUMC in Count XII, alleging that she "is a qualified individual with the disability of chronic kidney disease, and, at all

---

[36] AUMC asserts that although Kavianpour "makes allegations under Title III of the ADA, [it] [] is completely inapplicable" under the facts of this case. [Doc. 32-1 at 15 n.5]. Despite Kavianpour's arguments to the contrary, see [Doc. 40 at 16 n. 9], the Court agrees with AUMC. Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Kavianpour alleges that she was employed by both AU and AUMC, see [Doc. 29 ¶ 5], and "[t]erms and conditions of employment are covered under Title I, not Title III," as "Congress sought to regulate disability discrimination in the area of employment exclusively through Title I, notwithstanding the broad language of Title III," Kortyna v. Lafayette Coll., 47 F. Supp. 3d 225, 234 (E.D. Pa. 2014) (citations and internal marks omitted); see also Neisler v. Tuckwell, 807 F.3d 225, 228 (7th Cir. 2015) (citations omitted) (explaining that Title III of the ADA "prohibits discrimination by places of public accommodation" and "does not cover claims of employment discrimination"); Doohan v. Doohan, No. 4:09–CV–20 (CDL), 2010 WL 3123080, at *1 n.2 (M.D. Ga. Aug. 9, 2010) ("Because [p]laintiff makes no allegations related to employment, against a governmental entity, or for retaliation, the Court considers [p]laintiff's allegations under Ti[t]le III of the ADA."). In short, Kavianpour's "factual allegations, taken as true, fail to establish that [she is] entitled to relief under Title III of the ADA," Jones v. Nat. Essentials, Inc., CASE NO. 5:16-cv-93, 2017 WL 1133945, at *7 (N.D. Ohio Mar. 27, 2017), aff'd, 740 F. App'x 489 (6th Cir. 2018) (unpublished), and it is **RECOMMENDED** that her Title III ADA disability discrimination claim asserted in Count X be **DISMISSED**, see Schultz v. Alticor/Amway Corp., 177 F. Supp. 2d 674, 679 (W.D. Mich. 2001), aff'd, 43 F. App'x 797 (6th Cir. 2002) (unpublished) ("Title III does not apply to discrimination suits brought by employees against their employers for claims arising out of employment.").

relevant times, was regarded by [d]efendants as having the perceived disability of a substance abuse disorder" and that she suffered adverse actions of "targeted drug tests" and the "suspension of clinical activities and termination." [Id. ¶¶ 268-76].

"The ADA prohibits discrimination 'against a qualified individual on the basis of disability' in any of the 'terms, conditions, and privileges of employment.'" Plummer v. Hous. Auth. of Columbus, CASE NO. 4:18-CV-32 (CDL), 2018 WL 3520677, at *4 (M.D. Ga. July 20, 2018) (quoting 42 U.S.C. § 12112(a)).[37] "So, to state a discrimination claim under the ADA, [Kavianpour] must demonstrate that 'she had a disability, she was a qualified individual, and she was subjected to unlawful discrimination because of her disability.'"[38] Id. (quoting U.S. Equal Emp. Opportunity Comm'n v. St. Joseph's Hosp., Inc., 842

---

[37] Similarly, "[s]ection 504 of the Rehabilitation Act prohibits any program or activity receiving federal financial assistance from discriminating against an otherwise qualified person based solely by reason of her . . . disability[.]" Mimbs v. Spalding Cty. Sch. Dist., CIVIL CASE NO. 3:17-cv-00032-TCB-RGV, 2018 WL 7348863, at *16 (N.D. Ga. Dec. 21, 2018) (second alteration in original) (citation and internal marks omitted).

[38] "Unlawful discrimination can occur when an employer fails to provide a reasonable accommodation to an otherwise qualified person unless doing so would impose an undue hardship on the employer." Laun v. Bd. of Regents of Univ. Sys. of Ga., CV 118-033, 2019 WL 4694940, at *7 (S.D. Ga. Sept. 25, 2019) (citation and internal marks omitted).

F.3d 1333, 1343 (11th Cir. 2016)). And, "[u]nder the ADA's anti-retaliation provision, '[n]o person shall discriminate against an individual because such individual has opposed any act or practice made unlawful by this chapter.'" Zainulabeddin v. Univ. of S. Fla. Bd. of Trs., 749 F. App'x 776, 782 (11th Cir. 2018) (per curiam) (unpublished) (second alteration in original) (quoting 42 U.S.C. § 12203(a)). "To state a *prima facie* case of retaliation under the ADA, [Kavianpour] must show that (1) [s]he engaged in statutorily protected conduct; (2) [s]he suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action."[39] Upton v. Day & Zimmerman NPS, Civil Action Number 2:15-cv-02131-AKK, 2018 WL 465979, at *6 (N.D. Ala. Jan. 18, 2018) (citing Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 798 (11th Cir. 2000)); see also Albra v. City of Fort Lauderdale, 232 F. App'x 885, 891 (11th Cir. 2007) (per curiam) (unpublished) (citation

---

[39] "And[,] disability retaliation claims require [Kavianpour] to meet the heightened 'but-for' causation standard." Leone v. All. Foods, Inc., No. 8:14-cv-800-T-27TBM, 2015 WL 4879406, at *8 (M.D. Fla. Aug. 14, 2015) (citations omitted) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)); see also Frazier-White v. Gee, 818 F.3d 1249, 1258 (11th Cir. 2016) (citation omitted); Gary v. City of Warner Robins, CIVIL ACTION No. 5:16-CV-151 (TES), 2018 WL 3825220, at *12 (M.D. Ga. Aug. 10, 2018).

omitted); <u>Edwards v. Gwinnett Cty. Sch. Dist.</u>, 977 F. Supp. 2d 1322, 1329 (N.D. Ga. 2013) (citation omitted).[40]

### a. ADA & Rehabilitation Act Discrimination Claims

AUMC moves to dismiss Kavianpour's Title I ADA discrimination claims because it contends that her "factual allegations show that she was not a protected employee under the ADA." [Doc. 32-1 at 15 (footnote omitted)]. In particular, AUMC argues that the ADA "does not protect employees or job applicants who have recently tested positive for drug use" and her "allegations demonstrate that she tested positive for drug use in her pre-employment drug screen" and was therefore "reasonably viewed . . . as a 'current drug user'" under the ADA. [Id. at 16-17, 19 (citations omitted)]. BOR similarly moves for dismissal of Kavianpour's Title I ADA discrimination claims, pointing out that based on Kavianpour's "initial positive test in July, 2018," her "diluted test sample in October, 2018," and

---

[40] "Discrimination [and retaliation] claims under the Rehabilitation Act are governed by the same standards used in ADA cases[.]" <u>Cash v. Smith</u>, 231 F.3d 1301, 1305 (11th Cir. 2000) (citation omitted); <u>see also Goldberg v. Fla. Int'l Univ.</u>, No. 20-11462, 2020 WL 7703136, at *4 (11th Cir. Dec. 29, 2020) (per curiam) (unpublished) (citation omitted); <u>Schandolph v. Bd. of Regents of Univ. Sys. of Ga.</u>, CASE NO. CV417-247, 2019 WL 6041071, at *10 n.4 (S.D. Ga. Nov. 13, 2019) (citations omitted) ("The standard for determining liability under the Rehabilitation Act is the same as that under the ADA and cases involving the ADA are precedent for those involving the Rehabilitation Act."); <u>McNeal v. Duval Cty. Sch. Bd.</u>, No. 3:11-cv-00498-J-32MCR, 2011 WL 6010293, at *2 (M.D. Fla. Dec. 1, 2011) (quoting <u>Albra</u>, 232 F. App'x at 891) ("'[T]he prima facie case for retaliation under the Rehabilitation Act is the same as that under the ADA.'").

"her arrest and charge of DUI in November, 2018," it was "justified in [its] reasonable continued belief that [she] may continue to have a substance abuse problem and [was] justified in requiring her to continue the testing." [Doc. 34 at 18-20 (citations omitted)]. AUMC also contends that Kavianpour has pled herself out of her amended complaint by alleging that "she was suspended from the hospital and later terminated for failure to comply with the drug testing policies" since the ADA "only protect[ed] [her] if she was terminated because she had or was perceived as having a disability." [Doc. 32-1 at 17 (citation omitted)]. Finally, AUMC asserts that because claims under the Rehabilitation Act are governed by the same standards as those under the ADA, Kavianpour's Rehabilitation Act claim asserted in Count XII fails for the same reasons as her ADA discrimination claims and because she has "not plead a single fact to show that she was somehow discriminated against based on chronic kidney disease[.]" [Id. at 17-18 (citation omitted)].

Kavianpour alleges that BOR and AUMC subjected her to discriminatory drug testing protocols, suspended her clinical privileges, and terminated her residency in violation of the ADA and the Rehabilitation Act because they erroneously perceived her as suffering from the disability of a substance abuse disorder. [Doc. 29 ¶¶ 229-37, 268-76]. The ADA provides that "a qualified individual with a disability shall not include any employee or applicant who is

currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a). However, it also provides that "[n]othing in subsection (a) shall be construed to exclude as a qualified individual with a disability an individual who . . . is erroneously regarded as engaging in such use, but is not engaging in such use," "except that it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs."[41] Id. § 12114(b)(3). Thus, while "a current drug user is precluded from relying upon the protections of the ADA, an employee who is erroneously regarded as engaging in such use, but is not engaging in such use is not so

---

[41] Subparagraphs (1) and (2) provide that a qualified individual with a disability includes an individual who "has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or had otherwise been rehabilitated successfully and is no longer engaging in such use" or is "participating in a supervised rehabilitation program and is no longer engaging in such use[.]" 42 U.S.C. § 12114(b)(1)-(2). The ADA further provides that "it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs." Id. § 12114(b).

precluded." Hill v. Hamilton Cty. Pub. Hosp., 71 F. Supp. 2d 936, 950 (N.D. Iowa 1999) (citations and internal marks omitted).[42]

The ADA and the Rehabilitation Act do "not define 'currently engaging' and the Eleventh Circuit has not addressed the phrase's meaning," but "[o]ther circuit courts have held that the statute[s] do[] not lend [themselves] to a bright-line rule, instead concluding that the proper test is whether the drug use was sufficiently recent to justify the employer's reasonable belief that the drug abuse remained an ongoing problem." Martin v. Estero Fire Rescue, No. 2:13–cv–393–FtM–29DNF, 2014 WL 2772339, at *3 (M.D. Fla. June 18, 2014) (citations and internal marks omitted); see also Mauerhan v. Wagner Corp., 649 F.3d 1180, 1187 (10th Cir. 2011) (citation omitted); Vedernikov v. W. Va. Univ., 55 F. Supp. 2d 518-19, 521, 523 (N.D. W. Va. 1999) (finding plaintiff, an anesthesiology resident, did not fall under the protection of the ADA even though he was not a current drug user from the

---

[42] The Rehabilitation Act similarly "excludes an individual who is currently engaging in the illegal use of drugs" as an "individual with a disability" and also provides "a safe harbor provision" and "an exception to th[e] safe harbor provision which states that it shall not be a violation for a covered entity to adopt or administer reasonable policies, including but not limited to drug testing, designed to ensure that an individual is no longer engaging in the illegal use of drugs." Daniels v. City of Tampa, No. 8:09–CV–1151T33AEP, 2010 WL 1837796, at *2 (M.D. Fla. Apr. 12, 2010), adopted by 2010 WL 1837802, at *1 (M.D. Fla. May 4, 2010) (alterations, citations, and internal marks omitted) (quoting 29 U.S.C. §§ 705(20)(C)(i)-(ii)).

time of his admission for treatment to the time of his discharge, since he tested

positive for the use of drugs and admitted to others that while he was not abusing

drugs, he had used fentanyl for experimental purposes, and "[t]hus, under ADA

regulations, [he could] be considered as actively engaged in the use of illegal

drugs"); Figueroa v. Fajardo, 1 F. Supp. 2d 117, 120-21 (D.P.R. 1998) (citations and

internal marks omitted) (explaining that "current illegal use" was "not limited to

the use of drugs on the day of, or within a matter of days or weeks before, the

employment action in question," but that it applied to an individual "whose illegal

use of drugs occurred recently enough to justify a reasonable belief that a person's

drug use [was] current"; that "ADA protection [was] limited to persons who ha[d]

refrained from using drugs for some time" and that at least one court had found

that a seven-week drug-free period was not long enough to be protected; and that

"[a] person who tests positive for illegal use of drugs is not entitled to the

protection that may be available to former users who ha[d] been or [were] in

rehabilitation"). "In the employment context, currently engaging in the illegal use

of drugs is defined by reference to the employer's perspective," and "current use

of illegal drugs includes that which bears a temporal relationship to the

employment action such that an employer may reasonably conclude at the time of

the employment action that illegal drug use is an ongoing problem." Lott v.

Thomas Jefferson Univ., CIVIL ACTION NO. 18-4000, 2020 WL 6131165, at *6 (E.D.

Pa. Oct. 19, 2020) (citations and internal marks omitted).

The arguments for dismissal advanced by AUMC and BOR fall short at this

stage of the litigation because "on the current state of the record[,] the Court cannot

conclude as a matter of law that [their] belief was reasonable, and that

[Kavianpour] was 'currently engaging [in] the illegal use of drugs' at the time of

[her] termination." Id. While the positive results for THC on Kavianpour's pre-

employment drug test in June 2018 provided a reasonable basis to require drug

testing for a period of time thereafter and "could potentially disqualify [her] from

the ADA's protections,"[43] Martin, 2014 WL 2772339, at *3; see also [Doc. 29 ¶ 23],

---

[43] Although Kavianpour argues that her "first drug test was not 'positive'" because "[a]fter a properly performed confirmatory test, she tested negative" and under the "Federal Testing Guidelines . . . .[, i]f the confirmatory test is negative, the positive initial test is not reported," [Doc. 47 at 4, 21 (citations and internal marks omitted)], her reliance on these guidelines is misplaced as they were developed in order to "[e]stablish comprehensive standards for all aspects of laboratory drug testing and laboratory procedures to be applied," to "[s]pecify the drugs for which [f]ederal employees may be tested; and [to e]stablish appropriate standards and procedures for periodic review of laboratories and criteria for certification and revocation of laboratories to perform drug testing," Mandatory Guidelines for Federal Workplace Drug Testing Programs, 53 Fed. Reg. 11970-01, 1988 WL 280386 (Apr. 11, 1988), but "even when a lab is certified to provide testing services for federal government agencies under [these guidelines]," they do not "govern a laboratory's duties to private employers" and "[t]his Court is not required to accept [Kavianpour's] unsupported and unreasonable interpretation of the [g]uidelines," Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 713 F. Supp.

the allegations of the amended complaint that she tested negative thereafter and on every random drug test that she took over several subsequent months, that she denied any drug use when confronted with rumors of her marijuana use for stress but was referred to substance abuse treatment,[44] and that "Coule and multiple other physicians testified [at her grievance hearing] that [she] never had any performance issues or displayed signs of impairment," [Doc. 29 ¶¶ 28, 36-41, 43-47, 49, 56, 101], "make it plausible that [s]he was not 'currently engaging' in the use of drugs at the time of [her] termination," Martin, 2014 WL 2772339, at *3; see also Jones v. Corr. Corp. of Am., 993 F. Supp. 1384-85, 1387 (D. Kan. 1998) (citation

_____

2d 527, 542-43 (W.D.N.C. 2010) (citations and internal marks omitted). Thus, Kavianpour's contention in this regard is without merit.

[44] Kavianpour alleges that BOR and AUMC "erroneously regarded her as having the disability of a substance abuse disorder" and that they referred her to GA PHP, a program "designed for physicians with substance abuse disorders," after meeting with her to discuss the rumor about her marijuana use. [Doc. 29 ¶¶ 36-40, 250]. "Before the [2008] amendments, [Kavianpour] had to show that . . . she was regarded as having an impairment that substantially limited a major life activity," but now, she "must [] only demonstrate that . . . she was subjected to an action prohibited by the ADA because of actual or perceived physical or mental impairment, regardless of whether the impairment limits or is perceived to limit a major life activity." Gordon v. Swift Transp. Servs., LLC, CIVIL ACTION NO. 5:19-cv-00117-TBR, 2020 WL 1668275, at *2 (W.D. Ky. Apr. 3, 2020) (first alteration in original) (citation and internal marks omitted). That is, "[i]t is not enough that the employer is simply aware of a plaintiff's symptoms; rather the plaintiff must show that the employer regarded the individual as 'impaired' within the meaning of the ADA," and to do so, "an employee need only show that [her] employer believed [she] had a physical or mental impairment, as that term is defined in federal regulations." Id. (citation and internal marks omitted).

omitted) (finding "plaintiff's complaint sufficiently . . . present[ed] a prima facie case of disability discrimination under the ADA" where he alleged that defendants erroneously believed that he was addicted to drugs since they demanded that he enter drug treatment as a condition of his continued employment based on a positive result for marijuana use on a random drug test, which he asserted was mishandled and then refuted with his own negative drug screen from a private physician, and then terminated him because of his positive urinalysis and his refusal to enter drug treatment, which "relate[d] directly to defendants' belief that [plaintiff] was using illegal drugs," but "[a]n employee cannot be required to accept an unnecessary accommodation" and "the termination of an employee because of his refusal to accept an unnecessary accommodation [was] in violation of the ADA"). In short, "[a]t this juncture of the case, [the Court is] not called on to determine whether [Kavianpour] will ultimately prevail; [but] simply [finds] that [s]he has stated a claim." Jones, 993 F. Supp. at 1387 (citation omitted).[45]

---

[45] Kavianpour's Rehabilitation Act claim differs slightly from her discrimination claim under the ADA as it alleges that she was a "*qualified individual with the disability of chronic kidney disease*, and at all relevant times, was regarded by [d]efendants as having the perceived disability of a substance abuse disorder." [Doc. 29 ¶ 270 (emphasis added)]. However, the only allegations in her amended complaint with regard to her chronic kidney disease are that when her drug test results came back diluted in October 2018, she explained that it was because she had chronic kidney disease for which she received treatment and had a doctor's note from September 2018 to drink three liters of water daily. See [id. ¶¶ 44-46]. To the extent Kavianpour intended to assert a claim based on her alleged chronic

Accordingly, it is **RECOMMENDED** that BOR and AUMC's motions to dismiss Kavianpour's discrimination claims asserted under the ADA and the Rehabilitation Act in Counts VIII and XII be **DENIED**.

### b.    ADA Retaliation Claim

Kavianpour also asserts a retaliation claim under Title I of the ADA.  [Doc. 29 ¶¶ 238-47].  However, "[u]nlike [ Kavianpour's] disability discrimination claim, to prove retaliation under the ADA[], [Kavianpour] does not need to establish that she was 'disabled' as that term is defined in the Act."  Vaughan v. World Changers Church Int'l, Inc., Civil Action No. 1:13–CV–0746–AT, 2014 WL 4978439, at *12 (N.D. Ga. Sept. 16, 2014) (citations omitted); see also Scoggins v. Floyd Healthcare Mgmt. Inc., CIVIL ACTION FILE NO. 4:14-CV-00274-HLM-WEJ, 2016 WL 11544774, at *25 n.65 (N.D. Ga. June 10, 2016), adopted by 2016 WL 11544908, at *30 (N.D. Ga. Aug. 30, 2016) (first alteration in original) (citations and internal

---

kidney disease, she has failed to state a plausible claim based on the facts alleged in her amended complaint.  Indeed, "it is not sufficient simply to cite to [] health problems and an adverse employment result," Marsh v. Ga. Dep't of Behavioral & Health Dev. Disabilities, No. CV410–273, 2011 WL 806423, at *1 (S.D. Ga. Feb. 14, 2011), adopted by 2011 WL 806658, at *1 (S.D. Ga. Mar. 2, 2011) (citation omitted), but she "must [] plausibly allege that . . . her . . . alleged ailment[] constitutes a physical or mental impairment that substantially limits a major life activity," Shine v. N.Y. City Hous. Auth., No. 19-cv-04347 (RA), 2020 WL 5604048, at *4 (S.D.N.Y. Sept. 18, 2020), and here, while Kavianpour has alleged an impairment that "may well rise to the level of [a] cognizable disabilit[y], she has failed to allege sufficient detail with respect to how her impairment[] substantially limit[s] one or more major life activities," id., at *5.

marks omitted) (noting that "[i]n contrast to an ADA discrimination claim, a plaintiff bringing an ADA retaliation claim need not demonstrate that [s]he has a disability," since "[b]y its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA"). "Instead, to successfully allege a prima facie retaliation claim under . . . the ADA, [Kavianpour] must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." Vaughan, 2014 WL 4978439, at *12 (first alteration in original) (citations and internal marks omitted); see also Williams-Evans, 2021 WL 61610, at *3 (citation omitted). "The allegations in the [amended] complaint need only give plausible support to the reduced prima facie requirements[.]" Stinnett v. Delta Air Lines, Inc., 278 F. Supp. 3d 599, 616 (E.D.N.Y. 2017) (last alteration in original) (citation and internal marks omitted).

AUMC contends that Kavianpour's amended complaint fails to state a claim for relief because she failed to put defendants "on notice that she thought [the drug testing] discriminated against her because she was . . . disabled" and because she "has not pled any facts [] to show that drug testing (and ultimately termination for failure to comply with drug testing) occurred because she was . . . disabled or that she complained of this to her employer or that she could have objectively believed

this to be true."  [Doc. 46 at 6-8 (emphasis and footnote omitted)]; see also [Doc. 32-1 at 19].[46]  However, in her amended complaint, Kavianpour alleges that she met with Moore in December 2018 to express concern regarding the timing of the drug tests interfering with departmental operations and patient care, among other things, and she volunteered to undergo daily drug testing if it was set at a suitable time that did not interfere with her responsibilities and she could coordinate her pager responsibilities; that she requested a meeting with Norton and Arnold in January 2019 to discuss the drug testing and "lack of flexibility and justification," but that in response, she received a reminder from Arnold that refusal to participate or failure to complete the testing process would result in her discharge and that her academic and clinical responsibilities were not an excuse; and that she then complained that "[i]nstead of facilitating a conversation for more reasonable arrangements, you decide to buckle down with a list of demands" and that the testing was "clearly not random and [was] quite frankly discriminatory" while reiterating that she was "not refusing the testing," but she received no response and was subsequently suspended and terminated after failing to appear

---

[46] BOR does not make any specific arguments for the dismissal of Kavianpour's ADA retaliation claim aside from its argument that she "was not a qualified individual as that term is defined in the disability statutes pursuant to which [she] brings her claims," and she therefore "failed to state a claim for disability discrimination under any of her disability counts[.]"  [Doc. 34 at 18, 20].

for a drug test that she alleges interfered with patient care coverage while she was on pager duty. [Doc. 29 ¶¶ 57, 59, 62-63, 65-68, 71-74, 77, 81, 83-84]. Based on these allegations, Kavianpour asserts that when she "asked to meet with [Human Resources] [d]efendants for drug testing flexibility or accommodation of patient care, [d]efendants refused and responded with a retaliatory memo that made her objections grounds for dismissal[.]" [Id. ¶ 240]; see also [id. ¶¶ 62-63, 65]. Thus, Kavianpour appears to allege that she engaged in statutorily protected activity by requesting a reasonable accommodation under the ADA of "drug testing flexibility or accommodation of patient care." [Id. ¶ 240].

"A plaintiff engages in statutorily protected activity in requesting an ADA accommodation if [s]he had a good faith, objectively reasonable belief that [s]he was entitled to those accommodations under the ADA." Collins v. Compass Grp., Inc., 965 F. Supp. 2d 1321, 1348 (N.D. Ala. 2013) (citations and internal marks omitted); see also Monroe v. Fla. Dep't of Corr., 793 F. App'x 924, 928 (11th Cir. 2019) (per curiam) (unpublished) (citation omitted) ("The employee must have had a good faith, reasonable belief that the activity was protected by the statute."); Isley v. Aker Philadelphia Shipyard, Inc., 191 F. Supp. 3d 466, 470 (E.D. Pa. 2016) (citation and internal marks omitted) ("Although a person need not have a qualifying disability to receive the protections of the ADA's retaliation provision, the requester must have a reasonable, good faith belief that [she] was entitled to

request the reasonable accommodation.").  And, "[w]here [plaintiff] has a good faith belief . . . that [s]he is perceived as disabled, making a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity." Weed v. Sidewinder Drilling, Inc., 245 F. Supp. 3d 826, 838–39 (S.D. Tex. 2017) (third alteration in original) (footnote and citation omitted).[47]

AUMC and BOR have not offered any arguments for dismissal aside from their contention that Kavianpour was not a protected individual under the ADA, and "[i]t is not for the [C]ourt to manufacture arguments on [their] behalf." Keaton

---

[47] In order to initiate the interactive process by requesting an accommodation, the "employee need not use the magic words 'accommodation' or even 'disability,'" Chaniott v. DCI Donor Servs., Inc., Case No. 3:19-cv-00222, 2020 WL 4937515, at *9 (M.D. Tenn. Aug. 24, 2020) (citation and internal marks omitted), as "[w]hat matters under the ADA, at least with regard to . . . the request for accommodation, [is] not formalisms about the manner of the request, but whether the employee . . . . provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of [] the . . . desire for an accommodation." Id. (citations and internal marks omitted); see also Norris v. Allied-Sysco Food Servs., Inc., 948 F. Supp. 1418, 1437 (N.D. Cal. 1996), aff'd, 191 F.3d 1043 (9th Cir. 1999) (footnotes omitted) ("[A]n employee is not required to use the phrase 'reasonable accommodation' when requesting reasonable accommodation—an employee must merely let the employer know, in a manner that would be understood by a reasonable employer, that the employee has a disability that requires some sort of accommodation in order for the employee to be able to perform [her] work duties" and "[o]nce an employee has let an employer know that [s]he . . . desires reasonable accommodation, the employer is then obligated to offer reasonable accommodation (if a reasonable accommodation that does not impose undue hardship is feasible), which may entail engaging in an interactive process with the employee to determine what reasonable accommodation(s) would permit the employee to perform the essential functions of . . . her position").

v. Cobb Cty., 545 F. Supp. 2d 1275, 1310 n.25 (N.D. Ga. 2008), aff'd, No. 08-11220,

2009 WL 212097 (11th Cir. Jan. 30, 2009) (per curiam) (unpublished) (citation and

internal marks omitted).   Although the allegations of Kavianpour's amended

complaint are not a model of clarity, she has adequately alleged that she had a

good faith, reasonable belief that she was perceived as having a substance abuse

disorder, even though she denied having such a disorder, and that she engaged in

protected activity by requesting a reasonable accommodation in order to perform

her work duties without interruption due to her perceived disability.   See [Doc.

29].   Based on the allegations in Kavianpour's amended complaint,[48] the Court

finds that she has plausibly stated an ADA retaliation claim, and it is

**RECOMMENDED** that BOR and AUMC's motions to dismiss Kavianpour's Title

---

[48] To the extent Kavianpour seeks to raise new allegations with regard to her ADA retaliation claim in her response in opposition that were not included in her amended complaint, see [Doc. 40 at 18-20], "allegation[s], made for first the time in response to a motion to dismiss, [are] plainly inappropriate," Brown v. J.P. Turner & Co., Civil Action No. 1:09–CV–2649–JEC, 2011 WL 1882522, at *5 (N.D. Ga. May 17, 2011) (citation omitted), and will not be considered, see Ballard v. Bank of Am. Corp., CIVIL ACTION FILE NO. 1:13-cv-04011-ODE-RGV, 2014 WL 11970543, at *13 n.13 (N.D. Ga. Sept. 11, 2014), adopted by 2014 WL 12284028, at *1 (N.D. Ga. Oct. 30, 2014) (third alteration in original) (citations and internal marks omitted) (noting that since "[n]o such allegations were made in the complaint . . . and the "[C]ourt's review on [a] motion to dismiss [was] 'limited to the four corners of the complaint," the "allegations, raised for the first time in plaintiffs' filings in response to the motion to dismiss, [would] not be further addressed in the Court's consideration of the merits of plaintiffs' discernible claims for purposes of ruling on the pending motion to dismiss").

I ADA retaliation claim asserted in Count IX of her amended complaint be **DENIED**.

   5.   *Kavianpour's Due Process Claims*

In Count XIV of her amended complaint, Kavianpour asserts a due process claim under § 1983 and the Fourth and Fourteenth Amendments against Arnold and Norton in their individual capacities and against AUMC for the actions of Norton in her official capacity based on the "illegal drug testing" policy "in which [Kavianpour] was targeted and which was used to facilitate her termination." [Doc. 29 ¶¶ 287-97]. And, in Count XV of her amended complaint, she asserts a due process claim against Arnold in her individual capacity, against Norton and Sprouse in their individual and official capacities, and against "AUMC for the [a]ctions of [] Coule [in his] [i]ndividual[] and . . . [o]fficial [c]apacit[ies]" based on the alleged violation of her rights for failing to provide her notice of the charges against her and an opportunity to respond prior to suspending her clinical privileges of which a foreseeable consequence was the "end of her residency." [Id. ¶¶ 298-326].

AUMC moves for dismissal of Counts XIV and XV, arguing that "Norton was not an employee of AUMC" and that Kavianpour "has not shown 'state action' by AUMC or that [] Coule was 'acting under the color of state law.'" [Doc. 32-1 at 21, 23 (citations omitted)]. AUMC argues that Count XIV also is due to be

dismissed because "[d]rug testing does not deprive a person of any protected interest," [id. at 23], and that Count XV is subject to dismissal because "due process does not always require a hearing before doctors' privileges are suspended," and "medical residents, such as [Kavianpour], who have been put on notice of the policies they must follow and the consequences of failure to do so, and who fail to follow such policies, are generally not entitled to any process at all prior to termination or suspension from their program," [id. at 22 (citations and internal marks omitted)].

The individual defendants also seek dismissal of these claims, arguing that Count XIV should be dismissed because the "instant case involves [] a special needs case" that establishes "ample reason for [d]efendants to request repeated testing of Kavianpour" and that she "has failed to establish a plausible violation of her constitutional rights." [Doc. 35 at 10-12]. They also contend that Count XV is due to be dismissed because "there are no facts alleged that [Kavianpour] was contractually entitled to any pre or post deprivation hearing concerning her medical staff privileges" and that "no [] contract between she and AUMC exists establishing such a property interest," and therefore, her "claims related to the suspension of her medical privileges must fail." [Id. at 13-14]. The individual defendants also contend that they are entitled to qualified immunity on these claims. [Id. at 15-21]. Coule separately moves to dismiss Count XV, arguing,

among other things, that since he was acting in his capacity as the Chief Medical Officer of AUMC, a private entity, he did not act under the color of state law; that as a medical resident, Kavianpour was not entitled to any due process prior to having her clinical privileges suspended when patient safety concerns were involved; and that if the Court finds that he was acting under color of state law, he is entitled to qualified immunity. [Doc. 33-1 at 6-18 (citation omitted)].

"The Due Process Clause of the Fourteenth Amendment provides that the State shall not 'deprive any person of life, liberty, or property, without due process of law,'" and the "United States Supreme Court has interpreted this clause to contain two different kinds of constitutional protection: procedural due process and substantive due process." 6420 Roswell Rd., Inc. v. City of Sandy Springs, CIVIL ACTION NO. 1:18-CV-5742-ODE, 2020 WL 5792635, at *5 (N.D. Ga. Aug. 27, 2020) (citation omitted) (quoting U.S. Const. Amend. XIV, Sec. I). "To successfully assert a Fourteenth Amendment procedural due process claim under § 1983, [Kavianpour] must establish that (1) the defendant[s] deprived [her] of a liberty or property interest protected by the Constitution;[49] (2) the deprivation

_____

[49] "Property interests are not created by the Constitution; rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Siler v. Hancock Cty. Bd. of Educ., 510 F. Supp. 2d 1362, 1378 (M.D. Ga. 2007), aff'd, 272 F. App'x 881 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted).

occurred under color of state law, and (3) [s]he was not provided with constitutionally adequate process to redress the harm." McNeal v. Columbus Police Dep't, No. 4:18-cv-00067-CDL-MSH, 2018 WL 2293954, at *3 (M.D. Ga. May 18, 2018) (citation and internal marks omitted). "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post deprivation remedy for the loss is available." Id. (alteration in original) (internal marks omitted) (quoting Hudson v. Palmer, 468 U.S. 517, 533 (1984)). "In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under [§] 1983 arise." 6420 Roswell Rd., Inc., 2020 WL 5792635, at *6 (citation and internal marks omitted).

### a.     State Action & Under the Color of State Law

"Section 1983 provides a private right of action whenever an individual has been deprived of any constitutional or statutory federal right under color of state law." Whited v. Children's Healthcare of Atlanta Egleston, No. 3:17-cv-00121-CDL-CHW, 2018 WL 10086541, at *4 (M.D. Ga. Jan. 16, 2018) (quoting Schwier v. Cox, 340 F.3d 1284, 1290 (11th Cir. 2003)). "A defendant acts under color of state law when [it] deprives the plaintiff of a right through the exercise of authority that

[it] has by virtue of [its] government office or position." Id. (citation and internal marks omitted). "Thus, [§] 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." Id. (citations and internal marks omitted).

AUMC, a separately incorporated nonprofit hospital, see [Doc. 29 ¶ 4], and Coule, acting in his capacity as the Chief Medical Officer of AUMC, [id. ¶ 7], were "not employed by or acting on behalf of the state," and because they "are not state actors, they cannot be held liable in a [§] 1983 suit unless their actions amount to state action," which may be found "when one of three tests is met: the (1) public function test; (2) the state compulsion test; and (3) the nexus/joint action test,"[50]

---

[50] "The public function test limits state action to instances where private actors are performing functions traditionally the exclusive prerogative of the state," and "[a] mere showing that a private person performs a public function is not enough to establish state action." Mahone v. Midtown Med. Ctr., CASE NO. 4:15-CV-180-CDL-MSH, 2017 WL 4295259, at *3 (M.D. Ga. Aug. 24, 2017), adopted by 2017 WL 4295218, at *1 (M.D. Ga. Sept. 27, 2017) (citations and internal marks omitted). "The state compulsion test limits state action to instances where the government has coerced or at least significantly encouraged the action alleged to violate the Constitution," and the "state must have exercised such coercive power or [have] provided such significant encouragement, either overt or covert, that the private actor's choice must be deemed to be that of the state." Id. (alteration in original) (citations and internal marks omitted). And, "[f]inally, for the nexus/joint-action test to be met, the state must have intertwined itself with the private actor to such an extent that the state was a joint participant in the enterprise." Id. (citation and internal marks omitted).

but "[o]nly in rare circumstances will one of these tests be met by a private party." Whited, 2018 WL 10086541, at *4 (footnote, citations, and internal marks omitted).

Kavianpour maintains that AUMC, like BOR, was a state actor because AUMC's incorporating documents show that it was incorporated to perform services on behalf of the state and because of the ongoing relationship between AUMC and the BOR. See [Doc. 40 at 22-23; Doc. 41 at 8-10]. Kavianpour also contends that Coule, as an agent of AUMC, engaged in state action, and that he could also be found to be a state actor by relying, in part, on information provided by the AU Human Resources employees in issuing the suspension or by "acting jointly with [] Norton and Arnold" or "in conspiracy" with Norton, Arnold, and AU. [Doc. 41 at 10-16]. However, a mere contract with a state entity, such as a contract between a public hospital authority under Georgia law and a private entity operating and managing its hospital, does not transform all actions within a private entity, such as the denial of hospital privileges by the hospital, into state action for purposes of § 1983, even if the public entity "may be liable for the acts of [the private entity] under an agency theory[.]" Patrick v. Floyd Med. Ctr., 201 F.3d 1313, 1315-17 (11th Cir. 2000); see also Mahone, 2017 WL 4295259, at *4; Untracht v. Fikri, 454 F. Supp. 2d 289, 323 (W.D. Pa. 2006), aff'd, 249 F. App'x 268 (3d Cir. 2007) (unpublished) (citation omitted) (finding the revocation of staff privileges by private hospital was not attributable to the university and therefore

not attributable to the state for purposes of § 1983 where the relationship was pursuant to an affiliation agreement that provided for "mutual support for their respective educational and health services missions").[51]  Moreover, "[a] mere showing that a private person performs a public function is not enough to establish state action," and AUMC "does not perform a function that is traditionally an exclusive function of the state."  Sims v. Hassenplug, No. 4:05-CV-155 (CDL), 2006

---

[51] Although Kavianpour attempts to distinguish Patrick by alleging that "Coule acted pursuant to the recommendations of [] Arnold and Norton, who were state agents" when he suspended her clinical privileges, thereby rendering his actions and those of AUMC's state actions, see [Doc. 41 at 15-16 (citation omitted)], a review of the February 21, 2019, memo Arnold sent to Coule reveals that it merely relayed the events that had recently occurred with regard to Kavianpour's drug testing in January and February of 2019, as well as her arrest for speeding and DUI in November 2018, but it did not make any recommendations, contrary to Kavianpour's contention, see [Doc. 33-2 at 2].  Instead, after receiving this information, Coule prepared a letter to Kavianpour stating, "Information has come to our attention that has led to concern for patient safety.  Please accept this letter as notice of your immediate suspension from all clinical activities within AU Health System, including [AUMC], and all other practice sites."  [Doc. 33-3 at 2 (emphasis omitted)].  And, to the extent Kavianpour maintains that state action on the part of Coule can be found because the bottom of the suspension letter also lists Coule in his position as "Interim Associate Dean for Clinical Affairs, Medical College of Georgia," see [Doc. 33-3 at 2], she admits that Coule is an AUMC employee, see [Doc. 40 at 6], and any argument in this regard "ignores the well-recognized legal principal that individuals may act in multiple capacities," Loewen v. Grand Rapids Med. Educ. Partners, No. 1:10–CV–1284., 2012 WL 1190145, at *7 (W.D. Mich. Apr. 9, 2012) (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 543 n.6 (1986)) ("'Acts performed by the same person in two different capacities are generally treated as the transactions of two different legal personages.'").

WL 2085481, at *4 (M.D. Ga. July 25, 2006) (citation and internal marks omitted);

see also Jones v. Haw. Residency Program Inc., Civ. No. 07-00015 HG BMK, 2007 WL 9710959, at *5 (D. Haw. Nov. 30, 2007), aff'd, 727 F. App'x 423 (9th Cir. 2018) (unpublished) (citation and internal marks omitted) ("Although health care is certainly an essential public service, it does not involve the exercise by a private entity of powers traditionally exclusively reserved to the State."). In short, Kavianpour's factual allegations included in her amended complaint, "do not establish that [AUMC] or its employees are state actors." Sims, 2006 WL 2085481, at *4.[52] Accordingly, because neither AUMC or Coule are state actors for purposes

---

[52] Applying the state compulsion test "to determine whether the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the private actor's choice must be deemed to be that of the state," Sims, 2006 WL 2085481, at *4 (citation and internal marks omitted), the Court finds that Kavianpour has failed to sufficiently allege that the state exercised coercive power over AUMC or Coule since it was Coule who made the decision to suspend Kavianpour's clinical privileges after receiving information from AU, [Doc. 29 ¶¶ 82-83, 304, 310-11, 317; Docs. 33-2 at 2 & 33-3 at 2]. Kavianpour also argues that she has adequately alleged that Coule "acted in conspiracy" with Norton and Arnold, [Doc. 41 at 13-14 (citation omitted)], but her amended complaint does not assert any such allegations that would render it plausible that Coule conspired with any state actor to suspend her clinical privileges, see generally [Doc. 29]. Furthermore, "an allegation of a conspiracy to violate the Constitution must be pled with specificity, provide the nature of the conspiracy, and state that the actors reached an understanding," and "[t]his level of detail is not to be found in [] vague, conclusory allegation[s.]" Cross v. Doctors Hosp. of Augusta, LLC, Civil Action No. 5:14–CV–6 (HL), 2014 WL 2440544, at *8 (M.D. Ga. May 30, 2014) (citations omitted).

of Kavianpour's due process claims, it is **RECOMMENDED** that her claims asserted against them in Counts XIV and XV be **DISMISSED**.[53]

### b.    Drug Testing Policy

Kavianpour alleges that the "illegal drug testing . . . violated her rights under the Fourth and Fourteenth Amendments to the United States Constitution by depriving her of her liberty and property interests by manipulating the timing of testing and falsely representing that she failed to appear when [d]efendants blocked the test . . . even though [] Arnold and Norton knew [she] would test negative as she had in the five preceding tests." [Doc. 29 ¶ 294]. She asserts that Norton "created the so-called random drug testing policy in which [she] was targeted and which was used to facilitate her termination," [id. ¶ 295 (internal marks omitted)], and that "[d]efendants' actions were a clear violation of [her] clearly established Constitutional rights under the Fourth and Fourteenth Amendments and of statutory rights of which a reasonable person would have known," [id. ¶ 293]. She alleges that she "suffered the adverse action of random drug tests" and "termination based on illegal testing and an intentionally and

_____

[53] Kavianpour asserts her claim in Count XIV against AUMC for the actions of Norton in her official capacity, see [Doc. 29 at 53]; however, as AUMC points out, [Doc. 32-1 at 23 (citation omitted)], and Kavianpour alleges in her amended complaint, [Doc. 29 ¶ 10], Norton was not an employee of AUMC, but was "AU's VP [of] Human Resources [ and ] Chief [Human Resources] Officer," [id.]. Thus, Count XIV is due to be dismissed against AUMC for this additional reason.

willfully false narrative alleging willful violation of testing procedures that were in fact illegal in and of themselves." [Id. ¶¶ 289-90]. The individual defendants contend that the drug testing did not run afoul of Kavianpour's constitutional rights because the circumstances presented special needs to test a medical resident who had previously tested positive for marijuana use in order to detect any illegal drug use during her tenure in the residency program, which also supplied reasonable suspicion to continue testing her. [Doc. 35 at 10-12]. Kavianpour disagrees, again reiterating that defendants should not have considered her positive pre-employment drug test and disputing that this is a special needs case. [Doc. 48 at 19-22].

"The Fourth Amendment proscribes all unreasonable search and seizures" and therefore, "warrants are generally required to search someone's . . . person." 6420 Roswell Rd., Inc., 2020 WL 5792635, at *11 (citation omitted). "A urine drug test imposed by state officials constitutes a search under the Fourth Amendment." Straub v. Cty. of Greenville, No. Civ.A.6–04–21847–RBH, 2006 WL 1073883, at *3 (D.S.C. Apr. 20, 2006) (citing Skinner v. Railway Labor Executives' Assn., 489 U.S. 602 (1989)); see also Pierce v. Smith, 117 F.3d 866, 872 (5th Cir. 1997) (citations omitted). "The question then becomes whether the search is unreasonable," and "[u]nder the Fourth Amendment, a search must ordinarily be based on suspicion of wrongdoing." Straub, 2006 WL 1073883, at *3 (internal marks omitted).

"However, exceptions to the general rule may be justified for 'special needs, beyond the normal need for law enforcement.'" Id. (quoting Nat'l Treasury Emps. v. Von Raab, 489 U.S. 656, 665 (1989)). "Courts must undertake a 'context-specific inquiry, examining closely the competing private and public interests advanced by the parties,'" and "[w]here the privacy interests are minimal and where an important governmental interest would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." Id. (citation omitted) (quoting Chandler v. Miller, 520 U.S. 305, 314 (1997)). "To date, state and federal courts have allowed testing of correctional officers, fire fighters, public hospital employees, police officers, sewer district employees, court personnel and numerous other public employees of almost every rank and class." Id. at *4 (citation omitted).

The allegations of Kavianpour's amended complaint include that in June 2018, she tested positive for marijuana on her pre-employment drug screen, that her confirmatory test in July 2018 still showed the presence of marijuana but was under the threshold, and that she then petitioned for another pre-employment drug test, which came back negative, and she was offered an employment contract with AU's neurosurgery residency program on July 11, 2018, and advised on August 21, 2018, that her employment was subject to random drug testing per AU's Substance Abuse Policy No. 685, due to the high risk nature of the duties she

would be performing, which policy was also referenced in House Staff Policy 1.0. [Doc. 29 ¶¶ 23-33]. AU's Substance Abuse Policy No. 685 "replace[d] all existing policies concerning substance abuse and drug testing of employees," and applies to "all faculty and staff of [AU]," defining a "positive drug test" as meaning "any drug test whose results indicate[d] that the employee ha[d] committed substance abuse[.]" See AU's Substance Abuse Policy No. 685. It also requires "[a]ll employees obtaining high risk positions [to] undergo a drug screening test prior to beginning work as an employee with [AU]" and that random testing of employees be conducted on those performing duties considered to be high risk, with the "number of such employees to be tested and the scheduling of such testing [to] be determined by the Vice President of Human Resources (or designee) in accordance with applicable laws and regulations." Id. It also provides that "[e]mployees who refuse to participate in a drug test required under this policy may be discharged." Id.[54]

---

[54] Although Kavianpour maintains that her employment contract subjected her to USG's Policies, which incorporated the employee drug testing provisions under Georgia's State Personnel Board and which she specifically acknowledges does not apply to BOR, see [Doc. 48 at 3 & n.1 (citations omitted)]; see also Ga. Comp. R. & Regs. 478-1-.21(2) ("The policies and procedures within this Rule . . . . do[] not apply to the [BOR.]"), her contract stated that her "appointment" was "made subject to the policies, procedures and regulations of [AU] and the [BOR]," but it specifically made clear that AU's "[p]olicies and procedures for House Officers govern[ed] [certain] conditions of [Kavianpour's] employment," including "House Officer responsibilities," "chemical/substance abuse or dependence," and

Despite Kavianpour's arguments to the contrary, [Doc. 48 at 20-22], "[p]lainly, this is a special needs case," Pierce, 117 F.3d at 874 (emphasis and internal marks omitted). This case is analogous to Pierce,[55] which involved a "setting [that] not only involve[d] the practice of medicine, an endeavor subject to extensive government regulation, but also both a student-school and an employee-supervisor relationship," with the plaintiff "undergoing training in the medical school's emergency medicine residency program, and [being] in essence both a student and an employee providing professional services to the public." Id. In finding that the request for a urinalysis drug test was a "special needs" situation for purposes of the Fourth Amendment, and that the plaintiff resident had a diminished expectation of privacy, the Fifth Circuit explained, in relevant part:

"procedures for discipline and redress of grievances," and the House Staff policy for chemical/substance abuse or dependence referenced AU's Substance Abuse policy for drug testing of which Kavianpour was specifically made aware that she would be subjected to, beginning August 21, 2018, and which did not incorporate Georgia's State Personnel Board drug testing procedures, [Doc. 3-2 at 2; Doc. 29 ¶¶ 30-31 (citation omitted)]; see also AU's Substance Abuse Policy No. 685; House Staff Policies. Thus, Kavianpour's assertions in this regard are without merit.

[55] The plaintiff in Pierce was a medical resident in the emergency residency program who was suspected of drug use, and she was advised that she would need to undergo a psychiatric evaluation as well as a urine drug test and was placed on probation until her drug test result came back negative. 117 F.3d at 869-70. Plaintiff filed suit, alleging, among other things, the taking of a liberty interest by virtue of an unreasonable search of her person in violation of the Fourth and Fourteenth Amendments and § 1983. Id. at 870.

"In the case of searches conducted by a public employer, we must balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control, and the efficient operation of the workplace." What the Court said of the railroad employees in *Skinner* is true "in spades" as to [the plaintiff], practicing and learning emergency medicine, namely that she "discharge[d] duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Likewise, "the substantial need of teachers and administrators for freedom to maintain order in the schools" is a special need such that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search."

Id. (last alteration in original) (footnote and citations omitted). "Of course, the fact that special needs are present does not alone resolve the matter," as the Court must also consider "whether the individual['s] expectation of privacy is decreased and the relative obtrusiveness or otherwise of the search." Id. (citation and internal marks omitted). Again, the Fifth Circuit's decision in Pierce is instructive, explaining that the plaintiff's "status as a student-employee in the . . . residency program diminished her legitimate expectations of privacy vis-à-vis the search at issue." Id.

The individual defendants point out that Kavianpour "was a resident in a neurosurgery program training to be a doctor who would be involved with patients and required to exercise the greatest of judgment and care," and these circumstances provided "ample reason . . . to request repeated testing" where, "[i]n addition to an initial positive drug test, [Kavianpour] . . . presented a diluted

sample for testing, and was arrested for speeding and DUI during the testing protocol." [Doc. 35 at 11 (citations omitted)]. In short, Kavianpour "knew full well that [s]he would be [drug] tested in the future," Fowler v. N.Y. City Dep't of Sanitation, 704 F. Supp. 1264, 1276 (S.D.N.Y. 1989), following her pre-employment drug test, see [Doc. 29 ¶¶ 30-31, 36-42], and any argument about defendants' "deviation from established procedures—if there was any—cannot change that fact" and as to her argument that they "acted unconstitutionally by . . . testing [her] after receiving a negative result on the second test, . . . . [she] has still not shown how this could rise to the level of a Fourth Amendment violation," since "[t]hose guidelines define the [] internal procedures, not [her] constitutional rights" and additionally, "[t]he violation of a state statute does not automatically give rise to a violation of rights secured by the Constitution," Fowler, 704 F. Supp. at 1276 (citation and internal marks omitted). Accordingly, the first test "conducted in connection with the pre-employment [drug screen] was not a search within the meaning of the Fourth Amendment, and [the] subsequent tests at a minimum were based on reasonable suspicion and [] were reasonable under the Fourth Amendment," id., and it is therefore **RECOMMENDED** that Count XIV of Kavianpour's amended complaint be **DISMISSED**.

### c.    Suspension of Clinical Privileges

In Count XV of her amended complaint, Kavianpour brings a procedural due process claim under § 1983 and the Fourth and Fourteenth Amendments, alleging that she was deprived of due process when her clinical privileges were suspended by Coule without first being provided notice of the charges and an opportunity to respond.  [Doc. 29 ¶¶ 298-317].  She asserts this claim against Arnold in her individual capacity, Norton and Sprouse in their individual and official capacities, and "AUMC for the [a]ctions of [] Coule [in his] [i]ndividual[] and . . . [o]fficial [c]apacit[ies]."  [Id. at 56].[56]

AUMC contends that "courts have repeatedly rejected at the 12(b)(6) stage claims from medical students or medical residents that they are owed significant due process prior to being suspended from a hospital medical staff," and that "even if she were a full member of the medical staff, which she was not, due process does not always require a hearing before doctors' privileges are suspended."  [Doc. 32-1 at 20, 22 (citations and internal marks omitted)].  The individual defendants similarly argue that Kavianpour has failed to "allege some

---

[56] For the reasons previously discussed, AUMC and Coule are due to be dismissed for Kavianpour's failure to sufficiently allege that they were state actors or acting under the color of state law; however, even if the Court had found that they were state actors, this claim would still be subject to dismissal for the reasons discussed hereinafter.

authority supporting a state created property interest in the continuation of her medical staff privileges," and that her "bare allegations that she was entitled to a hearing on the issue of suspension of her medical staff privileges due to some ACGME requirement, or her employment contract is insufficient." [Doc. 35 at 13]. Coule also separately moves for dismissal, arguing that Kavianpour has failed to "allege that she had a property interest in her position at the hospital," that "neither the due process clause . . . nor more traditional rights under medical staff bylaws require hospitals to provide physicians with process prior to suspending their medical staff rights when there are patient safety concerns involved (regardless of whether those concerns ultimately are founded)," and "that in most circumstances medical residents are students first, not employees, and entitled only to the limited process to which students are entitled." [Doc. 33-1 at 10, 12 (citations omitted)].

"In assessing a procedural due process claim, a court must first determine whether the challenged state action infringed a protected constitutional right," and "[i]f the interest [Kavianpour] asserts is not of a constitutional dimension, *i.e.*, not a protected property or liberty interest, then [her] arguments must fail." Sussman v. N.Y. City Health & Hosps. Corp., No. 94 CIV. 8461(DBS), 1997 WL 334964, at *10 (S.D.N.Y. June 16, 1997) (citation omitted). Although the Eleventh Circuit has not addressed this issue, the majority of courts that have considered it ruled that

"[i]n the context of due process, medical residents are students rather than employees of the hospital" and are therefore entitled to lesser due process protections than employees. Ekmark v. Matthews, 524 F. App'x 62, 63-64 (5th Cir. 2013) (per curiam) (unpublished) (citing Shaboon v. Duncan, 252 F.3d 722, 729-30 (5th Cir. 2001)); see also Trotter v. Regents of Univ. of N.M., 219 F.3d 1179, 1185 (10th Cir. 2000); Davis v. Mann, 882 F.2d 967, 972-73 (5th Cir. 1989); McLean v. Miss. State Univ., CIVIL ACTION NO. 1:19-CV-00122-GHD-RP, 2020 WL 3980026, at *4 (N.D. Miss. July 14, 2020) (citations omitted); Cordova v. La. State Univ. Agric. & Mech. Coll. Bd. of Supervisors, CASE NO. 6:19-CV-01027, 2020 WL 1695053, at *2 (W.D. La. Apr. 7, 2020) (citation omitted); Halverson v. Univ. of Utah Sch. of Med., No. 2:06CV228 DAK, 2007 WL 2892633, at *11 (D. Utah Sept. 28, 2007) (citation omitted); Allahverdi v. Regents of Univ. of N.M., No. Civ 05–277 JB/DJS, 2006 WL 1313807, at *18 (D.N.M. Apr. 25, 2006); Fenje v. Feld, 301 F. Supp. 2d 781, 801 (N.D. Ill. 2003), aff'd, 398 F.3d 620 (7th Cir. 2005) (citations omitted). That is, "[i]t is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program," and "[i]n recognition of the complex student-faculty relationship, students are not entitled to the same due process protections as are employees." Ekmark, 524 F. App'x at 63-64 (citations and

internal marks omitted); see also Allahverdi, 2006 WL 1313807, at *18 (finding a medical resident "is a student for due process purposes").[57]

Kavianpour argues that her employment contract incorporated "the ACGME processes, which provide property and liberty interests exceeding the usual privileges of a physician at a hospital in Georgia[.]" [Doc. 41 at 19-20 (footnote and citation omitted)]. In particular, Kavianpour points out that her employment contract states that AU's policies and procedures for House Officers governs the conditions of her employment, see [Doc. 29 ¶ 172 (citation omitted); Doc. 3-2 at 2], and that House Staff Policy 10.0 provides that AU "fully supports the Residents policies established by the [ACGME] concerning the learning and working environment," see House Staff Policies, and therefore incorporates the ACGME policies, [Doc. 29 ¶ 173 (citation omitted)]. However, House Staff Policy 13.0 governs House Officer evaluations, grievances, and due process procedures with regard to the residency program and does not incorporate the ACGME policies or provide for due process with regard to clinical privileges at any AU

---

[57] "In addition, not only are students afforded less procedural due process than employees, but also, the Supreme Court has emphasized that even less stringent procedural requirements attach when a school makes an academic judgment about a student than when it takes disciplinary action." Halverson, 2007 WL 2892633, at *12 (citation omitted). "In making an academic judgment, the court has held that notice, followed by a careful and deliberate determination, satisfied the requirements of due process." Id. (citation omitted).

affiliated teaching hospitals. See House Staff Policies. Therefore, Kavianpour's arguments in this regard are unpersuasive.

Moreover, while Kavianpour may have been entitled to due process with regard to her dismissal from the residency program, in which she has a protected property interest,[58] her "limited clinical privileges only entitled her to treat

---

[58] Courts have held that a medical resident has a constitutionally protected right not to be terminated from a residency program without procedural due process in accordance with the terms of the contract. Barsoumian v. Williams, 29 F. Supp. 3d 303, 313 (W.D.N.Y. 2014), aff'd, 594 F. App'x 41 (2d Cir. 2015) (unpublished) (citation omitted). In her amended complaint, Kavianpour alleges that she was denied due process when she was terminated from her residency because her grievance process should have been handled in accordance with the terms of House Staff Policy 13.0, which was incorporated into her employment contract, but instead it was handled through AU's Human Resources, which was "the same department that had been unlawfully subjecting her to baseless testing for months and retaliated against her for engaging in protected patient activity." [Doc. 29 ¶¶ 318-26]. While the Court agrees that according to the terms of Kavianpour's contract, she was entitled to a grievance process in accordance with House Staff Policy 13.0, "[a] procedure required by contract, statute, or regulation does not create a constitutionally protected right nor does violation of a contract, statute, or regulation, by itself, constitute a violation of due process," Fenje, 301 F. Supp. 2d at 802-03 (citations omitted); see also Snyder v. Bd. of Regents for Agric. & Mech. Colleges ex rel. Okla. State Univ. Ctr. for Health Scis., Case No. CIV-16-384-F, 2020 WL 827412, at *33 (W.D. Okla. Feb. 19, 2020) (citation omitted) (explaining that even if defendants "failed to follow their own procedures, [the] failure does not, by itself give rise to a constitutional claim under the Fourteenth Amendment"), and the hearing Kavianpour was provided complied with the due process to which she was entitled in that she was provided notice of the charges and an opportunity to present evidence, see [Doc. 29 ¶¶ 96-97, 100-01]. However, certain rights "are not constitutionally required in a termination hearing" for a medical resident like Kavianpour. Fenje, 301 F. Supp. 2d at 803 (footnote omitted). For instance, there are no constitutional rights to have counsel present at such hearings, to confront witnesses or present live witnesses, to have witness

patients under the supervision of [AUMC] doctors, and her stipend was only payable while she remained a student," and these "privileges were not distinct from the performance of her residency," and she therefore "had no clearly established economic or noneconomic property interest in the limited privileges," Shaboon, 252 F.3d at 729, 732 (footnote omitted), and she has failed to allege facts that show any agreements created a property interest in her clinical privileges sufficient to survive the motion to dismiss, see generally [Doc. 29].[59]  In addition

_____

statements be provided prior to the hearing, to have the opportunity for discovery be provided prior to the hearing, or to have the hearing comport with the rules of evidence.  Id. (citations omitted).  Furthermore, even assuming the hearing provided to Kavianpour did not comport with due process requirements, she still has not shown a right to relief as she has alleged that in December 2019, defendants retroactively reinstated her as an employee, though her AUMC clinical privileges are still suspended, provided her with notice and an opportunity to address her termination in accordance with House Staff Policy 13.0, and she is still awaiting a new hearing on her termination in accordance with that policy.  [Doc. 29 ¶¶ 136-44].  "As the Eleventh Circuit has held, 'the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under [§] 1983 arise.'"  Mawulawde v. Bd. of Regents of Univ. Sys. of Ga., CV 105-099, 2009 WL 10678751, at *11 (S.D. Ga. Mar. 27, 2009), aff'd, 372 F. App'x 51 (11th Cir. 2010) (per curiam) (unpublished) (quoting McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994)).  Therefore, Kavianpour has failed to state a claim in this regard.

[59] "[M]edical staff privileges can constitute a property interest [in situations where a physician's] contract[] explicitly or implicitly allow[s] termination only for cause," but Kavianpour "fails to allege that she had a contract with [AUMC] providing that she would be terminated from her clinical [privileges] only for cause, nor are any facts alleged from which such an agreement can be inferred." Kendricks v. Hopkins, Action No. 4:10–CV–289–Y, 2011 WL 2115832, at *4 (N.D.

120

to being created by contract, property interests may also stem from independent sources such as state law, see Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985),[60] and, even were Kavianpour entitled to the same due process as a physician rather than a medical resident, in Georgia, "[a] physician does not have absolute authority to practice medicine in the hospitals of this state," and a "hospital has the power to revoke or limit the staff privileges of a physician which the hospital finds to be incompetent or who fails to comply with its reasonable rules and regulations," Jimenez v. WellStar Health Sys., 1:08-cv-0049-WSD-JFK, 2009 WL 10668523, at *6 (N.D. Ga. Feb. 6, 2009), aff'd, 596 F.3d 1304 (11th Cir. 2010) (citations and internal marks omitted), and "[d]ue process does not always require a hearing before doctors' privileges are suspended," as privileges may be

---

Tex. May 25, 2011) (citation and internal marks omitted). Indeed, under Federal Rule of Civil Procedure 8(a), Kavianpour "must 'either attach a copy of an alleged contract to the [amended] complaint or plead it according to its legal effect.'" McClelland v. First Ga. Cmty. Bank, No. 5:09-CV-256 (CAR), 2010 WL 3199349, at *3 (M.D. Ga. Aug. 12, 2010) (citation omitted).

[60] While "[s]tate law establishes [] whether a property interest has been created; once state law creates such an interest, then only federal constitutional law determines whether the procedures used to deprive a person of that property interest accorded with due process." Allahverdi, 2006 WL 1313807, at *24 (citation omitted). That is, "[a] violation of due process does not depend on the state statute creating the property interest," and Kavianpour "may have a state law claim, for violation of [her] rights, contractual or otherwise, but not a federal constitutional due process claim." Id. (citation omitted).

summarily suspended when a post-termination hearing that comports with due process is provided, Jackson v. Fulton-DeKalb Hosp. Auth., 423 F. Supp. 1000, 1004 (N.D. Ga. 1976), aff'd, 559 F.2d 1214 (5th Cir. 1977)[61] (unpublished) (citations and internal marks omitted).  Thus, Kavianpour has failed to plausibly allege that she had a constitutionally protected property interest in her continued limited clinical privileges at AUMC, or that even if she did, she was entitled to a notice of the charges against her and a hearing prior to the suspension of those privileges separate and apart from the grievance hearing held on her termination from the residency program,[62] and it is **RECOMMENDED** that Count XV of Kavianpour's amended complaint be **DISMISSED**.[63]

---

[61] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[62] Furthermore, in her amended complaint, Kavianpour specifically alleges that she was advised prior to her grievance hearing on her termination that depending on the outcome, the panel could make a recommendation to AUMC regarding the reinstatement of her clinical privileges.  [Doc. 29 ¶ 316].

[63] The individual defendants, as well as Coule separately, argue that they are shielded from Kavianpour's constitutional claims asserted against them in their individual capacities by the doctrine of qualified immunity, [Doc. 33-1 at 16-18; Doc. 35 at 15-21]; however, the Court "need not reach the issue of qualified immunity[ since Kavianpour] has failed to state any federal claims against [them] upon which relief may be granted," Dockens v. Dekalb Cty. Sch. Sys., Civil Action No. 1:07–CV–1345–CAP, 2008 WL 9396388, at *3 (N.D. Ga. Apr. 25, 2008); see also Thomas-Weisner v. Gipson, Case No.: 3:19-cv-01999-JAH-BGS, 2020 WL 6271207, at *5 (S.D. Cal. Oct. 26, 2020) (citations and internal marks omitted) (explaining

C.    **Kavianpour's State Law Claims**

In addition to the federal claims, Kavianpour asserts state law claims against AUMC and BOR for breach of contract, breach of duty to refrain from taking hospital privileges, and violations of the GWA.  See generally [Doc. 29].  AUMC and BOR move to dismiss these claims on several grounds.

1.    *Kavianpour's State Law Retaliation Claims under the GWA*

In Counts II, III, and IV of her amended complaint, Kavianpour asserts that she was retaliated against by BOR and AUMC for complaining that the "drug tests [] were not random and did not comply with state or federal law," that "her drug testing interfered with patient coverage and safety," and that the "personnel actions [she was subjected to] did not comply with the ACGME and had conflicts of interest," in violation of the GWA.  [Doc. 29 ¶¶ 183-201].  AUMC moves for dismissal of these claims, arguing that because it is a private entity and not a "public employer," the GWA does not apply to it; the drug testing policies were those of AU and not AUMC and were not illegal under Georgia law; and the complaints about patient safety and the internal appeals process were not

_____

that the "better approach to resolving cases in which the defense of qualified immunity [was] raised [was] to determine first whether the plaintiff ha[d] alleged the deprivation of a constitutional right at all" and that since "the Court ha[d] found that [p]laintiff ha[d] failed to state a claim against [the defendants], it need not reach any issues regarding qualified immunity").

protected under the GWA since they were not subject to any law or regulation. [Doc. 32-1 at 19-20 (internal marks omitted)]. BOR also moves to dismiss these claims, arguing that Kavianpour "has not alleged sufficient facts to support a claim that she engaged in protected activity as defined by the GWA" and because her "allegations in Counts III and IV as to complaints about patient safety under House Staff policies and ACGME policies and failure to adhere to the internal appeal process under House Staff Policies . . . rel[y] upon complaints of alleged violations of internal policies and procedures," which do not trigger protection under the GWA. [Doc. 34 at 14-16 (citations omitted)].

Under the GWA, "[n]o public employer shall retaliate against a public employee for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency, unless the disclosure was made with knowledge that the disclosure was false or with reckless disregard for its truth or falsity." O.C.G.A. § 45-1-4(d)(2). "'Law, rule, or regulation' includes any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance." O.C.G.A. § 45-1-4(a)(2).[64]

_____

[64] To set forth a prima facie case for retaliation under O.C.G.A. § 45-1-4(d)(2), "the employee must present evidence that (1) the employer falls under the statute's definition of public employer; (2) the employee disclosed a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government

### a.      Public Employer

The GWA applies only to public employers, which are defined as "the executive, judicial, or legislative branch of the state; any other department, board, bureau, commission, authority, or other agency of the state which employs or appoints a public employee or public employees; or any local or regional governmental entity that receives any funds from the State of Georgia or any state agency." O.C.G.A. § 45-1-4(a)(4). AUMC moves to dismiss Kavianpour's GWA claims asserted against it, contending that it is a nonprofit, private entity, not a "public employer" as defined by the GWA. [Doc. 32-1 at 19-20 (citation and internal marks omitted)]; see also [Doc. 29 ¶ 4]. "Although the [amended] complaint alleges that [AUMC] functioned as an agent of the [BOR], it does not allege any facts to support this label," and Kavianpour's arguments regarding "the time, manner, means, and method of her work . . . do not demonstrate that this sort of control causes a party to be an employer for purposes of the [GWA]." Joseph, 2020 WL 6494202, at *9; see also [Doc. 29 ¶ 5; Doc. 40 at 12, 20]. And, "because the GWA [does] not refer to 'joint employers' or an 'integrated

_____

agency; (3) the employee was then discharged, suspended, demoted, or suffered some other adverse employment decision by the public employer; and (4) there is some causal connection between (2) and (3)." Hogan v. Hosp. Auth. of Valdosta & Lowndes Cty., Civil Action No. 7:15-CV-138 (HL), 2016 WL 3248374, at *5 (M.D. Ga. June 13, 2016) (citation and internal marks omitted).

enterprise,' . . . a theory of liability based on this fail[s]." Joseph, 2020 WL 6494202, at *9. Thus, it is **RECOMMENDED** that Kavianpour's GWA claims asserted against AUMC in Counts II, III, and IV be **DISMISSED**.

### b. Protected Activity under the GWA

In Counts III and IV of her amended complaint, Kavianpour alleges a violation of the GWA based on her complaints about patient safety under House Staff and ACGME policies and the failure to adhere to internal grievance and appeals processes also under House Staff and ACGME policies. [Doc. 29 ¶¶ 192-201]. However, Kavianpour "cites no authority that [these] polic[ies are] the type of law[s], rule[s], or regulation[s] contemplated by the [GWA], nor does she allege any facts to show [that these] [] polic[ies were] adopted pursuant to federal, state, or local statute or ordinance." Hampton v. Macon Bibb Cty. Transit Auth., Civil Action No. 5:14-CV-111 (MTT), 2014 WL 2916849, at *5 (M.D. Ga. June 26, 2014). Thus, these allegations are not sufficient to show that Kavianpour "engaged in protected activity under this Act." Id.; see also West v. City of Albany, 830 F. App'x 588, 598 (11th Cir. 2020) (per curiam) (unpublished) (citation and internal marks omitted) (finding dismissal of plaintiff's GWA claim appropriate where plaintiff complained about internal protocols, but "[t]hose protocols, or any violation of those protocols, did not constitute a violation of any law, rule, or regulation," and thus, "her complaints were not the type of protected activity the

126

[GWA] was intended to protect"); <u>Coward v. MCG Health, Inc.</u>, 802 S.E.2d 396, 400 (Ga. Ct. App. 2017) (citation omitted) (finding complaints "arising under internal policies," including "internal operating procedures" at a hospital regarding patient care, were "not . . . the type of protected activity the [GWA] was intended to protect"). Therefore, it is **RECOMMENDED** that Kavianpour's GWA claims asserted in Counts III and IV of her amended complaint be **DISMISSED**. <u>See</u> <u>Hogan</u>, 2016 WL 3248374, at *5.

Finally, in Count II of her amended complaint, Kavianpour asserts a retaliation claim in violation of the GWA, alleging that she was "repeatedly subjected to and opposed drug tests that were not random and did not comply with state or federal law" and that "[a]s a direct result of opposing [the] drug tests," her clinical privileges were suspended and her employment was terminated. [Doc. 29 ¶¶ 183-91]. In particular, Kavianpour cites O.C.G.A. §§ 45-20-110 and 45-20-111, as well as "HHS Regulations 53 Fed. Reg. 11979," as setting forth the proper drug testing protocol, [<u>id.</u> ¶¶ 187-88], and she also points to her allegations that on January 22, 2019, she emailed Macomson, Arnold, and others to ask for a meeting to discuss "the inappropriate timing of calls/testing, the lack of flexibility and justification per [Medical College of Georgia] policy (and stated federal laws)," [<u>id.</u> ¶ 62 (internal marks omitted)]; <u>see also</u> [Doc. 47 at 17 (citation omitted)], and that on January 31, 2019, she emailed Arnold and Norton, stating:

Instead of facilitating a conversation for more reasonable arrangements, you decide to buckle down with a list of demands . . . this forces me to question the legality of these practices you are imposing on me in the first place. It is clearly not random and quite frankly discriminatory. This is harassment . . . you can come up with arbitrary rules and memorandums all you'd like but that does not make them legal and it furthers the point that I am making which is that you have singled me out and subjected me to prejudice. I hope you reconsider and mitigate this. Again, I am not refusing the testing. I have been cooperative and have completed what I consider to be an intrusive and excessive amount of testing in a setting of undue suspicions —all of which have been negative.

[Id. ¶ 65]; see also [Doc. 47 at 17 (citation omitted)].

Although BOR contends that Kavianpour has failed to state a claim because she "provides conclusory allegations that [its] actions violated the law, but provides no factual allegations that establish any violation . . . or that [her] termination from employment was a result of any complaints she alleges she made" and that she "provides zero allegations that she disclosed that she believed that there was any violation of [O.C.G.A. §§ 45-20-110 and 45-20-111 or HHS Regulations 53 Fed. Reg. 11979]," [Doc. 34 at 14-15], "[t]he Court has found no requirement under Georgia law that a whistleblower name the specific code section [s]he feels the defendant violated when making [her] disclosure in order to win protection under [the GWA]," Jordan v. City of Waycross, No. 5:17-cv-33, 2018 WL 4089206, at *10 (S.D. Ga. Aug. 27, 2018), and viewing her allegations in the amended complaint in the light most favorable to her as the Court must on a

motion to dismiss, Kavianpour has plausibly stated a claim against BOR in Count II of her amended complaint.[65]  Accordingly, it is **RECOMMENDED** that BOR's motion to dismiss Kavianpour's GWA claim asserted against it in Count II of her amended complaint be **DENIED**.

### 2.    *Kavianpour's Breach of Contract Claims*

In Count I of her amended complaint, Kavianpour asserts breach of contract claims against BOR and AUMC, alleging that because her employment contract stated that her appointment was made subject to the policies, procedures, and regulations of AU and BOR, they were "contractually bound by Ga. Comp. R. &

---

[65] While BOR also contends that Kavianpour has failed to establish that her "termination from employment was a result of any complaints she alleges she made," [Doc. 34 at 14-15], the "causation element in a whistleblower case is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated" and "[a]ll that is needed is a showing that the decision-maker was aware of the protected disclosure and that the disclosure and action were not wholly unrelated," which may be established by "mere temporal proximity between an employer's knowledge of protected activity and [an] adverse employment action," Anderson v. Sumter Cty. Sch. Dist., 449 F. Supp. 3d 1329, 1344 (M.D. Ga. 2020) (citations and internal marks omitted).  Kavianpour alleges in her amended complaint that she was suspended and subsequently terminated within a month of her complaints to Macomson, Norton, and Arnold; that Norton and Arnold drafted a letter to Coule who subsequently suspended her privileges; that Macomson then immediately terminated her residency based on the suspension; and that Norton and Arnold alternatively used Coule as the "cat's paw to effect a taking of the privileges[] that directly caused the termination."  [Doc. 29 ¶¶ 62, 65, 81, 83-84, 303].  Based on these allegations, Kavianpour has sufficiently pleaded a causal relationship at this stage of the litigation.

Regs. r. 478-1.21C because USG Policies expressly adopt[ed] the State Merit System of Personnel Administration drug testing procedures," which required that the random selection for drug testing be made such that each position within a pool has an equal chance of being selected and that the appointing authority may delay issuing the testing to accommodate scheduling at a time when operations would not be unduly disrupted, and that the USG Policies also required that "employees be provided a specific date and time to report for drug testing[ and that] such date and time shall be as soon as possible, but not later than two [] business days following the date the individual receives notification to report," but that they failed to abide by these provisions. [Doc. 29 ¶¶ 166-71, 179-80 (alteration, citation, and internal marks omitted)]. She also alleges that her employment contract subjected her to AU's House Staff Policies, which incorporated the ACGME Policies, which required "due process relating to suspension and dismissal, as well as a policy for submitting and processing grievances at the program and institutional level that minimizes conflicts of interest," but that "[d]efendants breached the terms of [her] contract by violating House Staff Policies, AU Policies, AUMC Policies, USG Policies, and ACGME Policies, as well as the federal and state laws and regulations incorporated therein" and then "illegally terminated [her] contract." [Id. ¶¶ 172-73, 180, 182 (citations omitted)].

AUMC moves to dismiss Kavianpour's breach of contract claims, arguing that she "fails to allege that AUMC was a party to the contract between the [BOR] and [Kavianpour], and AUMC was not a party to that contract." [Doc. 32-1 at 23 (citation omitted)]. Kavianpour has not addressed AUMC's specific argument, but instead appears to rely on her assertion that because AUMC was acting as AU's agent, it was therefore bound by the provisions of the contract she entered into with AU. See [Doc. 40 at 3].

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Uhlig v. Darby Bank & Tr. Co., 556 F. App'x 883, 887 (11th Cir. 2014) (per curiam) (unpublished) (internal marks omitted) (quoting Norton v. Budget Rent A Car Sys. Inc., 705 S.E.2d 305, 306 (Ga. Ct. App. 2010)). "A breach occurs if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible." UWork.com, Inc. v. Paragon Techs., Inc., 740 S.E.2d 887, 893 (Ga. Ct. App. 2013) (citation omitted). "[T]o assert a claim for breach of contract, the party against whom the claim is brought must have been a party to the contract." Uhlig, 556 F. App'x at 887 (citation omitted). In other words, "[a] contract . . . must exist before someone can breach it[.]" Id.

Although Kavianpour asserts her breach of contract claims against both BOR and AUMC, see [Doc. 29 ¶¶ 166-82], AUMC is not a party to the employment contract, see [Doc. 3-2 at 2], and the Court has already addressed Kavianpour's conclusory joint employer and agency allegations, and she has not alleged that she otherwise had any contractual relationship with AUMC, see generally [Doc. 29]; see also Uhlig, 556 F. App'x at 887. In fact, although Kavianpour contends that AUMC breached the employment contract and incorporated documents, the only parties to that contract are Kavianpour and AU, see [Doc. 3-2 at 2], and "[i]n the absence of . . . a contract between [Kavianpour] and [AUMC], [Kavianpour's] breach of contract claim[s against AUMC] fail[]," James v. Litton Loan Servicing, L.P., No. 4:09–CV–147 (CDL), 2011 WL 59737, at *11 (M.D. Ga. Jan. 4, 2011) (citation omitted). Thus, Kavianpour's breach of contract claims asserted against AUMC are due to be dismissed since the amended complaint does not allege the existence of any contract to which AUMC is a party. See generally [Doc. 29].

As for her breach of contract claims against BOR, it argues that these claims should be dismissed because Kavianpour "has failed to plead sufficient facts to establish that any contractual term was breached related to the request to submit to drug testing for a year"; that she "cannot sustain [her ] claim" that "BOR breached her employment contract by failing to get her a student code of conduct hearing prior to discharging her from the residency program" because "the failure

to adhere to procedures in a personnel manual and policies for termination hearings are not actionable as a breach of contract" and, even were they, "she was given a hearing at the time of her termination" and "another hearing is currently underway"; that her allegations regarding patient safety "do not give rise to a breach of contract" because she "failed to set forth any facts to establish that she was damaged by any such lack of policies"; that her contract did not in fact incorporate the ACGME policies and she has failed to allege that its support of those policies would somehow transform "into a contractual obligation between it and [Kavianpour]"; and that the State Personnel Board Rules "are inapplicable [to her] case[.]" [Doc. 34 at 16-18 (citations omitted); Doc. 52 at 6-9 (citations omitted)].

The Court will first address Kavianpour's allegations that rest on the breach of the purported incorporation of certain documents into the employment contract. [Doc. 29 ¶¶ 167-71, 173-78, 180]. As previously noted, while the employment contract does specify that Kavianpour's appointment was "made subject to the policies, procedures and regulations of [AU] and the [BOR]," it also clearly and explicitly details that certain conditions of her employment, including "annual, sick, parental and educational leave, licensure, residency supervision, House Officer responsibilities, duty hours[,] moonlighting[,] chemical/substance abuse or dependence[,] rotation to unaffiliated hospitals[,] effect of leave for

satisfying completion of programs[,] House Officer eligibility, selection and promotion[, and] procedures for discipline and redress of grievances" would be governed by AU's House Staff Policies, [Doc. 3-2 at 2], and House Staff Policy 1.0 detailed that the "Program Director and Chair may, at their discretion refer the House Office[r] to Occupational Health for drug testing in accordance with the AU Health Substance Abuse policy," <u>see</u> House Staff Policies, which Kavianpour alleges she was provided on August 21, 2018, [Doc. 29 ¶¶ 30-33], notifying her that her employment was subject to random drug testing per AU's Substance Abuse Policy No. 685, due to the high risk nature of the duties she would be performing, which clearly provided that it "replace[d] all existing policies concerning substance abuse and drug testing of employees"; that random testing of employees be conducted on those performing duties considered to be high risk, with the "number of such employees to be tested and the scheduling of such testing [to] be determined by the Vice President of Human Resources (or designee) in accordance with applicable laws and regulations"; and that "[e]mployees who refuse[d] to participate in a drug test required under this policy may be discharged," <u>see</u> AU's Substance Abuse Policy No. 685. Thus, Kavianpour's factual allegations that BOR was "contractually bound" by the terms of the USG Policies, which adopted the State Merit System of Personnel Administration drug testing procedures, and that it breached those terms, [Doc. 29 ¶¶ 167-71, 179-80],

"are not plausibly plead and are, in fact, contradicted,"[66] and "[a]t the motion-to-dismiss stage[, the Court] even treat[s] specific facts demonstrated by exhibits as overriding more generalized or conclusory statements in the [amended] complaint itself," Ronald Sciortino Bankr. Estate v. Selene Fin. L.P., CIVIL ACTION FILE NO. 1:18-CV-0981-AT-JFK, 2018 WL 7075245, at *20 (N.D. Ga. Nov. 21, 2018), adopted by 2019 WL 1225201, at *1 (N.D. Ga. Jan. 31, 2019) (internal marks omitted) (quoting F.T.C. v. AbbVie Prods., LLC, 713 F.3d 54, 63 (11th Cir. 2013)).

Next, with regard to Kavianpour's contention that because her contract subjects her to the House Staff Policies, see [Doc. 3-2 at 2], and House Staff Policy 10.0 states that it "fully supports the Residents policies established by the [ACGME] concerning the learning and working environment," see House Staff Policies, the requirements of ACGME were therefore incorporated into her employment contract and BOR breached those requirements with regard to due process and patient care, [Doc. 29 ¶¶ 173, 175-78, 180]; see also [Doc. 47 at 18-19], her claims fail because her allegations are belied by the actual documents themselves. That is, while Georgia "law allows parties to incorporate contractual terms by reference . . . . to a separate, noncontemporaneous document . . . including

---

[66] Moreover, as previously noted, the employee drug testing provisions under Georgia's State Personnel Board specifically provide that they do not apply to the BOR. See Ga. Comp. R. & Regs. 478-1-.21(2).

a separate document which is unsigned," the contract must "make[ a] clear reference to the document to be incorporated and describe[] it in such terms that its identity can be ascertained beyond doubt[.]" Henkel Corp. v. Leggett & Platt, Inc., Civil Action No. 1:09–cv–0463–RLV, 2009 WL 2230813, at *2 (N.D. Ga. July 24, 2009) (second alteration in original) (citations and internal marks omitted). Therefore, while it is clear that Kavianpour's employment contract incorporated by reference the House Staff Policies, see [Doc. 3-2 at 2], the language included in the House Staff Policies "does not make it reasonably clear that [the] provisions of the [ACGME] are incorporated by reference into the contract," Wilson v. Clark Atlanta Univ., Inc., 794 S.E.2d 422, 432 (Ga. Ct. App. 2016); see also Rice v. St. Louis Univ., Case No. 4:19-cv-03166 SEP, 2020 WL 3000431, at *4 (E.D. Mo. June 4, 2020), and "[t]he contract does not incorporate or reference the [ACGME]," which "are more in the nature of a directive or policy statement" and "do not evidence a contractual relationship," Malakoff v. Alton Ochsner Med. Found., No. 99-3603, 2000 WL 805232, at *3 (E.D. La. June 20, 2000), aff'd, 253 F.3d 706 (5th Cir. 2001) (per curiam) (unpublished) (citations omitted); see also Irani v. Palmetto Health, Univ. of S.C. Sch. of Med., C/A No. 3:14-cv-3577-CMC, 2016 WL 3079466, at *49 (D.S.C. June 1, 2016), aff'd, 767 F. App'x 399 (4th Cir. 2019) (per curiam) (unpublished) (alterations, emphasis, citations, and internal marks omitted) (explaining that "[s]tandards that ACGME ha[d] established for all of its

accredited institutions [were] akin to regulations established by an administrative body, rather than a contract governing a relationship between two entities" and finding that the plaintiff resident had "produced nothing that demonstrate[d] that the sponsoring institution promised ACGME that it would follow its requirements," but rather, "it ha[d] produced a set of regulations that ACGME require[d] [the] sponsoring institution to follow if it wishe[d] to retain accreditation," and that "[a]ccrediting bodies [were] not engaged in commercial transactions for which state-law contract principles [were] natural matches"). Thus, Kavianpour's breach of contract claims premised on any violation of the terms provided by the ACGME Policies are due to be dismissed.

Kavianpour's employment contract with AU specifically states that certain conditions of her employment are governed by the House Staff Policies. [Doc. 3-2 at 2]. She alleges in her amended complaint that BOR breached her employment contract by failing to process her grievance regarding her dismissal from the residency program in compliance with House Staff Policy 13.0. [Doc. 29 ¶¶ 175, 180]. BOR argues that Kavianpour has failed to state a claim because "Georgia courts have long held that the failure to adhere to procedures in personnel manual and policies for termination hearings are not actionable as a breach of contract," [Doc. 34 at 17 (citation omitted)], but that even if they were, "she was given a hearing at the time of her termination" and she has further plead "that another

hearing [as contemplated under House Staff Policy 13.0] is currently underway" and she therefore "cannot maintain a claim for breach of contract on this basis," [Doc. 52 at 9-10 (citations omitted)]. Assuming, without deciding, that Georgia law permits Kavianpour to bring a breach of contract claim against BOR for failure to abide by the hearing procedures set forth in the House Staff Policies, the Georgia "Supreme Court has held that the breach must be more than de minimus and substantial compliance with the terms of the contract is all that the law requires." Kuritzky v. Emory Univ., 669 S.E.2d 179, 181 (Ga. Ct. App. 2008) (citation omitted). There is no question that AU did not comply with the grievance procedures set forth in House Staff Policy 13.0 prior to conducting the first grievance hearing on March 22, 2019, but it subsequently reinstated Kavianpour and restarted the grievance procedures in accordance with House Staff Policy 13.0, with a second hearing forthcoming. [Doc. 29 ¶¶ 89, 91, 93, 96-97, 136-44]. Although the Court does "not condone [AU's] actions, the question is whether th[e] failure deprived [Kavianpour] of [her] procedural due process rights where [AU] afforded [Kavianpour] notice and an opportunity to be heard," and it "is clear that such is not a violation of procedural due process, for the adequacy of due process is governed not by [internal policies] but by case law interpreting the federal and state constitutions, which only require that the employee (even if later) be notified and given an opportunity to be heard." Norris v. Henry Cty., 566 S.E.2d 428, 430

(Ga. Ct. App. 2002) (citations omitted).  Because in this case all "the requirements of due process [were] met, [AU's initial] failure to follow all the procedures . . . does not [] give rise to an action for breach of contract."  Id. (citation and internal marks omitted).

Kavianpour also alleges that BOR breached House Staff Policy 10.0 by failing to have "policies and procedures in place that ensure coverage of patient care in the event that a resident may be unable to perform their patient care responsibilities," see House Staff Policies, and asserts that this failure led to her being unable to present for drug testing within the timeframe provided on February 13, 2019, which ultimately resulted in her suspension and then termination from the residency program, [Doc. 29 ¶¶ 71-75, 81, 83-84, 176, 179-80; Doc. 47 at 19].  BOR has not specifically disputed her allegation that it did not have in place the required policies for patient safety, but instead argues that Kavianpour "has failed to set forth any facts to establish that she was damaged by any such lack of policies" or that her "termination from employment was [] caused by the lack of any such policies[.]"  [Doc. 34 at 17-18].  However, as Kavianpour points out, the lack of policies as required per House Staff Policy 10.0 as "incorporated in [her] contract placed her in the impossible position of violating her own patient care duties, outlined in the contract, or termination," and she "was ultimately suspended and terminated for refusing to leave her duty station without pager

coverage for patients," which shows "she suffered direct damage as a result of [BOR's] failure to implement patient coverage policies." [Doc. 47 at 19]. In reply, BOR asserts that because Kavianpour has failed "to allege any facts which establish that [it] consented in any way that its 'support' of ACGME policies would turn into a contractual obligation between it and [her] or any other resident[,] . . . . [her] allegations concerning patient safety protocols, or the lack thereof, [are] moot as a matter of contract between her and [BOR]." [Doc. 52 at 6].

BOR's reliance on the fact that Kavianpour's employment contract did not incorporate the ACGME policies to argue that her breach of contract claim with regard to its lack of a patient care coverage policy also fails, [id.], misses the mark because House Staff Policy 10.0, which is referenced in and incorporated into her employment contract, see [Doc. 3-2 at 2],[67] provides that each program would have policies and procedures in place to ensure patient care coverage in the event that a resident became unable to perform his or her responsibilities and that these policies would be implemented "without fear of negative consequences for the resident who [was] unable to provide the

_____

[67] In fact, Kavianpour's employment contract specifically states that "House Officers are required to comply with [House Staff] Policy 10.0 House Officer Duty Hours and Work Environment" and that "noncompliance may serve as grounds for loss of privileges and a permanent record in the House Officer file." [Doc. 3-2 at 2].

clinical work," see House Staff Policies, and BOR has offered no argument about this alleged contractual obligation. At this stage of the litigation, Kavianpour has sufficiently pled a breach of contract claim based on her allegation that BOR breached House Staff Policy 10.0 by failing to have policies in place with regard to patient care coverage, which she alleges led to her inability to appear for her scheduled drug testing that was the basis of the February 21, 2019, letter from Arnold to Coule that prompted her suspension and subsequent termination. [Doc. 29 ¶¶ 71-75, 81, 83-84, 176, 179-80; Doc. 33-2 at 2; Doc. 33-3 at 2]. Thus, BOR's motion to dismiss Kavianpour's breach of contract claim premised on the alleged violation of House Staff Policy 10.0 by failing to have policies in place with regard to patient care coverage is due to be denied. Accordingly, it is **RECOMMENDED** that AUMC's motion to dismiss Kavianpour's breach of contract claims be **GRANTED** and that BOR's motion to dismiss these claims be **GRANTED IN PART AND DENIED IN PART**.

### 3. *Kavianpour's Breach of Duty Claim Pursuant to O.C.G.A. § 51-1-6*

In Count XVI of her amended complaint, Kavianpour asserts a claim against BOR and AUMC under O.C.G.A. § 51-1-6 for an alleged breach of duty to refrain from taking her "hospital privileges to practice medicine" in an "arbitrary or capricious manner." [Doc. 29 ¶¶ 327-37 (internal marks omitted)]. AUMC and

BOR move to dismiss this claim on several grounds. [Doc. 32-1 at 24-25; Doc. 34 at 20-21].

O.C.G.A. § 51-1-6 provides that "[w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby." O.C.G.A. § 51-1-6. "This section does not create an independent cause of action," but "[i]nstead, it merely authorizes the recovery of damages for the breach of a legal duty otherwise created." Fanelli v. BMC Software, Inc., CIVIL ACTION NO. 1:11-cv-00436-JOF, 2013 WL 12190241, at *13 (N.D. Ga. July 29, 2013) (citations and internal marks omitted). That is, "§ 51-1-6 does not give rise to a private cause of action unless the statutes outlining the legal duty provide for a civil remedy." Northrup v. Conseco Fin. Corp., 141 F. Supp. 2d 1372, 1376 (M.D. Ga. 2001), aff'd, 281 F.3d 1285 (11th Cir. 2001) (unpublished) (citations omitted). "Thus, any right to recover under [this] section[] would be contingent upon a showing that some underlying obligation had been breached." Fanelli, 2013 WL 12190241, at *13 (citation omitted). And, "Georgia courts . . . have limited the statutes under which a legal duty is actionable under O.C.G.A. § 51-1-6." White v. Chicago Title Ins. Co., CIVIL ACTION FILE NO. 1:14–CV–2762–TWT, 2014 WL 12489755, at *3 (N.D. Ga. Dec. 31, 2014).

Kavianpour's amended complaint merely alleges that defendants breached their legal duty to refrain from taking "hospital privileges," see [Doc. 29 ¶¶ 327-37 (internal marks omitted)], but to the extent she has based this duty on her federal due process claim, "[§] 51-1-6 does not allow [her] to pursue duplicative remedies for an alleged violation of federal law," and she "has not alleged any legal duty [owed to her as a medical resident] under Georgia law that [d]efendants have violated," and "[§] 51-1-6 does not give rise to a private cause of action unless [she] cites statutes outlining the legal duty allegedly violated," Devese v. Chase Home Fin., LLC, CIVIL ACTION FILE NO. 1:11-CV-2882-AT-JFK, 2012 WL 13134463, at *8 (N.D. Ga. Apr. 16, 2012), adopted by 2012 WL 13134462, at *1 (N.D. Ga. June 21, 2012) (citations and internal marks omitted). Despite Kavianpour's arguments regarding a hospital's duty to comply with its bylaws when making determinations regarding staff privileges, see [Doc. 40 at 24-25 (citations omitted)],[68] as a medical resident, Kavianpour has "no hospital privileges and [is] only able to practice under [an] institutional license[] granted to [her] pursuant to OCGA § 43-34-33," Nelson v. Bd. of Regents of Univ. Sys. of Ga., 704 S.E.2d 868,

---

[68] Kavianpour has not provided any allegations regarding AUMC's bylaws in her amended complaint or alleged that any actions or inactions taken by any of the defendants were in fact contrary to AUMC's bylaws or that its bylaws applied to Kavianpour in the first place. See generally [Doc. 29].

876 (Ga. Ct. App. 2010) (footnote omitted), and as AUMC contends, she therefore "did not have 'medical staff privileges' to lose," [Doc. 32-1 at 24]. Accordingly, it is **RECOMMENDED** that Count XVI of Kavianpour's amended complaint be **DISMISSED**.[69]

## IV. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the motions to dismiss filed by Coule and the other individual defendants, [Docs. 33 & 35], be

---

[69] BOR also argues that Kavianpour's claim is due to be dismissed because she failed to provide an ante litem notice in compliance with the Georgia Tort Claims Act ("GTCA"), O.C.G.A. § 50-21-20 et seq., prior to bringing this claim against it. [Doc. 34 at 20-21 (citations omitted)]. Kavianpour disputes that she was required to file such a notice. [Doc. 47 at 23-25]. However, the "GTCA requires that plaintiffs give an *ante litem* notice of tort suits against Georgia to the State's Risk Management Division of the Department of Administrative Services" and it "further requires plaintiffs to attach as exhibits to their complaint a copy of the *ante litem* notice and a receipt for its delivery." Regalado v. Ga. State Univ., CIVIL ACTION NO. 1:20-cv-720-LMM, 2020 WL 5815924, at *7 (N.D. Ga. Sept. 10, 2020) (citation omitted). "The *ante litem* requirement is a 'condition precedent' to suit under the GTCA," and if the requirements are not met, "then the State does not waive sovereign immunity[.]" Id. (citations and internal marks omitted). "Section 51–1–6 imposes tort liability on persons for the breach of a legal duty," Hanover Ins. Co. v. Carroll, Civil Action No. 1:13–cv–01802–SCJ, 2014 WL 5472520, at *7 (N.D. Ga. Mar. 5, 2014), and to state a claim against BOR under § 51-1-6, Kavianpour must have given notice by way of an ante litem notice under the GTCA, see Chastain v. City of Douglasville, CIVIL ACTION FILE NO. 1:14-CV-4038-AT-CMS, 2017 WL 10753292, at *11 & n.8 (N.D. Ga. Jan. 20, 2017), adopted by 2017 WL 10768465, at *1 (N.D. Ga. Feb. 23, 2017) (finding that plaintiff could not state her breach of a legal duty claim under § 51-1-6 against certain defendants since it fell outside the ante litem notice period). Thus, Kavianpour's claim asserted in Count XVI of her amended complaint is due to be dismissed against BOR for this additional reason.

**GRANTED** and that AUMC and BOR's motions to dismiss [Docs. 32 & 34], be **GRANTED IN PART** and **DENIED IN PART**,[70] such that the only federal claims that would remain in the case are those alleging disability discrimination and retaliation against AUMC and BOR under Title I of the ADA in Counts VIII and IX and disability discrimination against AUMC and BOR under the Rehabilitation Act in Count XII premised on Kavianpour being perceived as having a substance abuse disorder, and the only remaining state law claims would be for breach of contract against BOR in Count I premised on BOR's alleged violation of House Staff Policy 10.0 and retaliation in violation of the GWA against BOR in Count II premised on Kavianpour's complaints of alleged violations of state and federal law.

**IT IS SO RECOMMENDED** this 28th day of January, 2021.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[70] The Clerk also is **DIRECTED** to terminate Horne and Waters as defendants listed on the docket since they were not named in Kavianpour's amended complaint.  <u>See</u> [Doc. 29].