UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SARAH M. KAVIANPOUR, MD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action File No.: |
| | : | 1:20-cv-00152-MLB-RGV |
| | : | |
| BOARD OF REGENTS OF THE | : | |
| UNIVERSITY SYSTEM OF | : | |
| GEORGIA et al., | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE
JUDGE'S FINAL REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTIONS TO DISMISS**

Pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), and LR 72.1.B, NDGa., Plaintiff Dr. Sarah Kavianpour ("Plaintiff" or "Dr. Kavianpour") files the following objections to the Magistrate Judge's Report and Recommendation for dismissal in part of her claims (Doc. 61.)

**I.    Factual Background**

Dr. Kavianpour incorporates by reference paragraphs 1-165 of her Amended Complaint.  (Doc. 29 at ¶¶ 1-165.)  In general, those allegations state as follows: Beginning July 2018 and ending with her February 21, 2019 termination, Dr. Kavianpour was the sole female resident physician in Defendants' Graduate Medical

1

Education program at Defendant Board of Regents ("BOR") and Augusta University's ("AU") Department of Neurosurgery. (*Id*. at ¶¶ 1-4, 19, 22.) AU operates in conjunction with Defendant Augusta University Medical Center ("AUMC"). (*Id*. at ¶ 4.)

On June 25, 2018, Plaintiff submitted a pre-employment drug test and, on June 28, 2018, was informed that it was positive for THC 19 ng/ml, that is, above the 15 ng/ml threshold. (Doc. 29 at ¶ 23.) On June 29, 2018[1], Dr. Moore notified Plaintiff that Defendants were rescinding Plaintiff's offer of employment, so that no residency contract would be issued to her. (*Id*. at ¶ 24.) Plaintiff appealed this decision on July 3, 2018. (*Id*. at ¶ 25). On July 5, 2018, the confirmatory testing result of the first preemployment test at an outside laboratory, MedTox, was 11 ng/ml, under the 15 ng/ml limit. (*Id*. at ¶ 26.) On July 5, 2018, Plaintiff submitted a petition for retest to Defendant Walter Moore, Senior Associate Dean for Graduate Medical Education, who granted a retest or a second pre-employment test later that day, after meeting with administrative decision-makers. (*Id*. at ¶¶ 9, 27.) The retest or second pre-employment drug test results were negative. (*Id*. at ¶ 28.) The Magistrate Judge erroneously states throughout his Report and Recommendation

[1] Paragraphs 24 and 27 of Plaintiff's Amended Complaint (Doc. 29) should read 2018 and not 2019.

that Dr. Kavianpour "tested positive" without qualification.  (Doc. 61 at 56, n.28, 58, 110.)  Subsequent to offering her employment, Defendants forced Plaintiff to submit to seven drug tests, all of which were negative including a hair follicle test. (Doc. 29 at ¶ 121.)

On December 13, 2018, Dr. Kavianpour expressed concern to Defendant Moore that her drug tests (particularly their timing) interfered with departmental operations, threatened patient care and safety, subjected her to adverse and disparate treatment, and took a toll on her work relationships with other residents asked to provide pager coverage while she was testing. (Doc. 29 at ¶ 57.)  She offered to be available for voluntary daily drug testing if: (1) it was at a set time in the afternoon that did not interfere with her clinical/patient responsibilities; and (2) she could coordinate pager-patient hand-off to a coresident. (*Id.* at ¶ 59.)  Plaintiff assumed sole on-call pager duties in January 2019. (*Id*. at ¶ 60.) On January 22, 2019, Plaintiff emailed Dr. Macomson, Defendant Debra Arnold (AU Human Resources) and others, asking to meet with Defendants Norton and Arnold "again to discuss the inappropriate timing of calls/testing, the lack of flexibility and justification per MCG policy (and stated federal laws)." (Id. at ¶ 62.)

On January 31, 2019, Defendant Arnold responded that Plaintiff was "subject to the AU and AUMC policies related to drug testing" and "refusal to participate or

a failure to complete any step of testing process results in discharge" and that "academic and clinical activity assigned by [the] department, will not be an excuse." (Id. at ¶ 63.)  Defendants agreed that Plaintiff's Residency Program Director, Dr. Samuel Macomson, would assist when a test was needed to provide confirmation that Plaintiff was available to test, which did not occur on the subsequent test day, February 13, 2019.  (Id. at ¶ 64.)

Plaintiff responded by emailing Defendants Arnold and Susan Norton, AU's Chief Human Resources Officer, stating:

> Instead of facilitating a conversation for more reasonable arrangements, you decide to buckle down with a list of demands…this forces me to question the legality of these practices you are imposing on me in the first place. It is clearly not random and quite frankly discriminatory. This is harassment … you can come up with arbitrary rules and memorandums all you'd like but that does not make them legal and it furthers the point that I am making which is that you have singled me out and subjected me to prejudice. I hope you reconsider and mitigate this. Again, I am not refusing the testing. I have been cooperative and have completed what I consider to be an intrusive and excessive amount of testing in a setting of undue suspicions – all of which have been negative.

(Doc. 29 at ¶ 65).  Defendants Arnold and Norton did not respond.  Dr. Kavianpour subsequently forwarded this chain to Dr. Macomson and asked to meet to come up with a plan for coverage so she could test, and he did not respond. (Id. at ¶¶ 67-68.)

Defendants did not subject any of the male residents to repeated drug testing; though, Defendants' policies require *random* drug testing. (Doc. 29 at ¶ 121.) Under Georgia law, random drug testing means identifying a pool of individuals from which any individual has an equal chance of being selected at any time, and not just a single, targeted individual. (*Id.* at ¶ 169.) Defendants ignored Plaintiff's requests for an appropriate plan to ensure her station was covered when she was the only resident on call and was called for a drug test with a few hours' notice. (*Id.* at ¶¶ 57-65, 90, 111, 121.) After Defendants hired her, Dr. Kavianpour submitted to *seven* drug tests, all of which were negative. (*Id.* at ¶ 121.) Defendants placed Dr. Kavianpour in the impossible position of submitting to tests at their whim despite multiple negative tests, thereby placing her patients at risk by leaving her station unattended without coverage, which Defendants admittedly failed to provide. (*Id.* at ¶¶ 62-65.) Plaintiff complained to Defendants, and to a Title IX Coordinator, about being singled out for drug testing. (*Id.* at ¶ 63.) Defendants ignored her complaints of a "Hostile Work Environment" incited by the excessive drug testing to which only she was subject. (*Id.* at ¶ 121.) Defendants attempted to conceal findings by an investigator regarding their failure to investigate Plaintiff's Hostile Work Environment claims and falsified factual bases for her termination. (*Id.* at ¶¶ 38, 104, 121, 124, 126.)

In addition to the Amended Complaint, Dr. Kavianpour references her "House Officer Notice of Appointment," which identifies AUMC as one of her work sites and notes that she was bound to follow AUMC policies and procedures as a condition of employment. (Doc. 3-2 at 2.) Dr. Kavianpour also references the memo describing alleged misconduct on her part under Defendants' AU and AUMC's Drug Testing Policies from Defendant Debra Arnold to Defendant Phillip Coule dated February 21, 2019, which was attached to Defendant Phillip Coule's Motion to Dismiss and considered by the Magistrate Judge. (Doc. 33-2.)

She further references the letter from Defendant Coule to her dated February 21, 2019, on August University letterhead, in which he suspended her privileges to work at AUMC, based on alleged violation of AUMC's Drug Testing Policy brought to his attention by Defendant Debra Arnold (Doc. 33-3.) Dr. Kavianpour was required to work at AUMC's facility as an express condition of her employment, as noted in her Notice of Discharge; accordingly, Defendant Coule's suspension of Plaintiff's privileges at Defendant AUMC resulted in her termination, as stated in her termination letter dated February 21, 2019. (Doc. 40-3.) When Plaintiff appealed the termination decision, her termination was affirmed by Dr. Fernando Vale, Chairman of the MCGHI Department of Neurosurgery, based on Defendant Coule's actions on March 1, 2019. (Doc. 40-2.)

## II.     Standards of Review on a Motion to Dismiss.

A complaint "[does] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Speaker v. U.S. Dep't of Health & Human Servs. Centers for Disease Control & Prevention*, 623 F.3d 1371, 1380 (11th Cir. 2010) (citation omitted). "A reviewing court must accept the factual allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010). Asking for plausible grounds to make an inference, "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.*  Plaintiff disagrees, of course, that her recovery is unlikely, but for purposes of the Motion to Dismiss standard, she objects to recommendations from the Magistrate Judge that reflect unreasonable factual inferences in favor of Defendants at the earliest stage of the litigation.

## III.    Plaintiff sufficiently alleged facts to establish a plausible connection of the adverse employment action to her sex, as required by her Title VII, Title IX, and Section 1983 Equal Protection claims based on sex.

A. <u>The Magistrate Judge applied an overly restrictive comparator standard in concluding that Plaintiff's allegations of similar misdeeds by male comparators were insufficient facts supporting sex-based claims.</u>

Generally, the Magistrate Judge recounted basic facts alleged by Plaintiff that Defendants discriminated against her on the basis of her sex, and even acknowledged more specific facts that pointedly support sex discrimination claims from the Amended Complaint in a footnote. (Doc. 61 at n.28, at 56-57.) Nevertheless, the Magistrate Judge applied too restrictive a standard for comparator analysis, requiring Plaintiff specifically to allege that the male residents engaged in essentially identical alleged misconduct of failing a drug test. (Doc. 61 at 56, n.28.) The Magistrate Judge cited *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1227 (11th Cir. 2019) for the proposition that a plaintiff is required to allege the "same basic misconduct" to establish that a comparator is similarly situated in all material respects to a plaintiff. (*Id*.) But the *Lewis* case specifically abrogated the "nearly identical" standard in favor of a materiality standard that is fact-specific. *Hester v. Univ. of Alabama Birmingham Hosp*., 798 F. App'x 453, 456–57 (11th Cir. 2020) (citing *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1227 (11th Cir. 2019) (abrogating "nearly identical" comparator standard in favor of "similar in all material respects" standard.))

The Magistrate Judge acknowledged that Plaintiff asserted that the male residents "repeatedly admitted to coming to work hungover and at times put the on-call neurosurgery pager status as 'at the bar'"; that two male residents arrived to her initial interview on December 7, 2017, two hours late and were hungover and had been drinking all night…" (Doc. 61 at 28, n.16.)  Additionally, Defendants AUMC and Phillip Coule suspended Plaintiff's privileges with vague reference to issues related to "patient safety" referenced in the February 21, 2019 letter; yet, even though it is plausible that male residents' consumption of alcohol to the point of intoxication could impair their work performance and patient safety, Defendants took no action to discipline or alcohol-test them.  Essentially, Plaintiff has alleged that she was subjected to repeated, excessive drug tests after an unconfirmed, pre-employment positive test that she successfully appealed and retested negative, while her male counterparts showed up on occasions to work under the influence or affected by several hours of drinking alcohol, with impunity. (Doc. 29 at ¶¶ 23-28, 145-147.)

B. <u>Plaintiff's allegations present a convincing mosaic that Defendants discriminated and retaliated against Plaintiff on the basis of her sex and created a sexually hostile work environment.</u>

Additionally, the fact that sexually inappropriate or alcohol-abusing behavior by male residents were tolerated as a matter of course by Defendants, while Plaintiff

9

was scrutinized especially severely, despite multiple negative tests, is further support for Plaintiff's sexually Hostile Work Environment claim.  For the Magistrate Judge to find that the male residents were not appropriate comparators was not a valid basis for dismissal at this stage.  (Doc. 61 at 56, n.28.)  "[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *Smith v. Lockheed Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011).  Instead, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*.  A triable issue of fact would exist, "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker."  *Id*. (footnote and internal quotation marks omitted).

This case has not yet even reached the summary judgment stage, but the Amended Complaint is replete with factual allegations that present at least a convincing mosaic from which discrimination and retaliation are plausible.  Plaintiff sought from multiple supervisors a solution for complying with their drug testing demands without compromising patient safety by leaving her station uncovered. (Doc. 29 at ¶¶ 52-55, 62-68, 72-76.) She complained to numerous management

officials that she felt targeted for a drug testing policy that was supposed to test everyone equally to be "random," and that she felt harassed and discriminated against because she was singled-out for testing. (*Id*. at ¶¶ 65, 90, 111, 121, 169.) It cannot reasonably be disputed that Plaintiff was the only female neurosurgery resident in the group. (*Id*. at ¶ 22.)

The work environment was such that she was isolated by her male colleagues' sexually inappropriate and insensitive conduct, and routinely received less support from Dr. Macomson. Dr. Macomson oversaw a hospital work environment meant to train future neurosurgeons that minimized and tolerated male residents' infantile fraternity house conduct, including sex acts at the hospital, pornography viewing, not timely responding to emergencies while on call, changing clothes in front of Plaintiff despite her protests, and appearing at work to train in neurosurgery while hungover. (*Id*. at ¶¶ 145-159.) But when it came to a female resident, Macomson supported Defendants' oppressive scrutiny of Plaintiff though she had absolutely no performance issues. (Id. at ¶ 101.) He also did not ensure she was covered for Defendants mandated drug tests, while actively covering for and redistributing workloads among male residents to accommodate and compensate for their shortcomings. (*Id*. at ¶¶ 64-68, 154.)

11

Further, Plaintiff requested multiple meetings with officials to discuss the ACGME[2] rules and contract requirements related to how the drug testing policies were supposed to be administered, and the necessity of ensuring patient coverage while she stepped away to test. (Doc. 29 at ¶¶ 52-55, 62-68, 72-76.)  Although Plaintiff went above and beyond trying to meet Defendants' expectations of drug testing (even if she objected to being singled-out), Defendants placed her in the impossible position of choosing between her obligation to submit to all of Defendants' arbitrary drug tests and her obligation not to leave her station unattended.  (*Id*. at ¶¶ 62-65.)  Defendants' solution to the purported "patient safety risk" presented by Plaintiff's unconfirmed pre-employment positive drug test, months into her employment after she repeatedly randomly tested negative, was to have no physician available at all, or a physician assistant, while she stepped away to test negative again and again and again.  (*Id*. at ¶¶ 55, 62-68, 71-80.)

The parties agreed that Dr. Macomson would intervene whenever Plaintiff was expected to drug-test to ensure she was available and her station was covered, but this did not occur.  (Doc. 29 at ¶¶ 64-68.)  Dr. Macomson admitted he ignored Plaintiff's request to meet and develop a plan to enable her to present for random drug tests without compromising patient safety.  (*Id*. at ¶ 76.) Plaintiff met with

---

[2] ACGME stands for Accreditation Council for Graduate Medical Education.

Defendants' "Title IX Coordinator," who, as the name suggests, is responsible for reviewing *sex* discrimination complaints, as well as Chief Compliance Officer ("CCO") John Lott for the purpose of seeking an investigation of her complaints of discrimination, harassment, hostile work environment and violations of policies related to the excessive drug testing.  (*Id*. at ¶ 110-111.)

Mr. Lott substantiated Defendants' violations of ACGME rules and its drug testing policies; he also found that Defendants ignored Plaintiff's Hostile Work Environment complaints.  (Doc. 29 at ¶ 121.) Mr. Lott was fired upon making these findings.  (*Id*. at ¶ 119.) Defendants ultimately gave Plaintiff a "hearing," but did not allow her "to raise pertinent evidence, perform re-direct or cross-examinations, or discuss discrimination/harassment by HR."  (*Id*. at ¶ 102.)  Following their refusal to consider her evidence, Defendants affirmed her termination based on a "pattern of passive unwillingness" and other false findings (*Id*. at ¶¶ 103-104.)  A few months later, Dr. Kavianpour submitted an Ethics and Compliance complaint. (Id. at ¶¶ 126-128.) Though there were internal conversations that Defendants had targeted and retaliated against Plaintiff with these drug tests, Defendants took no action to correct those missteps. (*Id*. at ¶¶ 128-129.)   Rather, Defendants ultimately reinstated Plaintiff for the sole purpose of providing her a sham rehearing that was

predetermined to achieve the same result, to correct their earlier procedural failures. (*Id*. at ¶¶ 135-144.)

## IV.   The Magistrate Judge erroneously concluded that Title VII preempts Plaintiff's Title IX claims (as to Count XI).

The Court should not find that Title VII preempts Title IX because the rationale for doing so is not only inapplicable, but punitive as applied to this case. Dr. Kavianpour, who was both a student and an employee, objects to the Magistrate Judge's recommendation to dismiss her Title IX claim (Count XI) on the ground that her Title VII claim preempts it.   First, Dr. Kavianpour did not evade any administrative requirement prior to bringing both claims, and should thus not be penalized under the rationale that recognizing both claims would moot Title VII's administrative requirements (see Doc. 29, ¶¶ 15-16).   Second, there is no legal basis to find that Title VII is the exclusive remedy for sex discrimination claims, where other civil rights statutes allow distinct causes of action for other protected characteristics without preemption (*e.g.* 42 U.S.C. § 1981).   Third, Plaintiff should at least be able to assert a Title IX claim against AUMC if the Court dismisses her Title VII, breach of contract, and other employment-based claims against AUMC based on the purported lack of an employment relationship.

Other courts, following guidance from the U.S. Supreme Court and viewing other anti-discrimination statutes, have found that Title VII does not preempt Title

IX.  In *Pruitt v. Emory Healthcare,* Inc., CIVIL ACTION FILE NUMBER 1:17-CV-04253-CAP-AJB (N.D. Ga. July 23, 2018), *report and recommendation adopted* (N.D. Ga. August 8, 2018), this Court examined the question of whether Title VII preempted Title IX and found, contrary to the Magistrate Judge in this case, that other employment discrimination statutes that do not have an administrative exhaustion requirement are not preempted as a general matter by Title VII, such as 42 U.S.C. § 1981's race discrimination provisions, or 42 U.S.C. § 1983's Equal Protection provisions as to any protected characteristic in common with a statute having an administrative exhaustion requirement. *See*, *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 457-58 (1975) (permitting party to bring simultaneous Section 1981 and Title VII action).  The Supreme Court has also held that Title IX's statutory language includes both students *and* employees.  *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 516 (1982).

The Magistrate Judge's recommendation of dismissal of Plaintiff's Title IX claim rests on cases reasoning that, to hold that Title VII is "not the exclusive remedy for sex discrimination in cases against institutions receiving federal funding would eviscerate Title VII's technical and administrative requirements, thereby giving plaintiffs who work at federally funded educational institutions unfettered ability to bring what are in reality Title VII sexual discrimination claims without adhering to

the same rules require[d] of every other employment discrimination plaintiff in the country." (Doc. 61 at 51, n.24) (citing *Reese v. Emory Univ.*, CIVIL ACTION FILE NO. 1:14-CV-2222-SCJ, 2015 WL 13649300, at *4 (N.D. Ga. Jan. 29, 2015).

The Magistrate Judge's reasoning rests on a false assumption that a cause of action under Title IX circumvents Title VII's requirements, a circumstance not present here, and should not be applied punitively to dismiss an otherwise valid cause of action. Dr. Kavianpour possesses rights under both statutes as *she is both an employee and a student*. The Magistrate Judge's line of reasoning penalizes the plaintiff, like Dr. Kavianpour, who duly complies with the Title VII exhaustion requirement, because other hypothetical plaintiffs could have circumvented Title VII's prerequisites by asserting a Title IX claim.

Another basis to reject the Magistrate Judge's reasoning is that Dr. Kavianpour has asserted a Title IX claim against Defendant AUMC (Doc. 29, Count XI), and to the extent that this Court finds, after discovery, that AUMC is not a joint employer with AU/BOR, Dr. Kavianpour should be able to assert a Title IX claim against the entity that receives federal funds to serve as a teaching hospital and fund her medical educational program. (Doc. 29 at ¶¶ 3-4 alleging factual basis for AUMC's status as an entity receiving federal financial assistance to operate an educational program under Title IX).

**V.     Plaintiff adequately pled facts demonstrating she engaged in protected activity opposing violations of Title VII and Title IX.**

A plaintiff "need not ... employ any magic words, such as discrimination, for the communication of a complaint of unlawful discrimination ... may be inferred or implied from the surrounding facts." *Saridakis v. S. Broward Hosp. Dist.*, 681 F. Supp. 2d 1338, 1353-4 (S.D. Fla. 2009) ("Saridakis need not have pointed out the obvious fact that she was comparing herself to a male employee to demonstrate her complaint concerned a pay disparity between a male and a female employee."); *see also*, *Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 112 (6th Cir. 2018) ("A plaintiff's objection to an employment practice is protected activity if her supervisors "should have reasonably understood that [she] was making a complaint of sex discrimination.") (plaintiff did not expressly specify "sex" discrimination).

The Magistrate Judge erroneously reported and recommended dismissal of Plaintiff's sex retaliation claims under Title VII and Title IX based on opposing sex discrimination on the ground that she purportedly did not engage in protected activity. (Doc. 61 at 69-73.) The Magistrate Judge did not consider some important factual allegations from the Amended Complaint that reflect that Plaintiff specifically complained about sex discrimination, and a Hostile Work Environment, which are legal terms of art directly tied to employment discrimination statutes. On July 2, 2019, after she complained in writing of discrimination and harassment from

the excessive drug tests, Plaintiff met with John Lott (her complaint investigator) and Michele Reid, a *Title IX coordinator*, for the purpose of complaining about sex discrimination. (Doc. 29 at ¶ 111.) *Harris v. Home Sales Co*., 499 F. App'x 285, 293 (4th Cir. 2012) (finding, even though written complaint of "unfair treatment" was insufficient on its own, the plaintiff engaged in protected activity when he followed up in phone call that he opposed a racist remark).

Use of the phrase "Hostile Work Environment" in an internal grievance, with its automatic association with unlawful employment discrimination, carries a certain weight in the workplace that an employer should reasonably understand to oppose unlawful action under Title VII, and cannot be compared to a general claim of unfairness. "'Hostile Work Environment' is a *term of art*, which refers to an unlawful employment practice under Title VII that arises because of 'discriminatory intimidation, ridicule, and insult[s]' repeatedly directed at an employee on the basis of a protected characteristic." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015) (finding written assertion of "Hostile Work Environment" unspecific to a protected characteristic to be sufficient to constitute opposition activity under Title VII) (emphasis added) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

Mr. John Lott, Defendants' investigator, found, in the course of his investigation, that Plaintiff complained of "a Hostile Work Environment" during her employment, and that Defendants ignored those complaints (Doc. 29. at ¶ 121.) Defendants knew Dr. Kavianpour was the only female resident in her department, and the only one targeted for testing. (*Id*.) Further, Plaintiff alleges that Mr. Lott found after an investigation that Defendants violated their own policies by failing to investigate Plaintiff's claims of Hostile Work Environment (which they admitted). (*Id*. at ¶¶ 112-15.) Defendants fired Mr. Lott for documenting Defendants' admission that they violated Plaintiff's contractual rights and ignored her Hostile Work Environment claims. (*Id*. at ¶¶ 119. 121.) So, to the extent Defendants argue that Plaintiff's complaints of discrimination and Hostile Work Environment were not protected activity because the protected characteristic was allegedly not specified, further specificity and explicitness would have been futile, since Defendants ignored Plaintiff's complaints and violated their own policies by failing to investigate her claims. (*Id*. at ¶¶ 92-95, 113-121.)

The futility of additional specificity is clear in the fact that on multiple occasions, Plaintiff complained of discrimination or Hostile Work Environment, invoked a grievance process, attempted to invoke compulsory process at a grievance hearing, was denied the ability to offer evidence of discrimination/retaliation at a

grievance hearing, or asked to invoke an anti-retaliation or complaint mediation process, and Defendants ignored her requests or refused.  (See, e.g., Doc. 29 at ¶¶ 66-68, 76, 93-96, 126, 128, 130, 132).  Defendants were openly contemptuous of protected activity, and Plaintiff feared retaliation for pressing her complaints, because Defendants (1) refused to comply with ACGME rules and their own policies regarding the terms and conditions of her employment; (2) fired John Lott after he recommended her reinstatement upon making official findings that Defendants targeted Plaintiff for unlawful drug testing policies; and (3) ignored Dr. Kavianpour's complaints of Hostile Work Environment.  (*Id.* at ¶¶ 94-123.)

## VI. The Magistrate Judge erroneously dismissed Plaintiff's Fourth Amendment Search and Seizure Claim.

### A. The drug tests in question were searches in violation of the Fourth Amendment.

Plaintiff objects to any finding that the drug tests to which she was subjected during her employment, or as a pre-condition of employment, were not searches within the Fourth and Fourteenth Amendments.  (Doc. 61 at 114.)  The cases holding that drug testing by a government entity is a "search" within the Fourth Amendment are "overwhelming." *Wrightsell v. City of Chicago*, 678 F. Supp. 727, 730 (N.D. Ill. 1988).  The Eleventh Circuit has specifically held that urinalysis drug testing of employees is a "search" for Fourth and Fourteenth Amendment purposes. *Am. Fed'n*

*of State, Cty. & Mun. Employees Council 79 v. Scott*, 717 F.3d 851, 866 (11th Cir. 2013) ("Testing a urine sample, which 'can reveal a host of private medical facts about an employee,' and which entails a process that 'itself implicates privacy interests,' is a search" for constitutional purposes) (citing *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 602 (1989)). The Magistrate Judge does not explain the distinction between a pre-employment drug test that is a prerequisite for employment, and the tests Defendants required of Plaintiff during her employment, for purposes of suggesting that the pre-employment test was not a Fourth Amendment Search.

   B.   <u>The Magistrate Judge erred in finding that this is a "special needs case."</u>

   Plaintiff objects that the Magistrate Judge misapplied the "special needs" exception to the Fourth Amendment "reasonableness" requirements for searches, where public safety interests are present. (Doc. 61 at 110, 112-113).   "To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing." *Chandler v. Miller*, 520 U.S. 305, 305, 117 S. Ct. 1295, 1297, 137 L. Ed. 2d 513 (1997).   While individualized suspicion is the normal requirement, "particularized exceptions to the main rule are sometimes warranted based on 'special needs, beyond the normal need for law enforcement.'" *Id.* (citation omitted.)   When such "special needs" are alleged, courts *must undertake*

*a context-specific inquiry*, examining closely the competing private and public interests advanced by the parties. *Chandler*, 520 U.S. at 306 (emphasis added); *see also*, *Scott,* 717 F.3d at 866.

The Magistrate Judge relied upon *Pierce v. Smith*, 117 F.3d 866, 873 (5th Cir. 1997), reporting and recommending that this is a "special needs case" purely because of Dr. Kavianpour's "status as a medical resident," without any contextualized balancing involving the number of repeatedly negative tests and the converse patient safety issues created by her absence that Defendants ignored and termed "not an excuse." (Doc. 61 at 113; Doc. 29 at ¶ 63.)  To the extent that Defendants have asserted that residents' access to patients and the high-risk nature of the work justifies the "special need" to repeatedly and endlessly test Dr. Kavianpour, Defendants' genuineness in claiming a "need" for this many tests should be questioned and should not be assumed by the Court at this early stage of the proceeding.  *Chandler*, 520 U.S. at 323 (requiring "blanket" searches to be "calibrated to the risk" to be reasonable.)  This risk has to be "real and not simply hypothetical." *Id.* at 319.

In the *Pierce* case relied upon by the Magistrate Judge, the Fifth Circuit Court of Appeals found minimal intrusiveness of a single drug test of a medical resident where it was one test and there was record evidence that the plaintiff, "exhibited

many of the behavioral problems that are symptomatic of drug use, such as incidents of unprofessional and out-of-character behavior, unexplained absences, and tardiness." *Pierce*, 117 F.3d at 882. In contrast, here, multiple supervisory physicians agreed that Dr. Kavianpour, "never had any performance issues or displayed signs of impairment at work." (Doc. 29 at ¶ 101.) Still, she cooperated with *seven* drug tests, all of which were negative, with no indication that they would ever stop until Defendants "caught" her in the impossible position of not being able to appear for the eighth test at the risk of leaving her post unattended. (Doc. 29 at ¶ 121.) There was no "need" for this many tests, and for Defendants to show such "need" would require discovery; the inquiry is more particularized than simply a person's status as a "medical resident" in a "safety-sensitive position," which appeared to be the Magistrate Judge's essential rationale.

Defendants did not test any other residents though Georgia law requires a "random" drug testing policy whereby every physician in the pool had an equal chance of being called for a test. (*Id*. at ¶ 169.) To the extent that Defendants claim that Plaintiff was in a safety-sensitive position, but Defendants disregarded safety-related concerns of having no physician present in Plaintiff's absences to go test, it is a reasonably plausible inference that patient safety was not the real objective of this excessive testing. (*Id*. at ¶ 34.) After seven negative tests, Defendants should

be held to an even higher standard of demonstrating that this is a "special needs" case, particularly where Georgia law requires that a pool of individuals be tested with equal chance of being drawn, for the test to be random. (Doc. 29 at ¶ 169). On the morning of the eighth test, on February 14, 2019, Defendants *would not allow Plaintiff to test*, *but allowed her to return to treating patients without restrictions that day and for the next week*. (Doc. 29 ¶¶ 77-80).

Complaints regarding the reasonableness of drug testing for constitutional purposes ordinarily cannot be dismissed on a motion to dismiss because a factual record is critical to conducting the balancing test. *See*, *e.g. Berry v. D.C.*, 833 F.2d 1031, 1034 (D.C. Cir. 1987) ("[T]he absence of a factual record militates against [reaching the constitutional issues], for it is clear that certain of the legal judgments yet to be rendered will hinge on findings of fact yet to be made with respect to the nature and scope of the drug testing program."); *Nat'l Fed'n of Fed. Employees v. Weinberger*, 818 F.2d 935, 942 (D.C. Cir. 1987) (same).

Lastly, the unconstitutionality of unlawful searches is clearly established, and the individual Defendants who participated in the decisions requiring Plaintiff's excessive testing in violation of her Fourth and Fourteenth Amendment Rights to be free from unlawful searches (excessive, unnecessary drug testing) should not be dismissed.  (Count XIV).

C. <u>The Magistrate Judge improperly converted this matter to a motion for summary judgment as to Dr. Kavianpour's Fourth Amendment claim without notice to the parties.</u>

Whenever a judge considers matters outside the pleadings in a 12(b)(6) motion, that motion is thereby converted into a Rule 56 Summary Judgment motion. Fed. R. Civ. P. 12(b). *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267 (11th Cir. 2002). Documents attached to the pleadings may be interpreted as part thereof. *Homart Dev. Co. v. Sigman*, 868 F.2d 1556 (11th Cir. 1989) (interpreting conversion rule in concert with Fed. R. Civ. P. 10(c)). When that conversion occurs, the district court is required to notify the parties that the motion has been converted and give the parties ten days in which to supplement the record. *Herron v. Beck*, 693 F.2d 125, 126 (11th Cir. 1982). Nevertheless, "[i]n ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).

The Magistrate Judge relied upon AU Substance Abuse Policy No. 685 in determining that Defendants were entitled to dismissal of Plaintiff's Fourth Amendment claim, but Plaintiff does not agree that this policy was controlling in her case. (Doc. 61 at 110-111). When Plaintiff's privileges were ultimately suspended, however, it was pursuant to a different policy—the substance abuse policy of

AUMC, not House Staff Policy 1.0 or Policy 685. (Doc. 29 at ¶ 179; *see also*, Doc. 33-2 (Defendant Arnold reporting to Defendant Coule violation of AUMC's substance abuse policy with no reference to policy 685); Doc. 40-3 (referring to "the Medical Center's substance abuse policy")).  As a result, Plaintiff objects that the Magistrate Judge relied on a document outside of the pleadings, or attachments to pleadings, that are not central to her case.  She also questions the authenticity of the Policy 685 because Defendants expressly referenced a different policy in terminating her. *Id*.  As a result, Plaintiff objects that she was not given due notice of conversion of Defendants Motion to a motion for summary judgment and respectfully requests that the Court reject any recommendations of the Magistrate Judge that relied upon her alleged noncompliance with Policy 685 or House Staff Policy 1.0.

**VII.   The Magistrate Judge erroneously recommended dismissal of Dr. Kavianpour's due process claims.**

      A.   <u>AUMC and Coule acted under color of state law in suspending Dr. Kavianpour's AUMC privileges.</u>

Plaintiff objects that the Magistrate Judge examined whether Defendants AUMC and Coule were "state actors" for purposes of her claims under 42 U.S.C. § 1983, but did not consider whether they, specifically Coule, acted "under color of" state law.  (Doc. 61 at 103-108.)  In footnote 51, the Magistrate Judge rejects Dr. Kavianpour's arguments that Defendant Coule acted under color of state law

26

because he acted in his capacity as Interim Associate Dean for Clinical Affairs, Medical College of Georgia at the time he suspended her medical privileges at AUMC.  (*Id.* at 106, n.51.)

A private hospital may be subject to the provisions of 42 U.S.C. § 1983 and the Fourteenth Amendment if its activities are significantly affected with state involvement. *Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993). The Magistrate Judge correctly identified three tests for examining whether an individual is a "state actor," but did not draw reasonable inferences in Plaintiff's favor in evaluating the sufficiency of the Amended Complaint.  The first test, the "public function test" refers to instances where private actors are performing functions "traditionally the exclusive prerogative of the state."   *Id.* (citations omitted). The second, "state compulsion test," limits state action to instances where the government "has coerced or at least significantly encouraged the action alleged to violate the Constitution."  *Id*. The nexus/joint action test applies where "the state has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Id.*

To charge a private party with state action under the joint action/nexus theory, the governmental body and private party must be intertwined in a "symbiotic relationship."  *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir.

2001).  The symbiotic relationship must involve the "specific conduct of which the plaintiff complains."  See *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999); *see also*, *Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO*, 860 F.2d 1022, 1027 (11th Cir. 1988) ("…the Supreme Court has suggested that the symbiotic relationship must involve the alleged constitutional violation.")

In *Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000), the case cited by the Magistrate Judge, the Eleventh Circuit held that, "[u]nder the nexus/ joint action test, *each case must be analyzed on its own facts* to determine whether the interdependence between the private and state entities reflects sufficient state involvement to sustain a § 1983 claim." *Id*. (emphasis added.) In *Patrick*, the plaintiff's best argument for holding the private hospital management company as a joint participant in his termination was that the private defendant received federal funding, falling far short of what Plaintiff has alleged in this case.

The R&R provided little explanation for its ruling apart from abstractly noting that the existence of a contract between Defendants AU/BOR and AUMC was insufficient to establish state action on its own, or the mere performance of a public function on its own by a private individual was insufficient. (Doc. 61 at 105-107.) Importantly, the Magistrate Judge assumed earlier in the R&R for purposes of the Title VII and ADAAA claims that *AUMC was a joint employer of Plaintiff*.  (Doc.

61 at 49).   Nevertheless, the Magistrate Judge incongruously rejected the joint action/nexus theory of state action for purposes of the Section 1983 claims against Defendants AUMC and Coule.

There were many facts alleged in the Amended Complaint from which a reviewing court could make reasonable inferences of plausible state action under the state-compulsion or nexus/joint action tests, which were not analyzed by the Magistrate Judge.   Plaintiff alleged that Defendant Coule was the Chief Medical Officer of AUMC.   (Doc. 29 at ¶ 7.)   Defendant Debra Arnold, an AU employee, sent Defendant Coule a letter dated February 21, 2019, with specific allegations against Plaintiff related to alleged violation of AU and AUMC Drug Testing Policies. (*Id*. at ¶ 81; Doc. 33-2.)

It is reasonable to infer from the February 21, 2019 correspondences to Plaintiff that the obvious purpose of Defendant Arnold's letter to Defendant Coule was to furnish a basis to take adverse employment action against her, namely, to revoke her ability to continue working at AU medical sites, a condition of her employment. (Doc. 33-2, 33-3.)  It is not implausible to conclude that Arnold's letter served as "significant encouragement" by an AU actor to take adverse action against Plaintiff. (Doc. 33-2.)    It is also not implausible to view this ping-ponging of information between AU and AUMC employees as joint decision-making to revoke

Plaintiff's privileges, and thereby terminate her employment, since her employment (according to her termination letter) was contingent on her ability to have privileges at AUMC. (Doc. 40-3). And further, Plaintiff's supervisors in her residency program and the neurology department claimed they were "powerless to overturn an AUMC decision." (Doc. 29 at ¶ 88.)

That the purpose of the February 21, 2019 letter from Arnold to Coule was to recommend adverse action against Plaintiff was borne out when Defendant Coule's immediate response was to cut off Dr. Kavianpour's privileges. (Doc. 33-3.)  The ability to work at AU health sites was a term of Plaintiff's employment, and the suspension of Plaintiff's privileges at all AU sites by Defendant Coule created a domino effect and was <u>the</u> reason cited for her discharge in her termination letter, which states:

> The Chief Medical Officer for the Health System [Defendant Coule] has exercised his discretion and authority to revoke your ability to practice in the medical center and related facilities. Therefore, you are not able to be trained in the health system, which is a requirement for you to be in our residency program.
>
> This decision is prompted by you not adhering to the Medical Center's Substance Abuse policy and the protocol that had been established for you for random drug testing.

(Doc. 40-3 at 2.)  AU characterized the basis for Plaintiff's termination as the action taken by Dr. Coule to suspend her privileges, on which her completion of her

residency was contingent. (Doc. 29 at ¶ 88; Doc. 40-3.) The Magistrate Judge did not analyze these particulars under each theory of state action in recommending dismissal of Counts XIV and XV.

In footnote 51, the Magistrate Judge also relied on cases that recognize that individuals can act in multiple capacities. *Id*. (citing *Loewen v. Grand Rapids Med. Educ. Partners*, No. 1:10-CV-1284, 2012 WL 1190145, at *7 (W.D. Mich. Apr. 9, 2012); *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 543 n. 6, (1986) ("Acts performed by the same person in two different capacities are generally treated as the transactions of two different legal personages." (internal quotation marks omitted)). Neither of these cases involve constitutional claims where the court examined whether an individual acting in two capacities is undertaking action "under color of state law." *Id*. The *Loewen* case was also decided under a summary judgment standard rather than a motion to dismiss. The footnote cited from the *Bender* decision refers to distinguishing between an individual capacity claim or an official capacity claim against a defendant employed by one entity, not involving one individual wearing two hats for two apparent employer-entities. *Bender* is completely inapposite and never examined what constitutes "under color of state law." 475 U.S. 534, 543 n. 6.

In *Watkins v. Roche*, 560 F. Supp. 416, 418 (S.D. Ga. 1983), aff'd sub nom. *Watkins v. Crouch*, 751 F.2d 1260 (11th Cir. 1985), the court held that, subsumed in the inquiry of whether an individual acts under color of state law, "is the issue of defendants' professional relationship with the State of Georgia." *Id*. There, the court found that a defendant physician who treated the patient-plaintiff acted under color of state law even though he treated the patient at a non-governmental hospital because he was a faculty member of the Medical College of Georgia (MCG), part of the University System of Georgia, an arm of the executive branch. *Id*. The court further found action under color of state law where the private actor "act[ed] as a conduit through which the State's authority and power flows"; as a result, his "failure to abide by these rights, in effect, could constitute the state's deprivation of these rights." *Id*. at 419.

Similarly, in this case, the commingled roles occupied by AUMC officials in carrying out their duties toward medical residents and the unilateral control that Dr. Coule has over a material condition of Dr. Kavianpour's employment (her ability to work at AUMC), which AU/BOR employees including Dr. Macomson, the Residency Director, and Dr. Fernando Vale, the Chief of Neurosurgery, are "powerless" to change, reflect joint action in terminating Plaintiff. (Doc. 29, ¶¶85, 88.)

As a result, Plaintiff objects that the Magistrate Judge's recommendation regarding Counts XIV and XV failed to fully consider all of the facts in her Amended Complaint and analyze them under the three tests for state action. The Magistrate Judge should have considered the above facts, which plausibly support either a state compulsion or joint action/nexus theory of state action.

Plaintiff incorporates by reference her prior analysis challenging the Magistrate Judge's conclusion that this is a special needs case for due process purposes, considering the sheer amount of tests she was subjected to—seven tests, with no limit on how many more tests she could be subjected to, and when, despite repeated negative tests. Plaintiff objects to the Magistrate Judge's finding recommending dismissal of her due process claims against the entity and individual Defendants based on the excessive drug testing violating substantive due process.

## VIII. The Magistrate Judge erred in recommending dismissal in part of Plaintiff's Georgia Whistleblower Act claims.

### A. The Magistrate Judge erred in finding Plaintiff failed to allege facts that AUMC was not a public employer under the Georgia Whistleblower Act.

The Magistrate Judge erroneously recommended dismissal of Counts II-IV of the Amended Complaint asserting Georgia Whistleblower Act ("GWA") claims against AUMC, on the ground that AUMC is not a public employer as defined by the GWA. (Doc. 61 at 125-126). The GWA defines public employers as "the

executive, judicial, or legislative branch of the state; any other department, board, bureau, commission, authority, or other agency of the state which employs or appoints a public employee or public employees; or any local or regional governmental entity that receives any funds from the State of Georgia or any state agency." O.C.G.A. § 45-1-4(a)(4). The GWA is a remedial statute to be broadly construed. *Ga. Lottery Corp. v. Tabletop Media, LLC.*, 346 Ga. App. 498, 503 (2018) ("laws…confirming…existing [laws], or adding to the means of…enforcing the same" are remedial), that are to be liberally construed. *See also*, *Williams Gen. Corp. v. Stone*, 280 Ga. 631, 632 (2006) (RICO liberally applied).

Plaintiff has alleged that AUMC was an agent of the state that employed her in that AUMC had direct control over a condition of her employment, her ability to perform medical services at the work site identified in her employment contract. (Docs. 33-2, 33-3.)   When AUMC revoked her ability to complete an essential condition of her employment, predictably, her employment was immediately terminated. (Doc. 40-3.)   Plaintiff's supervisors claimed they were "powerless to overturn an AUMC decision" when she was terminated.   (Doc. 29 at ¶ 88.)   Based on these allegations, which the Court must assume as true for purposes of this Motion, it is plausible that Defendant AUMC was a public employer under the GWA.

## IX.   BREACH OF CONTRACT

A.   <u>AUMC is a party to the contract because it is the sponsoring institution and has control over AU's performance of the contract.</u>

The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken. *Moore v. Lovein Funeral Home, Inc*., 852 S.E.2d 876, 880 (Ga. Ct. App. 2020).

> A breach occurs if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible. The interpretation of a contract is a question of law, unless the contract language presents an ambiguity that cannot be resolved by the rules of construction. The cardinal rule of construction is to ascertain the intent of the parties. Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties.... Where ambiguities exist, the court may look outside the written terms of the contract and consider all the surrounding circumstances to determine the parties' intent. Parol evidence may not be considered unless the written instrument is ambiguous.

*Id*.

The contract in question here specifies that one of the terms and conditions of Plaintiff's employment was her ability to work at an AUMC hospital site. (Doc. 3-2 at 2.)   AUMC also provides "Living Quarters" as part of the contract for fulfillment of terms and conditions.  *Id*.  In *Moore v. Lovein Funeral Home, Inc*., 852 S.E.2d

876, 880 (Ga. Ct. App. 2020), the Georgia Court of Appeals denied summary judgment on the grounds that the exact nature of the parties to the contract was unclear.

B.   Plaintiff has alleged facts supporting multiple plausible breaches.

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Uhlig v. Darby Bank & Tr. Co*., 556 F. App'x 883, 887 (11th Cir. 2014) (per curiam) (unpublished) (internal marks omitted) (quoting *Norton v. Budget Rent A Car Sys. Inc*., 705 S.E.2d 305, 306 (Ga. Ct. App. 2010)). "A breach occurs if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible." *UWork.com, Inc. v. Paragon Techs., Inc*., 740 S.E.2d 887, 893 (Ga. Ct. App. 2013) (citation omitted).

Plaintiff has alleged multiple plausible breaches in this case, and the Magistrate Judge even agreed that Defendants' acts constituted breaches in some respects, discussed further below.  (Doc. 61 at 138.) Violating handbook policies for a student being expelled can constitute a breach of contract.  Courts have found a breach of contract in an action brought by a medical student against a medical school for terminating the student, where the institution failed to conduct required informal

hearing, did not explain who had filed the complaint, what the process would be, or what the burden of proof was, the school refused to listen to student's evidence or accept documentary evidence from him). *Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 373, 669 S.E.2d 179, 182 (2008) (citing *Morehouse Coll., Inc. v. McGaha*, 277 Ga. App. 529, 532, 627 S.E.2d 39, 42 (2005)).

Here, the Magistrate Judge found plausible allegations supporting a breach: "There is no question that AU did not comply with the grievance procedures set forth in House Staff Policy 13.0 prior to conducting the first grievance hearing on March 22, 2019, but it subsequently reinstated Kavianpour and restarted the grievance procedures in accordance with House Staff Policy 13.0, with a second hearing forthcoming." (Doc. 61 at 138.) But, Plaintiff has alleged specifically that her reinstatement was a sham that was otherwise predetermined toward her non-renewal. (Doc. 29 at ¶¶ 136-138.) Her medical career has been halted, and she has been unable to obtain a license as a result of this breach, making the harm far from *de minimis*. (*Id*. at ¶ 160.) Plaintiff's hearing was continued at the time of the filing of the Amended Complaint, so there is no basis to assume that Defendants substantially complied with their contract obligations. (*Id*. at ¶ 144.) As a result, Plaintiff objects to dismissal of her contract claim in this regard, particularly where some of the

hearing irregularities are material to the breach and were not considered by the Magistrate Judge in reporting "substantial compliance." (Doc. 61 at 138.)

## Conclusion

For the reasons above, Plaintiff objects to the Magistrate Judge's recommendations of dismissal in this case. Plaintiff has set forth valid claims under state and federal law against both the entity and individual Defendants. Accordingly, this Court should reject the Magistrate Judge's recommendations objected to above.

Respectfully submitted this 18th day of February, 2021.

**BUCKLEY BEAL, LLP**

By:    */s/ Edward D. Buckley*
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleybeal.com
Anita K. Balasubramanian
Georgia Bar No. 372029
abala@buckleybeal.com

600 Peachtree Street NE, Suite 3900
Atlanta, GA  30308
Telephone: (404) 781-1100
Facsimile:  (404) 781-1101

**LAW OFFICE OF JOHN P. BATSON**

*/s/ John P. Batson*
John P. Batson
Georgia Bar No. 042150

jpbatson@aol.com

Post Office Box 3248
Augusta, GA 30914-3248
Telephone: (706) 737-4040
*Attorneys for Plaintiff*

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel hereby certifies this pleading conforms to the

Local Rules of this Court as to font and type size.

This 18th day of February, 2021.

**BUCKLEY BEAL, LLP**

*/s/ Edward D. Buckley*
Edward D. Buckley
Georgia Bar No. 092750

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SARAH M. KAVIANPOUR, MD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action File No.: |
| | : | 1:20-cv-00152-MLB-RGV |
| | : | |
| BOARD OF REGENTS OF THE | : | |
| UNIVERSITY SYSTEM OF | : | |
| GEORGIA et al., | : | |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2021, I electronically filed the foregoing

**PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINAL**

**REPORT AND RECOMMENDATION (ECF No. 61)** with the Clerk of Court

using the CM/ECF system which will automatically send email notification of such

filing to the following attorneys of record:

Bryan K. Webb (bwebb@law.ga.gov)
Robert C. Threlkeld (rthrelkeld@mmmlaw.com)

BUCKLEY BEAL, LLP

By:   */s/ Edward D. Buckley*
Edward D. Buckley

41