# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Sarah M. Kavianpour, MD,

    Plaintiff,

        Case No. 1:20-cv-152-MLB

v.

Board of Regents of the University
System of Georgia d/b/a Augusta
University, et al.,

    Defendants.

_____/

## ORDER

Plaintiff Sarah M. Kavianpour brings this action against eight defendants involved (in some way) in her termination from Augusta University's neurosurgery residency program: Defendants Board of Regents of the University System of Georgia ("BOR"), doing business as Augusta University ("AU"); Medical College of Georgia Health Inc., doing business as Augusta University Medical Center, Inc. ("AUMC"); Brooks Keel; Phillip Coule; Clay Sprouse; Walter Moore; Susan Norton; and Debra Arnold. Defendants have filed four motions to dismiss. (Dkts. 32–35.) The Magistrate Judge recommends granting in full the motions filed

by Defendants Keel, Coule, Sprouse, Moore, Norton, and Arnold; and granting in part the motions filed by Defendants AUMC and BOR. (Dkt. 61.) Plaintiff has filed objections to which Defendants responded. (Dkts. 64–66.) The Court adopts the Magistrate Judge's report and recommendation ("R&R") as modified herein.

## I. Background

In March 2018, AU offered Plaintiff a position in its neurosurgery residency program. (Dkt. 29 ¶ 19.) A few months later, Plaintiff underwent a pre-employment drug test, which detected marijuana in her urine at a level of 19 ng/ml—slightly above the "15 ng/ml threshold." (*Id.* ¶ 23; *see id.* at 11 n.1.) AU revoked her residency offer as a result. (*Id.* ¶ 24.) When Plaintiff appealed, an outside laboratory retested her urine sample and detected marijuana at a level of 11 ng/ml—slightly below the 15 ng/ml threshold. (*Id.* ¶¶ 25–26.) Given these mixed results, Plaintiff met with AU representatives and got permission to undergo a second pre-employment drug test. (*Id.* ¶ 27.) This test returned a negative result. (*Id.* ¶ 28.) Thereafter, AU again offered Plaintiff a position in its residency program. (*Id.* ¶ 29.) Plaintiff accepted this offer in July 2018. (*Id.* ¶ 29.) She was the only female resident in the program. (*Id.* ¶ 22.)

On August 21, 2018, Defendant Norton (AU Chief HR Officer) sent Plaintiff a "Random Drug Testing Notification" explaining she would be "subject to random drug testing beginning now until July 31, 2019 . . . because she performed duties considered high risk." (*Id.* ¶¶ 30, 32.) The notification said Defendant Arnold (AU Director of Employee Relations for HR) would "randomly" ask Plaintiff to appear for a drug test within an hour's notice. (*Id.* ¶ 33.)

On August 29, 2018, Dr. Samuel Macomson (Residency Program Director) invited Plaintiff into his office to address a rumor that she used marijuana to handle stress. (*Id.* ¶ 36.) Later that day, Plaintiff met with Dr. Macomson and Defendant Moore (Senior Associate Dean for Graduate Medical Education) to discuss a rumor that Plaintiff was previously prescribed marijuana, regularly used it for stress, and had cried in the Neuro-ICU. (*Id.* ¶ 37.) Plaintiff said the marijuana rumors were false and that she cried in the ICU only because she had a migraine. (*Id.* ¶ 38.) Defendant Moore told Plaintiff to report to the Georgia Professional Health Program, which was designed for physicians with substance abuse disorders. (*Id.* ¶¶ 39–40.) Plaintiff never did so. (*Id.* ¶¶ 41–42.)

Over the next few months, AU required Plaintiff to undergo several drug tests on short notice, often when she was off-duty or on pager duty. She tested negative in September 2018. (*Id.* ¶ 43.) In October 2018, she initially provided a diluted urine sample but tested negative two days later when she was asked to retest. (*Id.* ¶¶ 44–45.)[1] In November 2018, Plaintiff tested negative after failing to report for a drug test while on vacation the day before. (*Id.* ¶¶ 48–49.) Plaintiff also tested negative in December 2018 after arranging for someone to cover her shift so she could complete the test. (*Id.* ¶¶ 54–56.)

After the December 2018 test, Plaintiff told Defendant Moore that "her drug tests (particularly their timing) interfered with departmental operations, threatened patient care and safety, subjected her to adverse and disparate treatment, and took a toll on her work relationships with other residents asked to provide pager coverage while she was testing." (*Id.* ¶ 57.) Plaintiff offered to be available for drug testing if "(1) it was at a set time in the afternoon that did not interfere with her

---

[1] Plaintiff said her urine was diluted because she suffers from chronic kidney disease, which required her to drink three liters of water per day. (Dkt. 29 ¶ 46.)

clinical/patient responsibilities; and (2) she could coordinate pager-patient hand-off to a co-resident." (*Id.* ¶ 59.)

On January 17, 2019, Plaintiff missed a drug test while she was off-duty because she did not see the request until it was too late. (*Id.* ¶ 61.) Five days later, she asked to meet with Defendants Norton and Arnold "to discuss the inappropriate timing of calls/testing, the lack of flexibility and justification per [Medical College of Georgia] policy (and stated federal laws)." (*Id.* ¶ 62.) On January 31, 2019, Defendant Arnold responded that Plaintiff was "subject to the AU and AUMC policies related to drug testing," that "refusal to participate or a failure to complete any step of testing process results in discharge," and that "academic and clinical activity assigned by the department[] will not be an excuse." (*Id.* ¶ 63.) Defendant Arnold also agreed to avoid scheduling tests on Plaintiff's days off and to confirm Plaintiff's availability with Dr. Macomson before asking her to test. (*Id.* ¶ 64.) Plaintiff replied that she was being targeted unfairly:

> Instead of facilitating a conversation for more reasonable arrangements, you decide to buckle down with a list of demands . . . this forces me to question the legality of these practices you are imposing on me in the first place. It is clearly not random and quite frankly discriminatory. This is harassment . . . you can come up with arbitrary rules and

memorandums all you'd like but that does not make them legal and it furthers the point that I am making which is that you have singled me out and subjected me to prejudice. I hope you reconsider and mitigate this. Again, I am not refusing the testing. I have been cooperative and have completed what I consider to be an intrusive and excessive amount of testing in a setting of undue suspicions — all of which have been negative.

(*Id.* ¶ 65.) On February 1, 2019, Plaintiff forwarded this email thread to Dr. Macomson and asked him for a meeting to discuss patient coverage so she could present for testing when required to do so. (*Id.* ¶ 67.) He never responded. (*Id.* ¶ 68.)

On the morning of February 13, 2019, Defendant Arnold instructed Plaintiff to present for a drug test within four hours. (*Id.* ¶ 71.) Plaintiff responded that she "might not be able to [do so] because she was on sole pager duty and all the other neurosurgery residents were in the operating room and unable to cover for her." (*Id.* ¶ 72.) Defendant Arnold agreed to start the four-hour testing window at 12 p.m. (Dkt. 33-2.) At 4:43 p.m., Plaintiff sent Defendant Arnold an email explaining that she missed the test: "I just looked at the time clock and I just realized I missed my window. The other junior residents were in the [operating room] til late and I had a procedure and several consults. I will go first thing tomorrow

AM. . . . The third year refused to take the pager from me so I will talk to my program director about this." (*Id.*)

Early the next morning, Plaintiff presented herself for drug testing, but Defendants Arnold and Norton directed Employee Health officials not to test her because it was not the required date. (Dkts. 29 ¶ 77; 33-2.) Plaintiff called Dr. Macomson, who indicated he was unaware that Defendant Arnold had asked Plaintiff to test the day before. (Dkt. 29 ¶¶ 78–79.)

On February 21, 2019, Defendant Arnold sent Defendant Coule (AUMC Chief Medical Officer) a letter explaining that Plaintiff missed drug tests on January 17, 2019 and February 13, 2019 even though HR had warned her that she could be terminated for doing so. (Dkt. 33-2.) The letter also noted that, in November 2018, Plaintiff was "charged and arrested for speeding and DUI." (*Id.*) Later that day, Defendant Coule sent Plaintiff a letter saying (1) "[i]nformation has come to our attention that has led to concern for patient safety" and (2) Plaintiff was immediately suspended from all clinical activities at AUMC. (Dkt. 33-3.) Shortly thereafter, Dr. Macomson sent Plaintiff a letter terminating her residency employment with AU because Defendant Coule "exercised his

discretion and authority to revoke your ability to practice in the [AUMC] and related facilities. Therefore, you are not able to be trained in the health system, which is a requirement for you to be in our residency program." (Dkt. 40-3.)

Plaintiff appealed her termination, but the decision was upheld on March 1, 2019. (Dkt. 29 ¶¶ 86–87.) A few days later, Plaintiff submitted a statement of grievance to AU's HR department. (*Id.* ¶ 89.) She also raised concerns with others at AU and AUMC. For example, on March 5, 2019, she told Defendant Coule her suspension was a "prohibited adverse employment action." (*Id.* ¶ 90.) On March 13, 2019, she asked Defendant Sprouse to take over the HR-led grievance process on the grounds that HR had a conflict of interest and was retaliating against her. (*Id.* ¶ 91.) He never did so. (*Id.*) Plaintiff raised similar concerns about the grievance process in other emails to HR and Defendants Coule, Moore, and Sprouse. (*Id.* ¶¶ 93–94.) The grievance hearing ultimately went ahead on March 22, 2019 and was led by Defendant Norton's subordinate in AU's HR department. (*Id.* ¶ 97.) The grievance panel recommended upholding Plaintiff's termination based on her "pattern of

passive unwillingness." (*Id.* ¶ 103.) AU's Provost adopted this recommendation on April 2, 2019. (*Id.* ¶ 106.)

In May 2019, AU's Chief Compliance Officer contacted Plaintiff to "investigate compliance issues." (*Id.* ¶ 109.) A third-party contractor took over the investigation in June 2019. (*Id.* ¶ 110.) The contractor submitted his report to Defendant Keel (AU President) in July 2019. The report concluded that Plaintiff was "cited for violating a [drug testing] policy that she did not violate because it was not properly applied nor adhered to"; that "[n]o other resident in [Plaintiff's] department was random selected for drug testing"; that Plaintiff's complaints about "a hostile work environment"—in January and March 2019—should have triggered an investigation; and that Plaintiff's residency position should be reinstated. (*Id.* ¶¶ 120–21.)

Around the time of this report, Defendant Sprouse terminated the contractor for "express[ing] concern about Defendant Sprouse's collaboration with Defendant Norton and ability to independently investigate." (*Id.* ¶ 122.) Defendant Sprouse then took over the investigation himself. (*Id.* ¶ 124.) Plaintiff continued to raise concerns without success until she filed this lawsuit in December 2019.

(*See* Dkts. 1-1; 29 ¶¶ 125–35.)  Just a few days after that filing, Dr. Macomson sent Plaintiff a letter explaining (1) "her suspension and termination decisions would be subject to review by a Clinical Competency Committee ('CCC') under House Policy 13.01 on January 7, 20[20]"; (2) "pending this review, Plaintiff would be retroactively reinstated as an employee of AU in her previous role and would receive past compensation due from the date of termination"; and (3) "her [AUMC] suspension would remain in effect."  (Dkt. 29 ¶¶ 136–37.)  On January 11, 2020, the Clinical Competency Committee recommended "nonrenewal" of Plaintiff's contract based on "repeated violations of professional conduct, hospital policy and procedure[,] and failure to uphold standards of interpersonal and communication skills."  (*Id.* ¶ 138.)  On January 16, 2020, Dr. Macomson adopted this recommendation and told Plaintiff she could request a hearing by an Ad Hoc Committee.  (*Id.* ¶¶ 139–40.)  An Ad Hoc Committee was appointed in February 2020.  (*Id.* ¶ 142.)  It has not yet convened.  (*Id.* ¶¶ 143–44.)

In April 2020, Plaintiff filed an amended complaint asserting sixteen counts: (1) breach of contract; (2) retaliation under the Georgia

Whistleblower Act ("GWA") after Plaintiff complained that her drug testing was not random; (3) retaliation under the GWA after Plaintiff complained that her drug testing interfered with patient safety; (4) retaliation under the GWA after Plaintiff complained about AU/AUMC's internal appeals process; (5) discrimination under Title VII; (6) hostile work environment under Title VII; (7) retaliation under Title VII; (8) disability discrimination under Title I of the ADA; (9) retaliation under Title I of the ADA; (10) disability discrimination under Title III of the ADA; (11) discrimination under Title IX; (12) discrimination under the Rehabilitation Act; (13) sex discrimination under the Equal Protection Clause; (14) unlawful search and seizure under the Fourth Amendment; (15) due process violations under the Fourteenth Amendment; and (16) arbitrary revocation of "hospital privileges" under O.C.G.A. § 51-1-6. Defendants now move to dismiss the complaint in its entirety. The Magistrate Judge recommends dismissing all of Plaintiff's claims except for Counts 8–9 (Title I of the ADA), Count 12 (Rehabilitation Act), and portions of Counts 1 (breach of contract) and 2 (GWA retaliation). Plaintiff objects to the R&R.

## II.   Legal Standards

### A.   Motion to Dismiss

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This requires more than a "mere possibility of misconduct." *Id.* at 679.  Plaintiff's well-pled allegations must "nudge[] [her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In making this plausibility determination, the court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences." *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1196 (11th Cir. 2010).  But the court need not credit "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263 (11th Cir. 2004).  In other words, "labels and conclusions" are disregarded, and "formulaic recitation[s] of the

elements of the cause of action" are insufficient. *Twombly*, 550 U.S. at 555.

### B.    R&R

28 U.S.C. § 636(b)(1) requires district courts to "make a de novo determination of those portions of [an R&R] to which objection is made." Any such objection "must specifically identify the portions of the [R&R] to which objection is made and the specific basis for objection." *McCullars v. Comm'r, Soc. Sec. Admin.*, 825 F. App'x 685, 694 (11th Cir. 2020); *see United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009) ("[A] party that wishes to preserve its objection must clearly advise the district court and pinpoint the specific findings that the party disagrees with."). "Frivolous, conclusive, or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988). "It is reasonable to place upon the parties the duty to pinpoint those portions of the magistrate's report that the district court must specially consider" because doing so "facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." *Schultz*, 565 F.3d at 1361.

"It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985); *see Kimber v. Jones*, 2013 WL 1346730, at *1 n.1 (N.D. Ala. Apr. 3, 2013) ("The court notes that it was not required to conduct an independent review of the Report and Recommendation in this case because no party has filed objections."). And, in most cases, "[a] party failing to object to [an R&R] waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *McGriff v. Comm'r, Soc. Sec. Admin.*, 654 F. App'x 469, 472 (11th Cir. 2016). Ultimately, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Here, Plaintiff objects to limited portions of the R&R. The Court reviews each objection below.[2]

---

[2] Although many district courts do conduct a limited review of unobjected-to portions of an R&R—typically for "plain error"—the Supreme Court has said it is "not persuaded that the statute positively requires some lesser review by the district court when no objections are filed." *Thomas*, 474 U.S. at 150. That is, nothing "preclude[s]" a court from "treating the failure to object as a procedural default, waiving the

## III. Discussion

### A. Count 1: Breach of Contract

Count 1 asserts a breach of contract claim against Defendants BOR and AUMC on the ground that they violated several policies incorporated by reference into Plaintiff's employment contract with AU. Specifically, Plaintiff says Defendants breached polices promulgated by the Accreditation Council of Graduate Medical Education ("ACGME"); the drug testing procedures required by "USG Policies" and the State Merit System of Personnel Administration ("SMSPA"); patient coverage requirements under AU House Staff Policy 10; and due process requirements under AU House Staff Policy 13.2. (Dkt. 29 ¶¶ 166–82). "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Moore v. Lovein Funeral Home, Inc.*, 852 S.E.2d 876, 880 (Ga. Ct. App. 2020).

right to further consideration of any sort." *Id.* at 152; *see id.* at 151 ("There is no indication that Congress, in enacting § 636(b)(1)(C), intended to require a district judge to review a magistrate's report to which no objections are filed."). Regardless, the Court sees no clear error in the unobjected-to portions of the R&R in this case.

The Magistrate Judge found that AUMC cannot be liable for breaching Plaintiff's employment contract with AU because it was not a party to that contract (Dkt. 61 at 132); that Plaintiff's contract did not incorporate ACGME policies (*Id.* at 135–37); that Plaintiff's contract did not give controlling effect to the drug testing procedures outlined in the USG and SMSPA policies (*Id.* at 133–35); that Plaintiff adequately pled a violation of House Staff Policy 10 against Defendant BOR (*Id.* at 139–41); and that, although Defendant BOR violated House Staff Policy 13.2, this does not give rise to a breach-of-contract claim because Defendant BOR has since "reinstated [Plaintiff] and restarted the grievance procedures in accordance with House Staff Policy 13" (*Id.* at 138).

Plaintiff objects to the first and last conclusions. (Dkt. 64 at 35–38.) As to the first, she claims AUMC was a party to Plaintiff's employment contract because (1) "one of the terms and conditions of Plaintiff's employment was her ability to work at an AUMC hospital site" and (2) the contract said "[c]all rooms will be available for residents on call overnight at [AUMC]." (Dkts. 3-2; 64 at 35.) Plaintiff does not explain, and the Court does not see, why either of these things makes AUMC a party to a contract it never signed. The contract is expressly

between Plaintiff and "Augusta University." (Dkt. 3-2.) And Plaintiff does not object specifically to the Magistrate Judge's conclusion that AU and AUMC are separate entities. (Dkt. 61 at 40–47); *see also Sholes v. Anesthesia Dep't*, 2020 WL 1492175, at *2, 4 (S.D. Ga. Mar. 23, 2020) (treating AU and AUMC as separate entities). Plaintiff instead cites *Moore* for the proposition that dismissal is inappropriate where "the exact nature of the parties to the contract [is] unclear." (Dkt. 64 at 36); *Moore*, 852 S.E.2d 876. But *Moore* involved a contract that, while purportedly between A and B, was signed by A and C. Moreover, C was the one who "presented" the contract to A and "went over each term in the agreement for [A]'s approval." *Id.* In that context, the court found "a question of fact remains as to whether [B] was acting as the undisclosed agent of [C] in contracting with [A]." *Moore*, 852 S.E.2d at 881. In contrast, there is no allegation that AUMC signed or presented Plaintiff's employment contract with AU. So *Moore* does not control here.[3]

Plaintiff also objects to the R&R's conclusion about House Staff Policy 13.2. Under that policy, when residents are "evaluat[ed] . . . for

---

[3] The *Moore* contract also explicitly authorized and obliged C to do certain things for A, which muddied the waters further. *Moore*, 852 S.E.2d at 881.

promotion or for disciplinary actions," (1) a Clinical Competency Committee must "make recommendations on remedial action, non-renewal, disciplinary actions (e.g., suspension) and dismissal to the Program Director"; (2) the Program Director must decide whether to adopt the Clinical Competency Committee's recommendation; and (3) the resident may appeal the Program Director's decision to an Ad Hoc Committee. *See* AU House Staff Policy 13.2. Plaintiff claims Defendant BOR did not comply with this procedure when it terminated her. (Dkt. 29 ¶ 175.) The Magistrate Judge agreed. But he thought this did not establish a breach-of-contract claim because Defendant BOR has since "reinstated [Plaintiff] and restarted the grievance procedures in accordance with House Staff Policy 13.0." (Dkt. 61 at 138.) Plaintiff objects to this conclusion, but the Court sees no error in it.

"Under Georgia law, damages caused by the breach is a necessary element of [a] breach of contract claim." *Williams v. GreenPoint Mortg. Funding, Inc.*, 2017 WL 8218978, at *5 (N.D. Ga. July 28, 2017). Thus, to recover here, Plaintiff must show her termination "would not have occurred but for the breach" of the procedural requirements in House Staff Policy 13.2. *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126,

1133 (11th Cir. 2014). Plaintiff cannot make that showing here because Defendant BOR reached essentially the same decision (non-renewal of Plaintiff's contract) even after reinstating her and complying with House Staff Policy 13.2. In Georgia, all employees face an uphill battle in demonstrating a causal link between their termination and "[a]n employer's failure to follow contract procedures in dismissing [them]." *Savannah Coll. of Art & Design, Inc. v. Nulph*, 460 S.E.2d 792, 793 (Ga. 1995) ("An employer's failure to follow contract procedures in dismissing an employee does not 'cause' the termination," even if the termination occurs "without notice," "without a hearing," and without involvement from the required decision-maker). That hill is simply too steep where, as here, the employer eventually follows the "contract procedures" and still decides to terminate the employee. Given the record here, "Plaintiff has failed to allege how the end result would have been different if" Defendant BOR complied with House Staff Policy 13.2 earlier rather than later. *Clark v. Ocwen Loan Servicing*, 2016 WL 10988789, at *8 (N.D. Ga. Dec. 21, 2016); *see Giles v. Winn-Dixie Montgomery, LLC*, 574 F. App'x 892, 895 (11th Cir. 2014) ("Plaintiffs' theory about what 'could have' happened is too speculative to survive summary judgment" on the

issue of causation). The Court overrules Plaintiff's objections to the R&R's disposition of Count 1.[4]

## B.    Counts 2–4: GWA

Counts 2–4 assert GWA retaliation claims against Defendants BOR and AUMC. "The GWA applies only to public employers." *Joseph v. Bd. of Regents of Univ. Sys. of Ga.*, 2020 WL 6494202, at *9 (N.D. Ga. May 8, 2020). And the GWA defines a "public employer" as "the executive, judicial, or legislative branch of the state; any other department, board, bureau, commission, authority, or other agency of the state which employs or appoints a public employee or public employees; or any local or regional governmental entity that receives any funds from the State of Georgia or any state agency." O.C.G.A. § 45-1-4(a)(4).

---

[4] In her objections, Plaintiff claims "her reinstatement was a sham that was otherwise predetermined toward her non-renewal." (Dkt. 64 at 37.) But the complaint does not allege enough factual support for that theory. It simply asserts—in conclusory fashion—that "Defendants attempted to insulate their illegal and discriminatory drug tests and personnel decisions concerning Plaintiff from judicial review by creating a pretextual paper trail." (Dkt. 29 ¶ 136.) That "naked assertion[,] devoid of further factual enhancement," is insufficient. *Iqbal*, 556 U.S. at 678. Plaintiff identifies no specific deficiencies in the composition, work, or conclusions of the Clinical Competency Committee that eventually reviewed her case.

The Magistrate Judge found that Plaintiff's GWA claims against AUMC should be dismissed because AUMC is a "private entity" rather than a "public employer." (Dkt. 61 at 125–26.) Plaintiff objects on the ground that "AUMC was an agent of the state that employed her in that AUMC had direct control over a condition of her employment, [namely] her ability to perform medical services at the work site identified in her employment contract." (Dkt. 64 at 34.) The Court overrules this objection because, even assuming AUMC "controlled the time, manner, means, and method of [Plaintiff's] work" during her employment with AU (a state entity), "this sort of control [does not] cause[] a party to be an employer for purposes of the Georgia Whistleblower Act." *Joseph*, 2020 WL 6494202, at *9. "Further, because the GWA [does] not refer to 'joint employers' or an 'integrated enterprise,' . . . a theory of liability based on this fail[s]." *Id.* Plaintiff's objections cite no authority to the contrary.

### C. Count 5: Title VII Discrimination

Count 5 claims Defendants BOR and AUMC engaged in sex discrimination by subjecting her to "monthly drug tests" and "heightened surveillance," requiring her to attend a substance abuse program, giving her "artificially low evaluations without formative feedback or

opportunity to cure," suspending her from AUMC, and ultimately terminating her from the residency program. (Dkt. 29 ¶¶ 203–08.) To establish sex discrimination under Title VII, "plaintiff must prove that [her] sex was at least a motivating factor in the [challenged] employer's decision." *King v. HCA*, 825 F. App'x 733, 736 (11th Cir. 2020). "[T]he inquiry is not the whether the employer's decision was prudent or fair, but rather whether unlawful discriminatory animus motivated the decision." *Id.*

The Magistrate Judge found that Plaintiff "pleaded no facts indicating any correlation between her sex and the adverse action in this case," including because she failed to identify a similarly situated male employee who was treated more favorably. (Dkt. 61 at 55–56 & n.28.) Plaintiff objects saying "the Magistrate Judge applied too restrictive a standard for comparator analysis." (Dkt. 64 at 8.) The Court disagrees. The Magistrate Judge identified the correct standard, which requires a plaintiff and her proffered comparator to be "similarly situated in all material respects." (Dkt. 61 at 56 n.28 (quoting *Lewis v. City of Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019).)

While Plaintiff is correct that a substantive assessment of comparators is left to later stages of a case, a plaintiff still must plead a "facially plausible claim" of sex discrimination in order to survive a motion to dismiss. *Bartholomew v. Lowe's Home Ctrs., LLC*, No. 219-CV-695, 2020 WL 321372, at *6 (M.D. Fla. Jan. 21, 2020). "And courts often dismiss complaints for failing to allege enough factual support relating to a similarly situated comparator." *Id.* at *6 (granting motion to dismiss where complaint failed to identify how alleged comparators were similarly situated)*; see also Hale v. Mingledorff*, No. 2:13-CV-0228, 2014 WL 7012772, at *13 (N.D. Ga. Dec. 11, 2014) (granting motion to dismiss where plaintiff "did not set forth any facts in his complaint concerning Defendants' allegedly more favorable treatment of other employees sufficient to raise the inference of race discrimination"); *Gilliam v. U.S. Dep't of Veterans Affairs*, No. 2:16-cv-255, 2019 WL 1383156, at *3–4 (M.D. Fla. Mar. 27, 2019) ("And because Plaintiff has failed to identify an adequate comparator, his race, national origin, and gender discrimination claims are facially implausible.").

Typically, a valid comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff; will have been subject to the

same employment policy, guideline, or rule as the plaintiff; will . . . have been under the jurisdiction of the same supervisor as the plaintiff; and will share the plaintiff's employment or discipline history." *Lewis*, 918 F.3d at 1127–28. Ultimately, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Id.* at 1228. The test is a "strict" one. *Lewis v. City of Union City*, 934 F.3d 1169, 1187 (11th Cir. 2019).

Plaintiff claims she meets this standard because she "alleged that she was subjected to repeated excessive drug tests after an unconfirmed, pre-employment positive test that she successfully appealed and retested negative, while her male counterparts showed up on occasions to work under the influence or affected by several hours of drinking alcohol, with impunity." (Dkt. 64 at 9.) The Court again disagrees. Plaintiff's reference to a single "unconfirmed, pre-employment positive test" ignores several other facts suggesting misconduct on her part. She *twice* tested positive for marijuana (though one test fell below the applicable threshold), she was arrested for driving under the influence, people told Defendants she was previously prescribed marijuana and currently used

it for stress,[5] she regularly missed drug tests, and she was seen crying in the Neuro-ICU. These facts, taken together, paint a concerning picture that has nothing to do with Plaintiff's sex.

As for Plaintiff's alleged "male counterparts," Plaintiff says "male residents repeatedly admitted to coming to work hungover"; "at times put the on-call neurosurgery pager status as 'at the bar'"; and "arrived to her initial interview on December 7, 2017, two hours late and were hungover." (Dkt. 64 at 9.) But the first two allegations are conclusory, devoid of specifics, and only vaguely tied to "[m]ale neurosurgery residents." (Dkt. 29 ¶ 145.) That is not enough to establish a valid comparator. *See, e.g.*, *James v. City of Montgomery*, 823 F. App'x 728, 731–34 (11th Cir. 2020) (comparator was conclusorily pled where plaintiff alleged "white detectives were not required to provide doctor's notes when they called out sick," and "four white men had transferred into the Homicide Bureau . . . without meeting the ostensible

---

[5] Plaintiff told Defendants these rumors were untrue, but Defendants apparently believed them, which is all that matters in assessing Defendants' intent. *Cf. Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").

requirement of a latter of transfer"). Moreover, it is unclear whether Defendants were aware of any of these incidents. That is fatal because "[a] plaintiff identifying similarly situated comparators must also prove that her employer [who made the decision at issue] was aware of any misconduct allegedly committed by those comparators." *Palmer v. Masonite Corp.*, 2020 WL 3051240, at *6 (N.D. Ala. June 8, 2020). At most, Plaintiff alleges male doctors were disciplined by unidentified individuals for certain transactions. She alleges, for example, that IT shut down one male doctor's internet access after he accessed pornographic websites while at work, (Dkt. 29 ¶¶ 147–48), that another doctor changed lab finding numbers to "69" and "would not stop . . . despite being asked to," (*id.* at 149), and that another doctor was forced to pay for damaging a chair when he drew a penis on it. (*Id.* at 151). She does not allege that Defendants who took disciplinary action against her were, in any way, involved in these events, aware of them, or involved in the (limited) discipline. These allegations thus do not constitute an allegation that Defendants in this case were aware of this conduct by other doctors so as to show disparate treatment.

The male residents' alcohol consumption was also qualitatively different than Plaintiff's alleged drug use in that the former was legal while the latter was not. And, while Plaintiff was involved in *several* concerning incidents, she does not identify a specific comparator who was similarly involved in a *series* of comparable incidents. For these reasons (and others), the Court agrees with the Magistrate Judge that Plaintiff has not identified a similarly situated comparator.

Plaintiff also objects that, even if she did not present a valid comparator, her "allegations present a convincing mosaic that Defendants discriminated . . . against Plaintiff on the basis of her sex." (Dkt. 64 at 9.)[6] Plaintiff's explanation of this objection essentially repeats the allegations in her complaint without adding any legal argument or citation to authority. (*See id.* at 10–14.) Nothing about this factual recitation establishes a plausible link between Plaintiff's sex and the adverse employment actions about which she complains.

---

[6] "[T]he term 'convincing mosaic' is not a legal test." *Hayes v. ATL Hawks, LLC*, 2021 WL 391567, at *6 n.7 (11th Cir. Feb. 4, 2021). It is simply "a metaphor to illustrate why courts should not try to differentiate between direct and indirect evidence." *Id.*

The closest Plaintiff comes is her assertion that Defendants "minimized and tolerated male residents' infantile fraternity house conduct, including sex acts at the hospital, pornography viewing, not timely responding to emergencies while on call, changing clothes in front of Plaintiff despite her protests, and appearing at work to train in neurosurgery while hungover." (Dkt. 64 at 11.) But there is no allegation that Defendants allowed male residents, *but not Plaintiff*, to do these things. And, even if there was, this "fraternity house conduct" is different than Plaintiff's drug-related conduct—making it hard to assume Defendants' approach to the former explains their approach to the latter. *See, e.g.*, *James*, 823 F. App'x at 733 ("[T]he incidents that Hogan and James were disciplined for—Hogan for using excessive force on a subject and James for stopping a school bus while offduty (and out of her jurisdiction) to arrest a student for fighting with her daughter—were not materially similar."); *Tamba v. Publix Super Markets, Inc.*, 836 F. App'x 765, 769, 772 (11th Cir. 2020) (no national origin discrimination where immigrant was "terminated for dishonesty" while non-immigrant was "abusive to employees but was only suspended," because the "alleged misconduct" was different).

Ultimately, "while [Defendants] may have acted unfairly—and perhaps even dishonestly—[Plaintiff] has shown no evidence of [sex] being the motivating factor for [her alleged mistreatment]." *Powell v. Am. Remediation & Env't, Inc.*, 61 F. Supp. 3d 1244, 1255 (S.D. Ala. 2014). On the contrary, Plaintiff's own conduct presents an "obvious alternative explanation" for the way she was treated by Defendants. *See Iqbal*, 556 U.S. at 682 (finding that plaintiff's allegation of purposeful discrimination was not plausible in the light of an "obvious alternative explanation"); *Heard v. Hannah*, 51 F. Supp. 3d 1129, 1144 (N.D. Ala. 2014) (dismissing race discrimination claim where "the Amended Complaint itself supplies more than ample reason to think that Plaintiff's [alleged mistreatment] was motivated by reasons that were not race-based"). "Although [Plaintiff's] allegations are consistent with intentional [sex] discrimination, and may support a suspicion or possibility of misconduct, they do not raise a reasonable expectation that discovery would reveal evidence that these Defendants acted with [sexually]-discriminatory animus." *Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1354 (N.D. Ga. 2017). The Court thus overrules Plaintiff's objections to the R&R's disposition of Count 5.

### D. Count 6: Title VII Hostile Work Environment

Count 6 asserts a sexually hostile work environment claim under Title VII on the ground that Plaintiff alone "suffered the adverse action of monthly drug tests." (Dkt. 29 ¶ 216.) "To prove a hostile work environment under Title VII, a plaintiff must show that her employer discriminated because of her membership in a protected group, and that the offensive conduct was either severe or pervasive enough to alter the terms or conditions of employment." *Arrington v. Ala. Power Co.*, 769 F. App'x 741, 746–47 (11th Cir. 2019). The Magistrate Judge thought this claim fails because Plaintiff "has not alleged any facts that reasonably support an inference that [Defendants] engaged in any conduct about which she complains on the basis of her sex." (Dkt. 61 at 76.) Plaintiff objects to this conclusion on the same grounds that she objects to the R&R's recommended disposition of Count 5. The Court overrules those objections for the reasons explained above.

### E. Count 7: Title VII Retaliation

Count 7 claims that, "[a]s a result of opposing Defendants' illegal and discriminatory testing of her, Plaintiff suffered the adverse action of more stringent drug tests and, ultimately, suspension of her clinical

privileges and termination of her contract." (Dkt. 29 ¶ 223.) "To establish a retaliation claim under Title VII, a plaintiff must prove that she engaged in statutorily protected activity, that she suffered a materially adverse action, and that there was a causal relation between the complaint and the adverse action." *Arrington*, 769 F. App'x at 746. "In order to show that the employee engaged in protected activity, [s]he must show that [s]he either voiced some opposition to [sex] discrimination or participated in some proceeding concerning an allegation of [sex] discrimination. In this regard, a plaintiff must place the employer on notice that [s]he is complaining of unlawful practices" under Title VII. *Gerard v. Bd. of Regents of Ga.*, 2008 WL 11407252, at *14 (N.D. Ga. July 31, 2008).

The Magistrate Judge recommends dismissing Plaintiff's retaliation claim because Plaintiff did not make "any complaints [to Defendants] that suggested a belief that she was being discriminated against *on the basis of [her sex]*"—and thus she did not engage in protected activity under Title VII. (Dkt. 61 at 71 (emphasis added).) Plaintiff objects to this conclusion because (1) Plaintiff met with "AU's Title IX Coordinator" in July 2019 and (2) Defendants' third-party

contractor issued a July 2019 report that characterized some of Plaintiff's earlier complaints (in January and March 2019) as "complaints about a hostile work environment." (Dkt. 64 at 18–19; *see* Dkt. 29 ¶¶ 111, 121.) But the latest retaliatory act alleged by Plaintiff here is her termination, which occurred in February 2019. So, regardless of what Plaintiff (or anyone else) did after that date, it could not have "caused" Defendants' earlier retaliation.

The Court has also reviewed Plaintiff's January 2019 complaint to Defendants, which the contractor characterized as a "hostile work environment" objection. The complaint simply requests a meeting with Defendants "to discuss the inappropriate timing of calls/testing, the lack of flexibility and justification per MGC policy (and stated federal laws)." (Dkt. 29 ¶ 62.) Nothing about this communication suggests mistreatment based on sex or any other protected trait. *See Hernandez v. Premium Merch. Funding One, LLC*, 2020 WL 3962108, at *14 (S.D.N.Y. July 13, 2020) ("[The onus is on the speaker to clarify to the employer that she is complaining of unfair treatment due to her membership in a protected class and that she is not complaining merely of unfair treatment generally."). Although "hostile work environment"

*can* refer to Title VII discrimination, it is implausible that the contractor intended that meaning here given (1) the actual content of the complaint he was describing (which made no reference to Title VII or sex discrimination) and (2) the fact he never mentioned Title VII or sex discrimination in any other way. And, even if the contractor did intend that meaning, his after-the-fact characterization of Plaintiff's complaint does not show Defendants should have understood it that way months earlier when it was first made. Indeed, given the content of the complaint and the facts surrounding it, the opposite is true. Defendants had no reason to believe Plaintiff's complaints were sex-based. The Court overrules Plaintiff's objections to the R&R's disposition of Count 7.[7]

---

[7] To the extent Plaintiff claims it would have been futile to tell Defendants she was complaining about sex discrimination specifically, she cites no authority for the proposition that perceived futility exempts plaintiffs from the "protected activity" requirement of a sex retaliation claim. (*See* Dkt. 64 at 19–20.) Count 7 also asserts a separate Title VII retaliation claim on the ground that, "[w]hen Plaintiff opposed the illegal and discriminatory personnel actions, she was subjected to a retaliatory hostile work environment." (Dkt. 29 ¶ 225.) The Magistrate Judge recommends dismissing this claim as well. (Dkt. 61 at 77–81.) Plaintiff does not object to this recommendation with any specificity. Even if she had, the Court agrees with the Magistrate Judge that the claim lacks merit.

## F.    Count 11: Title IX Discrimination

Count 11 asserts a sex discrimination claim under Title IX on the ground that "Plaintiff suffered the adverse action[s] of random drug tests" and "termination." (Dkt. 29 ¶¶ 258–67.) Title IX provides that "[n]o person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added).

The Magistrate Judge recommends dismissing this claim because "a plaintiff does not have a private right of action to bring employment-based claims under Title IX." (Dkt. 61 at 50 n.24.) Plaintiff objects to this conclusion. (Dkt. 64 at 14–16.) But the Court need not resolve the issue because, either way, Plaintiff's IX claim fails for the same reason that her Title VII claim fails: the absence of any link between her sex and the adverse actions about which she complains. *See, e.g.*, *GP by & through JP v. Lee Cnty. Sch. Bd.*, 737 F. App'x 910, 913–14 (11th Cir. 2018) ("A private action for damages under Title IX requires a showing of discriminatory intent."). The Court overrules Plaintiff's objections regarding Count 11.

### G. Count 13: Equal Protection Clause

Count 13 claims Defendants engaged in sex discrimination by subjecting Plaintiff to "random drug tests" and "termination" in violation of the Equal Protection Clause. (Dkt. 29 ¶¶ 278–86.) The Magistrate Judge found that Plaintiff failed to plead facts supporting an inference that her sex motivated the Defendants' actions. (Dkt. 61 ¶ 64.) Plaintiff objects to this conclusion on the same grounds that she objects to the R&R's recommended disposition of Count 5 (Title VII sex discrimination). Those objections are overruled for the reasons explained above. *See Jones v. Gadsden Cnty. Schs.*, 758 F. App'x 722, 725 (11th Cir. 2018) ("Discrimination claims under the Equal Protection Clause require the same proof and analytical framework as Title VII.").

### H. Count 14: Fourth Amendment Search and Seizure

In Count 14, Plaintiff claims she was subjected to "illegal drug testing" in violation of her Fourth Amendment rights. (Dkt. 29 ¶ 294.) She brings this claim against Defendants Arnold and Norton in their individual capacities and Defendant "AUMC for the actions of Norton in her official capacity." (Dkt. 29 at 53.)

The Fourth Amendment forbids governmental violation of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Supreme Court has held that this guarantee extends to searches and seizures not only by law enforcement authorities, but also by government officials who conduct various civil activities." *Pierce v. Smith*, 117 F.3d 866, 872 (5th Cir. 1997). "[T]he collection and testing of urine by the government constitutes a search subject to Fourth Amendment constraints." *Id.* Whether such a search is "reasonable," as the Fourth Amendment requires, "depends on all of the circumstances." *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 619 (1989). "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Id.* "[A]lthough Fourth Amendment reasonableness ordinarily must be based on individualized suspicion of wrongdoing, nevertheless exceptions to the main rule are sometimes warranted based on special needs, beyond the normal need for law enforcement." *Pierce*, 117 F.3d at 873. "When such 'special needs'— concerns other than crime detection—are alleged in justification of a

Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id.* "Where the privacy interests are minimal and where an important governmental interest would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Straub v. Cnty. of Greenville*, 2006 WL 1073883, at *3 (D.S.C. Apr. 20, 2006).

The Magistrate Judge found that Defendants reasonably tested Plaintiff for drugs, including because Plaintiff's status as a medical resident presented a "special need" for the testing. (Dkt. 61 at 108–14.) Plaintiff objects, but the Court agrees with the Magistrate Judge. (Dkt. 64 at 21–24.) "Plainly, this is a special needs case" because "practicing and learning [neuro] medicine" required Plaintiff to "discharge[] duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Pierce*, 117 F.3d at 874. Plaintiff's "status as a student-employee in the [neuro] medicine residency program diminished her legitimate expectations of privacy vis-à-vis the search[es] at issue." *Id.* And the "intrusiveness" of the drug testing here was relatively "minimal." *Id.* at 875. For example, "[t]here

is no evidence that anyone observed, listened to, or otherwise monitored the excretion of the urine sample[s]." *Id.* "There is no evidence that the urinalysis was used to look for, or that its results reflected, anything other than the presence or absence of drugs, such as whether [Plaintiff] was epileptic, pregnant, or diabetic." *Id.* "[T]he test was not undertaken for law enforcement purposes, law enforcement personnel were not involved, and there was no threat of force and no potential criminal or civil penalty for refusing" (though there was, understandably, the threat of termination). *Id.* And, according to Plaintiff, each test took only about "45 minutes away from her job." (Dkt. 29 ¶ 34.)

Moreover, even if the facts ultimately landed on the wrong side of reasonable here, Defendants Arnold and Norton are protected by qualified immunity because Plaintiff's drug testing was not clearly unlawful. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "[F]or the law to be clearly established to the point that qualified immunity does not protect a government official, pre-existing law must dictate, that is, truly

compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *King v. Pridmore*, 961 F.3d 1135, 1145 (11th Cir. 2020). In other words, "the federal violation must have been beyond debate at the time; otherwise qualified immunity applies." *Malcolm v. City of Miami Police*, 574 F. App'x 881, 882 (11th Cir. 2014). "These principles have particular force where, as here, resolution of whether the defendant's conduct violated the constitutional provision sued on is heavily dependent on a balancing or weighing against each other of different factors according to the degree they are present in the matrix of facts constituting the particular context in which the asserted violation occurred." *Pierce*, 117 F.3d at 882; *see City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) ("[T]he clearly established right must be defined with specificity. . . . Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.").

Given all the circumstances here, Plaintiff has not shown her drug testing violated clearly established law. Defendants had several reasons to test her for drugs, including that (1) any drug-use would seriously endanger the public given the nature of Plaintiff's work, (2) she tested positive for marijuana in a pre-employment drug test, (3) people told Defendants that she was previously prescribed marijuana and that she currently used it for stress, (4) she was arrested for driving under the influence of an impermissible substance during her residency, (5) she was seen crying in the ICU, and (6) she repeatedly missed—and, on one occasion, presented diluted urine for—drug tests scheduled by Defendants. Even assuming there are enough countervailing facts to make Plaintiff's continued drug testing unreasonable, the Court cannot say every reasonable official would invariably have reached that conclusion—particularly given the fact-intensive balancing test applicable under the Fourth Amendment and the absence of any "materially similar case on point," which "usually means qualified immunity is appropriate." *King*, 961 F.3d at 1145; *see Malcolm*, 574 F. App'x at 883 ("When properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."). So,

even if Defendants Arnold and Norton violated Plaintiff's Fourth Amendment rights by subjecting her to drug testing, Count 14 would still warrant dismissal under the doctrine of qualified immunity. The Court overrules Plaintiff's objections to the R&R's disposition of Count 14.[8]

---

[8] Although Plaintiff also asserts Count 14 against Defendant "AUMC for the actions of Norton in her official capacity" (Dkt. 29 at 53), the Magistrate Judge found that this claim fails because "Norton was not an employee of AUMC." (Dkt. 61 at 108 n. 53.) Plaintiff does not specifically object to this conclusion, and the Court sees no error in it. Plaintiff does object to the Magistrate Judge's reference to AU Substance Abuse Policy No. 685 in the R&R's discussion of Count 14. (Dkt. 64 at 25–26.) Plaintiff claims the Court cannot consider the document at this stage because it is not "attached to the pleadings," it is not "central" to her case, and she "questions [its] authenticity." (*Id.*) The Court disagrees. The complaint both cites and provides a URL link to the policy, which is tantamount to attaching it. (Dkt. 29 ¶ 31.) Plaintiff cannot rely on a document and then attack the Court for doing the same thing. Moreover, the document is important because Defendants told her it governed the "drug testing" to which she was subject during her residency. (*Id.* ¶¶ 30–31.) And, even if the document should not be considered at the pleading stage, the Court would still dismiss Count 14. Finally, "Plaintiff objects to any finding that the drug tests to which she was subjected during her employment, or as a pre-condition of employment, were not searches within the Fourth and Fourteenth Amendments." (Dkt. 64 at 20.) The R&R is a touch confusing on this issue. On the one hand, it says "[a] urine drug test imposed by state officials constitutes a search under the Fourth Amendment." (Dkt. 61 at 109.) On the other hand, it says "the first test conducted in connection with the pre-employment drug screen was not a search within the meaning of the Fourth Amendment." (*Id.* at 114.) The issue is ultimately moot because, even assuming each drug test was a "search" here, all of them were reasonable (and certainly *arguably* reasonable) under the Fourth Amendment.

# I.  Count 15: Due Process

Count 15 asserts a due process claim on the grounds that Defendants "fail[ed] to provide notice of charges and an opportunity to respond before taking Plaintiff's [clinical] privileges" at AUMC.  (Dkt. 29 at 56.)  The Magistrate Judge recommends dismissing this claim because Plaintiff has not shown (1) "she held a constitutionally protected property interest in her continued limited clinical privileges at AUMC" or (2) she was constitutionally entitled to more process than she received.  (Dkt. 61 at 115–22.)  Plaintiff does not object specifically to either conclusion. Instead, she objects to the Magistrate Judge's finding that "neither AUMC [n]or Coule are state actors for purposes of [Plaintiff's] due process claims."  (*Id.* at 107–08.)  But, as the Magistrate Judge noted explicitly, Count 15 "would still be subject to dismissal" regardless of this tertiary conclusion.  (*Id.* at 115 n.56.)  So the Court need not address it. Count 15 is dismissed.[9]

---

[9] Even if the Court were required to determine whether Defendants AUMC and Coule functioned as state actors or acted under color of state law, the Court agrees with the Magistrate Judge that they did not.

## IV. Conclusion

The Court **OVERRULES** Plaintiff's Objections (Dkt. 64), **ADOPTS** the Magistrate Judge's Non-Final Report and Recommendation (Dkt. 61) as modified herein, **GRANTS IN PART** and **DENIES IN PART** Defendant AUMC's Motion to Dismiss (Dkt. 32), **GRANTS** Defendant Coule's Motion to Dismiss (Dkt. 33), **GRANTS IN PART** and **DENIES IN PART** Defendant BOR's Motion to Dismiss (Dkt. 34), and **GRANTS** the Motion to Dismiss (Dkt. 35) filed by Defendants Keel, Coule, Sprouse, Moore, Norton, and Arnold.

**SO ORDERED** this 29th day of March, 2021.

_____

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE