# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| SARAH M. KAVIANPOUR, MD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civ. Act. No.: 1:20-CV-00152-MLB |
| | ) | |
| BOARD OF REGENTS OF THE | ) | |
| UNIVERSITY SYSTEM OF | ) | |
| GEORGIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF JOHN LOTT**

1.     My name is John Lott, I am over the age of 18 and I am suffering from no deficiencies or impairments affecting my ability to give this declaration.

2.     This Declaration is based on my personal knowledge of the facts set forth herein, and my signature is below.

3.     I give this Declaration under the penalty of perjury, pursuant to 28 U.S.C. § 1746.

4.     I have been an Interim CEO of a Healthcare Clinic System, Chief Compliance Officer and Risk Officer of a hospital system, Chief Compliance Officer of multiple hospitals and organizations, Chief Quality Officer of a hospital, Chief Privacy Officer of multiple organizations and hospitals, the Compliance Officer of

1

Harvard University Health Services, and I am a nationally certified expert in compliance and a national expert on privacy.

5.      Currently, I am a Compliance Officer and a nationally recognized subject matter expert in Compliance, Privacy, and Risk Management. I speak at conferences and events on these issues. I will be speaking at events throughout 2022 on Risk Mitigation, Crisis Management, Compliance, Privacy, Public Relations Disaster Prevention from a Risk Management Lens.

6.      Between May 2019 and July 16, 2019, I served as Augusta University's ("AU") interim Chief Compliance Officer ("CCO"), a position I held on a contract basis through my employer, Cynergistek.

7.      In my capacity as interim CCO, I was charged with ensuring compliance for the entire enterprise including the university, medical school, hospital, athletics, research, and personnel issues.

8.      In June of 2019 I was charged with investigating Dr. Sarah Kavianpour's claims of discrimination, hostile work environment, and retaliation in connection with the drug testing protocol imposed on her by AU's Human Resources ("HR") department.

9.      I took over the investigation into Dr. Kavianpour's case on June 26, 2019.

10.     My primary point of contact regarding the investigation was Clay Sprouse, AU's then-Interim Vice President of Audit, Compliance, Ethics, and Risk Management.

11.     When I began my investigation into Dr. Kavianpour's claims, Mr. Sprouse provided me with what I believed to be the pertinent documents, emails, and information in AU's possession that related to the dispute.

12.     As part of my investigation, I conducted a two and a half hour meeting with Dr. Kavianpour on July 2, 2019. Michelle Reed, AU's Title IX investigator, and Benjamin Hutton, AU's Compliance Analyst also attended.

13.     At the meeting, Dr. Kavianpour gave me a large binder containing every document in her possession that was relevant to her dispute, including the applicable AU and AUMC policies, her contract, the HR memorandum regarding the drug testing, emails showing her engaging in protected conduct, transcription of the March 22, 2019, grievance panel hearing, and the grievance panel's recommendation to President Dr. Brooks Keel.

14.     We spent the July 2, 2019, meeting reviewing each document in the binder, including many documents that AU had, but did not show or provide to me.

15.     Dr. Kavianpour's binder contained numerous long emails that she sent to Clay Sprouse ahead of the grievance panel hearing, around March 13, 2019. Clay

Sprouse had not sent these emails to me, and the July 2, 2019, meeting was the first time I saw them. (Att. 1, Pl. Ex. 98)

16.    I was also never told that Clay Sprouse texted the accused (Debra Arnold) and let them know they had been reported right before Dr. Kavianpour's grievance hearing in March of 2019. (Att. 2, BOR0065951)

17.    I was concerned that Mr. Sprouse was implicated in Dr. Kavianpour's case and that it was not appropriate for him to participate in the investigation, particularly because he had withheld these documents from me and my team.

18.    During the July 2, 2019, meeting, I also reviewed testimony from the March 22, 2019, grievance panel hearing, which I had not previously seen. This testimony included statements by Debra Arnold (the administrator given sole discretion to test Dr. Kavianpour) in which she admitted that she had expected the February 13, 2019 drug test to come back negative and that Debra Arnold had no patient safety concerns when she requested the drug test, and Dr. James Foster's (the medical administrator in charge of university drug testing) admission that the testing had not been random drug testing or "follow-up" monitoring testing. Dr. James Foster admitted under oath that the university does not conduct random drug testing on anyone other than the police officers. There is an audio recording of this statement.

4

19.    I left the room for several minutes during the meeting in order to call Clark Speese, general counsel for AUMC, because the documents and grievance hearing testimony I had reviewed made me concerned that AU had violated its own policies and Dr. Kavianpour's contract by requiring her to engage in the drug testing.

20.    I called Clark Speese to gain understanding on whether there were contracts or addendums I had not seen or been given and to ensure that AU would be protected by attorney-client privilege.

21.    During our conversation, Clark Speese admitted that there were "issues" with the case, especially the fact that AU had not included any drug testing requirement in Dr. Kavianpour's employment contract or given her an addendum. Clark Speese made it clear that the drug testing was not terms and conditions of her employment and that AU had "screwed up".

22.    Dr. Kavianpour alleged that she was retaliated against for reporting and exposing that the drug testing protocol she was forced to endure was not "random drug testing" as cited under university policies.

23.    Dr. Kavianpour gave my team a true and correct copy of the memo given to her which was verified by Debra Arnold. That memo cited the university's random drug test policy and used quoted language from the policy so as there was no mistake as to what policy was being cited for Dr. Kavianpour's reference.

24.    In order to have a claim for whistleblower retaliation the aggrieved must have **(a)** engaged in protected activity, **(b)** an adverse action must be taken against the employee, and **(c)** a causal connection must exist between the protected activity and the adverse action.

25.    Dr. Kavianpour engaged in protected activity on multiple occasions according to the documentation given to us that had been confirmed. The last two instances of protected activity I found the most troubling.

26.    On January 22, 2019, Dr. Kavianpour made a complaint to Debra Arnold directly that the drug testing was unduly burdensome due to her work schedule. Debra Arnold was only giving Dr. Kavianpour one hour to arrive to test, thus Debra Arnold was blatantly violating the 48-hour rule that she was mandated to follow for the implementation of "random drug testing".

27.    Debra Arnold followed up this email by making the drug testing more stringent by endangering Dr. Kavianpour's career and patient safety when she stated in writing   *__"Please understand, your academic and clinical activity assigned by your department, will not be an excuse for you not to appear for testing in a timely manner as outlined above"__*. (Att. 3, Pl. Ex. 12)

28.    As a former Health Clinic CEO and a former Chief Quality Officer of a hospital I had never seen anything so blatantly irresponsible as telling a medical

doctor that their "clinical activity" would not be an excuse for them not to appear at a drug testing in a timely manner.

29.    This was a problem of Debra Arnold's own making. Had Debra Arnold complied with the 48-hour notice requirement for random drug testing, this would not have been a concern. Debra Arnold gave Dr. Kavianpour two different notice requirement's that were extremely stringent, violated policy, and created a myriad of coverage problems for Dr. Kavianpour's neurosurgery department.

30.    Debra Arnold gave Dr. Kavianpour **ONE HOUR** to find coverage in her department **and** report to testing. She admitted to doing this without any knowledge of Dr. Kavianpour's work schedule, job duties, getting explicit approval from Dr. Kavianpour's department, or getting Dr. Kavianpour's agreement or approval.

31.    Dr. Kavianpour was given the directive to report for "random drug testing" or be terminated, even though this version of random drug testing was not in university policies, Dr. Kavianpour's contract, and was not ever done to any other resident. Therefore, Dr. Kavianpour had a right to notice, and a right to refuse this version of drug testing until the proper policy or contract language was cited to her.

32.    These neurosurgery coverage issues created ill will against Dr. Kavianpour in her department, and this was completely avoidable if Debra Arnold

had complied with applicable policies and the law regarding the 48-hour notice requirements.

33.    The blatant disregard for Dr. Kavianpour's academic and clinical activity was deemed to be **adverse** to Dr. Kavianpour due to the fact that by policy Dr. Kavianpour was entitled to 48 hours to report for testing and **<u>NO OTHER RESIDENT</u>** was made to go through such a stringent process.

34.    Debra Arnold also extended the drug testing protocol, even though the drug protocol could not be found in policies nor contract.  This extension was until August 31, of 2019. The extension was especially important because medical residents renew contracts yearly, and thus this was Debra Arnold blatantly and directly overriding Dr. Kavianpour's contractual rights for the following academic year. We could find no such incidents of this conduct for any other residents and therefore deemed this to be **<u>adverse.</u>**

35.    Having satisfied the first two elements of a prima facie case of whistleblower retaliation, the last element was the causal connection between the protected activity and the adverse action.

36.    The January 31, 2019, email provided to us by Dr. Kavianpour which was subsequently verified by Debra Arnold, proved the causal connection. The email stated

**"Hi, Dr. Kavianpour.**

**This is in response to your email dated January 22, 2019. I have consulted with Ms. Norton and the Graduate Medical Education office and this email and the attached memo are our response to your email…"**

(Att. 3, Pl. Ex. 12)

37.    Debra Arnold's more stringent requirements and extension was a direct "response" to Dr. Kavianpour's protected activity "email."

38.    When her violation of these regulatory requirements was exposed to her superior Susan Norton, she sent an email that imposed more stringent protocols that violated the civil rights and contractual rights of Dr. Sarah Kavianpour.

39.    Dr. Kavianpour responded to the January 31, 2019, email with further protected activity making it abundantly clear that this was "harassment" and that this was not "random drug testing" in accordance with AU policies.

40.    Two weeks after this email, Debra Arnold violated the 48-hour rule again, informed Occupational Health not to test Dr. Kavianpour, and then emailed Dr. Phillip Coule and **<u>falsely</u>** stated to Dr. Phillip Coule that Dr. Kavianpour was in violation of the random drug testing policy. Dr. Coule then suspended Dr. Kavianpour's privileges which had an adverse effect on Dr. Kavianpour's residency and career.

41.    Based on the information we received from Legal Counsel for AUMC Clark Speese, Dr. Kavianpour, and by reviewing the emails that had been denied us by Clay Sprouse, my team felt it was important to interview Debra Arnold to establish some very fundamental baselines of competency and integrity.

42.    This was not the first time that Augusta University had been warned about the mistreatment of a resident regarding Drug Screening Protocols.

43.    In 2013 a university grievance panel found that a Resident was improperly terminated for a "pre-employment drug screening that was fundamentally flawed due to chain of custody errors in the collection process".

44.    The 2013 university grievance panel recommended that the "drug laboratory conduct a thorough review of their urine specimen collection and chain of custody processes as they are applied specifically to the drug screening for incoming residents to ensure that are flawless and will stand up to even the most rigorous scrutiny".

45.    Despite these recommendations, these policies were still not brought up to date with applicable University System of Georgia Policies, Georgia state laws, and federal laws.

46.    When Dr. Kavianpour exposed that the drug testing protocols were not following applicable federal laws, she was engaging in protected activity that

exposed that Augusta University knew for **FIVE YEARS** that their policies were non-compliant with the law, and that Susan Norton and Debra Arnold were responsible for knowing this, as they consistently cited that 2013 case as the precedent for Dr. Kavianpour's treatment despite the facts of the two cases being very different.

47.    My team interviewed Debra Arnold on July 3, 2019.

48.    **The team included me, Michelle Reed, and Clay Sprouse, .**

49.    Despite my objections, Clay Sprouse attended this interview and often interrupted the interview in a matter that seemed to be aiding Debra Arnold and prevent her from answering pertinent questions.

50.    Despite Clay Sprouse's interference we were able  to confirm evidence that was presented as being true, and determine the validity of claims made against Debra Arnold, including that she was not being honest.

51.    It was established that Debra Arnold knew that what she gave Dr. Kavianpour in August 2018 was a memo, and not a policy.

52.    It was established Debra Arnold knew that Dr. Kavianpour should have been notified about any changes to her contract before she signed the contract and during pre-employment. Debra Arnold's own handwritten notes acknowledge that she knew of this issue with their practice (Att. 4 Pl. Ex. 412 Debra's Handwritten

Notes).

53.    It was established that Debra Arnold is a Director level professional and knows how AU policies are drafted and approved before they are disseminated.

54.    It was established that Debra Arnold knew that policies did not apply to only one person.

55.    It was established that Debra Arnold knew that this was not random drug testing as cited in the policies.

56.    Debra Arnold admitted that the drug testing policies needed to be changed.

57.    Debra Arnold stated that Dr. Kavianpour would not have been removed had Dr. Kavianpour "just done what I told her to do".

58.    I cited to Debra Arnold the university policy that made it clear that Dr. Kavianpour had the legal right and was protected by university policy not to comply with "clearly illegal or unsafe" directives.

59.    It was established that the university must be honest and correct when citing its authority to employees and students.

60.    It was stated to Debra Arnold that you cannot procure someone's urine samples by misrepresentation, as that is not legal, and it is a violation of their civil and contractual rights.

61.    It was stated to Debra Arnold that her word is not the law, and that mishandling of a matter of such importance could place all the cases she has handled under direct scrutiny which could jeopardize the university.

62.    It was stated to Debra Arnold that ignorance of the law or policies is not an excuse, and Debra Arnold admitted that it was her job to know these policies.

63.    As a result of the July 2, 2019 meeting with Dr. Kavianpour, the July 3, 2019 meeting with Debra Arnold, my team's review of Dr. Kavianpour's documents, the admission of AUMC General Counsel Clark Speese that there was no contractual language making this protocol of "random drug testing" a term and condition of her employment, and my team's review of AU and AUMC's policies, I believed that the "once a month for 12 month drug testing requirement" imposed on Dr. Kavianpour violated established Augusta University, AU Medical Center, and University System of Georgia policies, and more seriously, it may have violated the law.

64.    I was very concerned about the fact that the grievance panel's recommendation to the President of the University had characterized the drug testing as a condition of Dr. Kavianpour's employment, despite the clear evidence to the contrary. Legal counsel had told me that this was not true, and my team had reviewed the contract and no such language existed.

65.    Because AU President Brooks Keel, had signed and implemented the grievance panel's recommendation, I believed he needed to know about the level of exposure AU could face for violating its policies and laws with respect to Dr. Kavianpour immediately. This fact regarding the contractual language was not in dispute. The four corners of the document in question did not include the language that mandated this testing. This belief has now been verified by Dr. Kavianpour's Program Director. (Doc. 178-1 Macomson 30(b)(6) Dep. 46:14-17, 55:11-25; 75:20-22, 46:18-24, 48:15-19; 53:24–54:3; 67:23–68:1).

66.    It was our opinion that Debra Arnold was responsible for following the policies of the university, the polices of AU Medical Center, the University System of Georgia, the laws of the state of Georgia, and federal law. Her ignorance of any of those requirements are her own professional malpractice and incompetence, and any failure to adhere to those regulatory requirements is her professional malfeasance. Debra Arnold has since admitted that she did not know about the 48 Hour rule for drug testing (see Att. 5, Pl. Ex. 17 Debra Arnold's Answer #8 at SMK 19062).

67.    Debra Arnold is responsible and directly liable for enforcing policies and regulations without knowing the protections afforded employees and medical residents, as she is the Director of Employee Relations.

68.    It was our opinion that not knowing the law, or the policies is not an excuse for a "Director" level professional when engaging in highly regulated practices such as drug testing.

69.    It was my finding that by intentionally citing a policy that did not apply, only using the language from that cited policy that gave collection and enforcement authority, intentionally leaving out any of the protections that should have been afforded to Dr Kavianpour, and by refusing to meet with Dr. Kavianpour to review the policy despite Dr. Kavianpour repeatedly asking for these meetings, Debra Arnold procured Dr. Kavianpour's urine samples by misrepresentation of her authority under the "color of law", and it was dangerously close to theft by deception of Dr. Kavianpour's genetic and bodily materials.

70.    For the purposes of my investigation, it did not matter whether it was a negligent misrepresentation or a fraudulent misrepresentation. There was, however, very strong evidence that this was fraudulent conduct. Whether it be negligent or fraudulent conduct, Dr. Kavianpour had been wronged, her rights had been violated, and she needed to be made whole.

71.    I repeatedly asked Clay Sprouse to set a meeting with the President regarding the Kavianpour matter. He refused on multiple occasions.

72.    Clay Sprouse repeatedly made jokes about Dr. Kavianpour being a

15

"spoiled and entitled millennial" and for me to be careful not to get "contact high" when reading her file. (This was later verified by Wesley Horne when he interviewed Andrew Mahler who served as the Privacy Officer).

73.    I informed Clay of the serious issues with the case, and that there is immense liability due to the fact they misled the president and there is no policy that allows for this form of drug testing. Clay agreed with my findings but told me that university was not likely to change their position. He said that they were stubborn. Clay Sprouse informed me that the university would "just have to pay her down the road". Clay estimated that the payment would be $2-3 million dollars and said it was not the first time the university has had to do such things. I was appalled that the university would knowingly destroy someone's career and look at it as a risk that they would assume just to protect university officials. That is not being a good steward of state resources, and it could be fraud against an insurance company if the insurance company is not duly notified on this intentional tortious conduct.

74.    I found Clay Sprouse's conduct to be unprofessional, counterproductive, and that he was intentionally jeopardizing the university and the University System of Georgia to preserve relationships with his colleagues at the expense of the integrity of our department.

75.    Mistakes happen often. You mitigate your risks, rectify them, and move

on. This isn't a popularity contest. It is business.

76.    Emails from August 16, 2018, show that Dr. James Foster informed Susan Norton and Legal Counsel Greg Bryan that he did not know how to make the drug testing "mechanistically" appear to be random. This email proves that they designed a drug testing protocol for ONE employee, Dr. Kavianpour. They designed this protocol behind the back of Dr. Kavianpour, without Dr. Kavianpour's consent.

77.    Susan Norton and Debra Arnold later told Dr. Kavianpour that she was being tested due to a policy that they only use for police officers and required a pool of candidates. Debra Arnold knew there was no such pool of candidates, as did Susan Norton, and Greg Bryan.  There is NO drug testing policy at Augusta University that allows for a medical resident to be tested once a month, for the period of 12 months, based on the whims of the Director of Employee Relations, without the consent of the Medical Resident, based on no objective criteria that has transpired during employment period, in violation of an employment contract.

78.    Augusta University has a Risk Management Policy that specifically states that one of the Risk that Augusta University cannot assume is the breach of a contract. Debra Arnold and Susan Norton were not compliant with this policy, and the failure to adhere to Dr. Kavianpour's contract was a reportable violation of university policy. (Att. 6 Pl. Ex. 40 Enterprise Risk Management Policy)

79.    Due to the designed misrepresentations to deceive Dr. Kavianpour, and thus the illegality of the "random" drug testing, everything that stemmed from this illegal testing was fruit of the poisonous tree. Dr. Kavianpour had the legal right not to comply with the testing without suffering any adverse action.

80.    Debra Arnold stated that Dr. Kavianpour would not have been removed if she had complied with the illegal testing. This belief has been confirmed by statements by Dr. Samuel Macomson (Neurosurgery Residency Program Director) and Dr. Phillip Coule (Chief Medical Officer).

81.    Emails show that on January 22, 2019, Susan Norton and Debra Arnold both ignored the 48-hour rule and Susan Norton was clear that this testing was not to be at Dr. Kavianpour's convenience, even though Dr. Kavianpour was legally allowed 48 hours in order to present for testing which would give her time to address clinical concerns, patient safety concerns, and any logistical coverage concerns.

82.    Had Susan Norton and Debra Arnold complied with university system of Georgia policies and Augusta University policies, Dr. Kavianpour would not have been tested in this manner, and the removal of Dr. Kavianpour and the tainting of her reputation is based on this non-compliant drug testing protocol.

83.    The email from January 22, 2019, makes it clear that Debra Arnold was instructed to review the policy regarding random drug testing, and yet she gave Dr.

Kavianpour none of the protections in that policy and violated that policy numerous times. (Att. 7 , Pl. Ex. 169)

84.    But for the failure of Debra Arnold to comply with University System of Georgia of policies, Dr. Kavianpour would not have been deemed to have not presented for drug testing, as Dr. Kavianpour reported within 24 hours, and she was entitled to 48 hours to present herself for drug testing.

85.    I spoke to Marti Arvin in order to report Clay Sprouse's malfeasance and mishandling of this matter, as well as his dishonesty regarding what he knew about the case. I asked that she report this issue to Russell Keen, the President's Chief of Staff. Marti Arvin agreed with my findings and reported these findings to Russell Keen.

86.    Russell Keen contacted Clay Sprouse on July 14, 2019, by text message and violated confidentiality of the whistleblowing in subsequent communications with Sprouse. He informed Sprouse that Sprouse had been reported for mishandling the Kavianpour matter, and that Sprouse was not to tell anyone that he was being tipped off. Sprouse continued to mislead the university and withheld information that he was secretly texting the defendants in this matter and giving them information.

87.    On July 14, 2019, I emailed Mr. Sprouse recommending that our office

make President Keel aware of Arnold's admission.

88.    On July 15, 2019, I interviewed Susan Norton, Clark Speese, and Gregory Bryan, who admitted that they "got it wrong" with Dr. Kavianpour and that they "cited the wrong policy".

89.    When I asked Susan Norton, Clark Speese, and Gregory Bryan what was the correct policy that needed to be cited so that we could correct the matter, they could not name a policy that would allow them to test Dr. Kavianpour in the way they tested her.

90.    The simple and fundamental question of asking "what is the correct policy" was later used against me in a clandestine meeting held between my supervisor Clay Sprouse and the accused (Susan Norton and Greg Bryan) when the three individuals I was reporting to President Brooks Keel (Sprouse, Norton, Bryan) for mishandling this matter decided that I had a "gotcha" mentality for asking investigative questions that exposed mistruths.

91.    On July 16, 2019, I met with Mr. Sprouse and advised him that based on the witness interviews I conducted, my review of the AU and AUMC policies, and my review of Dr. Kavianpour's contract, the evidence showed that HR's "random drug testing" had violated the policies and Dr. Kavianpour's contract. As I had stated to him the day before in the meeting with Gregory Bryan, Clark Speese,

and Susan Norton, I stated I would be reporting the wrongdoing to the President of the university.

92.    I also advised him that I believed HR had allowed unsubstantiated rumors to professionally and personally damage Dr. Kavianpour.

93.    I advised Clay Sprouse of my concerns for AU and AUMC, since I believed that both the school and the hospital had a high risk of exposure to liability to Dr. Kavianpour.

94.    Clay Sprouse immediately terminated me.

95.    Following this meeting and confirmation of my status from Cynergistek (who originally stated that Clay Sprouse did not have the authority to terminate me since he was not the executive sponsor of the contract), I sent an email to President Keel with my investigation report and summation, advising that AU and AUMC had violated their policies and Dr. Kavianpour's contract by subjecting her to "random drug testing" in violation of policies and laws. (Att. 8 Pl. Ex. 26)

96.    I also advised President Keel that Clay Sprouse had fired me for "backstabbing" his colleagues, since I had told Clay Sprouse I believed President Keel needed to know about AU and AUMC's noncompliance with policies and mistreatment of Dr. Kavianpour.

97.    I advised that I believed Clay Sprouse's decision to terminate me had

been retaliatory, as a result of my attempt to disclose Clay Sprouse's, AU's and AUMC's wrongdoing with respect to Dr. Kavianpour.

98.    I reported to President Keel that Dr. Kavianpour also reported ACGME Accreditation issues that could result in a citation from ACGME for the school or department. (see Att. 8 Pl. Ex. 26 at 1)

99.    Wesley Horne of the University System of Georgia has independently investigated this matter. I learned that Clay Sprouse had misled Wesley Horne.

100.   Clay Sprouse told Wesley Horne that Clay wanted more work to be done on the investigation and that he wanted to see the work papers.

101.   Clay Sprouse was given access to all the documents, knew that General Counsel had been spoken to, and Clay Sprouse **DID NOT** review the case binder of documents given to the compliance department before he made the decision to terminate me.

102.   Clay Sprouse did not review the case, did not conduct individual research into the policies and laws regarding drug testing, and did not interview Dr. Kavianpour himself before terminating me. Clay Sprouse had been requested to interview Dr. Kavianpour since March of 2019. Four months had passed between when Dr. Kavianpour requested to speak to Clay Sprouse and his decision to terminate me. He did not interview her during that time period.

103.   Notwithstanding the content of my report and my allegation of retaliatory termination, President Keel did not remove any of these individuals despite their dishonesty being proven on the record.

104.   I reported my findings as the former Chief Compliance Officer of Augusta University, the lead investigator and author of the official report regarding the retaliation claim of Dr. Kavianpour to the AD HOC committee that was assembled after Dr. Kavianpour was reinstated.

105.   I was dismayed to learn that the false narrative, that had already been disproven, was still be stated that she violated the Substance Abuse Policy. This false and defamatory statement was being made at her AD HOC by the Neurosurgery Residency Program Director Dr. Samuel Macomson, despite it having already been proven and admitted that Dr. Kavianpour did not violate the policy and despite Dr. Macomson knowing and later admitting that the drug testing Dr. Kavianpour underwent should have never been called Random Drug testing because it did not adhere to the policies and was not a term and condition of her employment.

106.   I explicitly informed Dr. Samuel Macomson and the committee that Dr. Kavianpour did not violate the drug policies, and Dr. Macomson refused to correct the record during the hearing.

107.   The ridiculous notion that the accidental reformatting of a university

23

computer was a major cybersecurity risk was truly worrisome and shows a failure to understand cybersecurity networks. The computer was no longer on the network once it was reformatted, but more importantly the AU network allowed phones that were not provided by the university and laptops that the university did not provide and format to be on the network. The network did not have the ability to remote wipe these devices completely.

108.  Even if such a cybersecurity threat existed, it was not a unique and unforeseen threat, and was one of hundreds of nonformatted devices on the network. None of those individuals with devices on the network that were not provided by the university and that were not formatted were sanctioned for this kind of access to the network. This access to the network by unsecured devices was required for many employees including the residents, and the intentional cherry picking of this incident shows an intent to attack Dr. Kavianpour at all costs. None of the other residents that accessed the network with their unsecured devices were sanctioned and removed from their programs for this conduct.

Submitted this 3rd day of June 2022.



24

John Lott