**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| SARAH M. KAVIANPOUR, MD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL CASE NO. |
| | : | 1:20-cv-00152-MLB-RGV |
| v. | : | |
| | : | |
| BOARD OF REGENTS OF THE | : | |
| UNIVERSITY SYSTEM OF GEORGIA, | : | |
| *doing business as* Augusta University, | : | |
| *et al.*, | : | |
| Defendants. | : | |

## <u>MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION</u>

Plaintiff Sarah M. Kavianpour, M.D. ("Kavianpour"), brought this action

against defendants the Board of Regents of the University System of Georgia

("BOR"), doing business as Augusta University ("AU"), and the Medical College

of Georgia Health  Inc., doing business as Augusta University Medical Center, Inc.

("AUMC"), jointly referred to as "defendants," and the following claims remain

after the adjudication of pretrial motions to dismiss and related motions: disability

discrimination and retaliation, in violation of the Americans with Disabilities Act

("ADA"), as amended by the ADA Amendments Act of 2008, 42 U.S.C. §§ 12101

<u>et seq.</u>; disability discrimination, in violation of Section 504 of the Rehabilitation

Act ("Rehabilitation Act"); violations of the Georgia Whistleblower Act ("GWA");

and breach of contract arising out of her acceptance into and employment as a resident in AU's neurosurgery residency program from July 2018 until her termination in February 2019.  See [Docs. 29, 32, 33, 34, 35, 61, 69, 73, & 90].[1] Defendants have separately moved for summary judgment as to each of Kavianpour's remaining claims asserted against them, [Doc. 199 (AUMC's motion); Doc. 207 (BOR's motion)], which Kavianpour opposes, [Doc. 229 (response to AUMC's motion); Doc. 230 (response to BOR's motion)].  Defendants each have filed a reply in support of their respective motions for summary judgment.  [Doc. 241 (AUMC's reply); Doc. 242 (BOR's reply)].  Kavianpour also has filed a motion for summary judgment, [Doc. 209], which defendants oppose, [Doc. 224 (AUMC's response); Doc. 225 (BOR's response)], and Kavianpour has filed replies in support of her motion, [Doc. 246 (reply to AUMC's opposition); Doc. 247 (reply to BOR's opposition)].  Defendants also have filed a renewed motion to exclude expert reports relied on by Kavianpour, [Doc. 248], which Kavianpour opposes, [Doc. 251].   For the reasons that follow, it is **RECOMMENDED** that defendants' renewed motion to exclude, [Doc. 248], be

---

[1] The listed document and page numbers in citations to the record in this Final Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF, except that citations to deposition transcripts will also be cited according to the transcript page numbers.

**GRANTED IN PART** and **DENIED IN PART**, that their motions for summary judgment, [Docs. 199 & 207], be **GRANTED**, and that Kavianpour's motion for summary judgment, [Doc. 209], be **DENIED**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

A.   <u>Preliminary Procedural Issues</u>

1.   *BOR's Notice of Objections to Declarations, [Doc. 227]*

BOR objects to the Court's consideration of the declarations of two witnesses relied on by Kavianpour in support of her motion for summary judgment, [Doc. 227], which Kavianpour opposes, [Doc. 237].  BOR has filed a reply in support of its objections, [Doc. 244], and before addressing the merits of Kavianpour's remaining claims, the Court must first determine whether it may properly consider these two declarations offered by Kavianpour in ruling on the pending dispositive motions.

BOR moves to exclude the declaration testimony of John Lott ("Lott"), [Doc. 209-8 (Lott Decl.)], who served as AU's interim Chief Compliance Officer ("CCO") from May 2019 to July 2019 on a contractual basis through his employer, [<u>id.</u> ¶ 6], and Michele Reed ("Reed"), [Doc. 209-17 (Reed Decl.)], AU's Title IX Coordinator, [<u>id.</u> ¶¶ 2-3].  <u>See</u> [Doc. 227].  In particular, BOR contends that both declarations "contain speculative, vague, and foundationally baseless assertions, as well as assertions with no apparent connection to this lawsuit," and that "[a]fter clearing

3

away deficient assertions and assuming the remaining assertions are accurate," the testimony is "duplicative of evidence from individuals with personal knowledge" and is "useless[.]"   [Id. at 3 (emphasis and citations omitted)].   BOR states that while "the [d]eclarations may confirm some evidence already in the record," that "considering neither Lott nor Reed were involved in the matter until several months after [Kavianpour's] termination,[2] the [d]eclarations cannot refute [its] legitimate non-discriminatory reasons for implementing the drug testing protocol and, ultimately, terminating [Kavianpour's] employment."   [Id. at 4 (footnote added)].

Kavianpour responds to this particular argument by pointing out that BOR "authorized and directed [] Lott and [] Reed to conduct an internal investigation regarding [] Kavianpour's allegations" and that "BOR's argument that Lott and Reed's declarations are immaterial because their involvement occurred after [] Kavianpour's initial termination is without merit," since "[l]ogically, it is never going to be the case that an employer's internal investigation of an employee's allegations of discrimination occurs prior to the conduct complained-of" and that the "results of an employer's own internal investigation of an employee's

---

[2] In June 2019, Lott was tasked with conducting an internal investigation into Kavianpour's claims of discrimination and retaliation following her termination in February 2019, and as Reed's supervisor, he also involved Reed in assisting with the investigation.   [Doc. 209-8 ¶¶ 8-9, 12; Doc. 209-17 ¶¶ 7-9].

allegations are often proffered by employers when they support the employer's adverse action to demonstrate, for example, the exercise of reasonable care in response to an allegation." [Doc. 237 at 7-8 (citations omitted)].  Kavianpour thus contends that the "notion that Lott and Reed became involved after the initial termination decision in February 2019[] is of no moment" and that their investigative findings are material to the issues on summary judgment.  [Id. at 8-9].

The Court agrees with Kavianpour on this point and finds that the mere timing of Lott and Reed's involvement in this case does not render their declaration testimony immaterial.  Moreover, although the declarations may contain "testimony duplicative of evidence from individuals with personal knowledge" or include speculative and vague assertions, [Doc. 227 at 3 (emphasis omitted)], these are insufficient reasons to exclude the testimony at the summary judgment stage of the case, see Montoya v. Orange Cnty. Sheriff's Dep't, 987 F. Supp. 2d 981, 994 (C.D. Cal. 2013) (citations omitted) (explaining that while the Court may consider whether the evidence is relevant, it need not exclude evidence at the summary judgment stage on any of the grounds outlined in Federal Rule of Evidence 403 as those issues are more properly raised at trial); Alvarez v. T-Mobile USA, Inc., No. CIV. 2:10–2373 WBS GGH, 2011 WL 6702424, at *3 (E.D. Cal. Dec. 21, 2011) (emphasis and citation omitted) (explaining that "[o]bjections to evidence

on the ground that the evidence is irrelevant, speculative, argumentative, vague and ambiguous, or constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself," and that "[s]tatements based on improper legal conclusions or without personal knowledge are not facts and can only be considered as arguments, not as facts, on a motion for summary judgment," and thus, "[i]nstead of challenging the admissibility of this evidence, lawyers should challenge its sufficiency" as "[o]bjections on any of these grounds are superfluous"); see also Garcia v. City of Grantville, CIVIL CASE NO. 3:17-cv-00169-TCB-RGV, 2020 WL 10142254, at *4 (N.D. Ga. Nov. 16, 2020), adopted by 2021 WL 2548701, at *4 (N.D. Ga. Jan. 6, 2021), aff'd sub nom. Garcia v. Riley, No. 21-10439, 2021 WL 4127070 (11th Cir. Sept. 10, 2021) (per curiam); Fed. R. Evid. 403 (permitting the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," but not requiring it to do so). Therefore, BOR's general objections on these grounds are overruled, and the Court will address the remaining arguments advanced by BOR as they pertain specifically to each of the declarations at issue.

### a.    Lott's Declaration

BOR argues that Lott's declaration should not be considered on summary judgment because he "repeatedly references his experience[] and claims to be [a] nationally recognized subject matter expert in Compliance, Privacy, and Risk Management," and therefore, "it appears [Kavianpour] is attempting to rely on impermissible expert witness testimony," but that Lott "was not disclosed as an expert witness under Federal Rule of Civil Procedure 26(a)(2)(A), Local Rule 26.2(C) . . ., and this Court's operative Scheduling Order" and "his untimely expert testimony should [thus be] excluded" as an impermissible "attempt to evade the expert witness disclosure requirements . . . by simply calling an expert witness in the guise of a layperson[.]"  [Doc. 227 at 4-5 (citation and internal marks omitted)]. Kavianpour responds that Federal Rule of Evidence 701 "does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences,"[3] and that "[w]hile this Court is not bound by the substance of [] Lott's compliance findings, his declaration is not inadmissible or contain expert testimony if BOR designated him as a compliance officer within its

_____

[3] Rule 701 provides that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.

organization based on his particularized experience in that field, and he subsequently made observations and judgments about [] Kavianpour's allegations that he is now reporting to this Court." [Doc. 237 at 9-10 (citations omitted)].

Although BOR argues that Lott's declaration testimony "constitutes inadmissible expert testimony from [a] lay witness[]," it "does not." 523 IP LLC v. CureMD.Com, 48 F. Supp. 3d 600, 635 (S.D.N.Y. 2014) (footnote and citation omitted). Kavianpour "does not proffer [Lott] as [an] expert witness[], nor does [Lott] testify about any technical or other specialized knowledge," id. (internal citation and marks omitted),[4] but rather, he avers as to the circumstances surrounding the internal investigation he was tasked with conducting regarding Kavianpour's allegations of discriminatory and retaliatory treatment and his subsequent findings, see generally [Doc. 209-8], which were "within the purview of an opinion rationally based on the witness's perception," 523 IP LLC, 48 F. Supp. 3d at 635 (footnote and internal marks omitted). However, "the problem with [Lott's] testimony is that portions of it usurp the fact-finding function of the jury"

---

[4] In paragraph 28 of his declaration, Lott states that in his capacity as a "former Health Clinic CEO and a former Chief Quality Officer of a hospital," he had never observed anything "so blatantly irresponsible as telling a medical doctor that their 'clinical activity' would not be an excuse for them not to appear at a drug testing in a timely manner." [Doc 209-8 ¶ 28]. This opinion is clearly based on his specialized knowledge from his former positions and "will not be considered as lay opinion testimony." Parrott v. PNC Bank, Nat. Ass'n, 986 F. Supp. 2d 1263, 1272 (N.D. Ala. 2013).

by, for example, "essentially telling the jury [what] he has concluded" when "[d]etermining the weight and sufficiency of the evidence is the factfinder's job" and "his conclusion does not assist the factfinder in doing that job." Id. (alteration, citations, and internal marks omitted); see also Goodwin v. His Choice Towing & Recovery, LLC, CIVIL ACTION NO. 1:17-CV-753-MLB-LTW, 2019 WL 1212119, at *7 n.5 (N.D. Ga. Jan. 14, 2019) (citations and internal marks omitted) ("Unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment."), adopted by 2019 WL 7944075, at *5 (N.D. Ga. Dec. 3, 2019); R.W. v. Bd. of Regents of the Univ. Sys. of Ga., 114 F. Supp. 3d 1260, 1274 (N.D. Ga. 2015) (citation and internal marks omitted) (explaining that "all witnesses are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct"); Parrott, 986 F. Supp. 2d at 1272  (emphasis, citations, and internal marks omitted) (finding declaration testimony offered in certain paragraphs was not "'helpful,' but instead [was] an opinion offered to merely tell the jury what result to reach"). Accordingly, the Court finds that Lott's declaration is not due to be excluded; however, to the extent his declaration lacks a proper foundation, is not based on personal knowledge, or "state[s] an opinion or conclusion that essentially usurps the role of the factfinder, those statements have not been considered by the

Court[.]" 523 IP LLC, 48 F. Supp. 3d at 636 (footnote omitted); see e.g., [Doc. 209-8 ¶¶ 24-26, 29, 32-40, 42, 45-46, 50, 63-70, 73, 75, 77, 79-81, 84-86, 90, 101-02, 105-08]; see also Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) (citations omitted) ("A witness [] may not testify to the legal implications of conduct; the court must be the jury's only source of law.").

### b.   Reed's Declaration

BOR initially argued that paragraph 19 of Reed's declaration "contain[ed] hearsay statements that would not be admissible in evidence." [Doc. 227 at 10]. Paragraph 19 of Reed's declaration provides as follows:

> On or around July 16, 2019, I learned from Clay Sprouse [("Sprouse")] that [] Lott was no longer employed by AU and no longer my supervisor. I heard he was no longer employed based upon what [] Sprouse communicated to the [Audit, Compliance, Enterprise and Risk Management ("ACERM")] team and since he was the Interim supervisor. I heard through [] Sprouse and others at AU that Debra Arnold [("Arnold")] had complained about [] Lott, alleging that Lott had been rude to her in the July 3 meeting.

[Doc. 209-17 ¶ 19]; see also [id. ¶ 4]. BOR asserted that "[b]ased on the wording of [p]aragraph 19, it was unclear whether [Reed] learned of the information contained in the first two sentences through [] Sprouse or through the 'ACERM team' and whether the information contained in the third sentence was entirely from [] Sprouse or unidentified 'others at AU.'" [Doc. 244 at 9-10 (citation omitted)].

In her response, Kavianpour pointed out that pursuant to Federal Rule of Evidence 801(d)(2), "a statement by a party opponent constitutes an exception to the rule against hearsay" under certain circumstances, that Reed's "statements [were] corroborated by other evidence in this case," that Sprouse's "statement to [] Reed that [] Arnold complained about [] Lott constitutes an exception to the hearsay rule under any of the[] categories [listed under Rule 801(d)(2)]," and that Sprouse admitted in his deposition that he asked Lott's employer to remove him from his position at AU.  [Doc. 237 at 11-12].  "Upon review of [Kavianpour's] [r]esponse, and further review of [p]aragraph 19, [BOR withdrew] its hearsay objection to [p]aragraph 19."  [Doc. 244 at 10].  Accordingly, BOR's hearsay objection to paragraph 19 of Reed's declaration is hereby overruled.

**2.    *Defendants' Renewed Motion to Exclude Expert Reports, [Doc. 248]***

Defendants have filed a renewed motion to exclude the expert reports of Michael Kosnett, M.D. ("Dr. Kosnett"), and Robert Swotinsky, M.D. ("Dr. Swotinsky"), [Doc. 248], arguing that "they fall far short of the threshold for admissibility under Fed. R. Evid. 702 and the Supreme Court's Daubert[5] doctrine" because "the experts applied an erroneous methodology" and "the reports and proffered testimony [are] not relevant and do[] not assist the trier of

---

[5] See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

fact as neither expert adds anything new to the record and instead simply repeats what the documentary evidence shows and what a lay witness or trier of fact could deduce," [id. at 1]; see also [Docs. 128, 129, 152, 156, 163, 191, 222-3, 222-5, 222-7, 222-9, & 222-10].  Defendants point out that while the parties initially "agreed that a ruling on the motions was not necessary insofar as [Kavianpour] did not intend to rely heavily on the expert reports in her motion for summary judgment" and the Court "terminated the motions with direction to renew them after summary judgment or before then as needed," Kavianpour "does rely on the expert reports as absolute fact in her [r]eply to AUMC in [s]upport of her [m]otion for [s]ummary [j]udgment," included "approximately 60 paragraphs of citations to the reports . . . in her [s]tatement of [a]dditional [m]aterial [f]acts replying to AUMC's [m]otion for [s]ummary [j]udgment," and "[s]he also cites to the reports in her [s]tatement of [a]dditional [m]aterial [f]acts replying to [ BOR's] [m]otion for [s]ummary [j]udgment."  [Doc. 248 at 2 (footnotes and citations omitted)].

In response, Kavianpour "renews her response in opposition and requests a *Daubert* hearing," asserting that "[b]ecause [d]efendants have relied upon [Phillip L. Coule, M.D.'s ('Dr. Coule')] belief, based on his medical judgment, that [] Kavianpour suffered from a substance abuse disorder, then [] Kavianpour should be permitted to present some evidence that rebuts that conclusion as so unreasonable that it constitutes evidence of pretext."  [Doc. 251 at 7-8 (footnote

omitted)].   She maintains that her "expert evidence should be allowed for consideration by the fact-finder to reach the truth regarding Dr. Coule's determination about [ her] posing a safety threat" and that "[d]efendants are essentially advocating that the Court accept the judgment of their own employee and decisionmaker, Dr. Coule, while shielding him from expert evidence disputing his judgment," which "would be an error of law" and would "deprive[ her] of a fair and equal chance to meet her burden of proof and to provide the competing view that will assist a trier of fact in this matter."   [Id. at 8-9 (citation and internal marks omitted)].

"In federal court, federal law applies to the admissibility of expert testimony."   Fowler v. Gracas, CIVIL ACTION FILE NO. 1:20-CV-5059-MHC, 2022 WL 4596681, at *2 (N.D. Ga. Aug. 11, 2022) (citations omitted).   "Trial courts serve a critical gate-keeping function for the admissibility of expert testimony."   Mueller v. Daugherty Sys., Inc., Case No. 1:18-cv-3358-MLB, 2021 WL 3754582, at *1 (N.D. Ga. June 14, 2021) (citation omitted).   "'Federal Rule of Evidence 702, as explained by the Supreme Court in *Daubert* . . . and its progeny, controls determinations regarding the admissibility of expert testimony.'"   United States v. Diaz, No. 07-20398-CR, 2008 WL 906725, at *1 (S.D. Fla. Mar. 28, 2008) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).   Specifically, Rule 702 states that a witness "who is qualified as an expert by knowledge, skill,

13

experience, training, or education may testify in the form of an opinion or otherwise" provided that (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). Thus, "[p]ursuant to Rule 702, expert testimony is admissible when: (1) the expert is qualified to testify competently, (2) the expert's methodology is reliable, and (3) the expert's testimony will assist the trier of fact to understand the evidence or to determine a fact in issue in the case." Brown v. Roche Labs., Inc., Civil Action No. 1:06–cv–3074–JEC, 2013 WL 2457950, at *2 (N.D. Ga. June 6, 2013) (citations omitted), aff'd, 567 F. App'x 860 (11th Cir. 2014) (per curiam) (unpublished). "The admissibility of an expert's opinion thus turns on three things: qualification, reliability, and helpfulness." Mueller, 2021 WL 3754582, at *2 (citation omitted).[6] "'The burden of establishing qualification,

---

[6] "Under the first prong, experts may be qualified in various ways," and "[w]hile scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." Ross v. Awe, CV419-201, 2022 WL 3927837, at *5 (S.D. Ga. Aug. 31, 2022) (citations and internal marks omitted). "As to the second prong, the reliability criterion remains a discrete, independent, and important requirement for admissibility," which includes various factors such as whether the expert's theory or technique can be or has been tested, whether it has been subjected to peer review and publication, what its known or potential

reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or defendant in a civil suit, or the government or the accused in a criminal case.'" Diaz, 2008 WL 906725, at *2 (quoting United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)). "The proponent of expert testimony must establish the factors set out in Rule 702 by a preponderance of the evidence." Mueller, 2021 WL 3754582, at *2 (citation omitted).

"The *Daubert* inquiry is a flexible one, giving district courts great latitude in determining which of the *Daubert* factors, if any, are appropriate in assessing the admissibility of expert testimony in a particular case."[7] Diaz, 2008 WL 906725, at *2 (citation omitted). "'Whether the *Daubert* opinion factors are even pertinent to assessing reliability in a given case will depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his or her testimony.'" Id. (alteration in original) (citation and internal marks omitted). Therefore, the Court

---

rate of error is, and whether it is generally accepted in its field. Id. (citations and internal marks omitted). Finally, "[e]xpert testimony must also assist the trier of fact," meaning that it is "admissible if it concerns matters that are beyond the understanding of the average lay person." Id. (citation and internal marks omitted).

[7] "And while *Daubert* focused on the admissibility of scientific expert testimony, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that *Daubert's* methodology applies equally to experts who are not scientists." Mueller, 2021 WL 3754582, at *2.

has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co., 526 U.S. at 152.[8]

On November 22, 2021, Dr. Kosnett provided an expert report, [Doc. 222-3], in which he first set forth his qualifications, including that he was a "physician specializing in occupational medicine and medical toxicology," was "an Associate Clinical Professor in the Division of Clinical Pharmacology and Toxicology, Department of Medicine, University of Colorado School of Medicine, and the Department of Environmental and Occupational Health, Colorado School of Public Health," and that he had "been an Attending Physician at the Rocky Mountain Poison and Drug Center in Denver, CO since 1995," [id. at 1]. Dr. Kosnett indicated that he had "reviewed documents and records pertaining to drug testing performed on [Kavianpour], a first year neurosurgery resident at [AUMC], during 2018 and 2019" and offered his "assessment of the implications of this information from a medical toxicology and occupational health perspective" and "whether the information in the record [was] consistent with the conclusion reached by [Dr. Coule], Chief Medical Officer and Chief Patient Safety

---

[8] Additionally, "*Daubert* hearings are not required." Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113 (11th Cir. 2005) (citations and internal marks omitted).

16

Office at [AUMC]."  [Id. at 2].  Ultimately, Dr. Kosnett offered his "assessment, [that] the documentary record [did] not establish that cannabis use caused [] Kavianpour to be an 'impaired physician' whose service as a neurosurgery resident posed a threat to patient safety" and that the "punitive disciplinary action that was undertaken against [] Kavianpour by Dr. Coule was conducted contrary to well-established occupational health policies and practices that require a confirmatory interview and evaluation by a substance abuse disorder professional."  [Id. at 2, 5 (emphasis and citation omitted)].

After briefing was completed by the parties on the defendants' motion to strike and exclude this report, see [Docs. 128, 144, & 150], Dr. Kosnett submitted a supplemental expert report on February 28, 2022, [Doc. 222-5], in order to provide "a detailed explication and contextualization of the scientific foundation and methodology for all [his] opinions," [id. at 1].  Dr. Kosnett explained that he "applied a three-part methodological approach to assess whether [] Kavianpour was an impaired physician due to substance abuse," in that he "1) reviewed consensus definitions and criteria regarding what constitutes a substance abuse disorder and physician impairment, 2) examined whether available evidence established the presence of these conditions in [] Kavianpour, and 3) considered whether factors independent of substance abuse-induced impairment were as likely or more likely to have been responsible for her alleged performance

17

shortcomings," which "resulted in [his] opinion, as a specialist in medical toxicology and occupational medicine, that it cannot be concluded that [] Kavianpour exhibited workplace impairment due to substance abuse."  [Id. at 3 (emphasis omitted)].  He also opined that Kavianpour "was not afforded the comprehensive, multi-disciplinary evaluation and management approach for impaired physicians that [was] a standard practice in clinical and academic medicine."  [Id. at 13].

On December 24, 2021, Dr. Swotinsky provided an expert report, [Doc. 222-7], in which he relayed that his "opinions in []his report [were] based on [certain] documents, [] references cited in [the] report, and [his] knowledge of workplace drug testing," [id. at 1.  He set forth his qualifications as including that he was a "board-certified occupational medicine physician," a "certified medical review officer," and a "nationally recognized authority on workplace drug testing."  [Id. at 2 (footnotes omitted)].  In his report, Dr. Swotinsky reached the following conclusions: (1) the record lacked evidence that Kavianpour engaged in substance abuse; (2) Kavianpour's June 25, 2018, urine drug test was a canceled test under the AU/AUMC policy; (3) AUMC's policies did not authorize in-service drug testing of Kavianpour; (4) the policies did not authorize monthly in-service drug testing of Kavianpour; (5) the policies did not authorize random drug testing of Kavianpour; (6) the policies did not authorize for-cause drug testing of

Kavianpour; (7) the policies did not authorize follow up drug testing of Kavianpour; (8) Kavianpour was not drug tested in accordance with AU House Staff policies; (9) AUMC's policies did not authorize a one to four-hour testing window; (10) drug testing was not authorized during off-duty time; (11) the random testing rate was burdensomely high; and (12) the record did not demonstrate that Kavianpour was non-compliant with the policies. [Id. at 7-13].

After briefing on defendants' motion to strike and exclude this expert report was completed, see [Docs. 129, 147, & 149], Dr. Swotinsky submitted a supplemental expert report on February 22, 2022, [Doc. 222-9], in order to "respond[] to issues raised in the defendant[s'] January 24, 2022, 'Motion to Strike and Exclude,'" and provide "further explanation about how [he] reached the opinions in [his] December 2[4], 2021, report," [id. at 1]. He explained that "what [he] [brought] to [the] discussion as an expert[] [was] an understanding of standards of practice in workplace drug testing." [Id. at 2]. He submitted a second supplemental report on March 18, 2022, [Doc. 222-10], in order to "respond[] to . . . Dr. Coule's deposition," [id. at 1].

Defendants move to strike and exclude Dr. Kosnett's November 22, 2021, expert report pursuant to Federal Rule of Evidence 702 and Daubert, [Doc. 128]; see also [Doc. 222-3], arguing that his opinion "applies an erroneous methodology" and is "not relevant and do[es] not assist the trier of fact as [ he]

19

adds nothing new to the record and instead simply repeats what the documentary evidence shows," [Doc. 128 at 6].  In particular, defendants contend that Dr. Kosnett's report fails "to establish that [ his] opinion meets any of the four factors laid out in *Daubert* that courts should consider when determining whether testimony is reliable," that his report "simply employs no methodology other than the *ipse dixit* of the expert," and that his report "will not assist the trier of fact because it does not concern matters beyond the understanding of the average lay person and offers nothing more than what [Kavianpour's] lawyers can argue during closing arguments" based "on the documentary evidence[.]"  [Id. at 13-14, 17 (emphasis and citation omitted)].

Defendants also move to strike and exclude the December 24, 2021, expert report of Dr. Swotinsky, pursuant to Federal Rule of Evidence 702 and Daubert, [Docs. 129 & 248]; see also [Doc. 222-7], asserting that "Dr. Swotinsky applies an erroneous and legally insufficient methodology" and that his opinions are "not relevant and do[] not assist the trier of fact as [ he] adds nothing new to the record and instead simply repeats what the documentary evidence shows," [Doc. 129 at 6, 11].  Specifically, defendants contend that "each of Dr. Swotinsky's eight opinions, with the possible exception of his seventh opinion, . . . are based simply on the fact record as it relates to [Kavianpour] as compared to potentially relevant AU or AUMC policies"; that his methodology "appears to be nothing more than

reviewing the fact record and potentially applicable policies and 'opining' on whether the terms of those policies were met"; that his reports fail "to establish that [ his] opinions meet any of the four factors laid out in *Daubert* that courts should consider when determining whether testimony is reliable"; that his report fails "to explain why any expertise at all, beyond the ability to read English, is needed to come to his opinion"; that the "'methodology' employed in [his] seventh opinion is plainly insufficient under *Daubert*" and "lacks the necessary foundation of reliability"; that the "first through sixth, and eighth opinions . . . will not assist the trier of fact because they do not concern matters beyond the understanding of the average lay person and offer nothing more than what [Kavianpour's] lawyers can argue during closing arguments" and "based on the documentary evidence and policies"; and that his second opinion constitutes an improper legal conclusion.  [Doc. 129 at 13-14, 16-17, 19-20, 22 (emphasis, footnote, and citation omitted)].[9]

---

[9] Defendants alternatively request a <u>Daubert</u> hearing "to determine whether the reasoning and methodology underlying Dr. Kosnett[ and Dr. Swotinsky's] opinions are reliable and to evaluate whether they would assist the trier of fact." [Doc. 128 at 6; Doc 129 at 6].  Defendants also move to strike and exclude Dr. Kosnett's February 28, 2022, supplemental report, as well as Dr. Swotinsky's February 22, 2022, and March 18, 2022, supplemental reports, "as untimely and in violation of the Federal Rules of Civil Procedure, the Local Rules for the Northern District of Georgia, and this Court's operative Scheduling Order."  [Doc. 156 at 1; Doc. 163 at 1; Doc. 252 at 3 n.2, 4 n.3]; <u>see also</u> [Doc. 155; Doc. 191; Doc. 222-9; Doc. 222-10].

Kavianpour responds that "[c]ourts routinely find that specialized experience in the same or similar fields of Drs. Kosnett and Swotinsky, namely toxicology, occupational medicine, and employer drug testing, allows for reliable opinions," and that "[r]eliance on commonly accepted practices and standards in the field and peer-reviewed literature, also shows the reliability of the opinions of Drs. Kosnett and Swotinsky." [Doc. 251 at 10-11 (citations omitted)]. Kavianpour also contends that her "experts provide information and opinions that are relevant and helpful to the fact finder because they are beyond the understanding of the average juror" and address "the following disputed issues": (1) whether Kavianpour "was a direct threat to patient safety"; (2) "whether she was reasonably considered to be a current illegal drug user"; (3) "whether [d]efendants' asserted patient-safety reason for the suspension-termination is a legitimate, non-discriminatory reason as opposed to pretextual discriminatory and retaliatory one"; and (4) "whether [] Kavianpour's belief, that the drug testing she opposed as unlawful, was objectively reasonable." [Id. at 14-15]. Defendants have filed a reply in support of their renewed motion to exclude the expert reports on summary judgment. [Doc. 252].

While the parties first address the sufficiency of the methodology applied by Drs. Kosnett and Swotinsky, the Court finds that neither of their reports will "help the trier of fact to understand the evidence or to determine a fact in issue,"

especially considering that "[a]n expert should not merely tell the jury what result to reach." White v. Town of Hurley, No. CIV 17-0983 JB\KRS, 2019 WL 1411135, at *38 (D.N.M. Mar. 28, 2019) (citations and internal marks omitted).[10]  "An expert may not opine to information that the untrained layman would be qualified to determine intelligently and to the best possible degree . . . without enlightenment from those having a specialized understanding of the subject involved in the dispute."  Id. (citation and internal marks omitted).  Likewise, "[e]xperts also should not provide testimony that articulates and applies the relevant law, as such statements circumvent[ ] the jury's decision-making function by telling it how to

---

[10] "The helpfulness requirement goes primarily to relevance.  Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Kilgore v. Reckitt Benckiser, Inc., 917 F. Supp. 2d 1288, 1292 (N.D. Ga. 2013) (citations and internal marks omitted).  That is, "the expert testimony must assist the trier of fact," which means "it concerns matters that are beyond the understanding of the average lay person." Woodard v. Wal-Mart Stores E. LP, No. 5:09-cv-428 (CAR), 2011 WL 3759782, at *4 (M.D. Ga. Aug. 25, 2011) (citation and internal marks omitted).  "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. (alteration in original) (citation and internal marks omitted).  "Nor does expert testimony help the trier of fact if it fails to fit with the facts of the case," which means that "a large analytical leap must be made between the facts and the opinion." Id. (citations and internal marks omitted).  Therefore, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" and it "may exclude otherwise reliable testimony if it does not have sufficient bearing on the issue at hand to warrant a determination that it [is helpful to the trier of fact]." Id. (last alteration in original) (citations and internal marks omitted).

decide the case." Id. (second alteration in original) (citation and internal marks omitted).

In their reports, Drs. Kosnett and Swotinsky "recapitulate[] facts that a layman could determine intelligently without aid." Id., at *39 (citation and internal marks omitted).  Indeed, the "trier of fact does not need an expert to remind them of the case's facts," nor "to proffer a legal conclusion, which likewise the Court deems inadmissible and not helpful[.]" Id.  (citations omitted) (finding expert's opinion on whether defendant had "an affirmative defense to [plaintiff's] ADA claim[] so stray[ed] into an inadmissible legal conclusion"); see also Stolpner v. N.Y. Univ. Lutheran Med. Ctr., 16-cv-997(KAM), 2018 WL 4697279, at *19 n.8 (E.D.N.Y. Sept. 29, 2018) (explaining that "the court's consideration of the defendant's summary judgment motion does not rely on any expert report because the court [was] capable of determining whether defendants proffered a legitimate non-discriminatory reason for terminating plaintiff from the [] residency program" and that "the experts' reports submitted by the parties [were] not necessary to determine whether the plaintiff ha[d] carried his burden of showing that defendant's proffered reasons were pretextual"); Goswami v. DePaul Univ., 8 F. Supp. 3d 1019, 1030-31 (N.D. Ill. 2014) (emphasis, footnote, citations, and internal marks omitted) (explaining that the issue in the case was whether "one or more members of the tenure committee lied when they concluded that there were

various deficiencies in [ plaintiff's] scholarship that prevented her from being granted tenure in [her d]epartment" and "not whether [ plaintiff's] experts' views of her scholarship trump those of the committee members," because "[b]eauty is in the eye of the beholder and the beholder in [the] case is the employer" and "the trier-of fact will evaluate truthfulness, not beauty" as the "pretext inquiry focuses on whether the stated reason for the adverse employment action is in fact the reason for it—not on whether the stated reason is accurate or fair or even rational" and the expert testimony offered was "not relevant to the issue of pretext" and therefore did not "assist the trier of fact in understanding the issues"); Doane v. Burlington Res. Oil & Gas Co., No. 06–CV–040–D, 2007 WL 4616287, at *1 (D. Wyo. Jan. 10, 2007) (finding expert was "prohibited from testifying as to whether [p]laintiff was disabled under the [ADA], whether [p]laintiff's major life activity was substantially limited, and whether [p]laintiff's termination constituted a violation of the ADA").  Thus, the Court will not consider the expert reports to state facts or rely on these opinions as expert testimony on summary judgment, but may "weigh[ the opinions] as legal arguments on the same level as the [parties'] . . . briefs." White, 2019 WL 1411135, at *40-41; see also League of United Latin Am. Citizens (Lulac) v. Edwards Aquifer Auth., CIVIL ACTION NO. SA- 1 2-CA-620-OG, 2014 WL 10762935, at *2 (W.D. Tex. Sept. 30, 2014) (emphasis and citations omitted) (finding that because the "entirety of the [expert] report

constitute[d] a legal analysis of the constitutional provisions, case law, statutes, and rules that the Court [would] need to consider in determining the legal issues in [the] case" and "essentially offer[ed] [an ] opinion on how the law should be interpreted and applied[,]" which was "a question for the Court to decide," the expert report would "not be considered as summary judgment evidence" and would "be excluded"; however, "[t]o the extent this same analysis ha[d] been used in [the] summary judgment briefs, it [would] be considered as legal argument in support of [the] claims," but "it [was] simply argument, and nothing more" as "[a]n expert is not necessary to present legal arguments to the Court").  For the foregoing reasons and cited authority, it is **RECOMMENDED** that defendants' renewed motion to exclude expert reports, [Doc. 248], be **GRANTED IN PART** and **DENIED IN PART**.[11]

---

[11] Furthermore, defendants also maintain that Drs. Kosnett and Swotinsky's supplemental reports should be stricken and excluded "as untimely and in violation of the Federal Rules of Civil Procedure, the Local Rules for the Northern District of Georgia, and this Court's operative Scheduling Order."  [Doc. 156 at 1; Doc. 163 at 1]; see also [Doc. 155 at 1-2; Docs. 222-5, 222-9, & 222-10].  In particular, defendants point out that the deadline to identify other experts beyond the initial expert, Dr. Kosnett, whom she identified on November 22, 2021, and the subject of their testimony, was extended to December 31, 2021; that she designated Dr. Swotinsky as an expert witness on December 30, 2021, and served his December 24, 2021, expert report on defendants at that time; and that defendants filed motions to strike and exclude Drs. Kosnett and Swotinsky's expert reports and the briefing was completed in February 2022, prior to the submission of the supplemental reports, which were then submitted "nearly two months after the deadline for [Kavianpour] to identify her experts and the subject of their

### 3. *Compliance with Local Rules Governing Summary Judgment*

"In this District, the process for separating disputed from undisputed material facts is governed by Local Rule 56.1(B)."  Brandon v. Lockheed Martin Aeronautical Sys., 393 F. Supp. 2d 1341, 1347 (N.D. Ga. 2005), adopted at 1346; see also Dobson v. Fulton Cnty., CIVIL CASE NO. 1:19-cv-00902-ELR-RGV, 2020 WL 5549246, at *2 (N.D. Ga. July 9, 2020) (citation omitted), adopted by 2020 WL 5548771, at *7 (N.D. Ga. Aug. 31, 2020).  In compliance with Local Rule 56.1(B)(1), the parties have submitted statements of undisputed material facts, [Doc. 199-2 (AUMC's statement); Doc. 207-2 (BOR's statement); Doc. 209-2 (Kavianpour's statement)], and have responded to each of the statements, [Doc. 229-1 (Kavianpour's response to AUMC's statement); Doc. 230-1 (Kavianpour's response to BOR's statement); Doc. 224-34 (AUMC's response to Kavianpour's

---

testimony, and only five calendar days before the deadline to complete fact and expert discovery" in the case of Dr. Swotinsky's supplemental report and "on the current deadline to complete fact and expert discovery" for Dr. Kosnett's supplemental report.  [Doc. 156-1 at 2-3; Doc. 163-1 at 2-3 (footnote omitted)]. Additionally, Kavianpour submitted a second supplemental report from Dr. Swotinsky dated March 18, 2022, on May 26, 2022, [Docs. 191 & 222-10], which defendants also maintain should be excluded as untimely, [Doc. 252 at 4 n.3]. Despite Kavianpour's arguments, see [Docs. 165 & 170], the Court is unconvinced and declines to admit the untimely supplemental reports, see Cornerstone Missionary Baptist Church v. S. Mut. Church Ins. Co., Civil Action No. 5:12–CV– 149 (HL), 2013 WL 6712928, at *7-8 (M.D. Ga. Dec. 18, 2013).

statement); Doc. 226 (BOR's response to Kavianpour's statement)].[12]   The parties

have also submitted statements of additional material facts, [Doc. 224-35 (AUMC's

statement); Docs. 229-2 & 230-2 (Kavianpour's statements)], and responses thereto,

[Doc. 245 (Kavianpour's response to AUMC's statement); Doc. 241-20 (AUMC's

response to Kavianpour's statement); Doc. 243 (BOR's response to Kavianpour's

statement)].   The Court accepts as undisputed those facts which the parties admit

or have failed to properly dispute or deny in accordance with the Local Rules.   See

[Doc. 229-1, admitting or failing to properly deny or dispute ¶¶ 1-8, 10-14, 18-22,

24-28, 31-46, 48-55, 57-64, 66-78, 81-82, 85-87, and parts of ¶¶ 9, 15-17, 23, 29-30, 47,

56, 65, 79-80, 83-84, and 88 of AUMC's statement, Doc. 199-2; Doc. 230-1, admitting

or failing to properly deny or dispute ¶¶ 1-9, 12-23, 25-35, 39, 41-42, 44-48, 51-56,

58-79, 81-104, 106-41, 143-48, 150, 152-56, 158-66, and parts of ¶¶ 10-11, 24, 36-38,

40, 43, 49-50, 57, 80, 105, 142, 149, 151, and 157 of BOR's statement, Doc. 207-2;

Docs. 224-34 & 226, admitting or failing to properly deny or dispute ¶¶ 1-2, 4-7, 9-

15, 17-19, 21, 24-25, 27-36, 38-39, 41-42, 44-50, 53-60, 63-64, 66-68, 70-73, 77-80, 82-

---

[12] The Local Rules contemplate the movants for summary judgment filing a
"motion and brief" and "a separate, concise, numbered statement of the material
facts to which there is no genuine issue to be tried," and requires the nonmovants
to respond to that statement while also permitting the nonmovants to "file a
separate statement of additional facts which the nonmovant[s] contend[] are
material and present a genuine issue for trial."   Circle Grp., L.L.C. v. Se. Carpenters
Reg'l Council, 836 F. Supp. 2d 1327, 1349 (N.D. Ga. 2011) (citing LR 56.1(B),
NDGa.).

85, 88-89, 91-100, 102, 104-05, 107-08, 110-12, 114, 120-23, 129-30, 132, 134-35, 137-38, 142-43, 146, 149, 152, 154-56, 161, 164, 168-70, and parts of ¶¶ 3, 8, 16, 20, 22-23, 26, 40, 43, 51-52, 61-62, 65, 69, 74-76, 81, 86-87, 90, 101, 106, 113, 115-19, 125-28, 131, 133, 139-40, 144-45, 147-48, 150-51, 153, 157-60, 162-63, 165-67, and 171-72 of Kavianpour's statement, Doc. 209-2; Doc. 245, admitting or failing to properly deny or dispute ¶¶ 1-6, 8, 10-16, 18-22, 24, 27-29, 32-56, 58, 60, 62, 64, 66-69, 71-72, 74, 80, 84-86, and parts of ¶¶ 7, 9, 17, 23, 25-26, 30-31, 57, 59, 61, 63, 65, 70, 73, 75-79, 81-83, and 87-88 of AUMC's additional statement, Doc. 224-35; Doc. 241-20, admitting or failing to properly deny or dispute ¶¶ 1-2, 4-10, 13, 15-19, 21, 23-25, 27-30, 32-43, 45, 48-58, 61-63, 67, 69, 72, 75, 79-80, 83-84, 88-111, and parts of ¶¶ 3, 11-12, 14, 20, 31, 44, 46-47, 59-60, 64-66, 68, 70-71, 73-74, 76-78, 81-82, 85-87, and 112-14 of Kavianpour's additional statement, Doc. 229-2; Doc. 243, admitting or failing to properly deny or dispute ¶¶ 1-6, 8-9, 12-13, 16-19, 22-23, 25-26, 30, 33, 35-42, 44-47, 51-53, 55, 59-61, 63-64, 68-70, 75, 78-79, 83, 85-87, 90, 94, 97, 103-04, 110, 113-35, and parts of ¶¶ 7, 11, 14-15, 20-21, 27-29, 31-32, 34, 43, 48-50, 54, 56-58, 62, 65-67, 71-72, 74, 76-77, 80-82, 84, 88-89, 91-93, 95-96, 98, 101-02, 105-09, 112 of Kavianpour's additional statement, Doc. 230-2].[13]   The Court, however, has

---

[13] The parties also object to certain facts on hearsay grounds, see [Doc. 224-34 ¶¶ 41, 66-67; Doc. 226 ¶¶ 14, 22-23, 141, 168, 171-72; Doc. 229-1 ¶¶ 16, 18, 68; Doc. 230-1 ¶¶ 27, 65, 117-18, 140; Doc. 241-20 ¶¶ 14, 27-28; Doc. 245 ¶¶ 16, 18], and although "when considering [] motion[s] for summary judgment, [t]he general rule is that

omitted certain facts which are not material to the issues presented in the pending

motions, were stated as an issue or legal conclusion, or were not supported by

proper citations to evidence.  See LR 56.1(B)(1), (2)(a)(2), NDGa.

Furthermore, the facts will be construed in the light most favorable to the

non-moving parties, as required on a motion for summary judgment, Adickes v.

---

inadmissible hearsay cannot be considered," "there is an exception to the general rule: a district court may consider a hearsay statement in passing on [] motion[s] for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form," Coffman v. Battle, 786 F. App'x 926, 934 (11th Cir. 2019) (per curiam) (unpublished) (third alteration in original) (internal marks omitted) (quoting Macuba v. Deboer, 193 F.3d 1316, 1322-23 (11th Cir. 1999)); see also Johnson v. Fulton Cnty. Bd. of Tax Assessors, CIVIL ACTION FILE NO. 1:18-cv-5292-TWT-JKL, 2021 WL 2582304, at *13 n.31 (N.D. Ga. Jan. 28, 2021) (citation omitted), adopted sub nom. Johnson v. Fulton Cnty., CIVIL ACTION FILE NO. 1:18-CV-5292-TWT, 2021 WL 2581431, at *1 (N.D. Ga. Feb. 17, 2021).  The Court will resolve these objections as necessary in the discussion of the merits of the pending motions for summary judgment, but briefly notes that while Kavianpour and AUMC object to certain statements of fact as containing inadmissible hearsay based on the fact that it relies on discussions involving a formerly named defendant, Walter Moore, M.D. ("Dr. Moore"), the Designated Institutional Official ("DIO") for the Graduate Medical Education ("GME") Office at AU, who is now deceased, see [Doc. 224-34 ¶¶ 41, 66-67; Doc. 230-1 ¶ 27; Doc. 241-20 ¶¶ 14, 27-28]; see also [Doc. 29; Doc. 61; Doc. 69; Doc. 90], "the testimony is not hearsay[] as [they] contend," Guillemard Ginorio v. Contreras, CIV. NO. 03-2317 (PG), 2007 WL 9712212, at *3 (D.P.R. Sept. 19, 2007) (citation omitted) (explaining that evidence concerning discussions involving the deceased witness was not hearsay because it was not offered for the truth of any matter asserted in the statements but to simply show that certain suggestions were made); see also Goodwine v. Nat'l R.R. Passenger Corp., No. 12–cv–3882 (TLM), 2014 WL 1010928, at *4 (E.D.N.Y. Mar. 17, 2014) (finding documents containing statements made by the deceased who was present during the relevant time "may be admissible under [the hearsay exception for records kept in the regular course of business, as well as] other hearsay excepions").

<u>S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Knight v. Baptist Hosp. of Miami, Inc.</u>, 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam) (citation omitted), and "the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist," <u>Glenn v. Brumby</u>, 724 F. Supp. 2d 1284, 1295 (N.D. Ga. 2010), <u>aff'd</u>, 663 F.3d 1312 (11th Cir. 2011).[14] "Rather, '[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.'" <u>Id.</u> (alteration in original) (quoting <u>Shaw Constructors v. ICF Kaiser Eng'rs, Inc.</u>, 395 F.3d 533, 538-39 (5th Cir. 2004)); <u>see also</u> <u>Adega v. State Farm Fire & Cas. Ins. Co.</u>, No. 07-20696-CIV, 2009 WL 3387689, at *3 (S.D. Fla. Oct. 16, 2009) (citation omitted) ("When evaluating cross-motions for summary judgment, the Court analyzes each individual motion on its own merits and thus views the facts on each motion in the light most favorable to the respective nonmovant.").  Thus, "the denial of one does not require the grant of another.  <u>Perez-Santiago v. Volusia Cnty.</u>, No. 6:08-cv-1868-Orl-28KRS, 2010 WL 917872, at *2 (M.D. Fla. Mar. 11, 2010) (citation and internal marks omitted).  "Even

---

[14] "For the limited purposes of [] summary judgment [], the court views the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving part[ies]," but the "court is mindful that what is considered to be the facts at the summary judgment stage may not turn out to be the actual facts if the case goes to trial."  <u>E.E.O.C. v. W. Customer Mgmt. Grp., LLC</u>, 899 F. Supp. 2d 1241, 1246 n.1 (N.D. Fla. 2012) (citations and internal marks omitted).

where the parties file cross motions pursuant to Rule 56, summary judgment is

inappropriate if disputes remain as to material facts." Id. (citations and internal

marks omitted).[15]

## B.    Statement of Facts and Procedural History

On March 22, 2018, Kavianpour, who graduated from the Chicago Medical

School Rosalind Franklin University of Medicine and Science with Distinction in

the top ten percent of her class, received a written offer to be a first year resident

in AU's seven-year Neurosurgery residency program, which was contingent upon

her completion of all Medical College of Georgia employment, departmental,

institutional, and other license requirements.[16]   [Doc. 188-7 at 25; Doc. 189 (Pl.'s

---

[15] "In determining whether evidence creates a factual dispute, [the Court] draw[s] reasonable inferences in favor of the nonmoving part[ies], but inferences based upon speculation are not reasonable."  Byrd v. UPS, 814 F. App'x 536, 537 (11th Cir. 2020) (per curiam) (unpublished) (citation omitted).   Additionally, "[t]he substantive law will identify which facts are material, and material facts are those which are key to establishing a legal element of the substantive claim which might affect the outcome of the case." Campbell v. Shinseki, 546 F. App'x 874, 877 (11th Cir. 2013) (per curiam) (unpublished) (citation and internal marks omitted); see also Varnedoe v. Brennan, CV418-067, 2021 WL 1115300, at *3 (S.D. Ga. Mar. 2, 2021) (citations omitted), adopted by 2021 WL 1112700, at *1 (S.D. Ga. Mar. 23, 2021).  Accordingly, what follows is a summary of facts as presented by the parties in their statements of undisputed material facts, see [Docs. 199-2, 207-2, & 209-2], and the Court will note those occasions in which the parties offered additional or conflicting factual statements that are supported by the evidence of record, J.D.P. v. Cherokee Cnty., Ga. Sch. Dist., 735 F. Supp. 2d 1348, 1350 (N.D. Ga. 2010).

[16] The Medical College of Georgia, which is a college within AU and is itself a component of Georgia's BOR, is the sponsoring organization of the Neurosurgery

Dep. Vol. I) at 49-51 pp. 49-51, 53-54 pp. 53-54; Doc. 190 (Pl.'s Dep. Vol. II) at 94 p. 341; Doc. 216 (Pl.'s Decl.) ¶ 3].   On April 2, 2018, Kavianpour signed a pre-employment drug screen request notification form,[17] and she also completed a voluntary self-identification of disability form, indicating that she did not have a disability.   [Doc. 189 at 55 p. 55, 62-64 pp. 62-64; Doc. 189-6 at 1-2; Doc. 207-54 at 1-3].

On June 25, 2018, AU held orientation for incoming residents, and on this first day, the residents were called by either groups or tables to report for urine

_____

residency program.   [Doc. 178-19; Doc. 194 (Norton Dep. Vol. I) at 31-33 pp. 31-33; Doc. 221 (Savage Dep.) at 193-94 pp. 192-93, 230-32 pp. 229-31; Doc. 223-1 (Coule Dep.) at 127-28 pp. 126-27].   AUMC and its parent, AU Health System, Inc. ("AUHS"), entered into a "Research, Education, and Professional Services Agreement" with BOR, pursuant to which AUHS and AUMC agreed to operate as the primary teaching hospital and associated non-hospital clinics at which AU's Trainees, including residents, shall participate in clinical learning.   [Doc. 204-8 at 1-14].   In addition, pursuant to this agreement, BOR agreed that it was "responsible for the approval, administration, accreditation and curriculum of all Education Programs, as well as for the recruitment, evaluation, supervision, testing and advancement of Trainees." [Id. at 12].   Thus, AUMC is a primary training site for AU's Neurosurgery residency program and is not accredited or governed by the Accreditation Council for Graduate Medical Education ("ACGME"), which governs the residency programs themselves.   [Doc. 177-1 (Seehusen Dep.) at 39-45 pp. 39-45; Doc. 178-1 (Macomson's 30(b)(6) Dep.) at 98-99 pp. 98-99, 126-32 pp. 126-32; Doc. 178-11 at 2; Doc. 221 at 230-32 pp. 229-31].

[17] All incoming residents were required to complete a pre-employment drug screen.   [Doc. 194 at 50 p. 50].

drug screens at Employee Health.  [Doc. 189 at 71-72 pp. 71-72, 76 p. 76].[18]  At approximately 3:30 p.m. that day, Kavianpour reported to Employee Health, and Senior Employee Health Nurse Edith Swab ("Swab") administered her pre-employment drug screen.  [Id. at 71 p. 71, 77-78 pp. 77-78, 80-82 pp. 80-82; Doc. 194 at 50-51 pp. 50-51; Doc. 207-7 (Swab Decl.) ¶¶ 2-3, 6].  A custody and control form for the urine drug screen was completed, and Kavianpour received a cup, provided a sample, and returned the cup to Swab.  [Doc. 189 at 81-82 pp. 81-82; Doc. 207-7 ¶¶ 5, 8; Doc. 229-3 (Pl.'s Decl.) ¶ 7; Doc. 230-3 (Pl.'s Decl.) ¶ 7].  Kavianpour believes that Swab then checked the temperature of the sample and sealed the specimen cup and placed it in a plastic bag.  [Doc. 189 at 83 p. 83].  Swab sealed the plastic bag containing Kavianpour's specimen cup and then placed it in a refrigerated storage unit before it was transported to the lab for testing.  [Doc. 207-7 ¶¶ 5, 8-10].

James Foster, M.D. ("Dr. Foster"), a Medical Review Officer, was responsible for verifying the resident drug screen test results, and on June 28, 2018, he contacted Kavianpour and informed her that the "THC levels in [her] urine was found to be 19 ng/ml," which was above "the cut-off point [of] 15 ng/ml" and

---

[18] Employee Health was located in a building adjacent to AUMC.  [Doc. 223-1 at 68 p. 67].  Generally, testing took "20 minutes if no one [was] there," but could take 45 minutes to an hour if it was busy.  [Doc. 178-1 at 53 p. 53; Doc. 178-12 at 45 p. 45; Doc. 216 ¶ 12].

"was considered positive, and thus a failed drug screen." [Doc. 188 (Foster Dep.) at 6-7 pp. 6-7, 9 p. 9, 17 p. 17, 69 p. 69; Doc. 189 at 82-87 pp. 82-87, 91 p. 91; Doc. 189-7; Doc. 190-1; Doc. 194 at 51 p. 51].[19]   Kavianpour advised Dr. Foster of her prescription medications and requested a confirmatory test, but she did not disclose that she had consumed marijuana as recently as April 2018. [Doc. 189 at 86-87 pp. 86-87; Doc. 190 at 133-37 pp. 380-84].   On June 29, 2018, Dr. Foster contacted both Kavianpour and the other incoming resident who had tested positive and advised both that they were on "noncontract status" due to the results of their pre-employment drug screens.  [Doc. 188 at 68-69 pp. 68-69; Doc. 194 at 283 p. 283].  Following her failed pre-employment drug screen, Kavianpour's offer of employment as a post-graduate year one resident was rescinded by letter dated June 29, 2018, from Dr. Moore, the DIO for GME at AU.  [Doc. 189 at 95-96 pp. 95-

---

[19] Kavianpour admits that she intentionally consumed marijuana "[p]robably once" between 60 and 90 days prior to her pre-employment urine drug screen on June 25, 2018.  [Doc. 189 at 99-101 pp. 99-101].  Prior to taking the June 25, 2018, pre-employment drug screen, Kavianpour also independently took a drug test in order to ensure she would test negative on her pre-employment drug screen. [Doc. 190 at 122-24 pp. 369-71].  Kavianpour was not the only incoming resident who tested positive for THC as another incoming male resident also tested positive. [Doc. 188 at 101 p. 101; Doc. 194 at 283-84 pp. 283-84].  Dr. Coule, an employee of AU who serves as the Chief Medical Officer for AUMC, was notified that two incoming residents had tested positive for marijuana on their pre-employment drug screens.  [Doc. 223-1 at 10-11 pp. 9-10, 30 p. 29].

96, 228 p. 228; Doc. 190 at 127-30 pp. 374-77; Doc. 190-2; Doc. 194 at 51-52 pp. 51-

52].[20]

On July 3, 2018, Kavianpour contested the decision to rescind her offer of

employment in a letter to Dr. Moore, stating, in relevant part:

> I am writing a letter of appeals for the rescission of my offer for PGY-
> 1 Resident.  On Friday, June 29, 2018 at approximately 5 PM I received
> a rescission notice . . ., indicating that I failed a mandatory
> employment drug test, the offer of employment as a PGY-1 was
> rescinded effective immediately, and that no residency contract
> would be issued to me.
>
> The letter indicated if I had questions regarding this notice they
> should be directed to the GME office, so I called the GME office, gave
> them my name and number, asking to speak to you.
>
> On the afternoon of June 28, 2018, I was informed by Dr. [] Foster that
> I failed a mandatory drug screen.  He indicated that the THC levels in
> my urine was found to be 19 ng/ml, and he indicated that the cut-off
> point was 15 ng/ml, so it was considered positive, and thus a failed
> drug screen.
>
> I repeatedly stated that this must be a mistake, and that I wanted a
> recollection which he denied because he said it was not allowed.

---

[20] After AU rescinded her offer of employment, Kavianpour stayed with Earl Dane
Jones, M.D. ("Dr. Jones"), a second year resident at the time, and his wife, for one
night at their house, and Dr. Jones subsequently reported during an interview that
he and Kavianpour "discussed using marijuana for stress relief after she failed the
pre-employment drug test," [Doc. 190-9 at 118], and that Kavianpour commented,
"'How could I be so stupid and let this become [a] problem,'" [id.], and that "she
had a problem and needed to stop, or something to that effect, referring to
marijuana use," [id.], though Kavianpour could not recall having such a
conversation, [Doc. 190 at 148-51 pp. 395-98].

He indicated that the GC/MS reading is unlikely to be inaccurate and asked me if it was possible that I gotten secondhand exposure given the low level detected in my urine.  I confirmed that possibility as I am a Washington D.C. native where THC is legal for recreational use.

I did not know that secondhand exposure would lead to a failed drug test, but Dr. Foster explained to me how the concentrates on the market these days where it has been legalized are much higher than those of the past.

I asked him if I could contest the results which he also denied.

He said he would let the GME office know that secondhand exposure could account for this low level.

I was told that he just reports results back to the GME office, and that the rest of the decision-making was in your hands.

The only option given to me was a split-urine test, using the sample already in their possession.

Dr. Foster did indicate that the 15 ng/ml level are based on guidelines set by the National Institute on Drug Abuse (NIDA), and that although I may have not used, I am still subject to those guidelines. This discussion occurred over a couple of telephone conversations on Thursday and Friday.

I disagreed with the results and I have been denied meaningful notice and meaningful opportunity to respond.  Because marijuana is not metabolized rapidly, another test, under mutually agreeable protocols would be a meaningful chance to respond.

I was not informed about the metabolite level for my initial immunoassay screening as per NIDA guidelines that would result in GC/MS confirmatory testing and I did not receive a copy of any of the results.  I believe I have been denied due process and equal protection of the law.

The [Medical College of Georgia] Substance Abuse Policy (#20.4.2.2) has a section titled, "PRE-EMPLOYMENT TESTING" which stipulates that recollections are at the discretion of the Medical Review Officer, and it continues to outline the criteria for recollection. So a process of retesting does exist that has not been provided, causing a further denial of due process.

Dr. Foster lead me to believe that a retest was not allowed at all, when he informed me of my results on Thursday, after I had specifically asked for it on Thursday.

And then again on Friday, when I asked about a retest, he stated that everyone wants a retest, and that would be making an exception for me.

It was possible, while the policy was at his discretion, when the policy is considered in the context of the duty of this state entity under the law to provide due process, there was a reasonable mutual expectation, upon which I relied, that a retest would be provided.

The same policy document has another section called: "OPPORTUNITY TO CONTEST OR EXPLAIN TEST RESULTS".  I specifically asked if there was a way that I could contest the results, and I was denied.  The policy however indicated that "job applicants who have positive test results may explain or contest the results to the health system within five (5) business days after the health system contacts the employee or job applicant confirming positive test results."

I am asking that you please reconsider the rescission of my offer and allow for a recollection or for me to contest the results that I believe are incorrect, as per [Medical College of Georgia's] policy and due process under this State's, and federal, laws providing due process and equal protection.

I am willing, and hereby demand another test immediately, that follows the NIDA standards and protocols, and that action be taken now to set up this test, even if it means that I would have to go to your ED immediately for the test, as suggested in the policy.  If a test were

done as late as Friday, then the retest would still have been provided within the five business days, as required by policy.

[Doc. 189-7].[21]

On July 5, 2018, after meeting with Dr. Moore, Kavianpour sent another letter to Dr. Moore in an attempt to "be granted a recollection" and explaining that she was a "[d]onor with known kidney disease and with medical records to prove it," that "[f]alse positives [were] common with kidney disease," that the "specimen [] exhibit[ed] an 'abnormal physical characteristic[]'" and the "nurse noted that [she] should be drinking more water," that Dr. Foster "was informed of kidney issues by [her] when the original test results were given," that her test should have been considered canceled if determined that her medical condition interfered with the collection, that no split sample was collected at the time of the initial collection

---

[21] Kavianpour's June 25, 2018, urine sample was retested by MedTox, a third-party testing facility, and was confirmed positive at 11 nanograms of THC per milliliter. [Doc. 187-9 at 340-48 pp. 340-48, 360-61 pp. 360-61; Doc. 188 at 29 p. 29, 53 p. 53; Doc. 188-2 at 14-15; Doc. 189 at 88-89 pp. 88-89; Doc. 190 at 157-58 pp. 404-05; Doc. 190-1 at 8; Doc. 194 at 52 p. 52]. Kavianpour contests the validity of these results due to the lack of split specimen collections, [Doc. 189 at 110-12 pp. 110-12], but Dr. Foster testified that he did not believe the federal regulations were applicable and that there had never been a point of collection split as the samples had been split internally in the lab if a reconfirmation was required or requested and that in this case, a "specimen volume was maintained for reconfirmation" and that the fact that the specimen was split within the lab "versus aliquoted at the point of collection" did not "present a reason for [him] to not accept [the] lab's analytic evaluation" or to cancel the test "because there was specimen for analysis," [Doc. 188 at 9-10 pp. 9-10, 26 p. 26, 32-33 pp. 32-33, 53 p. 53, 58-59 pp. 58-59, 62-63 pp. 62-63].

but the same primary sample was used for confirmatory testing of which the results "were questioned in the first place," and that the "integrity and validity of [the] specimen itself [was] questionable to [ her] given the positive results of the test."  [Doc. 189 at 89-90 pp. 89-90, 102-03 pp. 102-03, 108-09 pp. 108-09; Doc. 189-9; Doc. 190 at 138 p. 385].[22]

A meeting with Greg Bryan ("Bryan"), a BOR employee and attorney in the Office of Legal Affairs; Dr. Moore; Dr. Foster; and Susan Norton ("Norton"), AU's former Vice-President of Human Resources,[23] was held to discuss Kavianpour's request to retest, and although Dr. Foster relayed that there were no concerns regarding the validity of the drug screen, a decision was made to allow Kavianpour to provide a second sample.  [Doc. 188 at 28-29 pp. 28-29; Doc. 194 at 16 p. 16, 52 p. 52, 148-49 pp. 148-49; Doc. 201 (Bryan Dep.) at 11-12 pp. 10-11].[24]  Dr.

---

[22] Although Kavianpour claimed to be a donor with known kidney disease in the July 5, 2018, letter, she testified that she was not officially diagnosed with chronic kidney disease until September 2018.  [Doc. 189 at 27 p. 27, 108 p. 108; Doc. 207-46 at 1-3].

[23] AU and AUMC each had separate Human Resources personnel dedicated to each entity with one overall director, Norton, whose time and salary were shared between AU and AUMC.  [Doc. 194 at 34-37 pp. 34-37].  AUMC paid separately for its portion of any Human Resources services.  [Id. at 85 p. 85].

[24] The other resident who had tested positive for THC also contested the positive drug test and as a result, a decision was also made to allow this resident to submit a second sample.  [Doc. 194 at 283 p. 283].  However, during the meeting with Bryan, Dr. Moore, Dr. Foster, and Norton, Dr. Foster relayed his opinion that a

Foster contacted Kavianpour and advised her that she could submit a second sample but did not comment on what the end result would be if the results were negative, and on July 5, 2018, she took another urine drug screen at Employee Health which was negative.  [Doc. 189 at 110-11 pp. 110-11, 119-20 pp. 119-20, 124-26 pp. 124-26; Doc. 190 at 158-59 pp. 405-06; Doc. 207-54 at 7].[25]

On July 12, 2018, Kavianpour signed an AU "House Officer Notice of Appointment" for Post Graduate Year One in AU's Neurosurgery Department, beginning July 10, 2018, through July 9, 2019, and she began her residency program. [Doc. 178-5 at 1; Doc. 189 at 124-25 pp. 124-25, 127 p. 127; Doc. 189-11;

---

retest should not be allowed if there was no intent to clear the residents upon testing negative and allow them into the residency program.  [Doc. 188 at 72-73 pp. 72-73; Doc. 188-7 at 64].  During the meeting, they also discussed that they felt they could not ignore that there was a previous positive drug screen and that it was therefore important that a monitoring system be implemented to "ensure a safe patient care environment, and that monitoring system was periodic testing[.]" [Doc. 194 at 71 p. 71, 149-51 pp. 149-51, 187-89 pp. 187-89].  Dr. Moore suggested the same protocol be followed for Kavianpour as was utilized for a 2013 resident (the "2013 resident"), who had failed a pre-employment drug screen, but because the 2013 resident had already began employment when the results came back, the 2013 resident was able to dispute the results through a grievance hearing which ultimately led to the 2013 resident being provided the opportunity to submit a second drug screen that was negative and then being subjected to intermittent unannounced drug tests moving forward.  [Id. at 52-54 pp. 52-54, 59-64 pp. 59-64, 70 p. 70, 147-48 pp. 147-48, 236 p. 236, 277 p. 277; Doc. 194-23 at 3-5].

[25] The other resident who had tested positive also had a negative drug screen upon providing a second sample and was allowed to begin a Psychiatry residency program at AU.  [Doc. 188 at 89 p. 89; Doc. 194 at 283-85 pp. 283-85].

Doc. 190 at 89-90 pp. 336-37; Doc. 194 at 224 p. 224].[26]  The "House Officer Notice

of Appointment" provides, in relevant part:

> Policies and Procedures: This appointment is made subject to the
> policies, procedures and regulations of [AU] and the [BOR], which
> are hereby incorporated into this contract by reference.  The House
> Officer agrees to perform satisfactorily and to the best of his/her
> ability the customary services of residency; to conform to applicable
> policies, procedures and regulations; and not to engage in any outside
> remunerative work without the express permission of the
> Chairperson of the Department. . . . House Officers also agree to abide
> by the policies at any institution where they may perform services,
> including [AUHS], U.S. Veterans' Administration, and others, as
> applicable.  House Officers are required to comply with HS Policy
> 10.0 House Officer Duty Hours and Work Environment,[[27]] and must

---

[26] AUMC is not a party or signatory to this Notice of Appointment, see [Doc. 189-11 at 1; Doc. 208-6 at 1], and residents were considered employees of AU and were paid and tendered checks as an employee by AU, [Doc. 190 at 89-91 pp. 336-38; Doc. 194 at 37 p. 37].  While Kavianpour maintains that the employment contract she signed was two pages and cites to Housestaff Delinquent Records Policy No. M.4.0 as the second page, see [Doc. 178-5 at 1-2; Doc. 209-2 ¶ 4; Doc. 229-1 ¶ 4], as the Honorable Michael L. Brown, United States District Judge for the Northern District of Georgia, noted in ruling on Kavianpour's motion for reconsideration, see [Doc. 90], "[i]t is [] unclear to the Court whether 'Page 2' is indeed the second page of [Kavianpour's] employment contract" as "the document appears to be a separate, general institution-wide policy" and Kavianpour's "name does not appear anywhere on the page, and the signatures at the bottom of the page are dated over a year earlier than the signatures in [her] contract," [id. at 6 n.2].
[27] AU's House Staff Policy and Procedure 10.0 provides, in pertinent part:

> Each program must have policies and procedures in place that ensure
> coverage of patient care in the event that a resident may be unable to
> perform their patient care responsibilities.  These policies must be
> implemented without fear of negative consequences for the resident
> who is unable to provide the clinical work.

[Doc. 207-47 at 10]; see also [Doc. 201-12 at 2-3, 5, 10].

complete One45 duty hour reporting monthly.  House Officers are required to complete medical records at all participating institutions in a timely manner as outlined in applicable policies; noncompliance may serve as grounds for loss of privileges and a permanent record in the House Officer file.

The [AU] Policies and procedures for House Officers govern the following conditions of your employment: annual, sick, parental and educational leave, licensure; residency supervision, House Officer responsibilities, duty hours; moonlighting; chemical/substance abuse or dependence; rotation to unaffiliated hospitals; effect of leave for satisfying completion of programs; House Officer eligibility, selection and promotion; procedures for discipline and redress of grievances; and procedures whereby complaints of sexual harassment and exploitation may be addressed in a manner consistent with the law and due process.

[Doc. 178-5 at 1; Doc. 189-11; Doc. 192-6 at 1]; see also [Doc. 193 (Melcher 30(b)(6) Dep.) at 22-25 pp. 22-25, 65 p. 65].

The Neurosurgery residency program is a seven-year program,[28] and for the first three months of her residency, Kavianpour was on rotation with the Neurology Department.  [Doc. 189 at 75 p. 75, 139 p. 139].  As a first year resident, Samuel Macomson, M.D. ("Dr. Macomson"), AU's Neurosurgery Residency Program Director, as well as other attending physicians within the Neurosurgery Department, supervised Kavianpour.  [Id. at 183 p. 183; Doc. 189-11 at 1; Doc. 190

---

[28] Neurosurgery is delicate and involves care such as spine surgery, craniectomies, treatment of aneurysms, and similar sensitive surgeries.  [Doc. 189 at 46-48 pp. 46-48; Doc. 197 (Vale Dep.) at 48-49 pp. 48-49].  In fact, it is one of the most difficult and competitive medical residency practice areas.  [Doc. 216 ¶ 4].

at 91-92 pp. 338-39; Doc. 192 (Macomson Dep.) at 17-18 pp. 17-18; Doc. 197 at 39-40 pp. 39-40, 212 p. 212].   Kavianpour, as a first year resident, and Dr. Jones, as a second year resident, were responsible for running the neurosurgery service when the other residents were in the operating room, but ultimately, the second year resident was responsible for the service.   [Doc. 189 at 200-01 pp. 200-01; Doc. 190 at 22 p. 269; Doc. 207-4 (E. Jones Decl.) ¶¶ 3, 18].

In August 2018, Norton discovered that no one was administering intermittent unannounced drug screens for Kavianpour or the other resident who had tested positive as had been previously discussed when determining whether to allow the residents an opportunity to submit a second urine drug screen.   [Doc. 194 at 284-85 pp. 284-85].   As a result, a string of emails ensued between Norton and Arnold with Human Resources, Dr. Foster, AU's Legal Department, and AU's Neurosurgery Department in an effort to address moving forward with Kavianpour's employment and drug testing.   [Doc. 188-2 at 1-16; Doc. 194 at 52 p. 52, 63-64 pp. 63-64, 70-71 pp. 70-71, 233-34 pp. 233-34; Doc. 201 at 46-47 pp. 45-46; Doc. 208-10 at 2-4].

In particular, on August 16, 2018, Dr. Foster emailed Norton and Frances Toole ("Toole"), Human Resources Director of Employee Health & Wellness, stating:

I confirm the timeline data presented by . . . Toole below. There are a few more details I can offer. Dr. Moore and I tried to call both residents right after our meeting. We were able to contact [Kavianpour]. . . . They were verbally told that there had been a review of issues related to the circumstances, and that the consensus was to authori[z]e recollection procedures. Both were verbally told that details of their possible future contract would come to them from elsewhere, presumable whom so ever does the contracts for all the other residents (context here meaning - as in not from me as I do not have knowledge nor authority of contra[c]ts). Both recollected specimens were negative. The day I received the results I contacted each resident personally. I informed them of their negative results and advised them that future details regarding contract offer for them and any unique stipulations would come to them through HR or the GME office.

Today when I learned of your questions I called the GME office and spoke with [] Cand[i]ce Henders[o]n [("Henderson"), GME Operations Manager]. She stated that it was her impression that there was allusion to future administrative issues but that she did not believe any declarative stipulations were clearly laid forth at that time. I have a call in to Dr. [] Moore re[garding] his conve[r]sations with these two, but he has been in clinic so far today and unavailable. When I he[ar] from him I will again append this e[]mail line.

I unders[t]and another of your questions related to whether . . . Arnold was specifically called. I do not recall calling her at that time. I probably would not have done so though as I really do not have any idea what the process is with employment contracts (more specifically who writes them, places unique language in them regarding contingencies of employment, and from where they originate).

Regarding follow up surveillance testing: [Employee Health] has done collections (and me [Medical Review Officer] verifications) on some residents and faculty through the years. We are happy to do so as it is the most efficient for the donor, most inexpensive path and proced[urally] more streamlined for all involved. That stated, there have been a significant number of returned to duty profes[s]ionals who are monitored elsewhere through the monitoring service of their

> third party treatment programs.  This has been the case with the
> [Georgia Professional Health Program ("PHP")].  Non professional
> staff (some guided by Employee Relations) have been monitored by
> EAP.  I have not supervised that, and those records are not viewed by
> me (though if they were collected here I would sign off on them as
> [the Medical Review Officer]).  I do not know how or when a returned
> donor employee is told they must do a sample collection for the
> purpose of mon[i]toring.

[Doc. 188-2 at 6, 14-15].  Norton immediately responded that she recalled that they

had "discussed requiring them to undergo random drug testing so we will need

to work with Dr. Moore's office to advise them of this intent."  [Id. at 14].  Dr.

Foster sent a follow-up email at the end of the day to Norton, Toole, and Dr.

Moore, stating, in relevant part:

> Dr. Moore and I were in communication a couple times today and
> wished to pass on a further consolidated trail of ideas. . . .
>
> Re[garding] [] K[avianpour], Dr. Jacobs has suggested to Dr. Moore
> that a one year surveillance, with testing randomly done monthly,
> would be best for all parties. Though a shorter monitoring duration
> may be suitable for the immediate desires of the GME and HR in
> general situation, the longer duration (evidently as some industry
> standard) carries far more weight in the addiction/legal review arena.
> Therefor[e] if there was ever any future question of [] K[avianpour]
> re[garding] this test or any future issue whereby it could surface and
> be used against her (or presumably the Enterprise as a whole entity)
> she would be on very solid ground to refute any outside detrimental
> claim of use. . . Therefor[e] this suits her best as the strongest
> defensive position for her future, and by default the whole AU sphere.
>
> This immediately generates the question of how to mechanistical[l]y
> do so in a way that is impartial and random.  I recommended the
> addition of her name to the program already used to generate the
> random collections ordered for University Public Safety.  I do not

> personally however know the mechanism of that process in detail to
> be able to implement same.
>
> I am not generally in the habit of adding new individual recipients to
> an existing e-mail sequence, but as this so clearly involves Dr[.]
> Moore, I have added him to the "send to address."

[Id. at 13].  Norton replied later that evening that she had also reached out to Bryan

and that similar to how they handled a past situation, they have drafted a

memorandum to provide to Kavianpour.  [Id. at 12-13]; see also [Doc. 194 at 71-72

pp. 71-72].[29]  It was also determined in subsequent emails that the memorandum

could come from Human Resources with GME and legal copied thereon.  [Doc.

188-2 at 12].

On August 21, 2018, Arnold and Norton met with Kavianpour and provided

her with a memorandum, titled "Random Drug Testing Notification," which

relayed in relevant part:

> In accordance with [AU's] Substance Abuse Policy, this is official
> notification that you will be subject to random drug testing beginning
> now until July 31, 2019.  [AU] reserves the right to randomly test
> groups or individuals per policy under the section titled Random
> Drug Testing: ". . . *The State of Georgia requires all state entities to conduct*
> *random testing of employees that (1) are regulated by the US department of*
> *Transportation and its operating authorities, (2) require Peace Officer*
> *Standards and Training (P.0.S.T.) certification, or (3) perform duties*

---

[29] Norton also explained that since the other resident who tested positive for THC
voluntarily agreed to enroll in the Georgia PHP, which included random drug
testing, that resident was "already taken care of."  [Doc. 188-2 at 13]; see also [Doc.
188 at 79-80 pp. 79-80; Doc. 194 at 283-85 pp. 283-85, 287 p. 287; Doc. 223-1 at 49 p.
48].

*considered to be high risk. . . .*"  Our positions involved in patient care, including residents and fellows, are considered high risk.  Our determination to include you in the random testing is also our good faith response to your explanation to us in late June that your initial test result was in error and necessary to ensure patient safety.

You will be contacted randomly by [] Arnold, the University Director of Employee Relations, and requested to appear at Employee Health within the hour you are contacted for testing.  Please ensure you provide us with your correct mobile telephone number.  Please ensure you provide [] Arnold with your monthly rotation schedule to include days you are scheduled to be off for personal leave.

Should any test return as positive, you will be subject to immediate termination from the Residency program.  We reserve the right to extend the testing time frame.

If you have any questions, please contact the [GME] at 706-721-7005.

Thank you for your cooperation.

[Doc. 186 (Arnold Dep.) at 7 p. 25; Doc. 186-1 at 1; Doc. 189 at 165-66 pp. 165-66;

Doc. 189-12; Doc. 194 at 50 p. 50, 52 p. 52, 60 p. 60; Doc. 194-1 at 1; Doc. 207-54 at

7-17].[30]  Kavianpour objected to the testing as not being random since it appeared

---

[30] Although not incorporated into Kavianpour's employment contract, it was understood that the drug testing was considered a condition of Kavianpour's participation in the residency program.  [Doc. 178-1 at 46-49 pp. 46-49, 53-55 pp. 53-55, 67-68 pp. 67-68, 75 p. 75; Doc. 178-5 at 1; Doc. 186 at 9 p. 33; Doc. 186-11 at 2; Doc. 193 at 21 p. 21; Doc. 194 at 267-68 pp. 267-68; Doc. 194-1 at 1].  AU Substance Abuse Policy 685, which was referenced in the August memorandum, defines substance abuse as the "use or possession of any drug in a manner prohibited by law" and the "use of alcohol or any legal drug or other substance in such a way that the user's performance of his/her official job duties is impaired," and it provides that the "number of such employees to be tested and the scheduling of such testing shall be determined by the Vice President of Human Resources (or

that she would be the only one tested and said she would not sign the

memorandum, even though no one asked her to sign it,[31] but she nevertheless

––––––––––––––––––

designee) in accordance with applicable laws and regulations."  [Doc. 187-8 at 1, 4; Doc. 194-8 at 1, 4]; see also [Doc. 194 at 56-57 pp. 56-57, 147-48 pp. 147-48].  Pursuant to Policy 685, medical residents were considered employees in high risk positions, since they provided medical care to patients and provided for both "For Cause Testing" and "Random Drug Testing."  [Doc. 194-8 at 2-5 (emphasis omitted)].  Norton relied upon an interpretation of this policy, as well as the prior testing procedure established with the 2013 resident, in drafting the August memorandum, but she did not view Kavianpour as an addict or a recovering addict.  [Doc. 194 at 55 p. 55, 148 p. 148, 190-91 pp. 190-91, 233 p. 233, 277 p. 277].  Additionally, University System of Georgia ("USG") Human Resources Administrative Practice Manual provides for drug testing of high-risk employees via either random drug testing or reasonable suspicion drug testing and states as follows:

> Employees identified for drug testing under this policy shall be provided a specific date and time to report for testing; such date and time shall be as soon as possible, but not later than two (2) business days following the date the individual receives notification to report.  Therefore, individuals should be notified to report at a time that takes into account when the testing location is open.  Most testing locations are closed on Saturday and Sunday, so in general, Monday, Tuesday and Wednesday are preferable to Thursday and Friday.

[Doc. 194-11 at 3-5].

[31] Chris Melcher ("Melcher"), AU's in-house counsel, testified on behalf of BOR and acknowledged that the use of the phrase "random drug testing" in the August 21, 2018, memorandum in connection with AU's Substance Abuse Policy was misplaced and "should have said periodic unannounced testing rather than random testing, but [Norton] used the word random to reference that the dates of each month would be selected randomly," which was to ensure those individuals submitting tests would not be able to subvert the testing process.  [Doc. 193 at 6 p. 6, 27 p. 27, 43-44 pp. 43-44, 47 p. 47].  Melcher also testified that the testing protocol established for Kavianpour did not neatly fit within the testing categories established in AU's Substance Abuse Policy, explaining that the "intent of the

49

indicated that she would comply with the testing protocol, continued her rotation with neuro-ICU following her receipt of the memorandum, and did not contact GME to complain about the issuance of the memorandum or ask any questions as directed in the memorandum until early December 2018 when she contacted Dr. Moore.  [Doc. 186 at 8-9 pp. 32-33; Doc. 189 at 167-74 pp. 167-74, 196 p. 196; Doc. 194 at 267 p. 267; Doc. 208-10 at 1].  Kavianpour also did not provide Human Resources with her on-call schedule or days off as directed.  [Doc. 207-54 at 18-19].

Additionally, in early August 2018, Lauren Jones ("L. Jones"), the Neurosurgery Department's Residency Coordinator, observed Kavianpour in a state of significant stress and asked her what she did to relieve her stress in medical school, and Kavianpour responded that she smoked daily but that she could no longer do that since she had a job, and L. Jones understood that she was not referring to smoking cigarettes.  [Doc. 207-48 (L. Jones Aff.) ¶¶ 2-4].  Kavianpour denies that she told L. Jones that she previously used marijuana or that she alluded to using marijuana as a form of stress relief,  [Doc. 189 at 164-65 pp. 164-65; Doc.

---

testing program in this case was [Kavianpour] had failed a drug test" and she was therefore someone who was believed to have "used a substance that she should not[ or] potentially was abusing substances, and we needed to ensure the safety of the patients and her fellow residents and others by ensuring that she did not abuse those substances in the future" and thus, "she was selected intentionally," but "then the testing would be done randomly during the course of each month."  [Id. at 27-28 pp. 27-28, 58 p. 58, 65 p. 65].

229-3 ¶ 15; Doc. 230-3 ¶ 15], though Dr. Jones also relayed to the Title IX investigator that Kavianpour discussed using marijuana for stress relief in June 2018 after she failed her pre-employment drug test, [Doc. 190-9 at 118].

L. Jones reported her interaction with Kavianpour to Dr. Macomson, who then scheduled a meeting for late August 2018 with Kavianpour and Dr. Moore, during which Kavianpour denied the conversation with L. Jones, but agreed to enroll in the Georgia PHP.  [Doc. 188-2 at 3-5; Doc. 207-5 (Macomson Decl.) ¶¶ 3-7; Doc. 208-3 at 2-3; Doc. 229-3 ¶¶ 15-16; Doc. 230-3 ¶¶ 15-16].  Kavianpour subsequently decided against enrolling in the Georgia PHP after learning that enrollment was voluntary and upon not receiving a response to her request for clarification as to whether her enrollment was a requirement for employment or voluntary, and BOR moved forward with the testing protocol set forth in the August 21, 2018, memorandum.  [Doc. 188-2 at 1-2, 6; Doc. 194 at 284-85 pp. 284-85, 293 p. 293; Doc. 207-5 ¶ 7; Doc. 208-3 at 1-3; Doc. 229-3 ¶ 17; Doc. 230-3 ¶ 17].[32] Kavianpour was contacted for testing at approximately 9:10 a.m. on September 17, 2018, and her drug screen was negative.  [Doc. 190-7 at 1-4; Doc. 207-54 at 23-25].

_____

[32] Dr. Macomson was not consulted prior to the issuance of the August 21, 2018, memorandum, and he relied on Norton, Arnold, and Dr. Moore for guidance with respect to Kavianpour's drug testing protocol.  [Doc. 192 at 20-21 pp. 20-21, 26 p. 26].

Kavianpour finished her rotation with the Neurology Department and started with the Neurosurgery Department on October 1, 2018. [Doc. 189 at 155 p. 155].[33]   While on rotation with the Neurosurgery Department, there were five neurosurgery attending physicians, including Dr. Macomson, and six other residents. [Id. at 73-74 pp. 73-74, 189-90 pp. 189-90].[34]   When Kavianpour began her Neurosurgery rotation, she followed the neurosurgery resident carrying the "on-call" pager and assisted.[35] [Id. at 155-56 pp. 155-56].

_____

[33] On October 2, 2018, Dr. Macomson met with Kavianpour and advised her that she had received positive feedback from faculty about her performance while on her rotation with the Neurology Department, but that there were some possible concerns related to the Neurology medical students. [Doc. 192 at 58 p. 58; Doc. 207-54 at 25-26], see also [Doc. 178-8 at 8-11].   In particular, Dr. Macomson counseled Kavianpour about certain issues that had been brought to his attention while she was on Neurology rotation, including her failure to see patients, relying on medical students for information, intimidating medical students, and showing up to work allegedly impaired. [Doc. 178-1 at 160-61 pp. 160-61, 166-67 pp. 166-67; Doc. 178-8 at 9; Doc. 192 at 58-59 pp. 58-59].

[34] As a first year resident, Kavianpour's duties on a typical day began around 6:30 to 7:00 a.m., with pre-rounds, which included gathering and reviewing data such as patient vitals and bloodwork from the prior evening, preparing progress notes, reviewing imaging and consults, and receiving sign-out information from other residents to summarize and report. [Doc. 189 at 176-78 pp. 176-78; Doc. 197 at 51-55 pp. 51-55].   The number of patients seen in the Neurosurgery Department on a daily basis is random and it could be from ten to thirty or more such that the workflow could be unpredictable on any given day. [Doc. 197 at 52-55 pp. 52-55]. The senior residents typically set the junior residents' schedules. [Doc. 190 at 98-99 pp. 345-46].

[35] Junior residents, like Kavianpour, were assigned on-call pager duty, which was the on-call pager number assigned to a resident's beeper who was on call to

respond to medical calls to triage and/or transfer to the appropriate physician. [Doc. 178-1 at 59 p. 59; Doc. 189 at 211-14 pp. 211-14; Doc. 197 at 58-60 pp. 58-60; Doc. 216 ¶ 8].  Initially, on-call pager duty is shared between the first-year and second-year residents until the first-year resident has more experience.  [Doc. 178-12 at 25-27 pp. 25-27; Doc. 192 at 73-76 pp. 73-76, 119-20 pp. 119-20].  Kavianpour testified that she was instructed that she should respond by telephone to any page within about ten minutes in the event a patient had a neurological status change that could be life threatening.  [Doc. 189 at 214 p. 214; Doc. 216 ¶ 9].  Dr. Macomson explained that there was also a "hand-over process[]," which meant that "at the end of a shift, when someone goes home from their day shift, they transition care of the patient over to the . . . resident coming on call."  [Doc. 192 at 39 p. 39; Doc. 192-33].  He also explained that if a resident had the on-call pager and had to leave, whereby the resident would be unreachable for a significant amount of time, then the resident would need to undertake the transition of care process.  [Doc. 192 at 39 p. 39].  Additionally, AU's House Staff Policies and Procedures 24.0 set forth that transition of care occurred "each time[] any of the following situations exist[ed] for an inpatient, emergency room patient, clinic patient, observation patient, or any other patient:" (1) move to a new unit; (2) transport to or from a different area of the hospital for care; (3) assignment to a different physician temporarily, such as overnight or weekend coverage, or longer, such as rotation change; and (4) discharge to another institution or facility.  [Doc. 228-24 at 62].  It further provided that transition of care would be conducted in conjunction with certain physician events, including shift changes, meal and rest breaks, changes in on-call status, when contacting another physician when there was a change in the patient's condition, and transfer of the patient from one care setting to another, and that a "[r]esident physician must not leave the hospital until an effective [transition of care] ha[d] occurred."  [Id. at 63].  While it was important for the resident to respond to pages while assigned the on-call pager, there was no expectation of instantaneous in-person examination and there was usually backup coverage available in the event the resident carrying the on-call pager was not able to respond.  [Doc. 192 at 74 p. 74, 94-95 pp. 94-95; Doc. 197 at 131-32 pp. 131-32; Doc. 207-5 ¶¶ 8-10].  There were also no rules about when residents could disrupt a procedure to talk to another more senior resident or physician performing a procedure as interruptions related to emergencies were acceptable at any time while other needs could wait until the end of the day.  [Doc. 190 at 33-34 pp. 280-81; Doc. 197 at 56-57 pp. 56-57, 62-63 pp. 62-63, 66-67 pp. 66-67, 79-80 pp. 79-80; Doc. 207-49 at 1].

On October 17, 2018, Arnold contacted Kavianpour to report for drug testing.   [Id. at 193-95 pp. 193-95; Doc. 207-54 at 38-39].   Following her communication with Kavianpour, Arnold sent Norton, Dr. Moore, Bryan, Henderson, and Becky Williams ("Williams"), Arnold's boss, an e-mail at 8:04 a.m., with Toole copied thereon, stating, in pertinent part:

> I just contacted [] Kavianpour to go and test today.  She didn't want to because she is just getting off of call (I may be stating that wrong).  I asked if she was still on campus and she indicated yes, I said well just stop by on your way out.  She said no, I will do it tomorrow.  She said as far as you're concerned I am not on campus.  I said as far as I am concerned you are, because you just told me you were.  I told her today was a test day, she could either go or not go.  She wanted to know who my boss was; I gave her [Williams'] name and number.  She said this was not random, that this [was] harassment, and that I was aggressive with her (she was rude and aggressive with me).  She said she would be contacting an attorney and the GME office because she [] has been on campus too long and this is a violation of some work hour rules law that she wanted to quote but could not.  I had her on speaker and [Williams] could hear her (I believe).  I was very nice to her when I called, said good morning, how are you doing and I proceeded to tell her this was a test day and it all went downhill from there.
>
> Copying [Toole] so she knows today is a test day and she is angry so be careful with her.

[Doc. 186-5 at 1-2]; see also [Doc. 186 at 13 p. 52; Doc. 189 at 194-95 pp. 194-95; Doc. 190-7 at 8].[36]   Kavianpour nevertheless presented for testing that day, but her

---

[36] Following a 24-hour shift, there is a 4-hour period during which a resident may engage in nonclinical activity.   [Doc. 192 at 196 p. 196; Doc. 207-47 at 3]. Subsequent to Kavianpour's conversation with Arnold, Dr. Macomson observed

results were dilute.[37]  [Doc. 189 at 185 p. 185; Doc. 190-7 at 8; Doc. 207-54 at 42].

Therefore, Kavianpour was retested on October 19, 2018, the results of which were

negative.  [Doc. 189 at 185-87 pp. 185-87, 198-99 pp. 198-99, 206 p. 206, 223 p. 223;

Doc. 190 at 160-65 pp. 407-12; Doc. 190-7 at 6-8; Doc. 207-54 at 44-45].[38]

On November 13, 2018, Kavianpour was on vacation and may have missed

a call for a drug screen request.  [Doc. 189 at 201-02 pp. 201-02; Doc. 190 at 168-69

pp. 415-16; Doc. 190-8 at 3-5; Doc. 207-54 at 45].  Upon discovering that Kavianpour

was on leave that day, she was scheduled to test the following day, November 14,

---

Kavianpour crying and they had a brief conversation, during which Kavianpour
expressed concerns regarding the drug testing protocol and whether the October
2018 call was a "violation of duty hours[.]"  [Doc. 189 at 194-95 pp. 194-95].

[37] A dilute finding occurs when a sample contains high water concentration and
results in the need for a retest due to the inability to accurately measure the
concentrations.  [Doc. 189 at 186 p. 186].  Dr. Foster explained that for dilute
samples due to over-hydration for whatever reason, they "would do up to two re-
collections typically" and "if there's a third dilute specimen, what has been
standard operating procedure was level of detection analysis on the specimens."
[Doc. 188 at 108 p. 108].

[38] Kavianpour testified that she requested an accommodation from Swab related
to her kidney condition following the dilute result when she told Swab that she
wanted to provide her nephrologist's instructions to drink three liters of water a
day in order to show that there was a medical explanation for the result and that
there was no reason for her to have to submit another sample.  [Doc. 189 at 185 p.
185, 187 p. 187; Doc. 190 at 163-64 pp. 410-11; Doc. 216 ¶ 23].  Swab emailed
Kavianpour the instructions regarding submission of medical records, but
Kavianpour did not submit any documentation to Swab.  [Doc. 189 at 185-87 pp.
185-87, 223 p. 223; Doc. 207-7 ¶¶ 15-16].

since there was no expectation for her to test on a day off, and her results were negative.  [Doc. 178-1 at 84-85 pp. 84-85; Doc. 186 at 14 p. 54, 16 p. 62; Doc. 189 at 206 p. 206; Doc. 190 at 169 p. 416; Doc. 207-54 at 46].[39]

On November 16, 2018, Kavianpour was arrested and charged with speeding and driving under the influence ("DUI") for refusing a blood test.  [Doc. 190 at 14 p. 261, 172-79 pp. 419-26; Doc. 190-3 at 1; Doc. 207-54 at 46, 49].  She admits that she had been drinking on the night in question, but asserts that she was not impaired and declined to take a blood test while in custody.  [Doc. 190 at 172-79 pp. 419-26].  Kavianpour contacted her father while in jail and requested that he contact her residency program to let them know that she would not be appearing for duty that day, which he did, but prior to him contacting the program, Dr. Moore had learned of her arrest.  [Id. at 173-76 pp. 420-23, 179-80 pp. 426-27, 182 p. 429; Doc. 190-3 at 1].  Kavianpour then subsequently self-reported the arrest to AU.  [Doc. 190 at 182-83 pp. 429-30; Doc. 190-3 at 1].[40]

---

[39] Kavianpour did not inform Arnold she would be taking several days off in November, and Arnold advised Kavianpour that if she was contacted for testing on a day off, she could report for testing the following morning.  [Doc. 186 at 14 p. 54; Doc. 189 at 204 p. 204].

[40] Dr. Coule testified that he has suspended medical staff members for being charged with a DUI in the past and that typically, medical staff members who are arrested and charged with a DUI must enter a monitoring or testing program to ensure patient safety, though it is undisputed that residents are not considered members of the medical staff but are considered "House Staff."  [Doc. 186 at 16 p.

Kavianpour started carrying the on-call pager solo around December 2018 to prepare for when she would have overnight calls in January.  [Doc. 178-12 at 25-27 pp. 25-27; Doc. 189 at 210-11 pp. 210-11; Doc. 216 ¶ 27].  On December 5, 2018, at 7:55 a.m., Arnold contacted Kavianpour to submit for a drug screen, but Kavianpour told her that her work obligations would prevent her from being able to appear within the hour.  [Doc. 189 at 209 p. 209; Doc. 207-54 at 50-51].  Arnold reached out to the GME office who then reached out to the Neurosurgery Department and it was determined that Kavianpour should be able to appear for testing in the morning as there were other residents and a physician's assistant that could step in and assist, and ultimately, Kavianpour appeared for her drug screen at approximately 10:11 a.m., the results of which were negative.  [Doc. 207-54 at 50-51].[41]

---

62, 35 p. 138; Doc. 223-1 at 65 p. 64, 84-85 pp. 83-84, 143-44 pp. 142-43].  Kavianpour's DUI charge was eventually dropped in October 2020 and she entered a no-contest plea for speeding and reckless driving.  [Doc. 229-3 ¶ 29; Doc. 230-3 ¶ 29].

[41] On December 13, 2018, Kavianpour met with Dr. Moore and indicated that she "would volunteer to do daily drug tests if it was scheduled at a certain time that [she] knew [she] could appear in time without disrupting patient care[.]"  [Doc. 207-54 at 52-53; Doc. 216 ¶¶ 25-26]; see also [Doc. 178-12 at 53 p. 53; Doc. 189 at 173 p. 173].  She also expressed concerns about the timing of the drug tests and that they interfered with departmental operations and threatened patient care and safety, as well as subjected her to adverse and disparate treatment while taking a toll on her relationships with her colleagues and other residents who she asked to provide coverage.  [Doc. 216 ¶ 25].

On January 17, 2019, Arnold contacted Kavianpour for a drug screen, but Kavianpour missed the call, and because she was post-call when she noticed, she did not return the call as it was too late to report to Employee Health.  [Doc. 189 at 218-19 pp. 218-19; Doc. 190 at 54 p. 301; Doc. 190-9 at 24; Doc. 194 at 175 p. 175; Doc. 194-6 at 3; Doc. 216 ¶ 28].  On this same day, Arnold also sent Kavianpour an email, titled "Test Day" in the subject line, with Henderson and Toole copied thereon, stating, "Just left you a message.  Not sure if you are in today.  Today is a test day.  If you can go over within the hour that will be great, if not, please respond to this email to let us know your plan."  [Doc. 189-13 at 3; Doc. 194-6 at 3]; see also [Doc. 189 at 225 p. 225; Doc. 190 at 185-86 pp. 432-33; Doc. 194-20 at 2].  Kavianpour, however, did not contact Arnold until January 22, 2019, when she responded to her email, with Henderson, Toole, L. Jones, and Dr. Macomson copied thereon, stating, in relevant part:

> I was postcall the day you emailed and I never heard from you again like I did the last time I was postcall (Thursday, the 17th). Unfortunately, there is only one neurosurgery intern and I have been busy all day . . .and most days in general but I have had many consults and was not able to make it to occupational health today.  I actually would like to meet with you and [] Norton again to discuss the inappropriate timing of calls/testing, the lack of flexibility and justification per [Medical College of Georgia] policy (and state and federal laws).

[Doc. 189-13 at 2; Doc. 194-6 at 3]; see also [Doc. 186 at 16 p. 63; Doc. 186-11 at 3; Doc. 190 at 57 p. 304; Doc. 194-20 at 1; Doc. 207-54 at 54-57].

Upon receipt of Kavianpour's January 22 email, Norton and Arnold consulted with GME and the Neurosurgery Department regarding a response, [Doc. 186 at 21 p. 81; Doc. 186-11 at 1-2; Doc. 194 at 79-81 pp. 79-81, 271 p. 271, 274 p. 274; Doc. 207-6 (Norton Decl.) ¶¶ 4-7],[42] and at 4:01 p.m. on January 31, 2019, Arnold, with Norton copied thereon, replied to Kavianpour's email as follows:

> This is in response to your email dated January 22, 2019.  I have consulted with [] Norton and the [GME] office and this email and the attached memo are our response to your email.
>
> Pursuant to the memorandum issued to you on August 21, 2018 by [] Norton, Vice President of Human Resources, you are subject to random drug testing.  As a reminder, in your position as a Resident, you are subject to both the University and [AUMC] policies related to drug testing.   The AUMC policy specifically states under the Employee Testing section, "*Refusal to participate or failure to complete any step of the testing process results in discharge*".
>
> To avoid conflicts with your schedule, we will apply the following approach going forward:

---

[42] In particular, Arnold forwarded Kavianpour's email to Norton late afternoon on January 22, 2019, and stated, "I don't know what she is talking about" as "I have never telephoned her twice or followed-up, she typically answers the phone and if she does not, I leave a message and she calls me back," but "she never called me back and I usually don't email her either; she's been compliant until last week" and now she "wants to meet with us to discuss the timing of the calls," however, this "process isn't meant to be when she prefers to be called, unless I misunderstood the process, which I'm open to discuss."  [Doc. 194-20 at 1].  Norton replied, "You have not misunderstood the process at all" and that "[r]andom means random, not at the person's convenience" so "[l]et's review her letter tomorrow" and also "review the section in policy re[garding] random tests, and then go from there."  [Id.].

1.  Per the August 21, 2018 memorandum, you were to provide your schedule to include days off to me.  As of today you have not done that and therefore effective immediately you are to provide your monthly schedule to me not later than the first Monday of each month; February 4, 2019 is the due date for next month.  This will allow us to avoid any days off as was discussed with you in August.

2.  For your convenience, we will begin to notify the Residency Program Director or designee when a random drug test is needed. This will allow us to determine if there have been any changes to your schedule and if clinic responsibilities would interfere with your ability to arrive timely for the random drug test.  Upon confirmation from the Residency Program Director or designee, I will reach out to you as I have done previously by placing a phone call to you followed by an email to you to notify you of the requirement to come to employee health for the random screening.  This notification to your supervisor is consistent with our practice in the medical center.  You will have four (4) hours from the point of notification to arrive at employee health for the screen.   We will also request that the Residency Program Director or designee notify you using the Imprivata Coretext communication system.  Given all these means of communication, there should be no reason for you not to appear for testing as directed.  Please understand, your academic and clinical activity assigned by your department, will not be an excuse for you not to appear for testing in a timely manner as outlined above.

3.  If by chance you are off on the day that you are notified, then you will be expected to present yourself to employee health at 7:30 am on the first business day of your return to work.

In addition to the above, since you were unable to meet the last testing date which you indicated was due to your schedule, we will extend the random testing through August 31, 2019.  Please plan to adhere to these requirements effective immediately.

Should you have any questions or concerns, please contact me directly as indicated below.

[Doc. 186-11 at 2; Doc. 189-13 at 1-2; Doc. 194-6 at 2]; see also [Doc. 186 at 17 p. 68, 21 p. 81; Doc. 194 at 75-79 pp. 75-79; Doc. 207-54 at 57-66].

At 9:56 p.m. on January 31, Kavianpour responded to Arnold's email as follows:

> I was able to force in some time today to complete the test. For the record, I have never refused a test. I was postcall and I never heard from you again. Your calls have not been at the most feasible times but I still have completed all other requests.
> I specifically asked for a meeting with you and [] Norton and you have not obliged me with one.
> I have gathered documentation that indicates the original sample collected during orientation had a concentration of 11ng/dl when measured by an outside facility and that is a negative result. This being the same sample which [Medical College of Georgia] obtained a false positive result. Legally, when the collection and the testing are done by the same institution/facility that is doing the hiring it is more likely to be considered susceptible to bias and fraudulent measures. This means that the reading from the outside facility holds more water when the validity of a result is brought into question.
> Not to mention that this whole ordeal has caused me undue emotional stress and continues to do so. It resulted in the defamation of my character before I even started and it has created resentment among my colleagues who have to do my job during these 'random' untimely testing.
> Instead of facilitating a conversation for more reasonable arrangements, you decided [to] buckle down with a list of demands. I was postcall and asked for flexibility and you respond with punishment and extension of testing as retaliation.
> This forces me to question the legality of these practices you are imposing on me in the first place. It is clearly not random and quite frankly discriminatory. This is harassment.
> [Medical College of Georgia] policy indicates that the random testing occurs with reasonable suspicion etc. You can come up with arbitrary rules and memorandums all you like but that does not make them

legal and it furthers the point that I am making which is that you have
singled me out and subjected me to prejudice.

I hope you reconsider and mitigate this.  Again, I am not refusing the
testing.  I have been cooperative and have completed what I consider
to be an intrusive and excessive amount [of] testing in a setting of
undue suspicions - all of which have been negative.  I am open to
further testing with predetermined times with advanced notice per
[Medical College of Georgia] policy.

If you need me to obtain a formal cease and desist letter from a lawyer
I can also do so.

[Doc. 186-11 at 1; Doc. 189-13 at 1]; see also [Doc. 194-6; Doc. 207-54 at 65].[43]  On

February 1, 2019, Kavianpour forwarded her responsive email to Dr. Macomson

and stated, "I thought I make you aware of this situation[sic]," and asked if they

could discuss it, and she met with Dr. Macomson and another attending physician

on February 11, 2019, but did not discuss the January 31, 2019, memorandum or

drug testing at that time.  [Doc. 178-14 at 1; Doc. 192 at 120-23 pp. 120-23; Doc. 192-

22 at 1].[44]

---

[43] Kavianpour self-reported for a drug screen on January 31, 2019, as no one had
asked her to test that day.  [Doc. 189-13 at 1; Doc. 190 at 184-97 pp. 431-44; Doc.
194-6].  She testified that because the subject line of the email read, "Test Day," she
"went and submitted a test" because she "thought [she] had to go submit a test,"
[Doc. 190 at 188-89 pp. 435-36], but the email exchange occurred in response to the
original email sent on January 17, 2019, with the subject line, "Test Day," and it is
undisputed that no one had asked Kavianpour to submit for a test on January 31,
see [Doc. 189-13].

[44] Instead, during the meeting on February 11, 2019, Dr. Macomson and another
neurosurgery attending physician provided Kavianpour with a "Resident
Counseling Form," which was new to the Neurosurgery Department and was
introduced by Fernando Vale, M.D. ("Dr. Vale"), who became the Chair of the

_____

Neurosurgery Department on February 1, 2019, and Kavianpour initialed and signed the form.  [Doc. 178-8 at 1-11; Doc. 192 at 60 p. 60, 65 p. 65, 125-26 pp. 125-26; Doc. 192-17; Doc. 207-54 at 80-83].  This form indicated that it was Kavianpour's first occurrence of verbal counseling; that the areas of concern were patient care, interpersonal and communication skills, and professionalism; and that the examples included her failure to see patients on morning rounds, leaving work without appropriate check out, failure to see patients in consultation, and her argumentative and dismissive attitude toward consulting services and ancillary staff.  [Doc. 192-17 at 1].  This form also advised Kavianpour in relevant part:

> As a [Medical College of Georgia] Resident, you are expected to uphold the expectations of our affiliates, and are ultimately employed at their discretion.  Please be advised, in the event that [AUMC], or Charlie Norwood Veteran's [sic] Administration Hospital, decide that you are not allowed to practice within their walls, you cannot and will not be able to complete your residency training at [Medical College of Georgia].
>
> . . .
>
> You are expected to understand the limits of your knowledge and your abilities, and ask for help when you have reached those limits. As a resident, you always have a Chief Resident and at least one Attending available to reach out to in the event you are unable to manage a patient, or patients.
>
> . . .
>
> Please be sure you are working your scheduled shifts.  Duty Hours should not exceed 80 hours.  You must have at least 8 hours off between shifts.  If you are having any issues with these regulations, you must notify your Chief Resident and Dr. Macomson.

[Id. at 1-2 (emphasis omitted)]; see also [Doc. 192 at 60 p. 60].  It also provided for a remediation plan that included follow up meetings in six and twelve weeks, pursuant to House Staff Policy and Procedure 18.0.  [Doc. 192-17 at 4-5; Doc. 197-14].  Dr. Macomson had circulated a draft of this counseling form to Dr. Moore on February 7, 2019, who then forwarded it to Bryan for input, and on February 8, 2019, Bryan replied with a recommendation that the "problem areas be fleshed out in more detail in [Kavianpour's] file," especially "those instances when she did not check out appropriately, the failures in rounding and the specifics of the argumentative behavior," as he could "already sense that [they were] headed for

63

At 8:00 a.m. on February 13, 2019, Arnold contacted Kavianpour and requested that she present for a drug screen within four hours, and she also emailed Kavianpour the same at 8:32 a.m. [Doc. 189-14 at 1-2]; see also [Doc. 186 at 30 pp. 118-19; Doc. 189 at 236-37 pp. 236-37; Doc. 190 at 194-97 pp. 441-44; Doc. 207-54 at 83]. Arnold also notified Dr. Macomson's designee, L. Jones, that Kavianpour needed to present for a drug screen that day. [Doc. 192 at 92 p. 92]. When Kavianpour spoke with Arnold, she "informed [her] that everyone else was in the operating room and [she] shared uncertainty about [her] availability," and Arnold thus provided her until 4:00 p.m. to present at Employee Health for the drug screen. [Doc. 207-54 at 84-87 (citation omitted); Doc. 186 at 20 pp. 77-78, 30 p. 119; Doc. 189 at 236-37 pp. 236-37; Doc. 189-14 at 1]. Around 1:00 p.m., Kavianpour asked a third-year resident to accept the on-call pager so she could go to Employee Health for her drug screen, but he told her it was not his job to take the pager and they would need to contact Dr. Jones, who was in the operating room, to take the pager, since he was the second-year resident and the responsibility for the Neurosurgery service fell upon him, and he was available to cover the pager throughout the day. [Doc. 189 at 238-39 pp. 238-39; Doc. 207-4 ¶¶ 10-18]. Kavianpour, however, asked the other resident not to contact Dr. Jones as

a rough time with this resident." [Doc. 178-8 at 1-11; Doc. 186-16 at 1; Doc. 192 at 125-27 pp. 125-27; Doc. 197-13 at 1-11; Doc. 201 at 98-99 pp. 97-98].

she did not want to interrupt him while he was in surgery, and she did not contact anyone else in an effort to transfer the pager, despite others being available.  [Doc. 189 at 199-200 pp. 199-200, 238-39 pp. 238-39; Doc. 207-5 ¶¶ 15-17].  When Dr. Jones returned to the resident room around 3:00 p.m., Kavianpour still did not ask him to cover the on-call pager so she could report for testing as she asserts that she was handling other patient matters and clinical responsibilities and still needed to update the patient list.  [Doc. 178-12 at 64 p. 64; Doc. 207-4 ¶¶ 17-20].[45]

Kavianpour did not contact Arnold prior to 4:00 p.m. to advise her that she was having difficulty transferring the pager, [Doc. 189 at 241 p. 241], and at 4:43

---

[45] Dr. Vale testified that there was no patient safety concern for a resident to leave the hospital to go get drug tested, that it was reasonable for Human Resources to request Kavianpour to report for drug testing regardless of her clinical activities, and that because she was supervised, her "responsibilities [were] minimal."  [Doc. 197 at 132-33 pp. 132-33]; see also [Doc. 192 at 129 p. 129].  Dr. Coule also testified that if a patient care emergency was paged, there were others that could handle it and there was no reason that Kavianpour could not go across the street to complete a test as the pager worked across the street at Employee Health and in the cafeteria which residents go to frequently.  [Doc. 223-1 at 68-69 pp. 67-68, 71 p. 70, 124-25 pp. 123-24].  He explained that there was no restriction on taking pagers out of the hospital to another nearby building and that there should be "no circumstances where [a] resident is not able to complete the testing within the specified time frame."  [Id. at 68 p. 67, 125 p. 124]; see also [Doc. 178-12 at 164-65 pp. 164-65].  Dr. Macomson also testified that had Kavianpour taken the pager with her for drug testing and had to leave Employee Health prior to completing the test due to an emergency, he would not have held her accountable for missing the test.  [Doc. 192 at 195-96 pp. 195-96].  Kavianpour even admitted that she was "overly cautious" about the pager and could not "pee in comfort with that pager."  [Doc. 178-12 at 166-67 pp. 166-67].

p.m., she emailed Arnold that she had "looked at the time and [] just realized [she] missed [her] window," but that the "other junior residents were in the [operating room un]til late and [she] had a procedure and several consults" so she would "go first thing tomorrow AM" and "really [did] not want to lose [her] job" and "just ha[d] a lot of responsibilities," [Doc. 189-14 at 1]; see also [Doc. 186 at 31 p. 121; Doc. 186-6 at 1; Doc. 186-21 at 1]. She also wrote that the "third year refused to take the pager from [her] so [she would] talk to [her] program director about this." [Doc. 189-14 at 1].[46] Kavianpour thus did not appear for testing on February 13, 2019, and instead, presented on the morning of February 14, 2019. [Doc. 186 at 31-32 pp. 124-25; Doc. 186-6 at 1; Doc. 186-21 at 1; Doc. 207-54 at 100-02]. However, Arnold sent an email to Dr. Moore, Bryan, Toole, L. Jones, Henderson, Norton, and Dr. Macomson at 5:48 a.m. on February 14, advising them that Kavianpour had been scheduled to test the day prior, and after accommodating her request to move the test to the afternoon since "she had the pager and everyone was in the [operating room] and she would be free in the afternoon," she still did not report for testing and that she was therefore requesting that Employee Health not test her

---

[46] The third year resident confirmed to Dr. Macomson that he did not accept the pager, but he explained that he did not refuse to help Kavianpour and offered to cover and make himself available if anything came up while she was testing. [Doc. 192 at 118 p. 118]; see also [Doc. 178-1 at 57 p. 57].

if she showed up, and she was not tested on February 14.  [Doc. 194-18 at 1]; see

also [Doc. 186 at 31-32 pp. 124-25; Doc. 186-21 at 1].[47]  Thereafter, Kavianpour

returned to full patient care on February 14, and she even performed one of her

first operating room procedures on February 15 and continued to perform her

responsibilities as a resident and engage in patient care through February 21, 2019.

[Doc. 190 at 79-80 pp. 326-27].[48]

Following the missed drug screen on February 13, 2019, a meeting was held

on February 18, 2019, between Bryan, Dr. Moore, Norton, Dr. Vale, Dr. Macomson,

Dr. Coule, and Arnold during which Kavianpour's missed drug screen was

discussed.  [Doc. 192 at 46-47 pp. 46-47; Doc. 194 at 121 p. 121; Doc. 194-18 at 1-4;

Doc. 195 (Norton Dep. Vol. II) at 13 p. 13; Doc. 197 at 128-29 pp. 128-29, 138-40 pp.

138-40; Doc. 197-16 at 1-5; Doc. 223-1 at 78 p. 77].  After the meeting, Human

Resources, in conjunction with in-house counsel, circulated drafts of a suspension

letter and a termination letter for consideration by Drs. Macomson and Vale, and

---

[47] After Kavianpour failed to appear for her test on February 13, 2019, Dr. Macomson investigated her stated reasons for her failure to report and determined that there was time throughout the day that she could have presented for testing and that "[t]here was no acceptable reason why she did not present to testing on the 13th within that four-hour window."  [Doc. 192 at 118 p. 118].

[48] Kavianpour also met with Dr. Vale on February 14, 2019, and at that time, Dr. Vale offered to take the pager from Kavianpour whenever she needed to leave to test.  [Doc. 197 at 80 p. 80]; see also [Doc. 194 at 290 p. 290, 293-95 pp. 293-95].

on February 20, 2019, another meeting was held between Bryan, Norton, Arnold, Dr. Moore, Dr. Coule, and Clark Speese ("Speese"), AUMC's in-house counsel, among others, after Speese emailed Bryan and Norton a draft suspension letter for Dr. Coule that would "be used in conjunction with the termination letter."  [Doc. 192 at 47 p. 47; 132 p. 132; Doc. 192-21 at 23; Doc. 193 at 8 p. 8, 112 p. 112; Doc. 194 at 88-89 pp. 88-89, 123 p. 123; Doc. 194-18 at 5-35; Doc. 207-41 at 26].  Subsequently, Dr. Coule asked Arnold to provide him with a letter detailing the issues discussed,[49] and on February 21, 2019, Arnold provided Dr. Coule with a letter, stating, in pertinent part:

> On Wednesday, February 13, 2019, Sarah Kavianpour, MD, Resident PGYl , did not present herself for a random drug test.  [] Kavianpour has failed to adhere to the administrative process related to random drug testing that she was notified of on August 21, 2018.
>
> I contacted [] Kavianpour on Wednesday morning, February 13, 2019, indicating it was a test day.  She stated to me she was unable to leave because everyone was in the [operating room] and she had the pager. [] Kavianpour then expressed that mornings were usually not a good time for her to test.  I agreed to allow the testing clock to start at 12pm and from that time she would have four hours to present [her]self to Employee Health for testing (this was sent in an email to her as well). At 4:43pm [] Kavianpour emailed me and stated: "[] Arnold, I just looked at the time clock and I just realized I missed my window.  The other junior residents were in the [operating room un]til late and I had a procedure and several consults.  I will go first thing tomorrow AM.  I really do not want to lose my job.  I just have a lot of

---

[49] During the meeting, Dr. Coule had been apprised of "some of the difficulties around [Kavianpour] appearing for tests, or failing to appear for tests," as well as some performance issues.  [Doc. 223-1 at 35-36 pp. 34-35, 38-39 pp. 37-38].

responsibilities.  The third year refused to take the pager from me so I will talk to my program director about this."

On, Thursday, February 14, 2019, [] Kavianpour presented herself to Employee Health for testing and was denied because it was not the random testing date.

On January 17, 2019, she repeated the same behavior as described above when notified it was a test day, which led to another memo dated January 31, 2019.  [] Kavianpour was sent a letter on January 31, reminding her that she was subject to both University and AU[MC] policies related to drug testing.  This was the 2nd communication she had received from Human Resources notifying her that she was subject to random testing.  The January 31, 2019 letter outlined clear instructions for her to meet this requirement, established coordination with her department so she could meet the requirement, and informed her that her academic and clinical activity "will not be an excuse for her to not appear for testing."  The letter also indicated that per the AUMC policy "Refusal to participate or failure to complete any step of the testing process results in discharge".  In addition, the letter also instructed [] Kavianpour to provide me a copy of her monthly schedule, no later than the first Monday of each month and February 4, 2019 would be her first submission date.  She has failed to submit the schedule to me as requested.

In addition, on November 16, 2018, [] Kavianpour was stopped for speeding and subsequently charged and arrested for speeding and DUI.

[Doc. 186-4 at 1 (emphasis omitted); Doc. 187-5 at 1 (emphasis omitted); Doc. 194 at 89 p. 89; Doc. 223-1 at 41-43 pp. 40-42].  Although Kavianpour maintains that Dr. Coule failed to conduct an independent investigation following his receipt of Arnold's letter, the evidence shows that after reviewing this letter, Dr. Coule "asked for additional information, including the results of [Kavianpour's] initial

preemployment drug screening as well as her confirmatory test confirming that it was indeed metabolites of THC that was in her urine" and records related to her November 2018 DUI arrest. [Doc. 223-1 at 53 p. 52, 67 p. 66, 74-75 pp. 73-74, 78-79 pp. 77-78; Doc. 208-10 at 11].

On this same day, February 21, 2019, Dr. Coule issued Kavianpour a letter, with Dr. Macomson, Dr. Vale, Dr. Moore, Norton, and Arnold copied thereon, stating:

> Information has come to our attention that has led to concern for patient safety. Please accept this letter as notice of your immediate suspension from all clinical activities within [AUHS], including [AUMC] and all other practice sites.

[Doc. 187-3 at 1 (emphasis omitted)]; see also [Doc. 190-13 at 13; Doc. 223-1 at 22-24 pp. 21-23, 87 p. 86, 94 p. 93].[50]   Once Dr. Coule issued this suspension letter,

---

[50] In deciding to suspend Kavianpour's clinical privileges at AUMC, Dr. Coule testified that he "believed that [] Kavianpour could potentially have a substance abuse disorder, as evidenced by her positive drug test, her DUI arrest, as well as her failing to appear for substance abuse testing as scheduled," but that he also considered "the totality of the picture of everything that had occurred and was occurring, as well as the reports that there were performance concerns within the residency program" and that it was "the totality of the information." [Doc. 223-1 at 37-39 pp. 36-38]. He also testified that Kavianpour's refusal to comply with the drug testing protocol "was a factor in [his] decision-making" and that it was "either subversive . . . in refusing to test or it's extremely poor judgment to have gotten a positive drug screen, a DUI, and then refusing to be compliant," but that he was not aware prior to suspending her that she had complained about the legality of the drug testing, though he was generally aware that she had expressed concerns about the drug testing. [Id. at 44-45 pp. 43-44, 81-83 pp. 80-82, 88 p. 87, 99-100 pp. 98-99]; see also [Doc. 187-9 at 174-75 pp. 174-75]. He explained that

Kavianpour could no longer practice in the hospital and was therefore unable to be trained as a Neurosurgery resident.  [Doc. 192 at 132 p. 132; Doc. 197 at 140-44 pp. 140-44].  Thus, on the same day, February 21, 2019, Dr. Macomson issued a termination letter, stating in relevant part:

> Your employment with [AU] is terminated effective immediately. The reason for this action is:
>
> The Chief Medical Officer for the Health System has exercised his discretion and authority to revoke your ability to practice in the medical center and related facilities.  Therefore, you are not able to be trained in the health system, which is a requirement for you to be in our residency program.

---

Kavianpour had been reminded that her patient care duties were not an excuse for not showing up for testing and that to not go test was "either a serious error in judgment or being evasive" as there was "no plausible explanation for not showing up for testing" when she was "properly informed" she had "to test" and was "a violation of what [she had] been informed and agreed to do" and that the "combination of both of those choices, combined with a previous positive drug test and an arrest for DUI" were the reasons for the suspension.  [Doc. 178-12 at 169-71 pp. 169-71, 173 p. 173].  He also explained that he never personally met Kavianpour until March 2019, after issuing her the suspension letter, since he did not have day-to-day involvement with residents in the Neurosurgery Department and did not supervise those residents.  [Doc. 190 at 182 p. 429; Doc. 223-1 at 16-17 pp. 15-16, 19 p. 18].  He further testified that he suspended her pursuant to Section 5.1 of the AUMC Medical Staff Bylaws, which permits the Chief Medical Officer to suspend House Staff if there is a concern related to patient safety, [Doc. 190-13 at 13; Doc. 223-1 at 22-24 pp. 21-23, 94 p. 93]; however, he explained that had Kavianpour complied with the drug screening, he likely would not have suspended her clinical privileges because when residents and faculty are compliant with drug testing, it would not have been elevated to his office unless some other patient safety concern arose and there would have been no need for him to take any action, [Doc. 178-12 at 174-75 pp. 174-75].

This decision is prompted by you not adhering to the Medical Center's Substance Abuse policy and the protocol that had been established for you for random drug testing.

Please return to me all [AU] property issued to you, including the identification badge, departmental keys, computer equipment and any other supplies.

Please proceed to Human Resources with the signed clearance form provided to you in order to complete the required clearance process, and to discuss the conversion of your benefits and COBRA coverage.

You have five (5) working days in which to appeal this action to Dr. [] Vale, Department Chair, Neurosurgery.  Whether you choose to appeal or not, you have the right to file a formal grievance within ten (10) working days from the receipt of this letter with the Human Resources Division.

[Doc. 187-4 at 1 (emphasis omitted)]; see also [Doc. 190 at 82 p. 329; Doc. 192 at 46

p. 46, 78-79 pp. 78-79].[51]

---

[51] While Dr. Coule testified his expectation when he suspends a resident like Kavianpour is that the "residency program and school conduct an investigation in order to determine what that the issues or challenges are and take appropriate action," [Doc. 223-1 at 93 p. 92], the evidence shows that in this instance, meetings were held in which various options including probation, suspension, and termination were presented and drafts of various letters were circulated based on whichever way a decision was made, and that ultimately, a meeting was held between Bryan, Norton, Arnold, Dr. Moore, Dr. Coule, and Speese, among others, after Speese emailed Bryan and Norton a draft suspension letter for Dr. Coule to sign that would also "be used in conjunction with the termination letter," [Doc. 192 at 47 p. 47; 132 p. 132; Doc. 192-21 at 23; Doc. 193 at 8 p. 8, 112 p. 112; Doc. 194 at 88-89 pp. 88-89, 123 p. 123; Doc. 194-18 at 5-35; Doc. 207-41 at 26].  In addition, Dr. Macomson testified that Dr. Coule's "suspension was the . . . triggering event for her termination."  [Doc. 192 at 99 p. 99]; see also [id. at 46 p. 46, 49-50 pp. 49-50].  Neither Norton, Dr. Vale, nor Dr. Macomson considered Kavianpour to have a substance abuse disorder at the time of her suspension and termination.  [Doc.

Following her termination, Kavianpour was entitled to two separate appeal rights, an academic appeal and an employment appeal.  [Doc. 193 at 76 p. 76]. Kavianpour submitted an appeal to Dr. Vale and the decision to terminate her from the residency program was upheld by Dr. Vale on March 1, 2019.  [Doc. 197 at 151 p. 151; Doc. 197-8 at 9].[52]  On March 14, 2019, Kavianpour was also advised

_____

186 at 8 p. 31; Doc. 192 at 52-55 pp. 52-55, 103-04 pp. 103-04, 152 p. 152; Doc. 194 at 81 p. 81; Doc. 197 at 43-44 pp. 43-44].  However, Dr. Macomson testified that he believed Kavianpour's "behavior" and "conduct represented a patient safety risk" and explained that there were "certain concerns that . . . arise with someone failing a preemployment drug testing that [he did not] think [could] be ignored," but that had she complied with the drug testing protocol, she would not have been terminated from the program.  [Doc. 192 at 53 p. 53, 105 p. 105].  He further stated that if he believed Kavianpour was an "impaired physician," he "would not have allowed her to practice[.]"  [Id. at 104 p. 104].  Kavianpour asserts that because she was terminated on February 21, 2019, she was not provided a remediation period consistent with House Staff Policy and Procedure 18.0 as set forth in her counseling form; however, it is undisputed that Kavianpour was terminated following a suspension of her clinical privileges at AUMC after she failed to report for her drug screen in February 2019, and therefore, her termination was not governed by her counseling form that provided a remediation period under AU's House Staff Policy and Procedure 18.0, which applied to performance-based deficiencies. [Doc. 178-10 at 1-2; Doc. 192 at 57 p. 57, 66, p. 66, 78-79 pp. 78-79, 103 p. 103, 113-18 pp. 113-18; Doc. 192-4 at 1; Doc. 192-20 at 1-2; Docs. 193-2 & 193-3; Doc. 197-14 at 1-2].

[52] On March 13, 2019, Kavianpour emailed Sprouse, stating that she needed "to file [a] complaint because [she had] been terminated for engaging in protected activity, putting patient safety first, which prevented [her] from making it to a random drug screen in the HR-designated time frame despite [her] having shared continued concerns for such a situation, which were ignored."  [Doc. 205-5 at 1 (internal marks omitted)]; see also [Doc. 216 ¶ 44].  She also stated that she "believe[d] [her] termination was retaliatory," that Human Resources was "mishandling [her] grievance and interfering with [her] right to due process

73

of her ability to pursue a grievance through the GME office.  [Doc. 192 at 164 p.

164; Doc. 207-51 at 1].  On March 22, 2019, a Human Resources grievance hearing

was held concerning Kavianpour's termination from the residency program, after

which the grievance hearing panel issued a decision on March 26, 2019,

recommending that Kavianpour's termination be upheld, and on April 4, 2019,

Brooks Keel, Ph.D. ("Dr. Keel"), President of AU and Chief Executive Officer of

AUHS, accepted the panel's recommendation and upheld her termination after

AU's Provost also adopted the recommendation on April 2, 2019.  [Doc. 178-12;

Doc. 186-7; Doc. 186-12 at 1; Doc. 194 at 130 p. 130; Doc. 204-15 at 1-2; Doc. 207-52

at 1-5].[53]  However, Kavianpour was subsequently reinstated with full back pay

and then allowed to pursue her House Staff appeal rights pursuant to House Staff

Policy and Procedure 13.0, as it was determined that she should have been

---

because of a conflict of interest," and that there was a "need for escalation and []
Arnold and [] Norton [] to be completely removed from the entire process."  [Doc.
205-5 at 1].

[53] Between May and July of 2019, Lott served as AU's Interim CCO on a contract
basis through his employer, Cynergistek, and in June 2019, he was charged with
investigating Kavianpour's claims of discrimination, harassment, and retaliation
in connection with the drug testing protocol, among other issues.  [Doc. 209-8 ¶¶
6, 8]; see also [Doc. 193 at 95-96 pp. 95-96; Doc. 205 (Sprouse Dep.) at 43-47 pp. 42-
46].  On July 16, 2019, Lott met with Sprouse and advised him of his findings, after
which Sprouse immediately terminated him, and Lott issued his investigative
report and findings with regard to Kavianpour's claims to Dr. Keel that day.  [Doc.
209-8 ¶¶ 91, 94-95; Doc. 209-16].

afforded a better process for both her academic and employment appeal and have

clinical competency committee ("CCC") review and then ad hoc committee

review.[54]  [Doc. 193 at 80 p. 80, 83 p. 83]; see also [Doc. 192 at 166-67 pp. 166-67; 174

p. 174; Doc. 192-26 at 1; Doc. 197-18 at 1-3].

  In January 2020, the CCC held a meeting, and on January 11, 2020, the CCC

issued a recommendation of non-renewal of Kavianpour to Dr. Macomson, who

accepted the CCC's recommendation, and on April 28, 2020, an ad hoc committee

hearing was held and it issued a recommendation of non-renewal of Kavianpour's

contract, which also was upheld on May 5, 2020, and then ultimately upheld by

Dr. Keel on May 22, 2020.  [Doc. 192 at 185 p. 185; Doc. 192-15 at 1-4; Doc. 204-13

at 5; Doc. 208-11 at 13-14, 18-23; Doc. 209-7 at 2].[55]  However, on December 3, 2021,

ACGME found AU had not shown "substantial compliance" that "Kavianpour

received a timely written notice of intent when it was determined that [ her]

---

[54] House Staff Policy and Procedure 13.0, entitled "House Officer Evaluation, Grievance[ &] Due Process," provides in relevant part that a "CCC shall make recommendations on remedial action, non-renewal, disciplinary actions (e.g., suspension) and dismissal to the Chairperson of the Department or designee." [Doc. 201-43 at 5].

[55] The Human Resources grievance hearing was primarily focused on non-compliance with the drug testing protocol while the GME hearing also included "ongoing performance issues that . . . were relevant."  [Doc. 192 at 171-72 pp. 171-72].

appointment to the Neurological Surgery residency program was not to be renewed." [Doc. 171-2]; see also [Doc. 178-1 at 130-31 pp. 130-31; Doc. 196-2].

On December 12, 2019, Kavianpour filed her original complaint in the Superior Court of Fulton County, Georgia, against ten defendants, [Doc. 1-1], and on January 10, 2020, the defendants removed the case to this Court on the basis of federal question jurisdiction, [Doc. 1].  After separate motions to dismiss and a motion for more definite statement were filed, see [Docs. 3, 4, 5, 6, & 7], Kavianpour, with the defendants' consent, filed an amended complaint against eight of the ten originally named defendants on April 20, 2020, [Doc. 29]; see also [Docs. 22, 27, & 28], rendering moot the pending motions to dismiss and motion for more definite statement directed at her original complaint, see [Doc. 28].[56]

---

[56] In the amended complaint, Kavianpour asserted sixteen counts: (1) breach of contract; (2) retaliation under the GWA after she complained that her drug testing was not random; (3) retaliation under the GWA after she complained that her drug testing interfered with patient safety; (4) retaliation under the GWA after she complained about AU and AUMC's internal appeals process; (5) discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.; (6) hostile work environment under Title VII; (7) retaliation under Title VII; (8) disability discrimination under Title I of the ADA; (9) retaliation under Title I of the ADA; (10) disability discrimination under Title III of the ADA; (11) discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.; (12) discrimination under the Rehabilitation Act; (13) sex discrimination under the Equal Protection Clause; (14) unlawful search and seizure under the Fourth Amendment; (15) due process violations under the Fourteenth Amendment; and (16) arbitrary revocation of her hospital privileges under O.C.G.A. § 51-1-6.  See [Doc. 29].

These eight defendants filed four motions to dismiss, see [Docs. 32, 33, 34, & 35], and on January 28, 2021, the undersigned recommended granting in its entirety the individual defendants' motions to dismiss and granting in part the motions to dismiss filed by defendants AUMC and BOR, see [Doc. 61], which was adopted, as modified, by Judge Brown on March 29, 2021, [Doc. 69].  On August 2, 2021, Judge Brown denied Kavianpour's motion for reconsideration, [Doc. 90]; see also [Doc. 73], and thus, the remaining claims in this action are: (1) disability discrimination and retaliation against AUMC and BOR under Title I of the ADA, asserted in Counts VIII and IX; (2) disability discrimination against AUMC and BOR under the Rehabilitation Act, asserted in Count XII and premised on Kavianpour being perceived as having a substance abuse disorder; (3) breach of contract against BOR, asserted in Count I and premised on BOR's alleged violation of House Staff Policy 10.0; and (4) retaliation in violation of the GWA against BOR, asserted in Count II and premised on Kavianpour's complaints of alleged violations of state and federal law, see [Docs. 29, 61, 69, & 90].

Defendants have separately moved for summary judgment as to each of Kavianpour's remaining claims asserted against them, [Doc. 199 (AUMC's motion); Doc. 207 (BOR's motion)], which Kavianpour opposes, [Doc. 229 (response to AUMC's motion); Doc. 230 (response to BOR's motion)].  Defendants each have filed a reply in support of their respective motions for summary

judgment.  [Doc. 241 (AUMC's reply); Doc. 242 (BOR's reply)].  Kavianpour also has filed a motion for summary judgment, [Doc. 209], which defendants oppose, [Doc. 224 (AUMC's response); Doc. 225 (BOR's response)], and Kavianpour has filed replies in support of her motion, [Doc. 246 (reply to AUMC's opposition); Doc. 247 (reply to BOR's opposition)].  The pending motions, [Docs. 199, 207, & 209], having been fully briefed, are now ripe for ruling.[57]

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment shall be granted if the movant[s] show[] that there [are] 'no genuine issue[s] as to any material fact[s]', such that the movant[s are] entitled to judgment as a matter of law."  Jerome v. Barcelo Crestline, Inc., 507 F. App'x 861, 863 (11th Cir. 2013) (per curiam) (unpublished) (quoting Fed. R. Civ. P. 56(a)); see also Mathews v. Wells Fargo, 758 F. App'x 842, 843 (11th Cir. 2019) (per curiam) (unpublished) (citation omitted); Holmes v. Ga. ex rel. Strickland, 503 F. App'x 870, 872 (11th Cir. 2013) (per curiam) (unpublished) (citations omitted); Young v. FedEx Express, 432 F. App'x 915, 916 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).  The parties moving for summary judgment bear the initial burden of demonstrating the absence of any genuine issue of material

---

[57] Additional facts will be set forth as they become necessary for discussion of Kavianpour's remaining claims and the issues presented in the pending motions for summary judgment.

facts, upon which the non-moving parties must then submit specific facts showing a genuine issue for trial.  See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1311 (11th Cir. 2018) (citation omitted); Premier Assocs., Inc. v. EXL Polymers, Inc., No. 1:08-cv-3490-WSD, 2010 WL 2838497, at *8 (N.D. Ga. July 19, 2010) (citations omitted), aff'd in part, 507 F. App'x 831 (11th Cir. 2013) (unpublished).

Parties "opposing a properly supported motion for summary judgment may not rest upon mere allegation[s] or denials of [their] pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Jackson v. B & L Disposal, Inc., 425 F. App'x 819, 820 (11th Cir. 2011) (per curiam) (unpublished) (citation and internal marks omitted); see also Shuler v. Ingram & Assocs., 441 F. App'x 712, 715 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); Bryant v. U.S. Steel Corp., 428 F. App'x 895, 897 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).  "Although [the Court] view[s] all the evidence and draw[s] all inferences in the light most favorable to the nonmoving part[ies], [i]f the non-moving part[ies] fail to make a showing on an essential element of [their] case with respect to which [they have] the burden of proof, then the entry of judgment as a matter of law is appropriate."  Lowe v. Exel, Inc., 758 F. App'x 863, 865 (11th Cir. 2019) (per curiam) (unpublished) (fifth alteration in original) (citations and internal marks omitted).

"Speculation or conjecture cannot create a genuine issue of material fact." Shuler, 441 F. App'x at 715 (citation omitted); see also Perry v. Pediatrix Med. Grp. of Ga., 841 F. App'x 174, 177 (11th Cir. 2021) (per curiam) (unpublished) (citation omitted); Howard v. Or. Television, Inc., 276 F. App'x 940, 941 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted); Goodman v. Ga. Sw., 147 F. App'x 888, 891 (11th Cir. 2005) (per curiam) (unpublished) (citation and internal marks omitted) ("[A]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant[s], but an inference based on speculation and conjecture is not reasonable."). "Moreover, the non-moving part[ies] cannot create a genuine issue through evidence that is 'merely colorable' or 'not significantly probative.'" Morales v. Ga. Dep't of Human Res., 446 F. App'x 179, 181 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted); see also Brown v. Wrigley Mfg. Co., LLC, Civil Action No. 2:18-CV-141-RWS, 2021 WL 1696384, at *2 (N.D. Ga. Mar. 29, 2021) (citation omitted) (explaining that "mere conclusions and unsupported statements by the party opposing summary judgment [were] insufficient to avoid summary judgment"); Hall v. Dekalb Cnty. Gov't, 503 F. App'x 781, 786 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted) ("[M]ere conclusions, unsupported factual allegations, and statements that are based on belief, as opposed to personal knowledge, are insufficient to overcome a summary judgment motion."). Indeed, "[t]o overcome a motion for summary

80

judgment, the nonmoving part[ies] must present more than a scintilla of evidence supporting [their] position[s]–rather, there must be enough of a showing that the jury could reasonably find for th[ose] part[ies]." Siddiqui v. NetJets Aviation, Inc., 773 F. App'x 562, 563 (11th Cir. 2019) (per curiam) (unpublished) (citation and internal marks omitted); see also James v. City of Montgomery, 823 F. App'x 728, 731 (11th Cir. 2020) (per curiam) (unpublished) (citation omitted); Wesley v. Austal USA, LLC, 776 F. App'x 638, 643 (11th Cir. 2019) (per curiam) (unpublished) (citation omitted); Mazzola v. Davis, 776 F. App'x 607, 609 (11th Cir. 2019) (per curiam) (unpublished) (citation omitted).  In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," Anyanwu v. Brumos Motor Cars, Inc., 496 F. App'x 943, 945-46 (11th Cir. 2012) (per curiam) (unpublished) (citation and internal marks omitted), and "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving part[ies], summary judgment for the moving part[ies] is proper," Premier Assocs., Inc., 2010 WL 2838497, at *9 (first alteration in original) (citation and internal marks omitted); see also Ellison v. St. Joseph's/Candler Health Sys., Inc., 775 F. App'x 634, 643 (11th Cir. 2019) (unpublished) (citation omitted).  "Summary judgment is required where the non-moving part[ies'] response to [the] motion[s] is merely a repetition of [their] conclusional allegations and is unsupported by evidence showing an

issue for trial."  <u>Comer v. City of Palm Bay</u>, 265 F.3d 1186, 1192 (11th Cir. 2001)

(per curiam) (citation and internal marks omitted).

## III.  DISCUSSION

In Counts VIII and IX of the amended complaint, Kavianpour asserts claims

of disability discrimination and retaliation under Title I of the ADA, alleging that

she "is a qualified individual who [d]efendant[s] erroneously regarded [] as

having the disability of a substance abuse disorder"; that she "suffered the adverse

action of selective random drug tests and an arbitrary, illegal and discriminatory

testing protocol"; that "[d]efendants interfered with the exercise and enjoyment of

ADA rights by ignoring her request for an otherwise interactive process" when

she asked to meet with Human Resources for "drug testing flexibility or

accommodation of patient care"; that she also "suffered the adverse action of

suspension of her clinical privileges and termination for the disability that she was

regarded as having and because of [d]efendants refusal to accommodate"; and that

when she objected to defendants' actions, her clinical privileges were suspended

and she was terminated, and when she objected to those actions, she was further

subjected to more illegal and biased internal appeals processes.  [Doc. 29 ¶¶ 229-

47].  Kavianpour also asserts a claim for disability discrimination under the

Rehabilitation Act in Count XII, alleging that she was regarded as having the

perceived disability of a substance abuse disorder and that she suffered the

adverse actions of targeted drug tests, suspension of clinical activities, and termination.  [Id. ¶¶ 268-76].

As for her remaining state law claims, Kavianpour asserts a breach of contract claim against BOR in Count I of her amended complaint, alleging that her House Officer contract subjected her to AU's House Staff Policies and Procedures, which she asserts incorporated the ACGME Policies, both of which required the residency program to have procedures in place to ensure coverage of patient care in the event that a resident was unable to perform patient care responsibilities, [id. ¶¶ 172-76 (citations omitted)], but that she was "selectively targeted to drug test every month during peak patient care hours and to present within the hour, which meant potentially leaving the hospital without patient coverage," [id. ¶ 179 (citation omitted)], and that BOR "breached the terms of [her] contract by violating House Staff Policies, AU Policies, AUMC Policies, USG Policies, and ACGME Policies, as well as the federal and state laws and regulations incorporated therein," that she "repeatedly protested [their] breaches but [BOR] ignored her protests and continued to breach [her] [c]ontract," and that BOR ultimately, "illegally terminated [her] contract," [id. ¶¶ 180-82].  Finally, she asserts a claim against BOR in Count II for violation of the GWA, alleging that she opposed drug testing that was not random and did not comply with state and federal law, and

that as a direct result of her opposition, her clinical privileges were suspended and her employment was terminated.  [Id. ¶¶ 183-91].

Defendants have filed separate motions for summary judgment as to each of Kavianpour's remaining claims.  [Docs. 199 & 207].  AUMC argues that it is entitled to summary judgment as to Kavianpour's claims asserted against it because it was not her employer or deemed her employer within the meaning of the ADA or the Rehabilitation Act and therefore cannot be liable under either of those statutes.  [Doc. 199-1 at 11-16].  AUMC also argues that even if it is considered to be Kavianpour's employer, it is still entitled to summary judgment on her ADA and Rehabilitation Act discrimination claims because she has failed to establish a prima facie case of discrimination by showing that she was a qualified individual with a disability, [id. at 18-30], and that even if she could establish a prima facie case, she has failed to show that AUMC's legitimate, non-discriminatory reason for her suspension was a pretext for discrimination, [id. at 16-18].  AUMC further argues that Kavianpour's retaliation claim fails because she has failed to show that she engaged in protected activity by requesting an accommodation from AUMC or by complaining about the legality of the drug testing to AUMC in order to establish a causal link between her suspension and complaints regarding the drug testing.  [Id. at 31-35].

BOR also moves for summary judgment on each of Kavianpour's remaining claims asserted against it.  See [Doc. 207].  In particular, BOR maintains that Kavianpour's discrimination claims under the ADA and the Rehabilitation Act fail because she cannot establish a prima facie case of discrimination by showing that she had a disability or a perceived disability, or that she was subjected to discrimination because of a perceived disability.  [Doc. 207-1 at 6-15].  BOR also maintains that even if Kavianpour could establish a prima facie case of discrimination, her claims would still fail because it has offered legitimate, non-discriminatory reasons for its allegedly adverse employment decisions, which she has failed to show were pretextual.  [Id. at 15-18].[58]  In addition, BOR contends that Kavianpour's ADA retaliation claims fail because she has failed to establish a

---

[58] BOR also argues that summary judgment is warranted on Kavianpour's discrimination claim under the Rehabilitation Act premised on her chronic kidney disease, see [Doc. 207-1 at 18-21]; however, in this Court's January 28, 2021, Non-Final Report and Recommendation ("Non-Final R&R"), [Doc. 61], the undersigned found that "[t]o the extent Kavianpour intended to assert a claim based on her alleged chronic kidney disease, she ha[d] failed to state a plausible claim based on the facts alleged in her amended complaint," [id. at 93-94 n.45], and only her "disability discrimination against AUMC and BOR under the Rehabilitation Act in Count XII premised on [her] being perceived as having a substance abuse disorder" was allowed to proceed, [id. at 145]; see also [Doc. 69].  Indeed, BOR acknowledges in its response to Kavianpour's motion for summary judgment that it erroneously "included argument addressing a portion of Count Twelve alleging discrimination based on kidney disease," since "this portion of Count Twelve was dismissed."  [Doc. 225 at 4 n.1 (citation omitted)].  Thus, BOR's argument in this regard will not be addressed further herein.

prima facie case by showing that she engaged in statutorily protected activity, and that even if she could establish a prima facie case, she has failed to show that its legitimate, non-retaliatory reasons for its employment decisions were pretextual. [Id. at 21-25].  Finally, BOR contends that Kavianpour's remaining state law claims asserted against it fail as a matter of law.  [Id. at 25-39].

Kavianpour opposes defendants' summary judgment motions, [Docs. 229 & 230], arguing that AUMC does not have to maintain an employer relationship with her to be liable under the ADA and the Rehabilitation Act, [Doc. 229 at 20-27; Doc. 230 at 23-24], that she has established a prima facie case of discrimination, [Doc. 229 at 27-35; Doc. 230 at 19-22], that she has also proffered direct evidence of discrimination, [Doc. 229 at 35-36; Doc. 230 at 23], and that even if the evidence is not considered direct evidence, she has shown that defendants' proffered legitimate, non-discriminatory reasons for their employment actions were pretextual, [Doc. 229 at 39-41; Doc. 230 at 25-30].[59]  She also argues that she was retaliated against when she was suspended and terminated for opposing discriminatory drug testing and requesting a reasonable accommodation, and that she has shown that defendants' legitimate, non-retaliatory reasons for their

---

[59] Kavianpour also asserts that Dr. Coule was merely a cat's paw for Arnold's discriminatory actions when he suspended her clinical privileges at AUMC, [Doc. 229 at 36-38; Doc. 246 at 18-19], and that BOR's legitimate, non-discriminatory reason for her termination is insufficient, [Doc. 230 at 25-26].

employment decisions were pretextual.  [Doc. 229 at 41-49; Doc. 230 at 30-37]. Finally, she contends that she has sufficiently stated claims under the GWA and for breach of contract against BOR.  [Doc. 230 at 38-46].

Kavianpour also has moved for summary judgment as to each of her remaining claims.  See [Doc. 209].  She contends that she has shown that defendants jointly employed her and therefore fall within the definition of employer under the ADA and the Rehabilitation Act.  [Doc. 209-1 at 18-22].  Next, Kavianpour contends that she is entitled to summary judgment on her discrimination claims under the ADA and the Rehabilitation Act because she was a qualified individual with a disability, and she has shown that defendants' legitimate, non-discriminatory reasons for their employment actions were pretextual.  [Id. at 24-33].  She also asserts that she has stated a failure to accommodate claim for which summary judgment is due to be granted in her favor, [id. at 33-37].  She additionally argues that summary judgment is warranted on her retaliation claims since she engaged in protected opposition to discriminatory drug testing, was subjected to retaliatory adverse actions, and has shown that the legitimate, non-retaliatory reasons were pretextual.  [Id. at 43-49]. Finally, she maintains that summary judgment is warranted in her favor on the remaining state law claims asserted against BOR.  [Id. at 49-51].  Defendants

oppose Kavianpour's motion.  See [Docs. 224 & 225].  The Court will now address the parties' arguments with respect to each of Kavianpour's remaining claims.

"Title I of the ADA specifically addresses discrimination in the employment context," Marsh v. Ga. Dep't of Behav. & Health Developmental Disabilities, No. CV410-273, 2011 WL 806423, at *2 n.9 (S.D. Ga. Feb. 14, 2011) (citation and internal marks omitted), adopted by 2011 WL 806658, at *1 (S.D. Ga. Mar. 2, 2011), and provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a); see also Andrews v. City of Hartford, 700 F. App'x 924, 926 (11th Cir. 2017) (per curiam) (unpublished) (quoting 42 U.S.C. § 12112(a)); Leme v. S. Baptist Hosp. of Fla., Inc., 248 F. Supp. 3d 1319, 1337 (M.D. Fla. 2017) (quoting Jordan v. City of Union City, 646 F. App'x 736, 739 (11th Cir. 2016) (per curiam) (unpublished)).  The ADA also prohibits "an employer from discriminating against any individual for participation in or opposition to practices made unlawful by . . . the ADA." Robinson v. RockTenn CP, LLC, 986 F. Supp. 2d 1287, 1310 (N.D. Ala. 2013).

Similarly, the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her . . . disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" Todd v. Carstarphen, 236 F. Supp. 3d 1311, 1341 (N.D. Ga. 2017) (second alteration in original) (citing 29 U.S.C. § 794(a)).  "Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases, and therefore [the Court] will discuss these [] claims together." Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000) (footnote and internal citation omitted); see also Owens v. Governor's Off. of Student Achievement, 52 F.4th 1327, 1333-34 (11th Cir. 2022) (citations and internal marks omitted) ("In employment discrimination cases, the standards for determining whether an employer violates the Rehabilitation Act shall be the standards applied under title I of the [ADA] . . . and the provisions of [§§] 501 through 504, and 510, of the [ADA] . . . relating to employment" and "[t]hus, cases involving the ADA are precedent for those involving the Rehabilitation Act").

Kavianpour may support her claim of disability discrimination and retaliation by offering either direct or circumstantial evidence.  Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001) (citation omitted); Hall v. Dougherty Cnty. Sch. Sys., CASE NO.: 1:15-CV-189 (LJA), 2017 WL 3584908, at *4 (M.D. Ga. Aug. 17, 2017) (citations omitted); see also Wilson v. B/E Aerospace, Inc., 376 F.3d 1079,  1085 (11th Cir. 2004); Obester v. Lucas Assocs., Inc., Civil Action File No.

1:08-CV-03491-MHS-AJB, 2010 WL 8292401, at *25 (N.D. Ga. Aug. 2, 2010), adopted by 2010 WL 8304884, at *4 (N.D. Ga. Sept. 7, 2010). "Direct evidence is 'evidence that, if believed, proves the existence of a fact without inference or presumption.'" Wilson, 376 F.3d at 1086 (alterations omitted) (quoting Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997)). "Where direct evidence is present, summary judgment is not appropriate." Bryant v. Jones, 696 F. Supp. 2d 1313, 1324 (N.D. Ga. 2010) (citations omitted).

Where there is no direct evidence of discrimination or retaliation, "'[t]he familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA [and the Rehabilitation Act] claims.'" Holton v. First Coast Serv. Options, Inc., 703 F. App'x 917, 920 (11th Cir. 2017) (per curiam) (unpublished) (alteration in original) (citation omitted); see also Jenkins v. Butts Cnty. Sch. Dist., CIVIL ACTION NO. 5:15-CV-30 (MTT), 2016 WL 740461, at *10 n.5 (M.D. Ga. Feb. 24, 2016) (citations omitted). Thus, "courts apply the framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny." Solloway v. White, CIVIL ACTION FILE NO. 1:13-CV-03827-TWT-WEJ, 2017 WL 1170895, at *29 (N.D. Ga. Feb. 15, 2017) (citation omitted), adopted by 2017 WL 1134460, at *1 (N.D. Ga. Mar. 27, 2017), aff'd, 738 F. App'x 985 (11th Cir. 2018) (per curiam) (unpublished).

"Under the *McDonnell Douglas*[] framework, [Kavianpour] must first show an inference of discriminatory [or retaliatory] intent by establishing a prima facie case[.]" <u>Paye v. Sec'y of Def.</u>, 157 F. App'x 234, 236 (11th Cir. 2005) (per curiam) (unpublished) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802); see also <u>Iaciofano v. Sch. Bd. of Broward Cnty.</u>, Case No. 16-cv-60963-BLOOM/Valle, 2017 WL 564368, at *4 (S.D. Fla. Feb. 13, 2017) (citation omitted)).   "After [Kavianpour] has established a prima facie case of discrimination [and retaliation], the burden of production is placed upon [defendants] to articulate a legitimate non[-]discriminatory [and non-retaliatory] reason for [the] employment action." <u>Zeigler v. Ala. Dep't of Human Res.</u>, 710 F. Supp. 2d 1229, 1240 (M.D. Ala. 2010) (citing <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981)).   If defendants meet their burden of production, the inference of discrimination and retaliation is erased, and the burden shifts back to Kavianpour to show that defendants' articulated reasons are merely a pretext for discrimination and retaliation. <u>Entrekin v. City of Panama City Fla.</u>, 376 F. App'x 987, 997 (11th Cir. 2010) (per curiam) (unpublished).   Despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that [ defendants] intentionally discriminated [and retaliated] against [Kavianpour] remains at all times with

[Kavianpour]." <u>Burdine</u>, 450 U.S. at 253 (citations omitted).[60]   With these

principles in mind, the Court addresses each of Kavianpour's remaining claims.

---

[60] "Alternatively, [] [Kavianpour] may defeat a summary-judgment motion outside the *McDonnell Douglas* framework by presenting 'a convincing mosaic' of circumstantial evidence that raises a reasonable inference that the [defendants] discriminated against [her]." <u>Jones v. Unity Behav. Health, LLC</u>, No. 20-14265, 2021 WL 5495578, at *4 (11th Cir. Nov. 23, 2021) (per curiam) (citation omitted). Indeed, the Eleventh Circuit has "cautioned that establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." <u>Awaad v. Largo Med. Ctr., Inc.</u>, 564 F. App'x 541, 544 (11th Cir. 2014) (per curiam) (unpublished) (citation and internal marks omitted).  The Eleventh Circuit does not "appear to have considered in a precedential opinion whether a plaintiff can sustain her burden to establish a circumstantial case of retaliation by relying on the 'convincing mosaic' theory, though in unpublished opinions, [it has] assumed that [she] can." <u>Bailey v. Metro Ambulance Servs., Inc.</u>, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021) (per curiam); <u>see also</u> <u>Reyes v. Fed. Express Corp.</u>, Case No: 6:20-cv-278-WWB-EJK, 2021 WL 2895645, at *4 n.2 (M.D. Fla. July 9, 2021) (citation omitted) (noting that it was "not clear if the convincing-mosaic theory applies to retaliation claims"), <u>aff'd</u>, No. 21-12639, 2022 WL 3867901 (11th Cir. Aug. 30, 2022) (per curiam); <u>Change v. Midtown Neurology, P.C.</u>, CIVIL ACTION FILE No. 1:19-cv-00885-SCJ-AJB, 2021 WL 2483368, at *25 (N.D. Ga. Feb. 3, 2021), adopted by 2021 WL 2492470, at *5 (N.D. Ga. Mar. 26, 2021), <u>aff'd</u>, No. 21-11405, 2022 WL 2352339 (11th Cir. June 29, 2022) (per curiam).  "Ultimately, retaliatory intent is the crux of the matter, and whatever form it takes, if the circumstantial evidence is sufficient to raise a reasonable inference that the [defendants] retaliated against [Kavianpour], summary judgment is improper." <u>Lee v. City of Walthourville</u>, CIVIL ACTION NO.: 4:18-cv-90, 2020 WL 907862, at *14 n.11 (S.D. Ga. Feb. 24, 2020) (alterations omitted) (citation and internal marks omitted).  However, with respect to the GWA claim, the Court notes that "Georgia law requires [Kavianpour] to satisfy the *McDonnell Douglas* framework," and Kavianpour has cited "no authority stating that a claim under the [GWA] can be evaluated under a 'convincing mosaic' of circumstantial evidence or any other alternative framework." <u>Swint v. City of Carrollton</u>, 859 F. App'x 395, 400-01 (11th Cir. 2021) (per curiam) (unpublished).

A.   **BOR/AU and AUMC's Employment Relationship**

Claims under the ADA and the Rehabilitation Act, which prohibit employers from discriminating based on a disability, may be asserted only against an employer, the definition of which "mirrors the definition of employer under Title VII[.]"[33] Nelson v. Jackson, Civil Action File No. 1:14–CV–02851–ELR–JFK, 2015 WL 13545487, at *4 (N.D. Ga. Mar. 31, 2015) (citation omitted), adopted by 2015 WL 13546505, at *1 (N.D. Ga. Apr. 21, 2015).  Kavianpour maintains that defendants "jointly employed [ her] . . . and thus both fall within the ADA and Rehabilitation Act's definition of 'employer.'"  [Doc. 209-1 at 20].  AUMC, on the other hand, contends that "AU, not AUMC, was responsible for all of the material terms and conditions of her residency and employment"; that although it may still be liable under the ADA and the Rehabilitation Act even if it did not directly employ Kavianpour provided certain factors are met, it "does not dispute that much of [Kavianpour's] employment with AU occurred on AUMC's premises[,]

---

[33] "For purposes of Title VII, an 'employer' is a person in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty of more calendar weeks in the current or preceding calendar year[.]" Massengale v. Hill, CIVIL ACTION FILE NO. 1:05-CV-189-TWT, 2005 WL 8155075, at *3 (N.D. Ga. July 25, 2005) (citation and internal marks omitted).  "A 'person' includes individuals, governments, governmental agencies, [and] political subdivisions[.]"  Id. (first alteration in original) (citation and internal marks omitted).

and that it ha[d] the ability to suspend a resident's clinical privileges for patient safety reasons," it "did not control [Kavianpour's] day-to-day work schedule or the manner and means of her work"; that it "was not [Kavianpour's] employer and should not be deemed [her] employer," and that "the Court should grant summary judgment to [it]."  [Doc. 199-1 at 12-13, 16 (emphasis, citations, and internal marks omitted)].   BOR also maintains that "it is undisputed that [Kavianpour] was an employee of [AU]"; that AU and not AUMC "controlled the fundamental and essential aspects of the employment relationship"; and that even if a joint employer relationship is assumed, "each individual employer only bears liability for discriminatory acts within its control."  [Doc. 225 at 5-6 (citation and internal marks omitted)].

As explained in the January 28, 2021, Non-Final R&R, [Doc. 61 at 44 n.22], AU "exists and operates solely as a unit of the [BOR]," Sholes v. Anesthesia Dep't, CV 119-022, 2020 WL 1492175, at *4 (S.D. Ga. Mar. 23, 2020) (citations omitted), while AUMC, an entity under the umbrella of AUHS, has been recognized as a separate corporate entity from AU and the BOR, see id., at *2, 4; see also Williams v. Bd. of Regents of the Univ. Sys. of Ga., CV 120-100, 2022 WL 4588587, at *3 (S.D. Ga. Sept. 29, 2022) (citations omitted) (explaining that AUMC was a "private, non-governmental entity" and that Dr. Coule acted "as [AUMC's] agent" and that since AUHS and "AUMC are both privately owned and operated nonprofit

corporations, their employees, such as Dr. Coule, [were] private parties"). Although Kavianpour initially asserted the joint employment standard, see [Doc. 209-1 at 19], she appears to concede that she has failed to establish a genuine issue of material fact as to whether defendants jointly employed her in the traditional sense, consistent with the ruling in the Non-Final R&R on the motion to dismiss, see [Doc. 61 at 47], and instead argues that "a defendant who does not directly employ a plaintiff may still be liable where the defendant has used its control over access to employment opportunities with a third party to deny those opportunities to the plaintiff" and that defendants "jointly employed [ her], pursuant to [Zaklama v. Mt. Sinai Med. Ctr., 842 F.2d 291, 294-95 (11th Cir. 1988), and Pardazi v. Cullman Med. Ctr., 838 F.2d 1155, 1156 (11th Cir. 1988)], and thus both fall within the ADA and Rehabilitation Act's definition of 'employer,'" [Doc. 209-1 at 19-20].

"There are certain limited situations . . . in which Title VII [and similar statutes] extend[] beyond a direct employment relationship between the plaintiff and the defendant." Clark v. Marietta Surgical Ctr., Inc., No. 1:97-CV-0790-JOF, 1999 WL 1043772, at *6 (N.D. Ga. Mar. 18, 1999). The Eleventh Circuit has held that a defendant who does not directly employ a plaintiff may still be liable where the defendant has used its control over access to employment opportunities with a third party to deny them to the plaintiff, such as where a defendant hospital

95

engages in such interference by denying a resident privileges based on discrimination that led to plaintiff's dismissal from the residency program by plaintiff's employer.  See Zaklama, 842 F.2d at 294-95; see also Pardazi, 838 F.2d at 1156.  "Courts have found such relationships most often with cases involving . . . medical residencies[] or other methods of employment where such a person works for someone that places them in a location where their day to day work lives are controlled by someone else," and "courts look at three factors to determine whether a non-employer can be deemed an employer: '[1] whether or not the employment took place on the premises of the alleged employer; [2] how much control did the alleged employer exert on the employees; and, [3] did the alleged employer have the power to fire, hire, or modify the employment condition of the employees[.]"  Turner v. Jefferson Cnty. Comm'n, Case No.: 2:18-cv-01609-JEO, 2019 WL 2435872, at *4 (N.D. Ala. June 11, 2019) (third, fourth, and fifth alterations in original) (citations and internal marks omitted).

In the present case, AUMC concedes that "much of [Kavianpour's] employment with AU occurred on [its] premises and that it ha[d] the ability to suspend a resident's clinical privileges for patient safety reasons," but it maintains that it did not "control [Kavianpour's] day-to-day work schedule or the manner and means of her work," pointing out that "senior residents in the [N]eurosurgery [D]epartment, a component of the [BOR], set [Kavianpour's] schedule" and that

"physician supervisors in the [N]eurosurgery [D]epartment evaluated, supervised and directed [her] work[.]"  [Doc. 199-1 at 13-14 (citations omitted) (citing [Doc. 190 at 91-92 pp. 338-39, 98-99 pp. 345-46; Doc. 197 at 39-40 pp. 39-40, 212 p. 212; Doc. 223-1 at 92-93 pp. 91-92])].  Although AUMC also asserts that Dr. Coule "did not suspend [Kavianpour's] privileges with the intent that this would lead to her termination from her program," [Doc. 199-1 at 14 (citations omitted)], Kavianpour has shown that Dr. Coule "was present in meetings in which three possible outcomes regarding disciplinary action—probation, suspension, and termination—were discussed"; "AU Human Resources provided Dr. Coule with the information he used as the basis for suspending [] Kavianpour's clinical privileges"; and he "participated in discussions about possible disciplinary actions to take against [Kavianpour], and ultimately decided to suspend [ her] clinical privileges at the hospital," which "triggered her termination from the residency program."  [Doc. 209-1 at 21 (citations omitted)].  Indeed, the evidence shows that a meeting was held after Speese, AUMC's in-house counsel, emailed Bryan and Norton a draft suspension letter for Dr. Coule that would "be used in conjunction with the termination letter."  [Doc. 192 at 47 p. 47; 132 p. 132; Doc. 192-21 at 23; Doc. 193 at 8 p. 8, 112 p. 112; Doc. 194 at 88-89 pp. 88-89, 123 p. 123; Doc. 194-18 at

5-35; Doc. 207-41 at 26].[61]   Here, as in <u>Zaklama</u>, "the evidence [is] more than

sufficient to establish a prima facie case against [AUMC]," as it appears that

Kavianpour's "dismissal from the residency program was the direct result of Dr.

[Coule's] . . . decision to [suspend her] from the hospital," and therefore, AUMC

"was in a position to affect [Kavianpour's] employment in the residency program

and did affect [her] employment[.]"   <u>Zaklama</u>, 842 F.2d at 295; <u>see also</u> <u>Scott v.</u>

<u>Sarasota Drs. Hosp., Inc.</u>, 145 F. Supp. 3d 1114, 1124 (M.D. Fla. 2015), <u>aff'd</u>, 688 F.

App'x 878 (11th Cir. 2017) (per curiam) (unpublished).   Because Kavianpour has

presented sufficient evidence that AUMC had at least some control over her ability

to maintain employment with AU, even though she was not an employee of

AUMC, AUMC's motion for summary judgment on this basis as to Kavianpour's

---

[61] Although Kavianpour maintains that Dr. Coule "was an agent of BOR and was aided by that agency relationship when suspending [ her], because he is a BOR employee," [Doc. 247 at 3 (footnote and citation omitted)], she overlooks the evidence in this case that Dr. Coule served in the role of Chief Medical Officer for AUHS, and it was in this capacity that he suspended Kavianpour's privileges with AUMC, [Doc. 223-1 at 10-11 pp. 9-10].  And, while Kavianpour also points to Dr. Coule's "coordinated 'plan'" with BOR in an effort to also show that Dr. Coule merely acted as an agent for BOR, <u>see</u> [Doc. 247 at 4], as the <u>Williams</u> Court explained, "[w]hile the record reflects Dr. Coule relied on information provided by [ BOR], it does not demonstrate Dr. Coule substituted [its] judgment for his own; to the contrary, Dr. Coule consistently testified he made an independent decision after considering all the relevant facts and circumstances" and "a reasonable jury could only infer these were independent actors who shared information," <u>Williams</u>, 2022 WL 4588587, at *5 (citation omitted); <u>see also</u> [Doc. 223-1 at 37-39 pp. 36-38, 53 p. 52, 67 p. 66, 74-75 pp. 73-74, 78-79 pp. 77-78].

ADA and Rehabilitation claims asserted against it is due to be denied.[62]  See Scott,

145 F. Supp. 3d at 1124.

## B.  **Application of Sovereign Immunity**

Kavianpour asserts claims for discrimination and retaliation pursuant to

Title I of the ADA against BOR, [Doc. 29 ¶¶ 229-47], which "is an agency of the

State of Georgia," and therefore "raises questions of Eleventh Amendment

immunity," Fedorov v. Bd. of Regents for Univ. of Ga., 194 F. Supp. 2d 1378, 1385

(S.D. Ga. 2002); see also Nicholl v. Bd. of Regents of Univ. Sys. of Ga., 706 F. App'x

493, 495 (11th Cir. 2017) (per curiam) (unpublished) (citations omitted); [Doc. 225

at 6 n.2].  "[T]he Eleventh Amendment bars any suit against a State or a state

official in federal court unless the State has waived its immunity or otherwise

consented to the suit, or Congress has abrogated that immunity."  Williams v. Hill,

CIVIL ACTION NO. 1:20-CV-0186-JPB-JSA, 2022 WL 907789, at *15 (N.D. Ga. Jan.

31, 2022), adopted by 2022 WL 1715212, at *8 (N.D. Ga. Mar. 31, 2022).  "[A]lthough

the ADA states that it abrogates Eleventh Amendment immunity from suits

---

[62] However, as BOR points out, see [Doc. 225 at 6], regardless of the employer theory status addressed for purposes of the pending motions, the theories "concentrate on the degree of control an entity has over the adverse employment decision on which the . . . suit is based," Llampallas v. Mini-Cirs., Lab, Inc., 163 F.3d 1236, 1244–45 (11th Cir. 1998) (citations omitted).  Thus, the indirect employer must still bear some responsibility for the discriminatory act to be liable for an ADA violation.  See United States v. N.Y. State Dep't of Motor Vehicles, 82 F. Supp. 2d 42, 46 (E.D.N.Y. 2000).

arising under its provisions, the Supreme Court has held that, while Congress clearly intended to abrogate[] the States' Eleventh Amendment immunity under Title I of the ADA, the purported abrogation was invalid," and "[t]hus, employment discrimination claims brought in federal court against states or state agencies under Title I of the ADA remain barred by the Eleventh Amendment." Id. (citation omitted).

BOR does not address Eleventh Amendment immunity and appears to implicitly concede that it has waived Eleventh Amendment immunity on Kavianpour's ADA claims by removing the case to federal court; however, it does note that the "Georgia Court of Appeals recently granted certiorari in [a] case" with the "issue to be decided [being] whether the State of Georgia waived its sovereign immunity to ADA claims," pointing out that "[s]hould the Court rule in favor of [a]ppellant, [Kavianpour's] claims in this case will be barred." [Doc. 225 at 6 n.2 (citation omitted)]. The Eleventh Circuit has recognized that "a State's removal to federal court waives 'its immunity from a federal forum'—that is, its immunity from suit, not from liability," and therefore, a state has not waived "any defense it would have enjoyed in state court—including immunity from liability from particular claims." Page v. Hicks, 773 F. App'x 514, 518 (11th Cir. 2019) (per curiam) (unpublished) (emphasis and internal marks omitted) (quoting Stroud v. McIntosh, 722 F.3d 1294, 1302 (11th Cir. 2013). That is, "no one contests that [ BOR]

waived its Eleventh Amendment immunity from suit by removing the case to federal court," but "under this Court's precedent interpreting [Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 618 (2002)], this removal did not affect [BOR's] immunity from liability for monetary damages."  Id.

In Stroud, the Eleventh Circuit explained that "sovereign immunity is a divisible concept" and a "flexible defense with multiple aspects that states can independently relinquish without affecting others," emphasizing that "a state, if it chooses, can retain immunity from liability for a particular claim even if it waives its immunity from suit in federal courts."  Stroud, 722 F.3d at 1301-03 (citations omitted) (finding defendant, an arm of the state remained immune from liability for claims under the ADEA even though it removed the case from state court as it had only waived its immunity from suit in federal court).  Thus, as applied here, "the Eleventh Circuit's decision in Stroud supports a finding that [BOR] [] waived [its] right to claim Eleventh Amendment immunity from suit in federal court," but "[t]o the extent that [ BOR] would be able to invoke sovereign immunity as a defense to liability generally under [ Kavianpour's] ADA claims, however, Stroud holds that [it] did not waive that defense."  Williams, 2022 WL 907789, at *19 (citation omitted); see also Richardson v. Georgia, CIVIL ACTION NO. 1:20-CV-00519-LMM, 2020 WL 13574112, at *2 n.4 (N.D. Ga. May 5, 2020) (citation omitted) (explaining that "under Eleventh Circuit precedent, a party may remove a case to

federal court without waiving its immunity from liability"); <u>Crawford v. Ga. Dep't of Transp. (GDOT)</u>, 1:16-cv-3810-WSD, 2017 WL 1405326, at *4 (N.D. Ga. Apr. 20, 2017) (finding the State had not waived its sovereign immunity from liability as to claims brought under the FMLA by removing the action to federal court and granting dismissal of those claims).  The issue is thus whether BOR would have had immunity from liability if the Title I ADA claims had remained in state court, <u>see</u> <u>Stroud</u>, 722 F.3d at 1302 (explaining that "a state waives its immunity from a federal forum when it removes a case," but it does not waive "any defense it would have enjoyed in state court—including immunity from liability for particular claims"), but under current Georgia law, BOR's sovereign immunity argument fails, <u>see</u> <u>Williamson v. Dep't of Hum. Res.</u>, 572 S.E.2d 678, 681 (Ga. Ct. App. 2002); <u>see also</u> <u>Hicks v. Ga. Dep't of Hum. Servs.</u>, Civil Action No. 5:12–CV–210 (MTT), 2013 WL 1568052, at *4 (M.D. Ga. Apr. 12, 2013).[63]  Accordingly, BOR has waived

---

[63] In <u>Williamson</u>, the Court of Appeals considered whether Georgia had waived its sovereign immunity as to claims of disability discrimination under the ADA and found that because the state had explicitly waived its sovereign immunity to suit as to claims of disability discrimination under state law brought by state employees, the state necessarily had done so as to claims brought under federal law by state employees.  572 S.E.2d at 681.  "Thus, because Georgia had enacted the Fair Employment Practices Act [], O.C.G.A. §§ 45-19-21, *et seq.*, which prohibited discrimination against state employees on the basis of disability, the Court of Appeals reasoned, it could not claim sovereign immunity as a defense to claims brought by state employees under the ADA[.]"  <u>Williams</u>, 2022 WL 907789, at *19 (citation omitted).  Therefore, "[i]t is clear that after *Williamson* the State of Georgia may be sued in a Georgia state court for disability discrimination claims

Eleventh Amendment immunity to Kavianpour's Title I ADA claims in federal court, and it also cannot claim sovereign immunity as a defense to liability as to those claims at this time.

## C.    Kavianpour's Disability Discrimination Claims

In her amended complaint, Kavianpour asserts that she "is a qualified individual who [d]efendant[s] erroneously regarded [] as having the disability of a substance abuse disorder"; that she "suffered the adverse action of selective random drug tests and an arbitrary, illegal and discriminatory testing protocol"; that "[w]hen [she] asked to meet with [Human Resources ] for drug testing flexibility or accommodation of patient care, [d]efendants interfered with the exercise and enjoyment of ADA rights by ignoring her request for an otherwise interactive process"; that she "suffered the adverse action of suspension of her clinical privileges and termination for the disability that she was regarded as having and because of [d]efendants refusal to accommodate"; and that the drug testing and alleged reason for her termination were discriminatory and pretextual, in violation of Title I of the ADA.  [Doc. 29 ¶¶ 230-33, 236-37].  She also asserts a discrimination claim under the Rehabilitation Act, [id. ¶¶ 268-76], alleging that "at

based on federal law."  Id. (footnote, citation, and internal marks omitted); but see Stroud, 722 F.3d at 1299 n.2 (citation omitted) (explaining that "[a] state does not waive immunity against a federal law by waiving immunity against a similar state law").

103

all relevant times, [she] was regarded by [d]efendants as having the perceived disability of a substance abuse disorder"; that she suffered the adverse actions of targeted drug tests, suspension of clinical activities, and termination; and that the alleged reasons for placing her on random drug testing and terminating her were pretextual, [id. ¶¶ 270-72, 275-76].[64]  Defendants move for summary judgment as

---

[64] Although Kavianpour's amended complaint alleges selective random drug tests and an alleged discriminatory protocol, her suspension of clinical privileges, and her termination as the alleged adverse employment actions, [Doc. 29 ¶¶ 229-37, 268-76], in her motion for summary judgment, she asserts additional adverse actions, including "(2) refusal to communicate an approved reasonable accommodation to [] Kavianpour regarding transfer of the pager; (3) refusal to allow [] Kavianpour to take a drug test the next business day on February 14, 2019; . . . (6) BOR's failure to investigate [] Kavianpour's allegations of violations of law and regulations related to the application of the drug testing policy prior to the termination; (7) failure to provide [] Kavianpour the full three months provided in her February 11, 2019 Counseling Form to remediate alleged performance issues before using those issues to justify shifting, previously unidentified bases for termination on January 7, 2020; (8) failure to provide a GME hearing until January 7, 2020; and (9) failure to investigate [] Kavianpour's allegations of retaliation by [] Arnold after terminating [] Lott." [Doc. 209-1 at 38-39].  However, as BOR points out, [Doc. 225 at 16], the "law of this Circuit forbids a plaintiff from amending its pleadings via arguments made in summary judgment briefs," Fla. Found. Seed Producers, Inc. v. Ga. Farms Servs., LLC, No. 1:10–CV–125 (WLS), 2012 WL 4840809, at *21 (M.D. Ga. Sept. 28, 2012) (citing Hurlbert v. St. Mary's Health Care System, Inc., 439 F.3d 1286, 1297 (11th Cir. 2006)), op. clarified, 977 F. Supp. 2d 1336 (M.D. Ga. 2013); see also Harris v. Dep't of Child. & Fams., No. 21-11581, 2022 WL 247982, at *2 (11th Cir. Jan. 27, 2022) (per curiam) (second and third alterations in original) (citation and internal marks omitted) (explaining that "[t]he proper procedure for [a] plaintiff[] to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)," and that "a plaintiff may not raise a new claim at the summary judgment stage").  Accordingly, the Court will not consider these additional adverse actions as Kavianpour "is limited to the [] conduct alleged in the operative complaint." Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.,

to Kavianpour's ADA and Rehabilitation Act disability discrimination claims, arguing that Kavianpour cannot establish a prima facie case and that, even if she could do so, they have offered legitimate, non-discriminatory reasons for their actions, which she has failed to show are pretext for unlawful disability discrimination. <u>See</u> [Doc. 199-1 at 16-30; Doc. 207-1 at 6-21]. Kavianpour opposes defendants' summary judgment motions, [Docs. 229 & 230], and also moves for summary judgment, arguing that she has offered direct evidence of discrimination, and even if not, she has established a prima facie case of discrimination, shown that defendants' legitimate, non-discriminatory reasons were pretextual, and alternatively, shown a convincing mosaic of circumstantial evidence sufficient to support an inference of discrimination, [Doc. 209-1 at 22-43]; <u>see also</u> [Doc. 247 at 6-9].

### 1.    *Prima Facie Case*

In order to succeed on her claims under the ADA and the Rehabilitation Act, Kavianpour "must show that at the time of the adverse employment action, she

---

584 F. Supp. 3d 1215, 1247 (S.D. Fla. 2021) (declining to consider additional adverse employment actions that were not plead in plaintiff's second amended complaint and explaining that the fact that plaintiff discussed the allegations in her deposition was insufficient to place those claims before the Court), <u>aff'd</u>, No. 21-12854, 2022 WL 2761720 (11th Cir. July 15, 2022) (per curiam).

(1) had a disability,[65] (2) was a qualified individual, and (3) was subjected to unlawful discrimination because of her disability."[66]   Johnson v. Walt Disney Parks & Resorts U.S., Inc., No. 21-12696, 2022 WL 16915741, at *3 (11th Cir. Nov. 14, 2022) (per curiam) (footnote, citation, and internal marks omitted); see also Burgos v. Chertoff, 274 F. App'x 839, 842 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted) ("To establish a *prima facie* case of discrimination under the [Rehabilitation] Act, an individual must show that she: (1) has a

---

[65] "Under the ADA, a 'disability' means 'a physical or mental impairment that substantially limits one or more major life activities . . . a record of such an impairment . . . or [] being regarded as having such an impairment.'"   Equal Emp. Opportunity Comm'n v. Phoebe Putney Mem'l Hosp., Inc., 488 F. Supp. 3d 1336, 1348 (M.D. Ga. 2020) (alterations in original) (quoting 42 U.S.C. § 12102(1)).

[66] To show that she was discriminated against because of her disability, Kavianpour "must show that she suffered an adverse employment action and that her disability was the determining factor in [the alleged adverse action]." Cappetta v. N. Fulton Eye Ctr., CIVIL ACTION NO. 1:15-CV-3412-LMM-JSA, 2017 WL 5197207, at *24 (N.D. Ga. Feb. 1, 2017), adopted by 2017 WL 5443877, at *2 (N.D. Ga. Mar. 7, 2017), aff'd, 713 F. App'x 940 (11th Cir. 2017) (per curiam) (unpublished); see also Andrews, 700 F. App'x at 926 (citation omitted) (A plaintiff "is not required to establish that [her] disability was the sole basis for [her] discrimination, but need only show that [her] disability was a determinative factor."). "The ADA requires that the [p]laintiff show that her disability was the 'but for' cause of the adverse action." Cappetta, 2017 WL 5197207, at *24 (citation omitted); see also Moore v. Verizon Wireless (VAW), LLC, Case No.: 5:14-cv-02230-SGC, 2017 WL 1196959, at *7 (N.D. Ala. Mar. 31, 2017). "Thus, a 'plaintiff complaining of discriminatory discharge under the ADA must show that [her] . . . employer would not have fired [her] but for [her] actual or perceived disability.'" Cappetta, 2017 WL 5197207, at *24 (citation omitted).

disability; (2) is otherwise qualified for the position; and (3) was subjected to unlawful discrimination as the result of her disability."); <u>Moore v. Jackson Cnty. Bd. of Educ.</u>, 979 F. Supp. 2d 1251, 1258 (N.D. Ala. 2013) (citations omitted).

In addition, as relevant here, the ADA provides that "a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use."  42 U.S.C. § 12114(a).  However, it also provides that "[n]othing in subsection (a) shall be construed to exclude as a qualified individual with a disability an individual who . . . is erroneously regarded as engaging in such use, but is not engaging in such use," "except that it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs."[67] <u>Id.</u> § 12114(b)(3).  Thus, while "a current drug user is precluded from

---

[67] Subparagraphs (1) and (2) provide that a qualified individual with a disability includes an individual who "has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use" or is "participating in a supervised rehabilitation program and is no longer engaging in such use[.]"  42 U.S.C. § 12114(b)(1)-(2).  The ADA further provides that "it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs."  <u>Id.</u> § 12114(b).

relying upon the protections of the ADA, an employee who is erroneously regarded as engaging in such use, but is not engaging in such use is not so precluded." Hill v. Hamilton Cnty. Pub. Hosp., 71 F. Supp. 2d 936, 950 (N.D. Iowa 1999) (citations and internal marks omitted).[68]

Defendants argue that Kavianpour has failed to establish a prima facie case of disability discrimination under the ADA and the Rehabilitation Act because she was not a qualified individual with a disability because she was considered a current drug user and because she was not erroneously regarded as engaging in drug use.  [Doc. 199-1 at 18-28; Doc. 207-1 at 7-8, Doc. 224 at 17-22; Doc. 225 at 7-10; Doc. 241 at 7-13; Doc. 242 at 2-3].  AUMC also argues that Kavianpour has failed to establish that she was a qualified individual under the ADA because she was a direct threat to patient safety, [Doc. 199-1 at 28-30], and BOR argues that Kavianpour has failed to show that she was subjected to discrimination because of

---

[68] The Rehabilitation Act similarly "excludes an individual who is currently engaging in the illegal use of drugs" as an "individual with a disability" and also provides "a safe harbor provision" and "an exception to th[e] safe harbor provision which states that it shall not be a violation for a covered entity to adopt or administer reasonable policies, or procedures, including but not limited to drug testing, designed to ensure that an individual is no longer engaging in the illegal use of drugs." Daniels v. City of Tampa, No. 8:09–CV–1151T33AEP, 2010 WL 1837796, at *2 (M.D. Fla. Apr. 12, 2010) (alterations, citations, and internal marks omitted) (quoting 29 U.S.C. §§ 705(20)(C)(i)-(ii)), adopted by 2010 WL 1837802, at *1 (M.D. Fla. May 4, 2010).

a perceived disability, [Doc. 207-1 at 8-15; Doc. 225 at 15-19].  Kavianpour contends that she has established a prima facie case of disability discrimination because she has shown she was a qualified individual with a disability because she was not a current drug user as defined by the ADA and the Rehabilitation Act and she has offered direct evidence that she was erroneously perceived as engaging in illegal drug use, and that summary judgment is therefore due to be granted in her favor on her discrimination claims.  [Doc. 209-1 at 24-42; Doc. 229 at 27-38; Doc. 230 at 19-24].[69]

### a.    Current Drug User

The ADA provides that "a qualified individual with a disability shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use."  42 U.S.C. § 12114(a).  Similarly, the Rehabilitation Act provides that a "qualified individual with a disability do[es] not include individuals currently engaging in the illegal use of

---

[69] "Whether [Kavianpour] proceeds under the 'direct evidence' or the *McDonnell Douglas* burden-shifting mode of analysis, she cannot succeed on an ADA claim of disability discrimination absent a showing that she is 'disabled' within the meaning of the statute." Torok v. Gibralter Veterinary Hosp., Inc., 442 F. Supp. 2d 438, 457 (E.D. Mich. 2006) (citations omitted); see also Rodgers v. Norfolk S. Corp., 304 F. Supp. 2d 961, 965 (S.D. Ohio 2003) (footnote and citation omitted) (explaining that "[w]hether advancing a theory of discrimination under the ADA using direct or indirect evidence, the [p]laintiff bears the initial burden of establishing a *prima facie* case," which requires the plaintiff to show that she is disabled, among other factors).

drugs, when the covered entity acts on the basis of such use." 29 C.F.R. § 1630.3(a). Defendants contend that Kavianpour was not a qualified individual under the ADA or the Rehabilitation Act because she was a current drug user as evinced by her failed pre-employment drug screen, which removed her from protections under those Acts, and that the relevant inquiry is therefore whether defendants perceived Kavianpour as suffering from a substance abuse impairment at the time of her suspension and termination in February 2019. [Doc. 199-1 at 19-28 (citations omitted); Doc. 224 at 17-22; Doc. 241 at 7-13 (citations omitted); Doc. 242 at 2-3 (citations omitted)].

The ADA and the Rehabilitation Act do "not define 'currently engaging' and the Eleventh Circuit has not addressed the phrase's meaning," but "[o]ther circuit courts have held that the statute[s] do[] not lend [themselves] to a bright-line rule, instead concluding that the proper test is whether the drug use was sufficiently recent to justify the employer's reasonable belief that the drug abuse remained an ongoing problem." Martin v. Estero Fire Rescue, No. 2:13–cv–393–FtM–29DNF, 2014 WL 2772339, at *3 (M.D. Fla. June 18, 2014) (citations and internal marks omitted); see also Mauerhan v. Wagner Corp., 649 F.3d 1180, 1187 (10th Cir. 2011) (citation omitted); Vedernikov v. W. Va. Univ., 55 F. Supp. 2d 518, 519, 521, 523 (N.D. W. Va. 1999) (citations omitted) (finding plaintiff, an anesthesiology resident, did not fall under the protection of the ADA even though he was not a

current drug user from the time of his admission for treatment to the time of his

discharge, since he tested positive for the use of drugs and admitted to others that

while he was not abusing drugs, he had used fentanyl for experimental purposes,

explaining that in the Fourth Circuit, a one-year abstinence was not considered

current use, but use during weeks and months prior to discharge was considered

current use, and "[t]hus, under ADA regulations, [he could] be considered as

actively engaged in the use of illegal drugs"); Figueroa v. Fajardo, 1 F. Supp. 2d

117, 120-21 (D.P.R. 1998) (citations and internal marks omitted) (explaining that

"current illegal use" was "not limited to the use of drugs on the day of, or within

a matter of days or weeks before, the employment action in question," but that it

applied to an individual "whose illegal use of drugs occurred recently enough to

justify a reasonable belief that a person's drug use [was] current"; that "ADA

protection [was] limited to persons who ha[d] refrained from using drugs for some

time" and that at least one court had found that a seven-week drug-free period

was not long enough to be protected; and that "[a] person who tests positive for

illegal use of drugs is not entitled to the protection that may be available to former

users who ha[d] been or [were] in rehabilitation"). "In the employment context,

currently engaging in the illegal use of drugs is defined by reference to the

employer's perspective," and "current use of illegal drugs includes that which

bears a temporal relationship to the employment action such that an employer

may reasonably conclude at the time of the employment action that illegal drug use is an ongoing problem."  Lott v. Thomas Jefferson Univ., CIVIL ACTION NO. 18-4000, 2020 WL 6131165, at *6 (E.D. Pa. Oct. 19, 2020) (citations and internal marks omitted).

Defendants point out that because the evidence shows that Kavianpour admitted that she used marijuana at least once in the months leading up to her pre-employment drug screen, tested positive for marijuana in her pre-employment drug screen, was allowed to retest along with another resident who had tested positive and then tested negative, and had decided not to voluntarily enter the Georgia PHP program which had its own drug testing program, she was placed on a drug testing protocol, whereby she would be tested once a month at random for a year that was based on a testing protocol used with a 2013 Resident, and was therefore "removed [] from ADA [and Rehabilitation Act] protections under the exception for current drug users."  [Doc. 199-1 at 20 (citations omitted); Doc. 242 at 2 (footnote and citation omitted)]; see also [Doc. 189 at 99-101 pp. 99-101; Doc. 194 at 51 p. 51, 53-54 pp. 53-54, 284-85 pp. 284-85, 288 p. 288].  Thus, while Kavianpour alleges that she suffered the adverse actions of "selective random drug tests" and "discriminatory testing protocol" as a basis for her disability discrimination claims, see [Doc. 29 ¶¶ 231, 271, 275], and she argues that the one-year monitoring program evinces BOR's perception that she had a protected

disability under the ADA in June, July, and August of 2018, see [Doc. 230 at 20-21], she has failed to show that she was a qualified individual with a disability at the time she was subjected to the drug testing protocol because she was a current drug user as defined by the ADA and the Rehabilitation Act, see Skinner v. City of Amsterdam, 824 F. Supp. 2d 317, 333 (N.D.N.Y. 2010).   However, since there appears to be a dispute of fact as to whether she remained a current drug user as defined by the ADA and the Rehabilitation Act at the time of her suspension and termination since she had at least five negative drug screens, one diluted test, two missed tests, and a DUI arrest,[70] [Doc. 186-4 at 1; Doc. 186-11 at 1-2; Doc. 190 at 14 p. 261, 172-79 pp. 419-26; Doc. 190-3 at 1; Doc. 109-7; Doc. 207-54 at 46, 49-51], as BOR maintains, "the relevant inquiry is whether [defendants] perceived [Kavianpour] as suffering from a drug abuse impairment when she was [suspended and] terminated in February of 2019."   [Doc. 242 at 2 (citation and internal marks omitted)].

---

[70] Although Kavianpour objected to the monthly testing protocol, she agreed to comply with it following her receipt of the August 21, 2018, memorandum, which notified her that she would be subjected to random testing through July 31, 2019, and it was understood to be a condition of Kavianpour's participation in the residency program, even though it was not incorporated into her employment contract.  [Doc. 178-1 at 46-49 pp. 46-49, 53-55 pp. 53-55, 67-68 pp. 67-68, 75 p. 75; Doc. 178-5 at 1; Doc. 186 at 8-9 pp. 32-33; Doc. 186-11 at 2; Doc. 189 at 167-74 pp. 167-74, 196 p. 196; Doc. 193 at 21 p. 21; Doc. 194 at 267-68 pp. 267-68; Doc. 194-1 at 1; Doc. 208-10 at 1]; see also Skinner, 824 F. Supp. 2d at 333 n.18.

### b.    Erroneously Regarded as Engaging in Drug Use

"In addition to protecting individuals from discrimination based on their actual disabilities, the ADA [and the Rehabilitation Act] protect[] individuals who are 'regarded as' having 'a physical or mental impairment that substantially limits one or more major life activities.'" Williams v. FedEx Corp. Servs., 849 F.3d 889, 899 (10th Cir. 2017) (citations omitted).  "As relevant here, an individual may be regarded as disabled if [s]he 'is erroneously regarded as having engaged in [illegal use of drugs], but is not engaging in such use.'"  Id.  (citations omitted).  "The erroneous perception of being an illegal drug user is to be treated like any other perception of a disability."  Peters v. Interstate Warehousing, Inc., No. 3:10–cv–00970, 2012 WL 10609, at *9–10 (M.D. Tenn. Jan. 3, 2012) (citations omitted).[71]

---

[71] "Congress amended the ADA in 2008 to make clear an individual can be regarded as having an impairment whether or not the impairment limits or is perceived to limit a major life activity," and therefore, "if the evidence [] demonstrate[s] that [] defendant[s] [] erroneously regarded [Kavianpour] as currently engaging in the unlawful use of drugs, [she] [does] not [also have] to prove that [] defendant[s] perceived that unlawful drug use to limit or impair one of [her] major life activities."  Equal Emp. Opportunity Comm'n v. Rogers Behav. Health, Case No. 19-cv-935-pp, 2022 WL 4080649, at *25 n.8 (E.D. Wis. Sept. 6, 2022) (citation and internal marks omitted).  However, "an erroneous belief about drug use will only be a qualifying disability if the employer regarded the perceived drug use as an impairment and took action against the employee because of that perceived impairment" as "[i]t is not enough that the employer perceived the employee to simply be an illegal drug user to receive ADA protection; perceiving someone as having an impairing substance abuse problem is very different from perceiving them to be a casual or recreational drug user."  Polak v. Sterilite Corp.,

"An ADA claimant must prove that she was regarded as disabled at the time of the alleged discriminatory act." Evans v. Tex. Dep't of Transp., 547 F. Supp. 2d 626, 652 (E.D. Tex. 2007) (citations omitted), aff'd, 273 F. App'x 391 (5th Cir. 2008) (per curiam) (unpublished); see also Cash, 231 F.3d at 1306 n.5 (citation omitted) (noting that disability under the ADA and the Rehabilitation Act should be evaluated as manifested at the time of the challenged employment action); Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 884 (6th Cir. 1996) (footnote omitted) (explaining that "[i]n order to recover on any of [plaintiff's] ADA claims, [plaintiff] must first establish as part of her prima facie case that she was a 'qualified individual with a disability' *at the time of the discriminatory act*"). Kavianpour maintains that she "prevails on her claims that the [continued] drug testing and the suspension-termination violated the ADA and Rehabilitation Act because [ defendants] regarded her as disabled, specifically as having a drug abuse impairment," and that because she has presented direct evidence that Dr. Coule

---

Civil Action No. 3:19-CV-2972-D, 2021 WL 1753757, at *6 (N.D. Tex. May 4, 2021) (emphasis and citation omitted), aff'd, No. 21-10549, 2022 WL 457822 (5th Cir. Feb. 15, 2022) (per curiam). "In other words, the erroneous perception that an employee is an illegal drug user is insufficient of itself to establish a 'disability' under the ADA," and the "individual must also show that [her] employer regarded [her] as having a physical or mental impairment due to [her] usage and took action against [her] because of that perceived impairment." Id. (footnote omitted).

regarded her as having a substance abuse disorder, defendants' motions for "summary judgment must be denied regardless of whether the[y ] proffer[] a legitimate reason." [Doc. 229 at 35-36 (citation omitted); Doc. 230 at 19 (footnote omitted)].

### i.   **Direct Evidence**

Kavianpour contends that she has presented direct evidence that Dr. Coule regarded her as having a substance abuse disorder, [Doc. 229 at 35-36; Doc. 230 at 23; Doc. 247 at 6-7], pointing to Dr. Coule's testimony that at the time he suspended her clinical privileges at AUMC, he "believed that [she ] could potentially have a substance abuse disorder, as evidenced by her positive drug test, her DUI arrest, as well as her failing to appear for substance abuse testing as scheduled," or she was being "subversive or [using] extremely poor judgment in regards to her situation here" and the "totality of the information was sufficient to cause concern for patient safety," [Doc. 223-1 at 37-38 pp. 36-37, 59-60 pp. 58-59, 82-84 pp. 81-83, 88 p. 87].   Kavianpour contends that because this testimony constitutes direct evidence that Dr. Coule "suspended [ her] because he regarded her as disabled, summary judgment must be denied regardless of whether the employer proffers a legitimate reason." [Doc. 229 at 36 (citation omitted)].   She also contends that because BOR "admits the suspension directly caused the termination, damages

from the termination are recoverable on the unlawful-suspension claim against

BOR." [Doc. 247 at 6].[72]

---

[72] Kavianpour also asserts the "cat's paw" theory of liability, see [Doc. 229 at 36-38; Doc. 246 at 18-19], which permits a plaintiff to establish causation where the final decisionmaker is "a mere conduit to give effect to [the] recommender's discriminatory animus," Ross v. Baldwin Cnty. Bd. of Educ., Civil Action No. 06-0275-WS-B, 2008 WL 820573, at *7 (S.D. Ala. Mar. 24, 2008) (citation omitted). Under this theory, "the discriminatory animus of the recommender can be imputed to the decisionmaker[s] when the decisionmaker[s] do[] not conduct [their] . . . own independent investigation." Id. (internal marks omitted) (citations omitted); see also Hampton v. City of S. Miami, No. 03-22323-CIV, 2005 WL 5993476, at *11 (S.D. Fla. July 29, 2005) (citation omitted) ("[I]f the decisionmaker independently investigates the complaint and determines that the employee ought to be discharged, a cat's paw situation has not arisen and the decisionmaker's independent rationale for terminating the employee may survive scrutiny."), aff'd, 186 F. App'x 967 (11th Cir. 2006) (per curiam) (unpublished). Kavianpour contends that Dr. Coule was a cat's paw for Arnold's discriminatory actions when he suspended her clinical privileges at AUMC, since he failed to independently investigate the allegations presented in Arnold's February 21, 2019, memorandum, and that because AUMC's counsel worked in coordination with AU's counsel and others in circulating drafts of the suspension and termination letters, AUMC "was immediately involved in both the suspension and termination." [Doc. 229 at 36-38 (citations omitted)]. However, the undisputed evidence does not support such a theory, as the record shows that following a meeting about Kavianpour having missed a February 2019 drug screen, Dr. Coule asked Arnold to provide him with the February 21, 2019, letter detailing the issues that were discussed and after reviewing this letter, he asked for additional information, including the result of her drug screens and records related to her DUI arrest. [Doc. 187-5 at 1; Doc. 194 at 89 p. 89; Doc. 194-18 at 29; Doc. 223-1 at 41-43 pp. 40-42, 53 p. 52, 67 p. 66, 74-75 pp. 73-74, 78-79 pp. 77-78, 101 p. 100, 149 p. 148; Doc. 208-10 at 11]. Indeed, even the drafts of the various suspension and termination letters that were circulated while AU and AUMC were deciding on which action to take show that AU drafted both suspension and termination letters as options for AU to issue Kavianpour regarding the residency program and were awaiting feedback from Speese regarding "follow up with [Dr.] Coule" on his decision at AUMC regarding her clinical privileges and that Drs. Macomson and Vale also had a decision to make

The Eleventh Circuit narrowly defines "direct evidence," see Shedrick v. Dist. Bd. of Trs. of Miami-Dade Coll., 941 F. Supp. 2d 1348, 1367 (S.D. Fla. 2013), as evidence that "'if believed, proves the existence of a fact without inference or presumption,'" Holland v. Gee, 677 F.3d 1047, 1055 (11th Cir. 2012) (quoting Wilson, 376 F.3d at 1086). "Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997) (internal citations omitted). "'[O]nly the most blatant remarks, whose intent could be nothing other

---

and that "[w]hatever [they] decide[d] to go with," they needed to reach out to Arnold to confirm and should have a witness present when they met with Kavianpour. [Doc. 194-18 at 10-28]; see also [Doc. 192 at 49-50 pp. 49-50 (Dr. Macomson's testimony that while suspension and termination were discussed in the meeting, there was no effort to "coordinate actions" as they were "independent" and "Dr. Coule's decision was his decision" and there was "no coordinated effort to make him issue a letter" as "it was up to him," but "depending upon what . . . he decided, then that would have . . . implications as far as [] Kavianpour's continued training in the program")]. More importantly, Arnold, who does not appear to be a final decisionmaker in this case or to have made any recommendations but was present at the meetings in her capacity as AU's Human Resources Director of Employee Relations when the various options, including probation, suspension, and termination were discussed, testified that she did not believe there were any safety problems with Kavianpour, and as AUMC points out, she "must have the requisite discriminatory motive," but since there is no evidence that she held such motive, she "could not have used [Dr.] Coule as a cat's paw to suspend her for that reason." [Doc. 186 at 45 p. 178; Doc. 192 at 47 p. 47; Doc. 194 at 81 p. 81, 89-93 pp. 89-93; Doc. 241 at 19 (citation omitted)]. Thus, the record does not support that Dr. Coule merely rubber-stamped a recommendation from Arnold, and the "cat's paw" theory of liability is inapplicable.

118

than to discriminate' satisfy this definition." <u>Mathis v. Wachovia Bank</u>, 255 F. App'x 425, 429 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted). That is, the "vital principle is that direct evidence is a very narrow concept," and "[s]uch evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled[,]'" or "[p]erhaps a statement could constitute direct evidence if the employer is slightly less express about the fact that it is acting on discriminatory animus, but the statement needs to be rather express in this regard to constitute direct evidence[.]" <u>Benitez v. Tyson Fresh Meats, Inc.</u>, No. 3:18-cv-00491, 2022 WL 1283087, at *26 (M.D. Tenn. Apr. 28, 2022) (emphasis, citations, and internal marks omitted). In addition, "[f]or a statement to constitute direct evidence, it must be made by a person involved in the challenged decision," and "the statements must directly relate in time and subject to the adverse employment action at issue." <u>Obester</u>, 2010 WL 8292401, at *38 (citations and internal marks  omitted).

The testimony on which Kavianpour relies does not constitute direct evidence of discrimination. Dr. Coule's testimony "does not directly correlate with an intent to discriminate on the basis of disability. Instead the [testimony] requires an extra step: it requires the factfinder to infer that [Kavianpour's alleged perceived substance abuse disorder], as opposed to [the totality of her behavior which included her testing positive on a pre-employment drug screen, being

arrested on charges of DUI, and failing to comply with her drug testing protocol and showing either subversive action or extremely poor judgment], motivated his decision to [suspend] her [clinical privileges]." Beatty v. Hudco Indus. Prod., Inc., 881 F. Supp. 2d 1344, 1354 (N.D. Ala. 2012). Simply put, "[i]t is undisputed that no one told [Kavianpour] that [her] [privileges were] being [suspended] based on [her alleged] disability," and "[a]s such, lacking is any direct evidence of discriminatory motive." Equal Emp. Opportunity Comm'n v. Outokumpu Stainless USA, LLC, CIVIL ACTION NO. 20-521-CG-B, 2022 WL 4004769, at *8 (S.D. Ala. Sept. 1, 2022); see also Foos v. Taghleef Indus., Inc., 132 F. Supp. 3d 1034, 1055 (S.D. Ind. 2015) (finding email sent by employer's benefits manager that indicated that manager had contacted supervisors due to her belief that short-term disability and medical leave taken by two employees raised alcohol-related concerns, especially given one employee's alcoholic pancreatitis diagnosis, did not constitute direct evidence of discrimination under the ADA where manager was concerned about safety); Stokes v. City of Montgomery, Civil Action No. 2:07cv686-WHA, 2008 WL 4369247, at *9 (M.D. Ala. Sept. 25, 2008) (citation omitted) (determining that plaintiff had no direct evidence since "although the act of attempted suicide and the underlying disability of depression are connected, statements that the employer acted because of the suicide attempt requires an inference that action was taken on the basis of disability"). Because the testimony

Kavianpour points to requires the Court to "draw an inference in order to prove the existence of a fact," it "is not direct evidence[.]" <u>Macy v. Hopkins Cnty. Bd. of Educ.,</u> 429 F. Supp. 2d 888, 899 (W.D. Ky. 2006) (citations omitted) (rejecting plaintiff's argument that she had proffered direct evidence of disability discrimination based on her termination as a teacher for her outburst of anger toward students which was a symptom of her disabling condition, for which she was on an accommodation plan, since the evidence showed she was terminated due to her unacceptable behavior and misconduct and the fact that the behavior and misconduct was precipitated by a disabling condition did not present an issue under the ADA or the Rehabilitation Act), <u>aff'd</u> <u>sub nom.</u> <u>Macy v. Hopkins Cnty. Sch. Bd. of Educ.,</u> 484 F.3d 357 (6th Cir. 2007), <u>abrogated by</u> <u>Lewis v. Humboldt Acquisition Corp.,</u> 681 F.3d 312 (6th Cir. 2012); <u>see also</u> <u>Schultz v. Royal Caribbean Cruises, Ltd.,</u> 465 F. Supp. 3d 1232, 1264-65 (S.D. Fla. 2020) (last alteration in original) (citations and internal marks omitted) (finding statement that defendant could not medically clear plaintiff for duty based on his persistent and recurrent conditions involving major depression and associated complications under the applicable guidelines coupled with deposition testimony that one suicide attempt was enough and that it did not matter if it was likely or unlikely to happen again and that plaintiff's employment offer was withdrawn for the same reasons was not direct evidence of disability discrimination because there was "more than one

potential motive for the action" in that the evidence suggests the underlying

motive for the decision to withdraw the employment offer was to merely comply

with the guidelines and to state the reasons for that decision and that he

considered that employment would present a danger to plaintiff and that his

motive was not to discriminate but to exercise reasonable care to protect the

employees and thus the case lacked "direct evidence because [ the]

communications [did] not prove the existence of [the] fact in issue without

inference or presumption").[73]    Thus, the Court must determine whether

---

[73] In her reply in support of her motion for summary judgment against BOR, [Doc. 247], Kavianpour also argues for the first time that "[t]here is also direct or very probative evidence of [] BOR attorney[] [] Bryan's discriminatory (and retaliatory) motive," pointing to his email and testimony that he recommended that Kavianpour's performance issues be fleshed out on the Resident Counseling Form provided to her in February 2019 because he could already sense they were headed for a rough time with her, explaining that "she should have been shown the door" after she tested positive on her pre-employment drug screen, but that "we attempted to put her on the path of redemption to prove that she was not using" and "all we got in return was a bunch of . . . objections to this, that, and the other thing," [id. at 6-7 (citations and internal marks omitted)]; see also [Doc. 186-16; Doc. 201 at 98-99 pp. 97-98]. "However, '[a]s a general rule, federal courts do not consider arguments that are presented for the first time in a reply brief.'" M.H. v. Reese, CIVIL ACTION FILE NO. 1:15-CV-1427-TWT, 2015 WL 7283174, at *2 n.26 (N.D. Ga. Nov. 16, 2015) (citations omitted); see also Howard v. Metro. Atlanta Rapid Transit Auth., CIVIL ACTION FILE NO. 1:14-CV-03667-LMM-AJB, 2016 WL 10988790, at *17 (N.D. Ga. July 14, 2016) (explaining that an attempt to address an argument in a reply brief for the first time was "a nullity in the context of a summary judgment motion," since "courts do not consider arguments raised for the first time in the reply"), adopted by 2016 WL 10998309, at *10 (N.D. Ga. Sept. 30, 2016); Rindfleisch v. Gentiva Health Servs., Inc., 22 F. Supp. 3d 1295, 1301 (N.D. Ga. 2014) (citation omitted) ("As a general rule, federal courts do not consider

Kavianpour's circumstantial evidence establishes that defendants erroneously regarded her as engaging in illegal drug use.  See Hall v. Masterlock Co., No. Civ.A. 97–W–1273–E, 1999 WL 1458673, at *14 (M.D. Ala. Aug. 12, 1999).

## ii.   Indirect Evidence

In her brief in support of her motion for summary judgment, Kavianpour asserts that both Drs. Macomson and Vale, her "direct supervisors, testified that they did not believe [ she] was engaging in the use of marijuana at any time she was employed and actively working for [d]efendants"; that "Dr. Coule also testified he never observed [ her] being impaired or intoxicated on the job or suspected her as being impaired by a controlled substance"; that Norton "testified that she never considered [ her] to be a drug addict or a recovering drug addict"; that she continued to work "with neurosurgery patients for up to sixteen hours per shift from July 2018 to February 2019" and that Dr. Macomson "agreed he could not have allowed her to work with patients at all, let alone for such extensive

---

arguments that are presented for the first time in a reply brief."). Nevertheless, even if the Court were to consider Kavianpour's argument, Bryan's email and deposition testimony do not constitute direct evidence of discriminatory or retaliatory intent because such a conclusion requires an inferential step. See Smith v. N.Y. & Presbyterian Hosp., 440 F. Supp. 3d 303, 342 (S.D.N.Y. 2020); see also Equal Emp. Opportunity Comm'n v. St. Joseph's/Candler Health Sys., Inc., CIVIL ACTION NO.: 4:20-cv-112, 2022 WL 628542, at *12 (S.D. Ga. Mar. 3, 2022) (citation and internal marks omitted) (explaining that "evidence that only suggests discrimination [or retaliation] or that is subject to more than one interpretation does not constitute direct evidence").

periods of time on an almost daily basis," if she presented an immediate risk; and that following her November 2018 DUI arrest, her duties and responsibilities did not change.  [Doc. 209-1 at 25-27 (citations omitted)].  AUMC points out and specifically agrees with Kavianpour's assertions that "deposition testimony from numerous witnesses, including Dr. Coule, [show] that these individuals did not believe that [Kavianpour] was engaging in marijuana use a[t] any time when she was actively working for AU or at AUMC," [Doc. 224 at 17 (citation omitted)],[74] but that Kavianpour then "does an about-face [], arguing next that Dr. Coule did erroneously regard her as using drugs," [id. at 20 (emphasis and citation omitted)], based on Dr. Coule's testimony that "he thought her behavior could potentially indicate drug use," or that it could also indicate "subversion of authority[] or [] severe lapses in judgment," [id. at 21 (emphasis and citations omitted)].  Moreover, BOR points out that with the exception of the one diluted drug screen, Kavianpour's "post-employment drug screens were negative[,] and [she] was not [immediately] removed from duty after [she] failed to report for her February 13, 2019, test," but continued to work and perform her responsibilities as a resident

---

[74] BOR points out that Dr. Macomson, Dr. Vale, and Norton actually testified that they "did not consider [Kavianpour] to be suffering from a substance abuse problem."  [Doc. 225 at 8 (citation omitted)].

through her suspension and termination on February 21, 2019.  [Doc. 207-1 at 8 (citation omitted)].

Kavianpour "has failed to adduce [] evidence that . . . [defendants] perceived that [s]he had a physical or mental impairment due to [her] drug use or [suspended] or terminated [her] employment based on such a perception." Polak, 2021 WL 1753757, at *6.  While "viewing the facts in the light most favorable to [Kavianpour], the Court does not find that a genuine issue of material fact exists as to whether [d]efendant[s] considered [her] to be disabled." Peters, 2012 WL 10609, at *10.  "None of [Kavianpour's] evidence indicates that any of [d]efendants' employees [] considered [her] to be impaired in any way," and "it is undisputed that [d]efendant[s] expected [her] to work [after she submitted to the monthly random drug tests]." Id.  Indeed, while Dr. Coule testified that he "believed that [] Kavianpour could potentially have a substance abuse disorder, as evidenced by her positive drug test, her DUI arrest, as well as her failing to appear for substance abuse testing as scheduled," he also stated that he considered "the totality of the picture of everything that had occurred and was occurring, as well as the reports that there were performance concerns within the residency program" and that it was "the totality of the information."  [Doc. 223-1 at 37-39 pp. 36-38].  He also testified that Kavianpour's refusal to comply with the drug testing protocol "was a factor in [his] decision-making" and that it was "either subversive . . . in refusing

125

to test or [it was] extremely poor judgment to have gotten a positive drug screen, a DUI, and then refusing to be compliant," and that Kavianpour had been reminded that her patient care duties were not an excuse for not reporting to test, that to not go test was "either a serious error in judgment or being evasive" as there was "no plausible explanation for not showing up for testing" when she was "properly informed" she had "to test" and was "a violation of what [she had] been informed and agreed to do," and that the "combination of both of those choices, combined with a previous positive drug test and an arrest for DUI" were the reasons for the suspension.  [Id. at 44-45 pp. 43-44, 81-83 pp. 80-82, 88 p. 87, 99-100 pp. 98-99; Doc. 178-12 at 169-71 pp. 169-71, 173 p. 173]; see also [Doc. 187-9 at 174-75 pp. 174-75].  He further explained that had Kavianpour complied with the drug screening, he likely would not have suspended her clinical privileges because when residents and faculty are compliant with the drug testing protocol in place, the issues would not have been elevated to his office unless some other patient safety concern arose and there would have been no need for him to take any action.  [Doc. 178-12 at 174-75 pp. 174-75].  And, it is undisputed that neither Norton, Dr. Vale, nor Dr. Macomson considered Kavianpour to have a substance abuse disorder at the time of her suspension or termination, and that Dr. Macomson similarly testified that had Kavianpour complied with the drug testing protocol, she would not have been terminated from the residency program.  [Doc. 186 at 8

p. 31; Doc. 192 at 52-55 pp. 52-55, 103-05 pp. 103-05, 152 p. 152; Doc. 194 at 81 p. 81;
Doc. 197 at 43-44 pp. 43-44].

As previously noted, "[a] plaintiff claiming that [s]he is 'regarded' as
disabled cannot merely show that [her] employer perceived [her] as somehow
disabled; rather [s]he must prove that the employer regarded [her] as disabled
within the meaning of the ADA."  Hayes v. United Parcel Servs., Inc., Case No.
CIV-07-700-R, 2008 WL 11419004, at *5 (W.D. Okla. Nov. 5, 2008) (emphasis,
citation, and internal marks omitted); see also Granger v. N.Y. City Transit Auth.,
16 Civ. 2264 (BMC), 2017 WL 1067764, at *4 n.3 (E.D.N.Y. Mar. 21, 2017) (internal
marks omitted) (finding that there was no evidence, aside from plaintiff's two
failed drug tests, that defendants perceived plaintiff to be a drug addict and that
plaintiff's reliance on the testimony of defendant's witness that he believed the
failed drug tests showed a "medical incapacity" was insufficient, since there was
no indication the witness was "interpreting the ADA" and the "most that [could]
be said [was] that defendants perceived plaintiff as failing two drug tests[] and
that was bad enough to preclude him from holding any safety-related tittles," but
"that perception [was] not covered by the ADA"), aff'd,, 712 F. App'x 119 (2d Cir.
2018) (unpublished).  Because Kavianpour has failed to establish that defendants
regarded her as disabled, summary judgment is due be granted in favor of

defendants on her perceived disability discrimination claims under the ADA and the Rehabilitation Act.  See Peters, 2012 WL 10609, at *10.[75]

**2.** ***Legitimate, Non-Discriminatory Reasons & Pretext***

Even if Kavianpour could establish a prima facie case of disability discrimination and demonstrate a genuine issue of material fact as to whether defendants regarded her as disabled, defendants would still be entitled to

---

[75] AUMC also argues that Kavianpour is not a qualified individual under the ADA because she posed a threat to patient safety.  [Doc. 199-1 at 28-30].  "[R]egardless of whether [the Court] construe[s] this as an affirmative defense or an argument that [Kavianpour] has failed to make out a prima facie claim," Leme, 248 F. Supp. 3d at 1341 n.34 (emphasis omitted); see also Byrd v. Outokumpu Stainless USA, LLC, CIVIL ACTION 20-0520-WS-M, 2022 WL 2134993, at *3 (S.D. Ala. June 14, 2022) (citations and internal marks omitted) (explaining that the ADA "creates an affirmative defense for action under a qualification standard shown to be job-related for the position in question" that "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace" and addressing this defense as part of plaintiff's prima facie case); Collis v. Gwinnett Cnty., 156 F. Supp. 2d 1342, 1349 (N.D. Ga. 2001) (addressing defendants' direct threat to health and safety argument as part of plaintiff's prima facie case and whether plaintiff was a qualified individual), the Court "need not address [AUMC's] . . . direct-threat-to-safety defense[]," Armitage v. BNSF Ry. Co., Civil Action No. 4:20-cv-00209-O, 2021 WL 2805860, at *5 n.5 (N.D. Tex. July 6, 2021), because Kavianpour has failed to establish a prima facie case of disability discrimination under the ADA and the Rehabilitation Act, and for the reasons discussed below, she has failed to show that defendants' legitimate, non-discriminatory reasons for their employment actions are pretextual.  See Lundstrom v. Contra Costa Health Servs., Case No. 22-cv-06227-CRB, 2022 WL 17330842, at *5 (N.D. Cal. Nov. 29, 2022) (citation omitted) ("Having concluded that [plaintiff] cannot establish a disability that triggers the ADA's protections, the Court need not reach [defendant's] argument . . . that [plaintiff] was not a qualified individual because she posed a direct threat to her coworkers, patients, and clients").

summary judgment because she has failed to show that the reasons proffered by defendants concerning the challenged employment actions were pretextual.  As previously stated, Kavianpour alleges that defendants subjected her to the adverse actions of "selective random drug tests and an arbitrary, illegal and discriminatory testing protocol"; suspension of her clinical privileges"; and termination.  [Doc 29 ¶¶ 231, 233, 271-72, 275-76].

To demonstrate pretext, Kavianpour's evidence must reveal "'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [] [defendants'] proffered legitimate reasons for [their] actions that a reasonable factfinder could find them unworthy of credence.'"  Maples v. UHS of Ga., Inc., 716 F. Supp. 2d 1266, 1274 (N.D. Ga. 2010) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)).  Kavianpour may prove pretext by "either proving that intentional discrimination motivated [ defendants] or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason[s] proffered by the [defendants], which permits, but does not compel, the trier of fact to find illegal discrimination."  Wilson, 376 F.3d at 1088 (citations omitted); see also Gillman v. OkaLoosa Cnty. Fla., 58 F. Supp. 3d 1305, 1311 (N.D. Fla. 2014) (citation omitted).  Kavianpour may thus create an issue of fact at the pretext stage by (1) presenting evidence that defendants' proffered reasons are not worthy of belief, or (2) presenting evidence that discrimination was, in fact,

defendants' real reason.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

"Pretext means more than a mistake on the part of the [defendants]; pretext means a lie, specifically a phony reason for some action."  Tolley v. United Parcel Serv., No. Civ.A.1:05CV606TWT, 2006 WL 486523, at *5 (N.D. Ga. Feb. 27, 2006) (citation and internal marks omitted).  "Thus, the inquiry is limited to whether [ defendants] offered an honest, non[-]discriminatory explanation for [the adverse actions], regardless of whether the decision might have been mistaken."  Id. (citations omitted).  "Ultimately, [ Kavianpour] must meet [ defendants'] stated reason[s] 'head on and rebut [them], and [she] cannot succeed by simply quarreling with the wisdom of th[ose] reason[s].'"  Young, 432 F. App'x at 917 (citation omitted).  Kavianpour "cannot establish pretext by simply demonstrating facts that suggest [discriminatory] animus, but must specifically respond to . . . [ defendants'] explanations and rebut them."  Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 247 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted).  And, the "Eleventh Circuit makes clear that, [i]f [ defendants] proffer[] more than one legitimate, non[-]discriminatory reason, [Kavianpour] must rebut each of the reasons to survive a motion for summary judgment."  Meade v. Gen. Motors LLC, 317 F. Supp. 3d 1259, 1281 (N.D. Ga. 2018) (first alteration in original) (emphasis, citation, and internal marks omitted).  "If

[Kavianpour] fails to demonstrate that there is a genuine issue of material fact concerning whether [ defendants'] articulated reasons for the adverse employment action[s] are pretextual, then [ defendants are] entitled to summary judgment on the [discrimination] claim." Johnson v. Advertiser Co., 778 F. Supp. 2d 1270, 1277 (M.D. Ala. 2011) (citing Combs, 106 F.3d at 1528).  Finally, despite this burden-shifting framework, the "ultimate burden of persuading the trier of fact that the defendant[s] intentionally discriminated against [Kavianpour] remains at all times with [Kavianpour]." Burdine, 450 U.S. at 253 (citations omitted).

### a.    Drug Testing

BOR asserts that it "grappled with hiring a neurosurgery resident who failed her pre-employment drug test," and even though there was no evidence that Norton, Bryan, Dr. Moore, Dr. Foster, or anyone else involved in hiring or implementing the drug monitoring protocol for Kavianpour believed that Kavianpour suffered from a substance abuse disorder, BOR believed that it was necessary to implement a drug use monitoring protocol for Kavianpour and the other resident who had failed the pre-employment drug screen to ensure patient safety.[76]  [Doc. 207-1 at 17].  BOR also asserts that while the protocol, which was

---

[76] For purposes of the pending motions, the Court will assume without deciding that the random drug testing and drug testing protocol at issue in this case were adverse employment actions under the ADA.  See 42 U.S.C. § 12114(b); 29 CF.R. § 1630.16(c).

131

based on a similar protocol utilized for a 2013 Resident, "did not strictly comply with [AU] policy, it was not discriminatory," especially since "[t]here is no evidence BOR deviated from its policies in a discriminatory manner[.]"  [Id. at 17-18 (citations omitted)].[77]  Because BOR has proffered a "'clear and reasonably specific'" non-discriminatory explanation for its decision to place Kavianpour on a drug testing protocol, it has discharged its minimal burden of production, see Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 770 (11th Cir. 2005) (per curiam) (citation omitted), and the burden shifts back to Kavianpour to prove by a preponderance of the evidence that the reason provided by BOR is pretext for a prohibited, discriminatory motive, see Edmond v. Univ. of Miami, 441 F. App'x 721, 724 (11th Cir. 2011) (per curiam) (unpublished); Tiggs-Vaughn v. Tuscaloosa Hous. Auth., 385 F. App'x 919, 923 (11th Cir. 2010) (per curiam) (unpublished); Ashe v. Aronov Homes, Inc., 354 F. Supp. 2d 1251, 1265 (M.D. Ala. 2004) (citation omitted).

---

[77] AUMC contends that since the evidence shows that "AU rather than AUMC developed, administered and enforced the drug monitoring program" and it "took no part in [Kavianpour's] other alleged 'adverse action' of the design and administration of a drug monitoring program for [her] and could not be liable for same," it only "responds to [Kavianpour's] contentions that she suffered the adverse action of suspension of her clinical privileges from AUMC."  [Doc. 199-1 at 8-9 n.2 (citations omitted)]; see also [Doc. 224 at 22-24].

Kavianpour "makes no argument for pretext in response."  Flores v. Entergy

Nuclear Operations, Inc., 313 F. Supp. 3d 511, 524 (S.D.N.Y. 2018), aff'd, 768 F.

App'x 139 (2d Cir. 2019) (unpublished); see also [Doc. 230].[78]  Because she has

---

[78] In her brief in support of her motion for summary judgment, Kavianpour generally argues that "an employer's deviation from its own standard procedures in a discriminatory manner may be evidence of pretext," [Doc. 209-1 at 27 (citation omitted)], and asserts that "[m]ultiple witnesses for AU admitted that Human Resources failed to implement the procedures applicable to [] Kavianpour's drug testing protocol in conformity with the policies," including that Norton admitted that although the August 21, 2018, memorandum referenced "'Random Drug Testing' section of the AU Substance Abuse Policy," she was not selected "'randomly' based on 'neutral criteria'"; that Sprouse admitted that the testing protocol "was not 'congruent' with the drug testing policies and regulations applicable"; and that Melcher testified that the protocol "did not 'fit neatly within' either the Reasonable Suspicion drug testing or the Random Drug Testing sections of the AU Substance Abuse policy," [id. at 27-28 (citations omitted)].  While there is no dispute that the protocol, which was based on a similar protocol that was implemented previously with another resident in 2013 and that meetings were held to decide how to proceed with both Kavianpour and the other resident who tested positive but that the other resident decided to voluntarily enroll in the Georgia PHP program which had its own drug testing protocol, did not squarely line up with AU's Substance Abuse policy, [Doc. 186 at 7 p. 25; Doc. 186-1 at 1; Doc. 187-8 at 1, 4; Doc. 188 at 79-80 pp. 79-80; Doc. 188-1 at 1; Doc. 188-2 at 1-16; Doc. 189 at 165-66 pp. 165-66; Doc. 189-12; Doc. 193 at 6 p. 6, 27-28 pp. 27-28, 43-44 pp. 43-44, 47 p. 47, 58 p. 58, 65 p. 65; Doc. 194 at 50 p. 50, 52-55 pp. 52-55, 59-64 pp. 59-64, 70-72 pp. 70-72, 147-51 pp. 147-51, 187-88 pp. 187-88, 190-91 pp. 190-91, 233-34 pp. 233-34, 236 p. 236, 277 p. 277, 283-85 pp. 283-85, 287 p. 287; Doc. 194-1 at 1; Doc. 194-8 at 2-5; Doc. 194-23 at 3-5; Doc. 201 at 46-47 pp. 45-46; Doc. 207-54 at 7-17; Doc. 208-10 at 2-4; Doc. 223-1 at 49 p. 48], "the Court notes that the mere failure to follow [] procedures, without more, does not necessarily suggest that an employer was motivated by illegal discriminatory intent or that its proffered reason for [the alleged adverse action] was pretextual," Jones v. Ga. Ports Auth., CIVIL ACTION NO.: 4:20-cv-315, 2022 WL 2990908, at *9 (S.D. Ga. July 28, 2022) (citation and internal marks omitted).  That is, "[w]hile [a]n employer's departure from its normal policies and procedures can, in some cases, serve as evidence of

failed to "present any rebuttal evidence to [BOR's] legitimate, non-discriminatory reason" as to the random drug tests and the implementation of the drug testing protocol, she has therefore "failed to create any genuine issue with regard to pretext." Thompkins v. U.S. Xpress Inc., CIVIL ACTION NO. 1:13-cv-02674-AT-RGV, 2014 WL 11460488, at *17 (N.D. Ga. Nov. 26, 2014) (footnote and citations omitted), adopted by 2014 WL 11460779, at *1 (N.D. Ga. Dec. 15, 2014), aff'd, 611 F. App'x 672 (11th Cir. 2015) (per curiam) (unpublished). Accordingly, summary judgment is due to be granted in favor of defendants as to this claim. See Dalton v. Sebelius, CIVIL ACTION FILE NO.: 1:11-CV-3392-MHS-JCF, 2014 WL 11460778, at *10-11 (N.D. Ga. Feb. 19, 2014), adopted by 2014 WL 11461055, at *1 (N.D. Ga. June 16, 2014), aff'd, 602 F. App'x 749 (11th Cir. 2015) (per curiam) (unpublished).

### b.   Suspension

AUMC asserts that Dr. Coule suspended Kavianpour's clinical staff privileges out of concern that she could pose a threat to patient safety based on reports he received from AU's Human Resources Department and his own review of her positive pre-employment drug screen, her missed drug tests, and her DUI

---

pretext, a plaintiff must establish that . . . her employer's deviation from policy occurred in a discriminatory manner to establish pretext based on failure to follow internal procedures." Id. (second alteration in original) (citation and internal marks omitted). "Here, . . . [Kavianpour] failed to show anything more that suggests that [AU's] deviation from its own policy . . . occurred in a discriminatory manner." Id. (citation and internal marks omitted).

arrest record, which actions and behavior he believed were indicative of either a potential substance abuse disorder or were severe lapses in judgment given that she had just been warned that her patient care duties were not an excuse for failure to report for testing. [Doc. 199-1 at 16-17 (citations omitted)]. Kavianpour contends that AUMC's articulated reasons are insufficient and cannot be non-discriminatory because it "cannot 'divorce' its safety-based reason from its regarding [ her] as having [an] impairment." [Doc. 229 at 39 (citing <u>Lewis v. City of Union City</u>, 934 F.3d 1169, 1182 (11th Cir. 2019))]. In reply, AUMC points out that "[n]either *Lewis*, nor the Eleventh Circuit says this" and that "[i]nstead[,] . . . . [t]he ADA does not require that employers countenance dangerous misconduct, even if that misconduct is the result of a disability." [Doc. 241 at 14 (citation and internal marks omitted)].

"The employer's burden to articulate a legitimate, non-discriminatory reason for its employment decisions is one of production, not persuasion." <u>Orr v. Orbis Corp. (Wis.)</u>, Civil Action File No. 1:07–CV–2653–TWT–SSC, 2010 WL 3368124, at *11 (N.D. Ga. July 30, 2010) (citation omitted), adopted by 2010 WL 3368119, at *1 (N.D. Ga. Aug. 23, 2010). This "burden is 'exceedingly light,'" and defendants "'need not persuade the court that [their] proffered reasons are legitimate'" as their "'burden is merely of production, not proof.'" <u>Forehand v. Fulton Cnty.</u>, 510 F. Supp. 2d 1238, 1253-54 (N.D. Ga. 2007) (citation omitted); <u>see</u>

135

also Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983) (citations omitted).  And, "[t]o satisfy that burden of production, [t]he defendant[s] need not persuade the court that [they were] actually motivated by the proffered reasons." Combs, 106 F.3d at 1528 (second alteration in original) (citation and internal marks omitted); see also Bevill v. UAB Walker Coll., 62 F. Supp. 2d 1259, 1277 (N.D. Ala. 1999) (citation and internal marks omitted) (explaining that "an employer is not required to convince the district court that it was actually motivated by the reasons advanced, as the employer bears only the burden of production, not the burden of persuasion").

Despite Kavianpour's argument to the contrary, see [Doc. 229 at 39], subjecting an employee to an adverse employment action for misconduct that is caused by or related to an impairment does not constitute disability discrimination, see Bell v. Westrock Servs., Inc., CIVIL ACTION NO. 15-0148-CG-C, 2016 WL 3406117, at *9 (S.D. Ala. June 17, 2016) ("Plaintiff was fired because he repeatedly exhibited unacceptable and dangerous behavior.  The fact that the behavior may have been precipitated by Plaintiff's PTSD does not present an issue under the ADA."); McKane v. UBS Fin. Servs., Inc., CIVIL ACTION FILE NO. 1:08-CV-024-CAP, 2009 WL 10666056, at *20 (N.D. Ga. Mar. 24, 2009) ("It matters not that [plaintiff's] brittle diabetes caused his misconduct."), adopted by 2009 WL 10671829, at *1 (N.D. Ga. May 13, 2009), aff'd, 363 F. App'x 679 (11th Cir. 2010) (per

curiam) (unpublished); <u>Price v. Facility Mgmt. Grp., Inc.</u>, 403 F. Supp. 2d 1246, 1261 n.21 (N.D. Ga. 2005) (citation omitted) ("Even if some of plaintiff's inappropriate behavior at work was related to his bipolar disorder, it is well-settled that 'the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability.'"); <u>see also</u> <u>Hatfield v. Covenant Med. Grp., Inc.</u>, No. 3:20-CV-00152-JRG-HBG, 2021 WL 4484550, at *9 (E.D. Tenn. Sept. 29, 2021) (finding defendant "could terminate [p]laintiff[, a physician,] for his misconduct," even if the conduct was caused by his disability of substance abuse disorder); <u>Jackson v. Nor Loch Manor Healthcare Facility</u>, 297 F. Supp. 2d 633, 636 (W.D.N.Y. 2004) (explaining that "an employer [was] entitled to discharge an employee who fail[ed] to follow company rules and fail[ed] to appear for work without notification, even if the absences [were] attributable to a medical problem"), <u>aff'd</u>, 134 F. App'x 477 (2d Cir. 2005) (unpublished). Indeed, the ADA "does not immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace, and even if an incident of misconduct is connected to an alleged disability, an employer is entitled to discipline an employee for that incident, so long as it is not pretext for discrimination." <u>Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of N.Y. City, Inc. Emp. Benefit Funds</u>, 17cv7895 (DF), 2020 WL 5209779, at *10 (S.D.N.Y. Sept. 1, 2020) (citations and internal marks omitted), <u>aff'd</u>,

20-3092, 2021 WL 4851384 (2d Cir. Oct. 19, 2021); see also Pearson v. Unification Theological Seminary, 785 F. Supp. 2d 141, 164 (S.D.N.Y. 2011) (rejecting "plaintiff's argument that since her disability caused her conduct, she was in essence fired because of her disability").  Thus, the Court "finds [AUMC] has satisfied its 'exceedingly light' burden of articulating a legitimate, non-discriminatory reason for [suspending Kavianpour]," Melvin v. Fed. Express Corp., Civil Action File No.: 1:17-CV-00789-CC-JCF, 2019 WL 11660602, at *8 (N.D. Ga. Jan. 28, 2019), adopted as modified by 2019 WL 11660600, at *12 (N.D. Ga. May 1, 2019), aff'd, 814 F. App'x 506 (11th Cir. 2020) (per curiam) (unpublished), and consequently, any presumption of discrimination that would have been raised had Kavianpour established a prima facie case would vanish, shifting the burden back to Kavianpour "to show that the [] stated reason[s were] not the real reason[s] for [the] decision but rather, served as a pretext for [discrimination]," Bailey, 992 F.3d at 1277 (citation omitted).

In an effort to prove pretext, Kavianpour maintains that AUMC's "asserted reason that [ she] exhibited subversive or bad judgment by missing the drug test is false and pretextual" because "she consistently took all available efforts to comply with the drug testing requirements but due to the inflexibility of the timing requirement and the lack of an adequate pager policy, she was forced to prioritize patient safety and her on-call pager duty."  [Doc. 229 at 39 (citation omitted)].

Although Kavianpour asserts that she made every effort to comply with the drug testing protocol implemented by the August 21, 2018, memorandum, see [id.], the evidence shows that she did not respond to the January 17, 2019, request to drug test until January 22, 2019, because she said she was "postcall" on the day of the request and then did not hear from Arnold again, which prompted a string of emails, including Kavianpour's request to meet with Arnold and Norton to discuss the timing of the drug testing and flexibility.   [Doc. 186-1 at 1; Doc. 186-11 at 2-3; Doc. 189 at 218-19 pp. 218-19; Doc. 189-13 at 1-3; Doc. 190 at 54 p. 301; Doc. 190-9 at 24; Doc. 194 at 175 p. 175; Doc. 194-20 at 1; Doc. 207-6 ¶¶ 4-7; Doc. 216 ¶ 28]. Arnold responded by email on January 31, 2019, reminding Kavianpour that her academic and clinical activities would not be an excuse for her not to appear for testing in a timely manner, that she had been previously told to provide her schedule to include her days off and had not done so and was expected to do so effective immediately beginning the first Monday of each month in order to avoid scheduling testing on any days off, that they would begin notifying the Residency Program Director or designee when a drug test was needed to determine if any clinical responsibilities would interfere with her ability to test, that she would be allowed four hours from the point of notification to arrive for the drug screen, and that refusal to participate or failure to complete any step of the testing process would result in discharge, among other things.  [Doc. 194-6 at 2-3].  The evidence

further shows that when she was notified to report to test by Arnold on the morning of February 13, 2019, Arnold also notified Dr. Macomson's designee, L. Jones, and when Kavianpour indicated she was uncertain of her availability since everyone was in the operating room, Arnold extended the four-hour window until 4:00 p.m. to report for testing, but Kavianpour still failed to report that day and did not inform Arnold until after the testing window that she was unable to test, that she did not want to lose her job, and that she would report for testing the following morning, but Arnold requested that Employee Health not test Kavianpour the following morning since that was not her testing day.  [Doc. 186 at 31-32 pp. 124-25; Doc. 186-21 at 1; Doc. 189-14 at 1-2; Doc. 192 at 92 p. 92; Doc. 194-18 at 1].   The evidence further shows that Dr. Macomson investigated Kavianpour's reasons for her failure to report for testing and determined they were unfounded and that she had time throughout the day that she could have presented for a drug screen, and a series of meetings were held as a result of Kavianpour's failure to appear for her drug screen on February 13, 2019, after she was specifically reminded on January 31, 2019, that her failure to comply with the drug testing protocol would lead to discharge and that her academic and clinical duties were not an excuse, leading to Dr. Coule's decision to suspend her clinical privileges.  [Doc. 186-4 at 1; Doc. 187-3 at 1; Doc. 192 at 46-47 pp. 46-47, 118 p. 118, 132 p. 132; Doc. 192-21 at 23; Doc. 193 at 8 p. 8, 112 p. 112; Doc. 194 at 88-89 pp. 88-

89, 121 p. 121, 123 p. 123; Doc. 194-18; Doc. 195 at 13 p. 13; Doc. 197 at 128-29 pp. 128-29, 138-40 pp. 138-40; Doc. 197-16 at 1-5; Doc. 207-41 at 26; Doc. 223-1 at 37-39 pp. 36-38, 41-45 pp. 40-44, 53 p. 52, 67 p. 66, 74-75 pp. 73-74, 78-79 pp. 77-78, 81-83 pp. 80-82, 88 p. 87, 99-100 pp. 98-99; Doc. 208-10 at 11].

"An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Laun v. Bd. of Regents of Univ. Sys. of Ga., CV 118-033, 2019 WL 4694940, at *13 (S.D. Ga. Sept. 25, 2019) (citation and internal marks omitted). "The pretext analysis focuses upon whether the employer has given an honest account of its behavior or has instead used proffered lawful reasons as cover for discriminating against the plaintiff." Brakeman v. BBVA Compass, Case No.: 2:16-01344-JEO, 2018 WL 3328909, at *23 (N.D. Ala. July 6, 2018) (citing Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1266 (11th Cir. 2010)). Kavianpour "has not pointed to any evidence to show that [Dr. Coule's] beliefs regarding the allegations against [Kavianpour] were not honestly held," and "[s]o long as [ Dr. Coule] believed that [Kavianpour] engaged in the conduct she was alleged to have engaged in, the individuals providing reports about [Kavianpour], such as [Arnold, Norton, and other present during the meetings], could have been 'lying through their teeth.'" Oliver v. TECO Energy, Inc., No. 8:12-cv-2117-T-33TBM, 2013 WL 6836421, at *10 (M.D. Fla. Dec. 26, 2013) (citations omitted); see also Feise

141

v. N. Broward Hosp. Dist., 683 F. App'x 746, 753 (11th Cir. 2017) (per curiam) (unpublished) ("[A]n employer can hardly be said to have discriminated or retaliated against an employee if it terminated the employee based on a good faith belief that she violated a rule, even if the purported violation never actually occurred.").  Moreover, while Kavianpour "devotes a significant portion of [her] papers to a multitude of evidence about [her allegations concerning her and her experts' interpretation of defendants' policies and objections to the drug testing protocol and whether she could leave to test while carrying the pager,]" her "own perceptions (or the perceptions of [her] expert[s]) . . . are irrelevant; it is the perception of the decisionmaker which is relevant," Babbar v. Ebadi, 36 F. Supp. 2d 1269, 1279 (D. Kan. 1998) (footnote and citation omitted), aff'd, 216 F.3d 1086 (10th Cir. 2000) (unpublished); see also Oliver, 2013 WL 6836421, at *10, and regardless of what one may believe the policy requires, the "pretext analysis centers on the employer[s'] subjective beliefs; 'the employee's beliefs' or even 'reality as it exists outside of the decision maker's head' is irrelevant," Owens, 52 F.4th at 1340 (emphasis and citations omitted).  Indeed, "[e]very employer has the right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." Callaway v. Lee Mem'l Health Sys., Case No.: 2:19-cv-745-SPC-MRM, 2022 WL 93534, at *6 (M.D. Fla. Jan. 10, 2022) (citation and internal marks omitted).

In sum, Dr. Coule testified that he made the decision to suspend Kavianpour's clinical privileges for safety reasons because, after considering "the totality of the information," including Kavianpour's positive pre-employment drug screen, her subsequent negative drug screens, her DUI arrest, the reports that there were performance concerns within the residency program, and her failure to comply with the drug testing protocol by missing at least one, and possibly two, drug screens, he believed her pattern of behavior was "either subversive . . . in refusing to test or [was] extremely poor judgment to have gotten a positive drug screen, a DUI, and then refusing to be compliant,"[79] despite having recently been

---

[79] Kavianpour also attempts to show pretext by arguing that AUMC has offered "'shifting reasons' from the time of the March 2019 grievance (where [Dr.] Coule testified that but-for missing the Feb. 13 drug test, he would not have suspended her), to now, where AUMC expands its reasons for adverse action to this vague 'overall poor judgment' explanation."  [Doc. 229 at 39-40 (citation omitted)]. "Pretext may [] be established by proof of inconsistent statements or shifting explanations for the adverse employment decision, suggesting that the articulated reasons are recently fabricated or false."  Walker v. St. Joseph's/Candler Health Sys., Inc., 506 F. App'x 886, 889 (11th Cir. 2013) (per curiam) (unpublished) (citations omitted).  "But, those extreme cases involve instances where an employer offers a new, wholly inconsistent, or unrelated rationale for its adverse action."  Ward v. City of Lighting Prods. Co., Civil Action No. 20-208, 2021 WL 1720661, at *7 (W.D. Penn. Apr. 30, 2021) (citations omitted).  Kavianpour's "shifting reasons argument attempts to create superficial inconsistencies where no substantive ones exist and the evidence does not support her interpretation." Kohser v. Protective Life Corp., No. 2:11-cv-03915-JHE, 2015 WL 1395896, at *12 (N.D. Ala. Jan. 13, 2015) (citation omitted), adopted as modified by 2015 WL 1395911, at *17 (N.D. Ala. Mar. 25, 2015), aff'd, 649 F. App'x 774 (11th Cir. 2016) (per curiam) (unpublished).  Indeed, as AUMC points out, [Doc. 241 at 16-17], Dr. Coule specifically testified at the grievance hearing that he believed Kavianpour's

warned that her academic and clinical duties were not an excuse for failing to report for testing and that a failure to comply with the protocol would result in dismissal.  [Doc. 178-12 at 169-71 pp. 169-71, 173 p. 173; Doc. 223-1 at 37-39 pp. 36-38, 44-45 pp. 43-44, 81-83 pp. 80-82, 88 p. 87, 99-100 pp. 98-99]; see also [Doc. 187-9 at 174-75 pp. 174-75].  While Kavianpour does not dispute that she received the January 31, 2019, memorandum reminding her about her duty to comply with the protocol and also does not dispute that she failed to report for testing on February 13, 2019, and even emailed Arnold after she missed the extended testing window that she did not want to lose her job, but that she was unable to go test and would go the following morning, [Doc. 186-11 at 1-2; Doc. 189-14 at 1], she "argues that a reasonable jury could still infer that [her] noncompliance was not [defendants'] real reason for [suspending and subsequently terminating her]," Conaty v.

---

pattern of behavior was indicative of "either a serious error in judg[]ment or being evasive, one of the two," and he elaborated that it was "either a serious error in judgment" to be "told, informed, and reminded that your patient care duties [would] not be accepted as an excuse for not showing up for testing, to then be notified that they must be tested and not escalate that to their residency program director or someone else in the event that they were told they needed to go test[] and had concerns about whether or not someone would take the pager" or it was "being evasive."  [Doc. 178-12 at 169-70 pp. 169-70, 173 p. 173].  Thus, Kavianpour "has not established pretext on this basis."  Hamer v. City of Atlanta, CIVIL ACTION NO. 1:15-cv-00636-ELR-RGV, 2016 WL 10591434, at *14 (N.D. Ga. Dec. 27, 2016) (citations omitted), adopted by 2017 WL 5639953, at *1 (N.D. Ga. Jan. 18, 2017); see also Phillips v. Aaron Rents, Inc., 262 F. App'x 202, 210 (11th Cir. 2008) (per curiam) (unpublished) (finding no evidence of pretext where reasons were not fundamentally inconsistent, among other reasons).

Brocade Commc'n Sys., Inc., Civil Action No. 3:07–CV–1313–D., 2009 WL 937044, at *6 (N.D. Tex. Apr. 7, 2009).  However, "[m]uch of the arguments' substance questions the fairness and wisdom underlying . . . the decision," but "[t]hese arguments generally do not constitute evidence that can be relied upon to show pretext or a discriminatory motive."  Id.[80]  That is, "[t]o discredit [ defendants'] proffered reason[s] . . . [Kavianpour] cannot simply show that [ defendants'] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated [ defendants], not whether [ defendants are] wise, shrewd, prudent, or competent."  Kim-Foraker v. Allstate Ins. Co., 834 F. Supp. 2d 267, 281 (E.D. Pa. 2011) (citation and internal marks omitted); see also Baker v. Russell Corp., No. 3:07-CV-1127-WKW[WO], 2009 WL 1357242, at *6 (M.D. Ala. May 6, 2009) (citation omitted), aff'd, 372 F. App'x 917 (11th Cir. 2010)

---

[80] Kavianpour contends that AUMC's safety reason is pretextual "because it was not formed in compliance with the legal standard for showing a direct threat." [Doc. 246 at 6 (citation and internal marks omitted)].  Kavianpour, however, fails to appreciate that even if there is "an issue of fact as to the applicability of the direct threat defense, defendants' [] concerns over [her] ability to perform [her] job safely are a legitimate, nondiscriminatory reason for the allegedly adverse employment action."  Sutherland v. Edison Chouest Offshore, Inc., CIVIL ACTION NO. 19-414, 2020 WL 5436654, at *11 (E.D. La. Sept. 10, 2020) (citations omitted).  Indeed, it appears that Kavianpour "blurs the lines between the prima facie case of qualification and the affirmative defense of 'direct threat' to safety," but the Court declines to blur the direct-threat-to-safety defense within the McDonnell Douglas framework."  Armitage, 2021 WL 2805860, at *4 n.2 (citation omitted).

145

(per curiam) (unpublished).  "The Court will not second-guess [the defendants']
assessment[] and ultimate decision; [the Court is] not interested in whether the
conclusion is a correct one, but whether it is an honest one." Scott v. Shoe Show,
Inc., 38 F. Supp. 3d 1343, 1364 (N.D. Ga. 2014) (second and third alterations in
original) (citation and internal marks omitted), adopted at 1348.  Kavianpour's
"evidence, at most, question[s] the wisdom of [ defendants'] reasons; it does not
create a genuine issue as to whether [their] reasons were pretextual." Emanuel v.
George C. Wallace Cmty. Coll., No. 2:07-CV-819-WKW [WO], 2008 WL 4767727,
at *12 (M.D. Ala. Oct. 27, 2008) (first alteration in original) (citation and internal
marks omitted).  "In light of the fact that [Kavianpour] has failed to rebut
[AUMC's] legitimate non[-]discriminatory reasons for [suspending her clinical
privileges], the Court finds that [she has not demonstrated that [AUMC's] reasons
were pretextual," and "[s]ummary judgment is, therefore, appropriate as to [this]
[discrimination] claim." McNorton v. Ga. Dep't of Transp., 619 F. Supp. 2d 1360,
1380-81 (N.D. Ga. 2007); see also Snowden v. City of Daphne, 283 F. App'x 693, 696
(11th Cir. 2008) (per curiam) (unpublished); Oliver, 2013 WL 6836421, at *11.

     **c.**    **Termination**

    BOR maintains that Kavianpour "was terminated because she was barred
from practicing in the hospital and, therefore, could not work as a resident." [Doc.
207-1 at 15 (citation omitted)]; see also [Doc. 242 at 6 (citation omitted)].

Kavianpour questions the legitimacy of this reason, arguing that "BOR's reason is hypothetical and unclear because BOR never explains why a 'suspension' requires a termination" or "why a temporary suspension constituted a legitimate nondiscriminatory reason to fire Kavianpour." [Doc. 230 at 25-26 (citation omitted)]. She asserts that Dr. Coule "indicated that he had suspended other residents' privileges in the past, but his suspensions did not result in immediate terminations by BOR," and that BOR had the "discretion to take action other than termination in response to a suspension," and therefore, BOR's "asserted reason does not explain the rationale for the immediate termination for any reason other than the fact of the suspension[.]" [Id. at 26 (citation omitted)].

Despite Kavianpour's arguments to the contrary, BOR has clearly explained that her suspension of clinical privileges meant that she could not be trained as a resident, and indeed, she was clearly advised in the Resident Counseling Form she received during her meeting with Dr. Macomson on February 11, 2019, that "in the event that [AUMC] . . . decide[s] that [she is] not allowed to practice within their walls, [she could not] and [would] not be able to complete [her] residency training[.]" [Doc. 192-17 at 1-2]; see also Williams, 2022 WL 4588587, at *18-19 (citation omitted) (explaining that because plaintiff had been issued a letter, notifying her that she had been terminated from the residency program because she no longer had clinical privileges and access to AUMC following her

suspension, the state defendants, including BOR, had clearly provided her "an explanation for her termination"). And, although Kavianpour argues that BOR's reason is insufficient "if, as her evidence shows, it is exactly what the comparators did," pointing to Dr. Coule's testimony that "he had suspended other residents' privileges in the past, but his suspensions did not result in immediate terminations by BOR," [Doc. 230 at 26 (citation and internal marks omitted) (quoting Pearson v. Georgia, 806 F. App'x 940, 949 (11th Cir. 2020) (per curiam) (unpublished))], Dr. Coule's testimony actually indicates that the residents he suspended were eventually terminated and that he was just unaware of whether it occurred immediately or after a period of time, [Doc. 223-1 at 95-98 pp. 94-97].[81]  Thus, BOR

---

[81] Although Kavianpour generally argues that other residents received more favorable treatment, see [Doc. 230 at 26], she "has not brought forth sufficient evidence for the Court to compare or contrast her treatment with the treatment of any others, nor has she provided evidence that [defendants] took such actions [based on her alleged disability]," Lewis v. Marriott Int'l, Inc., CIVIL ACTION FILE NO. 1:18-CV-5917-WMR, 2021 WL 2193990, at *6 (N.D. Ga. Feb. 22, 2021), and "[s]imply introducing evidence of discriminatory animus unconnected to the employer's proffered reasons is insufficient to establish pretext," Tsavaris v. Savannah Law Sch., LLC, 847 F. App'x 634, 641 (11th Cir. 2021) (per curiam) (unpublished) (citation and internal marks omitted). Furthermore, even assuming "that disparate treatment of similarly situated comparators is sufficient to establish pretext," a comparator must be "similarly situated in all material respects." Id. at 640 (citation and internal marks omitted). "Though a comparator need not be the plaintiff's doppelganger, she will ordinarily share the plaintiff's employment or disciplinary history," id. (alterations, citation, and internal marks omitted), but Kavianpour has not offered sufficient comparator evidence to allow the Court to make a determination that she and any alleged comparator are similarly situated in all material respects.

has met its light burden of articulating a legitimate, non-discriminatory reason for terminating Kavianpour from the residency program, and Kavianpour must now "show that the [] proffered reason is a mere pretext for discrimination based on her disability." Todd v. Fayette Cnty. Sch. Dist., 998 F.3d 1203, 1217–18 (11th Cir. 2021) (citation omitted).

To show pretext, Kavianpour first argues that BOR deviated from its policies because Dr. Coule testified that after he suspends a resident, "[t]he expectation" would be that an investigation would be conducted regarding the appropriate action, but Dr. Macomson testified that he did not conduct an independent investigation into the reasons for the suspension in this instance prior to dismissing Kavianpour from the residency program.  [Doc. 230 at 27 (citing [Doc. 192 at 50 p. 50; Doc. 223-1 at 24 p. 23, 92-94 pp. 91-93])].  "Other than citing to [this] deposition testimony . . ., [Kavianpour] has not argued how [BOR] violated this policy." Keaton v. Cobb Cnty., 545 F. Supp. 2d 1275, 1310 (N.D. Ga. 2008) (citation omitted), aff'd, No. 08–11220, 2009 WL 212097 (11th Cir. Jan. 30, 2009) (per curiam) (unpublished).  Moreover, the evidence shows that defendants held multiple meetings to discuss the issues related to Kavianpour's missed drug screen, as well as other issues, in order to determine how best to proceed prior to concluding that suspension and termination were the best course of action to take, see [Doc. 178-8; Doc. 186-4 at 1; Doc. 192 at 46-47 pp. 46-47, 99 p. 99, 118 p. 118,

120-26 pp. 120-26, 132 p. 132; Doc. 192-17 at 1-5; Doc. 192-21 at 23; Doc. 193 at 112

p. 112; Doc. 194 at 88-89 pp. 88-89, 121 p. 121, 123 p. 123; Doc. 194-18; Doc. 197 at

128-29 pp. 128-29, 138-40 pp. 138-40; Doc. 197-16 at 1-5; Doc. 223-1 at 37-39 pp. 36-

38, 44-45 pp. 43-44, 78 p. 77, 81-83 pp. 80-82, 88 p. 87, 99-100 pp. 98-99], and as BOR

points out, Kavianpour has not shown any policy requiring "a second–

duplicative–investigation post-suspension," [Doc. 242 at 8].   Thus, "[e]ven

assuming there was a standard protocol which required [an investigation] . . .; this

is not a case where no investigation was conducted," and "the deviation from the

allegedly official procedures . . . is minor."  Rutland-Simpson v. Eli Lilly & Co., 940

F. Supp. 2d 504, 515 (S.D. Tex. 2013), aff'd, 575 F. App'x 314 (5th Cir. 2014) (per

curiam) (unpublished).[82]

---

[82] Kavianpour also cites to Dr. Coule's deposition testimony that DUI arrests of residents are not routinely reported to him as evidence that BOR deviated from procedure when Arnold included her DUI arrest in the February letter to Dr. Coule, [Doc. 230 at 27 (citation omitted)]; however, Kavianpour has again failed to point to any standard policy or practice that BOR deviated from, and Dr. Coule's complete testimony was that a resident's DUI arrest would not normally be elevated to his office unless there was also a concern for patient safety or other issues, [Doc. 223-1 at 65-66 pp. 64-65].  While "a departure from an internal [] policy may support an inference of pretext, the Court is unwilling to find that any departure from internal policy is sufficient to support a finding of pretext." Rutland-Simpson, 940 F. Supp. 2d at 514 (footnote omitted).  Kavianpour "appears to believe that any departure from internal procedures/policies is automatically evidence of pretext," but she "must do more than simply point out every deviation from internal procedures/policies she encountered during her employment," and, here, the departure simply does not provide "a reasonable basis for a fact finder to disbelieve the legitimate reason the [d]efendant[s] ha[ve] articulated for [the]

Kavianpour also argues that "on February 8, 2019, BOR attorney [] Bryan encouraged [Dr.] Macomson to 'flesh out' alleged performance issues regarding [] Kavianpour because '[he could] already sense that [they were] headed for a rough time with [ her],'" and that BOR failed to provide her with the required remediation period of at least three months in compliance with House Staff Policy and Procedure 18.0. and the February 2019 Resident Counseling Form, as well as mentoring, prior to terminating her residency.   [Doc. 230 at 27-30 (citations omitted)].  Kavianpour, however, was not terminated pursuant to the counseling form which provided her a remediation period pursuant to House Staff Policy and Procedure 18.0.  Rather, she was terminated following a suspension of her clinical privileges at AUMC after she failed to report for her drug screen on February 13, 2019, in compliance with her drug testing protocol after having been specifically reminded of her duty to do so on January 31, 2019, among having other issues that were brought to Dr. Coule's attention at that time, and thus, an intervening event

---

adverse employment action."   <u>Id.</u> at 517 (emphasis omitted).   Similarly, Kavianpour points to deviations to policies and practices that occurred post-termination, including the failure to provide the GME hearing until January 2020 and interference with Lott's investigation and Lott's subsequent termination, as evidence of pretext, <u>see</u> [Doc. 230 at 28 (citations omitted)]; however, "the causal connection to the termination of [Kavianpour's] employment is not evident, and [Kavianpour] has not articulated the causal connection," and the Court therefore finds that these actions are "not evidence of pretext." <u>Rutland-Simpson</u>, 940 F. Supp. 2d at 517.

manifested that justified the suspension and termination for reasons unrelated to and outside of the remediation period provided for in the counseling form.  See [Doc. 178-10 at 1-2; Doc. 192 at 78-79 pp. 78-79, 113-18 pp. 113-18; Doc. 192-4 at 1; Docs. 193-2 & 193-3; Doc. 197-14 at 102].[83]

---

[83] As evidence of pretext, Kavianpour also argues that between March 2019 and January 2020, BOR has offered shifting reasons for terminating her residency, pointing out that while BOR initially proffered that she was terminated only for the alleged missed drug test on February 13, 2019, the CCC recommended non-renewal of her contract based on several grounds in January 2020, including performance-based allegations that were not previously raised.  [Doc. 230 at 29-30 (citations omitted)].  However, Dr. Coule testified that Kavianpour's performance deficiencies were discussed in the meetings leading up to her suspension and termination after she missed the February 13, 2019, drug screen, [Doc. 223-1 at 35-36 pp. 34-35, 38-39 pp. 37-38], and although not specifically provided as a basis for her termination initially, the fact that BOR offered performance-based reasons as "additional justification for its decision in an administrative proceeding does not undermine [BOR's] proffered reliance on [its initial justification] as the main reason for [her] termination," and therefore, Kavianpour has "failed to show that a reasonable juror would find [BOR's] reason for firing [her] to be 'so plainly wrong,' that it is 'unworthy of credence,'" Proudfoot v. Arnold Logistics, LLC, 629 F. App'x. 303, 307-08 (3d Cir. 2015) (unpublished) (citations omitted); see also Litzsinger v. Adams Cnty. Coroner's Off., 25 F.4th 1280, 1293 (10th Cir. 2022) (citation and internal marks omitted) (explaining that while "different reasons for termination do not have to be contradictory to show pretext" and "only need to undermine the credibility of the employer's proffered reason for termination," this "point of law provides no help to [plaintiff] because she fail[ed] to demonstrate how any of the [defendant's] reasons for termination show[ed] a lack of credibility" and "[p]roviding additional justifications for termination without abandoning the primary reason for termination [did] not, without more, establish pretext" because "[t]o support an inference of pretext, the additional justifications must suggest dishonesty or bad faith."); DeCicco v. Mid-Atl. Healthcare, LLC, 275 F. Supp. 3d 546, 559 (E.D. Pa. 2017) (alteration in original) (citations and internal marks omitted) (explaining that the fact "that an employer relies on certain justifications as its bases for termination does not mean that additional

Finally, Kavianpour maintains that she was "subjected . . . to a significantly more intense and aggressive drug testing monitoring program than permitted by its written policies . . . even though [d]efendants denied testing her 'for cause'" as evidence of pretext, [Doc. 230 at 28 (citation omitted)]; however, as BOR points out, it has admitted that "the testing protocol did not strictly accord with policy," [Doc. 242 at 9], but "inconsistent or irrational employment practices" are not per se "illegal" as "only intentional discrimination based upon an employee's protected class characteristics" is prohibited, Equal Emp. Opportunity Comm'n v. JBS USA, LLC, 339 F. Supp. 3d 1135, 1192 (D. Colo. 2018) (emphasis and citation omitted).  That is, "[h]uman relationships are inherently complex," and "[l]arge employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ even among similar situations," and the "law does not require, nor could it ever realistically require, employers to treat all of their employees all of the time in all matters with absolute, antiseptic, hindsight equality," but "[w]hat the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class

_____

justifications undermine its position during litigation" and finding that this was "not a case where [the defendant] first identified one basis for the termination and later abandoned, changed, or exchanged that reason for an unrelated or inconsistent reason").

characteristics," and here, Kavianpour "has not shown that [BOR's] adverse employment actions . . . were motivated by discriminatory animus[.]" Id. (citation omitted). Indeed, "evidence in the record explains [BOR's] deviations from the standard [policies ] and militates against a finding of pretext." Fuller v. Seagate Tech., LLC, 651 F. Supp. 2d 1233, 1246 (D. Colo. 2009); see also [Doc. 194 at 52-54 pp. 52-54, 59-64 pp. 59-64, 70-71 pp. 70-71, 147-51 pp. 147-51, 187-88 pp. 187-88, 236 p. 236, 277 p. 277; Doc. 194-23 at 3-5 (meeting about whether to let Kavianpour and the other resident retest and if so, that a monitoring system should be implemented for periodic testing to ensure a safe patient care environment similar to one utilized for a 2013 resident); Doc. 188-2 at 1-16; Doc. 208-10 at 2-4 (email chain regarding the discussion on implementing a testing protocol for Kavianpour); Doc. 194 at 55 p. 55, 148 p. 148, 190-91 pp. 190-91, 233 p. 233, 277 p. 277 (Norton's testimony that she relied on her interpretation of the Substance Abuse Policy, as well as the prior protocol established with the 2013 resident, in drafting the initial August 21, 2018, memorandum, but that she did not view Kavianpour as an addict)]. "However unfair [Kavianpour] may view [her] termination, an employer may terminate an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason," and Kavianpour "has not carried [her] burden to show [defendants' reasons were] pretext for discrimination." Ball v. Bd.

154

of Regents of Univ. Sys. of Ga., Civil Action No. 1:20-cv-00012-SDG, 2021 WL
4272825, at *4 (N.D. Ga. Sept. 20, 2021) (alteration, citation, and internal marks
omitted).   Accordingly, it is **RECOMMENDED** that defendants' motions for
summary judgment as to Kavianpour's disability discrimination claims under the
ADA and the Rehabilitation Act be **GRANTED** and Kavianpour's motion for
summary judgment as to these claims be **DENIED**.[84]

---

[84] In her motion for summary judgment, Kavianpour argues that summary
judgment is warranted in her favor on her failure to accommodate claim, asserting
that she requested a reasonable accommodation in December 2018 by asking for a
fixed, predictable window of time in the afternoon to test and a designated
individual to whom she could hand off her pager, but that defendants failed to
engage in an interactive process and also failed to implement their own alternative
to her requested accommodation.  See [Doc. 209-1 at 33-37]; see also [Doc. 29 ¶¶
232-33].   However, to the extent Kavianpour asserts a stand-alone failure to
accommodate claim, as opposed to asserting allegations as part of her ADA
retaliation claim, such a claim fails as a matter of law, since she proceeds under the
"regarded as" definition of a disability for purposes of the ADA and the
Rehabilitation Act and does not contend that she has an actual disability, and
"there is no requirement to provide reasonable accommodations where an
employee is only regarded as disabled," Billups v. Emerald Coast Utilities Auth.,
714 F. App'x 929, 936 n.4 (11th Cir. 2017) (per curiam) (unpublished) (citing 42
U.S.C. § 12201(h)); see also Equal Emp. Opportunity Comm'n v. Allstate Bev. Co.,
LLC, CASE NO. 2:19-CV-657-WKW, 2022 WL 10197690, at *6-7 (M.D. Ala. Oct. 17,
2022) (citation and internal marks omitted) (explaining that "an ADA claim for
failure to accommodate cannot proceed under the 'regarded as' definition of a
disability" and that "[u]nder the ADA, a covered employer need not provide a
reasonable accommodation or a reasonable modification to policies, practices, or
procedures to an individual" under the "regarded as definition of a disability"),
vacated in part on other grounds by 2023 WL 158211, at *6 (M.D. Ala. Jan. 11, 2023);
Brown v. Roanoke Rehab. & Healthcare Ctr., 586 F. Supp. 3d 1171, 1178 (M.D. Ala.
2022) (citation and internal marks omitted) ("An accommodation claim requires
an  actual  disability,  there  is  no  requirement  to  provide  reasonable

D.    <u>**Kavianpour's Retaliation Claims**</u>

In Count IX of her amended complaint, Kavianpour asserts a retaliation claim under the ADA, alleging that she was a qualified individual who defendants erroneously regarded as having a disability of a substance abuse disorder; that when she asked to meet to discuss drug testing flexibility or accommodation of patient care, defendants refused and responded with "a retaliatory memo that made her objections grounds for dismissal"; that she "suffered the adverse action of random drug tests, of suspension of her clinical privileges, and termination"; that when she "objected to the illegal manner in which [d]efendant[s] performed these tests, her clinical privileges were suspended and she was terminated"; and

---

accommodations where an employee is only regarded as disabled."). Furthermore, even if Kavianpour could properly state a failure to accommodate claim, the Eleventh Circuit recently explained that "to identify a disability, an employee must provide at least some information about how a physical or mental condition limits her functioning," and she "must provide her employer enough information to assess how her proposed accommodation would help her overcome her disability's limitations." <u>Owens</u>, 52 F.4th at 1335. Indeed, "an employer is not required to accommodate an employee in any manner that the employee desires—or even provide that employee's preferred accommodation." <u>Id.</u> (emphasis, citation and internal marks omitted). Thus, Kavianpour's claim that defendants discriminated against her by failing to provide her reasonable accommodations by providing her a predictable window of time for testing in the afternoon and a designated individual to hand off the pager to when she had to test "does not explain how that accommodation would alleviate any physical or mental limitation" and "amounts to nothing but [v]ague or conclusory statements revealing an unspecified incapacity." <u>Id.</u> at 1337 (alteration in original) (citation and internal marks omitted).

that when she "objected to the illegal and retaliatory suspension of her clinical privileges and termination, she was subject[ed] to another illegal and biased internal appeals process." [Doc. 29 ¶¶ 238-47]. "To state a *prima facie* case of retaliation under the ADA, [Kavianpour] must show that (1) [s]he engaged in statutorily protected conduct; (2) [s]he suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action." Upton v. Day & Zimmerman NPS, Civil Action Number 2:15-cv-02131-AKK, 2018 WL 465979, at *6 (N.D. Ala. Jan. 18, 2018) (citing Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 798 (11th Cir. 2000)); see also Hughes v. Wal-Mart Stores E., LP, 846 F. App'x 854, 857 (11th Cir. 2021) (per curiam) (unpublished) (citation omitted); McConico v. City of Tampa, 823 F. App'x 763, 768 (11th Cir. 2020) (per curiam) (unpublished) (citation omitted). And, "disability retaliation claims require a plaintiff to meet the heightened 'but-for' causation standard." Leone v. All. Foods, Inc., No. 8:14-cv-800-T-27TBM, 2015 WL 4879406, at *8 (M.D. Fla. Aug. 14, 2015) (citations omitted) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)).

AUMC argues that it is entitled to summary judgment on Kavianpour's ADA retaliation claims because she cannot show that AUMC was on notice of any statutorily protected activity or that any requests for accommodation were made to AUMC. [Doc. 199-1 at 31-33]; see also [Doc. 241 at 22-25]. AUMC also argues

that even if it was on notice of protected activity, there is no causal connection between Kavianpour's complaints and her suspension.  [Doc. 199-1 at 34-35]. AUMC further argues that even if Kavianpour could establish a prima facie case of retaliation, it has offered a legitimate, non-retaliatory reason for her suspension of clinical privileges, which she has failed to show was pretextual.  [Doc. 241 at 19-21].

Similarly, BOR contends that it is entitled to summary judgment on Kavianpour's ADA retaliation claims, arguing that she cannot establish that she engaged in statutorily protected activity under the ADA, that only her termination constitutes a viable adverse employment action applicable to BOR, and that even if Kavianpour could establish a prima facie case of retaliation based on random drug testing and her termination, it has articulated legitimate, non-retaliatory reasons for its actions, which she has failed to show were pretextual.  [Doc. 207-1 at 21-25 (citations omitted)]; see also [Doc. 225 at 20-24; Doc. 242 at 11-15]. Kavianpour likewise moves for summary judgment as to her ADA retaliation claims, arguing that she engaged in protected opposition to discriminatory drug testing on January 22, 2019, when she asked to meet with Norton and Arnold to discuss the inappropriate timing and lack of flexibility of the testing, but was instead met with a new protocol on January 31, 2019, which she again objected to on that day.  [Doc. 209-1 at 43-44 (citations omitted)]; see also [Doc. 246 at 11-12].

She also argues that following her protected activity, defendants took retaliatory adverse actions against her, including suspending her clinical privileges and terminating her from the residency program. [Doc. 209-1 at 44-49].[85] The Court will address each of these issues.

### 1. *Statutorily Protected Expression*

Kavianpour maintains that she engaged in statutorily protected activity on January 22, 2019, when she emailed Arnold and requested to meet with her and Norton to "discuss the inappropriate timing of calls/testing, the lack of flexibility and justification per MCG policy (and state and federal laws)." [Doc. 189-13 at 2; Doc. 194-6 at 3]; see also [Doc. 230 at 32 (citation omitted)]. She contends that her request "can reasonably be construed to reflect her initiation of an interactive process regarding the timing of calls." [Doc. 230 at 33]. She also maintains that she engaged in statutorily protected activity on January 31, 2019, when she responded to Arnold's memorandum emailed on the same day, stating in relevant part that she had asked for a meeting, but that she had not been obliged; questioning the validity of the positive pre-employment drug screen; characterizing her January 31 response as "punishment" and the "extension of

---

[85] Because Kavianpour only addresses her suspension and termination, the Court does not address any other alleged retaliatory adverse actions. See [Doc. 209-1 at 44-49; Doc. 229 at 48-49; Doc. 230 at 36-37]; see also [Doc. 242 at 14].

testing as retaliation"; questioning "the legality of the practices" being imposed on her as "clearly not random," "discriminatory," and "harassment"; and reiterating that she was "open to further testing with predetermined times with advanced notice[.]" [Doc. 186-11 at 1-2]; <u>see also</u> [Doc. 230 at 33-34 (citation omitted)].

The Court first addresses "whether a plaintiff's failure to show . . . she is disabled within the meaning of the ADA causes requesting an accommodation to become an unprotected protected activity," since some circuits have not decided the issue, while "[o]ther circuits have found that such a request is still protected even if the plaintiff is not disabled," but "they have done so relying on a 'good faith belief' rationale[.]" <u>Okyere v. John Bean Techs. Corp.</u>, No. 5:20-CV-190-FL, 2020 WL 7625237, at *9 (E.D.N.C. Dec. 22, 2020) (citations omitted); <u>but see also</u> 20 C.F.R. § 1630.2(o)(4) ("A covered entity is required . . . to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability under the 'actual disability' prong . . ., or 'record of' prong . . ., but is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong . . ."); <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1328 (11th Cir. 1998) (finding pre-ADA amendments that plaintiff's requests for accommodation would constitute statutorily protected activity if he had a good faith, objectively reasonable belief that he was entitled to those accommodations under the ADA, but that he had

failed to produce "any evidence that, at the time that he requested accommodations . . ., his belief that he was disabled was objectively reasonable"), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); Sierra v. Port Consol. Jacksonville, L.L.C., Case No. 3:14-cv-1496-HES-JBT, 2016 WL 927189, at *9 (M.D. Fla. Mar. 4, 2016) (citation omitted) (finding plaintiff failed to engage in statutorily protected activity under the ADA because "an employer is not required to provide a reasonable accommodation to an employee whose disability qualifies solely under the 'regarded as' prong," among other reasons); Larkin v. Methacton Sch. Dist., 773 F. Supp. 2d 508, 530–31 (E.D. Pa. 2011) (alteration, citation, and internal marks omitted) (finding it "would be incongruous to [] hold that the [defendant] [] unlawfully retaliated against [plaintiff] by failing to engage in the interactive process to seek a reasonable accommodation," since the "antiretaliation provision is intended to ensure unfettered access to statutory remedial mechanisms by preventing harm to individuals who engage in protected activity," but it "should not be interpreted as imposing upon an employer an affirmative duty to accommodate that it would not otherwise have"). Nevertheless, because it appears that "a plaintiff bringing an ADA retaliation claim need not demonstrate that [s]he has a disability," and therefore, "[a plaintiff's] failure to prove h[er] disability does not preclude h[er] from attempting to establish a retaliation claim," the Court will consider whether

she has engaged in statutorily protected expression, including by requesting an accommodation.  Scoggins v. Floyd Healthcare Mgmt. Inc., CIVIL ACTION FILE NO. 4:14-CV-00274-HLM-WEJ, 2016 WL 11544774, at *25 n.65 (N.D. Ga. June 10, 2016) (alterations in original) (citation and internal marks omitted), adopted by 2016 WL 11544908, at *30 (N.D. Ga. Aug. 30, 2016); see also Branscomb v. Sec'y of Navy, 461 F. App'x 901, 906 (11th Cir. 2012) (per curiam) (unpublished).

Defendants contend that they are entitled to summary judgment because Kavianpour did not engage in any statutorily protected activity under the ADA. [Doc. 199-1 at 31-34; Doc. 207-1 at 22-23; Doc. 241 at 22-25; Doc. 242 at 11-14].  In response, Kavianpour argues that her January 22 email constitutes "her initiation of an interactive process regarding the timing of calls."  [Doc. 229 at 43].  BOR points out that the email simply "raised concerns regarding the timing of tests, not that the tests were based on erroneous perception of a disability," and that Arnold understood from the email that Kavianpour wanted to meet to discuss the timing of the calls and to accommodate her schedule.  [Doc. 242 at 11 (citations omitted)]; see also [Doc. 189-13 at 2; Doc. 194-20 at 1].

"[A]n employer's duty to provide a reasonable accommodation is not triggered unless the plaintiff makes a specific demand for an accommodation." Wiggins v. City of Montgomery, CASE NO. 2:17-CV-425-KFP, 2022 WL 625075, at *17 (M.D. Ala. Mar. 3, 2022) (citation omitted).  "If a specific demand is made,

however, the ADA provides that an employer may need to initiate an informal, interactive process with the individual with a disability in need of an accommodation to identify the person's precise limitations and potential reasonable accommodations." Id. (citation and internal marks omitted). "[F]or a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant[s] must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable [employer] to make appropriate inquiries about the possible need for an accommodation." Id. (first and third alterations in original) (internal marks omitted) (quoting United States v. Hialeah Hous. Auth., 418 F. App'x 872, 876 (11th Cir. 2011) (per curiam) (unpublished)). That is, "[b]efore an employer's duty to provide a reasonable accommodation—or even to participate in the interactive process—is triggered, the employee must make an adequate request that puts the employer on notice." Id. (citation omitted). Indeed, in order for an employee "who makes a demand for an accommodation" to "meet her obligation to demonstrate that her requested accommodation is reasonable," she "must do at least two things: identify her disability and suggest how the accommodation will overcome her physical or mental limitations." Owens, 52 F.4th at 1334. Thus, an "accommodation can qualify as reasonable . . . only [i]f it enables the employee to perform the essential functions of the job," but "an

employer is not required to accommodate an employee in any manner that the employee desires—or even provide that employee's preferred accommodation." Id. at 1335 (first alteration in original) (emphasis, citations, and internal marks omitted).  While "an employee's informational burden [is considered] to be modest," to "trigger an employer's accommodation duties, a disabled employee need only identify a statutory disability and explain generally how a particular accommodation would assist her."  Id. at 1336.

Kavianpour argues that she "had a good faith belief the drug testing violated the ADA's requirement that drug testing be reasonable," and she asserts that it was unreasonable because BOR deviated from policy since pursuant to USG policies, she "should have had forty-eight hours instead of the four hours given to present for random drug testing."  [Doc. 230 at 34 (citations omitted)]; see also [Doc. 229 at 45 (citations omitted)].  However, "the ADA explicitly states that it does not prohibit the use of drug testing programs," Crager v. Bd. of Educ. of Knott Cnty., 313 F. Supp. 2d 690, 702–03 (E.D. Ky. 2004) (citations omitted), and it "specifically allows a covered entity to adopt or administer reasonable policies or procedures including but not limited to drug testing designed to ensure that [an employee suspected of using drugs is not using them]" and "to permit [] employers to conduct drug tests or take reasonable actions to ensure that an individual is no longer using illegal drugs" and "grants employers the . . . right . .

164

. . to conduct drug tests on . . . employees without violating this Act," <u>Muhammed v. City of Philadelphia</u>, 186 F. App'x 277, 279–80 (3d Cir. 2006) (unpublished) (alterations in original) (citation and internal marks omitted).   And, "special conditions imposed on employees identified as substance abusers do not violate the ADA."   <u>Clifford v. Cnty. of Rockland</u>, 528 F. App'x 6, 9 (2d Cir. 2013) (unpublished) (citation omitted) (finding disciplinary stipulation that no level of alcohol would be tolerated in plaintiff's blood for a period of a year after she was found intoxicated while working at the hospital that was not generally imposed on other employees did not run afoul of the ADA); <u>see also</u> <u>Buckley v. Consol. Edison Co. of N.Y.</u>, 155 F.3d 150, 155-56 (2d Cir. 1998) (rejecting plaintiff's argument that defendant violated the ADA and discriminated against him by requiring testing every 25 days, while other employees were tested only every five years).   Thus, Kavianpour's objection to "imposing stringent drug testing," [Doc. 229 at 45 (citation omitted); Doc. 230 at 34 (citation omitted)], was not objectively reasonable in light of the existing substantive law, <u>see</u> <u>Muhammad v. Audio Visual Servs. Grp.</u>, 380 F. App'x 864, 872 (11th Cir. 2010) (per curiam) (unpublished) (citations and internal marks omitted) ("The objective reasonableness of an employee's belief that [her] employer has engaged in an unlawful employment practice must be measured against existing substantive law," and "[w]here binding precedent squarely holds that particular conduct is not an unlawful

employment practice by the employer, and no decision of this Court or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable.").[86]

The evidence also shows that defendants accommodated Kavianpour, at least in part, by modifying the protocol in response to her January 22, 2019, email, see [Doc. 186-11 at 2], and on February 13, 2019, her four-hour testing window was moved to the afternoon upon Kavianpour's request, which is what she contends she asked for in December 2018, when she requested a fixed, predictable window of time in the afternoon to test, yet she still failed to report for testing, see [Doc. 29

---

[86] And while Kavianpour argues that BOR's drug testing as applied to her was unreasonable because she should have been allowed up to 48 hours to report to testing instead of 4 hours under USG's policy, USG's policy actually provides that "[e]mployees identified for drug testing under this policy shall be provided a specific date and time to report for testing" and that "such date and time shall be as soon as possible, but not later than two (2) business days following the date the individual receives notification to report." [Doc. 194-11 at 3-5]. Thus, contrary to Kavianpour's interpretation, the policy does not require that she been given 48 hours to report for testing, and more importantly, Kavianpour's "own complaint fails to allege that the policy [was] applied in a discriminatory fashion based on a disability," but the "term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Smith v. City of N.Y., No. 15-cv-4493 (RJS), 2016 WL 4574924, at *10 (S.D.N.Y. Sept. 1, 2016) (citation and internal marks omitted); see also Berg v. Fla. Dep't of Lab. & Emp. Sec., Div. of Vocational Rehab., 163 F.3d 1251, 1255 (11th Cir. 1998) (finding plaintiff failed to support claim of ADA violation by arguing that state agency had failed to apply its policies correctly, absent showing that policies were misapplied because of plaintiff's disability).

¶¶ 232-33; Doc. 189-14 at 1; Doc. 207-54 at 84-87; Doc. 209-1 at 33-37].  The evidence further shows, as AUMC points out, see [Doc. 241 at 24], that there was no issue with Kavianpour leaving her clinical and patient duties while on pager duty to go report for a drug screen, and in fact, Kavianpour acknowledged being "overly cautious" about the pager, [Doc. 178-12 at 164-67 pp. 164-67; Doc. 192 at 195-96 pp. 195-96; Doc. 197 at 132-33 pp. 132-33; Doc. 223-1 at 68-69 pp. 67-68, 71 p. 70, 124-25 pp. 123-24.  Thus, "[t]he problem with this claim, for [Kavianpour], is that . . . [she] could do [her]. . . job without an accommodation," Wiggins, 2022 WL 625075, at *18, yet when she was provided the accommodation requested, at least in part, she still failed to report as directed and therefore, she "has not demonstrated that . . . she requested reasonable—as opposed to ineffective or unnecessary—accommodations," and her retaliation claim fails, Konieczny v. N.Y. State Div. of Parole, 647 F. Supp. 2d 256, 265 (W.D.N.Y. 2009); see also Summerland v. Exelon Generation Co., 455 F. Supp. 3d 646, 662 (N.D. Ill. 2020).[87]  Thus, Kavianpour failed

---

[87] Moreover, the evidence shows that neither Arnold nor Norton perceived Kavianpour as having a substance abuse disorder or as having any safety problems at the time she made this request, see [Doc. 186 at 8 p. 31, 45 p. 178; Doc. 194 at 81 p. 81], and because Kavianpour's argument is that defendants "regarded [her] as having a disability," but she "has not shown that [s]he had a good faith belief that [s]he was disabled or perceived as disabled," her "request for an accommodation cannot be considered protected by the ADA," and her "retaliation claim fails," Tabatchnik v. Cont'l Airlines, 262 F. App'x 674, 677 (5th Cir. 2008) (per curiam) (unpublished) (citation omitted).  To the extent she again relies on Dr. Coule's alleged perception of her as potentially having a substance abuse disorder

to engage in protected activity based on her January 22, 2019, email.  See Andrews

v. Cobb Cnty. Sch. Dist., CIVIL ACTION FILE NO. 1:20-CV-04043-MLB-WEJ, 2021

WL 6113735, at *13 (N.D. Ga. Oct. 28, 2021), adopted by 2022 WL 2387058, at *9

(N.D. Ga. July 1, 2022).

Kavianpour also relies on her January 31, 2019, email as protected activity,

in which she again objected to the calls as not being at the most feasible times,

reiterating that she had asked for a meeting with Arnold and Norton but had not

been obliged, objecting to the validity of her positive pre-employment drug screen,

and complaining that the drug testing practices were discriminatory, constituted

harassment, were intrusive and excessive, and has resulted in a defamation of her

character.  [Doc. 186-11 at 1]; see also [Doc. 229 at 44 (citation omitted)].  Although

Kavianpour's January 31 email to Arnold "used buzz words such as harassment

and [discrimination]," she "never referenced discrimination on the basis of a

protected classification or retaliation for suggesting discrimination on the basis of

a protected classification."  Canty v. Fry's Elecs., Inc., Civil Action No. 1:09–CV–

3508–WSD–LTW, 2012 WL 1038619, at *10 (N.D. Ga. Feb. 2, 2012), adopted by 2012

---

to show that defendants regarded her as having a disability, this argument fails,
since Dr. Coule testified that he was aware that Kavianpour had generally
expressed concerns about the drug tests but that he did not know she had objected
to the legality of the testing when he suspended her or about the specific nature of
her complaints.  See [Doc. 223-1 at 44-45 pp. 43-44, 81-83 pp. 80-82, 88 p. 87, 99-100
pp. 98-99]; see also [Doc. 187-9 at 174-75 pp. 174-75].

WL 1038611, at *10 (N.D. Ga. Mar. 27, 2012); [Doc. 186-11 at 1]; see also Jeronimus v. Polk Cnty. Opportunity Council, Inc., 145 F. App'x 319, 326 (11th Cir. 2005) (per curiam) (unpublished) (internal marks omitted) (finding that plaintiff's email complaining of being "singled out, being subjected to a campaign of harassment, and working in a hostile environment," did not "amount to protected conduct," since plaintiff "never suggested that this treatment was in any way related to his race"); Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006) (citation omitted) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."); Sanchez v. Mgmt. Enter. Dev. & Servs., Inc., CIVIL ACT. NO. 2:19-cv-277-ECM, 2022 WL 988378, at *15 (M.D. Ala. Mar. 31, 2022) (emphasis and citation omitted) (finding that "[w]hile it [was] true that [plaintiff] repeatedly complained of discrimination and harassment, he failed to specify or imply any unlawful basis that he believed such behavior was based on" and that he may have considered the actions discriminatory "in a broad sense [was] not the same as believing that they were unlawfully discriminatory because of his disability," but "[o]nly the latter constitutes protected activity," and "[w]ithout some indication that he complained of disability discrimination to his . . . supervisors, his claim of retaliation based on such a complaint" failed); Black v. Reynolds, 150 F. Supp. 3d 1273, 1281 (S.D. Ala. 2015) (citation omitted) (finding

169

plaintiff's email complaining of bullying and harassment did not constitute statutorily protected activity since it failed to mention that the conduct was based on a protected characteristic "as opposed to, say, a personal dislike," and explaining that "[s]imply complaining that one [felt] 'picked on' [would] not suffice"), aff'd, 674 F. App'x 851 (11th Cir. 2016) (per curiam) (unpublished); Mikell v. Marriott Int'l, Inc., 789 F. Supp. 2d 607, 619 (E.D. Pa. 2011) (footnote, citation, and internal marks omitted) (finding neither of plaintiff's informal complaints, which included a letter from plaintiff's lawyer referencing "illegal discrimination in the workplace" constituted "protected activity for purposes of a prima facie case of retaliation," since "there [was] no mention of the protected class in question"); Fitzhugh v. Topetzes, Civil Action No. 1:04-CV-3258-RWS, 2006 WL 2557921, at *11-12 (N.D. Ga. Sept. 1, 2006) (emphasis, citations, and internal marks omitted) (finding the "grievances [plaintiff] voiced to her employer were in the nature of personal complaints respecting her experiences with personal animus, being 'singled out' for unfair treatment, and 'discrimination' against her as an individual," but that she never complained that "she was being discriminated against on the basis of [a protected characteristic]" specifically).  In short, "[a]bsent from the record is any actual evidence indicating that [Kavianpour] informed [defendants], or any [] decision-maker, that [s]he felt [s]he was being discriminated against because of [her] . . . disability [or perceived disability]," and

"[t]his failure is fatal to [her] claims."  Cribbs v. NFI Network Logistic Sols., LLC,

No. CV411–263, 2014 WL 4805328, at *8 (S.D. Ga. Sept. 26, 2014) (emphasis and

citations omitted).  Because the Court finds that Kavianpour did not engage in

statutorily protected activity, she cannot establish a prima facie case of unlawful

retaliation under the ADA, and defendants' motions for summary judgment are

due to be granted as to these claims and Kavianpour's motion is due to be denied.

### 2.      *Legitimate, Non-Retaliatory Reasons & Pretext*

Even assuming Kavianpour could established a prima facie case of

retaliation under the ADA, for the reasons discussed with regard to Kavianpour's

disability discrimination claims, the Court agrees with defendants that

Kavianpour's retaliation claims fail because she has not shown that their proffered

legitimate, non-retaliatory reasons for suspending her clinical privileges and

terminating her from the residency program were pretextual.  See [Doc. 207-1 at

23-25; Doc. 241 at 19-21].  As discussed, AUMC asserts that Dr. Coule suspended

Kavianpour's clinical privileges upon discovering "a pattern of behavior"

involving missed drug tests following a positive pre-employment test and a DUI

arrest that he found concerning and indicative of either subversion of authority or

severe lapse in judgment, [Doc. 241 at 14-15, 19-21 (citations omitted)], and BOR

asserts that when her ability to practice in the hospital was suspended, it

terminated her employment because she could no longer continue in the residency

program, [Doc. 207-1 at 24], and these reasons constitute legitimate, non-retaliatory reasons for the adverse employment actions, thereby satisfying defendants' "exceedingly light" burden and shifting the onus to Kavianpour to prove by a preponderance of the evidence that defendants' reasons are pretext for prohibited, retaliatory conduct, see Vessels, 408 F.3d at 770 (citation omitted).  To establish pretext, Kavianpour "must present concrete evidence in the form of specific facts which show [] [defendants'] proffered reason[s are] mere pretext." Smith v. Harvey, 421 F. Supp. 2d 1370, 1378 (S.D. Ala. 2006) (citation and internal marks omitted).  Again, Kavianpour must meet defendants' reasons "head on and rebut [them]."   Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (footnote and citation omitted).

Kavianpour relies on the same pretext arguments she advanced with regard to her discriminatory discharge claim, see [Doc. 209-1 at 45-49 (arguing that BOR has asserted shifting reasons for her termination without implementing the remediation plan); Doc. 229 at 49 (same)]; however, the Court has already addressed these arguments and found them to be unpersuasive.  Because Kavianpour attempts to show pretext with respect to her retaliation claims in the same manner she did with respect to her disability discrimination claims, "[f]or the same reasons that this Court rejected her attempts to establish pretext for those claims, the Court finds that she has failed to introduce any evidence from which a

jury could infer pretext for her retaliation claim[s]." Philson v. Hosp. Auth. of Houston Cnty., Civil Action No. 5:08–CV–155 (HL), 2009 WL 2477255, at *15 (M.D. Ga. Aug. 10, 2009); see also Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1316 (N.D. Ga. 2009), adopted at 1290.  In sum, Kavianpour has failed to "produce[] any evidence, outside of [her] own conclusory say-so, that would support an inference of [] [retaliation] from the circumstances," and the Eleventh Circuit has "repeatedly and emphatically held[ that] employers may terminate an employee for a good or bad reason without violating federal law." Flowers v. Troup Cnty., Ga., Sch. Dist., 803 F.3d 1327, 1337-38 (11th Cir. 2015) (citation and internal marks omitted).  "Because [Kavianpour] has the burden of persuasion . . ., it is [her] responsibility to advance sufficient evidence of [] [retaliation] to create a triable factual dispute," id. at 1338, but she has failed to do so.  Accordingly, it is **RECOMMENDED** that defendants' motions for summary judgment on Kavianpour's retaliation claims under the ADA be **GRANTED**, and Kavianpour's motion for summary judgment as to these claims be **DENIED**.[88]

---

[88] Although Kavianpour argues in her reply brief in support of her motion for summary judgment that she could survive summary judgment on her ADA claims under the alternative analysis that there is "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination [or retaliation] by the decisionmaker," Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (footnote, citations, and internal marks omitted); [Doc. 247 at 7-9], for all the reasons discussed herein, the record simply does not support such an inference, see Johnson v. Airbus Def. & Space Inc, 858 F. App'x 304, 310 (11th Cir.

E.     **Kavianpour's State Law Claims against BOR**

Kavianpour asserts state law claims against BOR for breach of contract and retaliation under the GWA.  [Doc. 209-1 at 49-51].  Kavianpour's state law claims, however, do not on their face "aris[e] under the Constitution, laws, or treaties of the United States," and therefore are not a sufficient basis for federal question jurisdiction, <u>Bank of N.Y. v. Wilson</u>, Civil Action File No. 1:08-CV-332-TWT, 2008 WL 544741, at *1 (N.D. Ga. Feb. 25, 2008) (quoting 28 U.S.C. § 1331), adopted at *1; <u>see also</u> <u>Caterpillar Inc. v. Williams</u>, 482 U.S. 386, 392 (1987), and Kavianpour has not alleged diversity jurisdiction under 28 U.S.C. § 1332, <u>see</u> 28 U.S.C. § 1332(a), nor could she in this case.  Because Kavianpour has failed to allege any viable federal claim, if the recommendation to dismiss all the federal claims is adopted, it is further **RECOMMENDED** that supplemental jurisdiction not be exercised over the remaining state law claims against BOR and that those claims be **DISMISSED WITHOUT PREJUDICE**.  <u>See</u> <u>Carnegie-Mellon Univ. v. Cohill</u>, 484

---

2021) (unpublished) (citation omitted) (rejecting plaintiffs' mosaic of circumstantial evidence theory that was "largely based on their disagreement with [defendant's] business judgment," noting that the Eleventh Circuit had "rejected similar business-judgment quarrels in the past," since "courts do not sit as 'super-personnel departments,' reexamining the wisdom of business decisions"); <u>see also</u> <u>Davidson v. Chspsc LLC</u>, 861 F. App'x 306, 313 (11th Cir. 2021) (per curiam) (unpublished) (internal marks omitted) (finding plaintiff's "convincing mosaic arguments," which were "the same as her pretext arguments," failed "to provide sufficient circumstantial evidence of discrimination or retaliation under the ADA").

U.S. 343, 350 (1988); <u>Scarfo v. Ginsberg</u>, 175 F.3d 957, 962 (11th Cir. 1999); <u>see also</u>

<u>Bryant v. Norfolk S. R.R.</u>, No. 22-10452, 2022 WL 17420593, at *1 (11th Cir. Dec. 6,

2022) (per curiam) (finding no error where the district court declined to exercise

supplemental jurisdiction over the remaining state law claims after granting

summary judgment as to the federal claims).   Alternatively, if supplemental

jurisdiction is exercised over the remaining state law claims asserted against BOR,

for the reasons that follow, it is **RECOMMENDED** that BOR's motion for

summary judgment, [Doc. 207], be **GRANTED** as to Kavianpour's state law claims

asserted against it and that Kavianpour's motion for summary judgment, [Doc.

209], be **DENIED**.

### 1.   *Breach of Contract*

Kavianpour's remaining breach of contract claim asserted against BOR is

premised on her allegation that "BOR breached House Staff Policy 10.0 by failing

to have policies and procedures in place that ensure coverage of patient care in the

event that a resident may be unable to perform their patient care responsibilities,"

which ultimately resulted in her suspension and termination from the residency

program.   [Doc. 209-1 at 50 (internal marks omitted); Doc. 207-1 at 25 (citation

omitted)]; <u>see also</u> [Doc. 29 ¶¶ 71-75, 81, 83-84, 176, 179-80].   BOR maintains that

"there were policies/procedures to ensure patient care coverage when

[Kavianpour] was contacted for testing, which [she] ignored," and that "even if a

technical breach occurred, any damages are the result of [her] failure to utilize available procedures for ensuring patient coverage." [Doc. 207-1 at 25-26].

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Uhlig v. Darby Bank & Tr. Co., 556 F. App'x 883, 887 (11th Cir. 2014) (per curiam) (unpublished) (internal marks omitted) (quoting Norton v. Budget Rent A Car Sys. Inc., 705 S.E.2d 305, 306 (Ga. Ct. App. 2010)). "A breach occurs if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible." UWork.com, Inc. v. Paragon Techs., Inc., 740 S.E.2d 887, 893 (Ga. Ct. App. 2013) (citation omitted); see also N.Y. Life Ins. Co. v. Grant, 57 F. Supp. 3d 1401, 1410 (M.D. Ga. 2014) (citation omitted). Additionally, "[u]nder Georgia law, damages for breach of contract are given as compensation for the injury sustained as a result of the breach of a contract, and damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." LNV Corp. v. Branch Banking & Tr. Co., 723 F. App'x 653, 656 (11th Cir. 2018) (per curiam) (unpublished) (alteration, citations, and internal marks omitted). And, "[d]amages growing out of a breach of contract, in order to form the basis of a

recovery, must be such as can be traced solely to the breach[.]" Theni Guru Krishna Textile Mills (P), LTD. v. World's Glob. Source, LLC, CIVIL ACTION NO. 1:16-CV-1482-SCJ, 2018 WL 11336434, at *3 n.6 (N.D. Ga. Mar. 6, 2018) (citation and internal marks omitted), aff'd sub nom. Theni Guru Krishna Textile Mills, Ltd v. World's Glob. Source, LLC, 844 F. App'x 279 (11th Cir. 2021) (per curiam) (unpublished).

Although BOR argues that Kavianpour has failed to show a breach occurred, see [Doc. 207-1 at 27-31], the Court need not address this argument because, as BOR contends, Kavianpour has failed to establish that "any [] technical breach caused [her] damages," since the evidence shows that following Kavianpour's missed drug screen on February 13, 2019, BOR terminated her employment after Dr. Coule made the decision to suspend her clinical privileges at AUMC, which he made after considering the totality of the circumstances, including Kavianpour's pre-employment drug screen, DUI arrest, missed drug screens, and other issues, indicative of a pattern of behavior that appeared to him to be subversive or extremely poor judgment, and after it appeared that Kavianpour had been unwilling to simply seek coverage on February 13 or take the pager and go test as she had been instructed to do, and thus, her "damages cannot be traced solely to the alleged breach," [id. at 31-32 (footnote and citations

omitted); Doc. 242 at 18 (citation omitted)].  Therefore, summary judgment is due to be granted in favor of BOR on Kavianpour's breach of contract claim.

 2. *GWA*

 Kavianpour alleges that BOR retaliated against her in violation of the GWA by terminating from the residency program after she objected to the drug testing protocol to her supervisor as violating state and federal laws.  See [Doc. 209-1 at 49; Doc. 230 at 38-40]; see also [Doc. 29 ¶ 190; Doc. 207-1 at 33 (citation omitted)]. Under the GWA, "[n]o public employer shall retaliate against a public employee for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency, unless the disclosure was made with knowledge that the disclosure was false or with reckless disregard for its truth or falsity."  O.C.G.A. § 45-1-4(d)(2).[89]

 To set forth a prima facie case for retaliation under O.C.G.A. § 45-1-4(d)(2), "the employee must present evidence that (1) the employer falls under the statute's definition of public employer; (2) the employee disclosed a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government agency; (3) the employee was then discharged, suspended, demoted, or suffered

---

[89] "'Law, rule, or regulation' includes any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance."  O.C.G.A. § 45-1-4(a)(2).

some other adverse employment decision by the public employer; and (4) there is some causal connection between (2) and (3)." Hogan v. Hosp. Auth. of Valdosta & Lowndes Cnty., Civil Action No. 7:15-CV-138 (HL), 2016 WL 3248374, at *5 (M.D. Ga. June 13, 2016) (citation and internal marks omitted). BOR moves for summary judgment on this claim, arguing that Kavianpour cannot establish a prima facie case because she has failed to show that she engaged in protected activity and she cannot establish a causal connect between any alleged protected activity and her termination. [Doc. 207-1 at 33-37]. BOR also argues that even if Kavianpour could establish a prima facie case, it is still entitled to summary judgment on this claim because it has articulated a legitimate, non-retaliatory reason for her termination from the residency program, which she has failed to show was pretextual. [Id. at 38-39].

Kavianpour has also moved for summary judgment on her GWA claim, asserting that she has established a prima facie case, see [Doc. 209-1 at 49-50]; see also [Doc. 247 at 18-19], but as BOR points out, she "makes no effort to show [BOR's] legitimate, non-retaliatory[] reason for [her] termination was pretextual," [Doc. 225 at 25], and she has not responded to BOR's argument in this regard, see [Doc. 230 at 38-40], and "completely fails to establish pretext," [Doc. 225 at 25]. Because Kavianpour has failed to address BOR's arguments regarding its legitimate, non-retaliatory reasons for her termination and shown there is a

179

genuine issue of pretext, summary judgment is due to be granted on her GWA retaliation claim.  See Dimino v. Ga. Dep't of Admin. Servs., CIVIL ACTION FILE NO. 1:13-CV-00195-ODE-RGV, 2014 WL 11444088, at *20 (N.D. Ga. Nov. 26, 2014) (citations omitted) (finding plaintiff's GWA retaliation claim failed as a matter of law because she failed to rebut defendant's legitimate, non-retaliatory reasons for her termination), adopted by 2015 WL 11018406, at *14 (N.D. Ga. Mar. 24, 2015), aff'd, 631 F. App'x 745 (11th Cir. 2015) (per curiam) (unpublished); Schultz v. City of Hapeville, CIVIL ACTION NO. 1:08-cv-3222-WSD-RGV, 2010 WL 11493296, at *12 (N.D. Ga. Jan. 15, 2010) (citations omitted) (recommending summary judgment in favor of defendant on plaintiff's retaliation claim where defendant articulated legitimate, non-retaliatory reasons for the adverse employment actions, which plaintiff failed to address, and, "as a result, [plaintiff ] failed to establish that they were pretextual"), adopted by 2010 WL 11493295, at *3 (N.D. Ga. Feb. 9, 2010). Moreover, as previously explained with regard to Kavianpour's ADA retaliatory discharge claim, she "has failed to demonstrate her firing was not the result of any of the legitimate reasons proffered by [BOR]," and she "has failed to point to any evidence rebutting those reasons and has failed to demonstrate her [termination] was pretextual" and, "[a]s such, even if [she] could establish a prima facie case of GWA retaliation, her failure to rebut the proffered reasons for termination with evidence showing pretext means summary judgment on this claim must be

granted [in favor of BOR]." <u>Williams</u>, 2022 WL 4588587, at *14 (emphasis and all caps omitted).

## IV. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that defendants' renewed motion to exclude expert reports, [Doc. 248], be **GRANTED IN PART** and **DENIED IN PART**, that defendants' motions for summary judgment, [Docs. 199 & 207], be **GRANTED**, and that Kavianpour's motion for summary judgment, [Doc. 209], be **DENIED**.

The Clerk is **DIRECTED** to terminate this referral.

**IT IS SO RECOMMENDED** and **DIRECTED** this 27th day of January, 2023.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE