## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Sarah M. Kavianpour, M.D.,

                 Plaintiff,

                           Case No. 1:20-cv-152-MLB

v.

Board of Regents of the University
System of Georgia d/b/a Augusta
University, and Medical College of
Georgia Health, Inc. d/b/a AU
Medical Center, Inc.,

                 Defendants.

_____/

## OPINION & ORDER

Plaintiff Sarah M. Kavianpour claims Defendant Board of Regents of the University System of Georgia d/b/a Augusta University ("AU") and Defendant Medical College of Georgia Health, Inc. d/b/a AU Medical Center, Inc. ("AUMC") discriminated and retaliated against her in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. Plaintiff also asserts state law claims against AU for breach of contract and for violations of the Georgia Whistleblower Act. Several filings are now pending before the Court. All three parties move

for summary judgment (Dkts. 199; 207; 209), Defendants move to exclude Plaintiff's experts (Dkt. 248), and AU objects to two declarations submitted in support of Plaintiff's summary judgment motion (Dkt. 227). The Magistrate Judge recommends granting Defendants' summary judgment motions, denying Plaintiff's summary judgment motion, granting in part Defendants' motion to exclude, and sustaining in part AU's objections to the declarations. (Dkt. 254.) Plaintiff and AU both object to the Magistrate Judge's report and recommendation ("R&R"). (Dkts. 258; 264.) The Court grants summary judgment to Defendants on Plaintiff's federal claims, remands Plaintiff's state-law claims to the Superior Court of Fulton County, denies as moot Defendants' motion to exclude, and overrules as moot AU's objection to Plaintiff's declarations.

## I.   Factual Background

In March 2018, AU offered Plaintiff a position in its neurosurgery residency program. (Dkt. 230-1 ¶ 1.) A few months later, Plaintiff underwent a pre-employment drug test, which detected marijuana in her urine at a level of 19 ng/ml—slightly above the 15 ng/ml threshold required for a positive result. (Dkt. 229-1 ¶¶ 11, 13.) An outside laboratory then retested Plaintiff's urine sample and detected marijuana

at a level of 11 ng/ml—slightly below the 15 ng/ml threshold.  (Dkt. 229-1 ¶ 19.)  Plaintiff ultimately took another test and passed it.  (Dkt. 229-1 ¶ 20.)  So AU let her start her residency in July 2018.  (Dkt. 229-1 ¶ 20.)

In August 2018, AU Human Resources ("HR") employees Susan Norton and Debra Arnold met with Plaintiff, gave her a memorandum saying she was subject to "random drug testing" due to her "initial test result," and explained they would randomly contact her once a month for the next year to ask her to take a drug test within an hour's notice.  (Dkts. 186 at 12; 189 at 165–170; 194 at 267; 194-1.)  Plaintiff passed the first monthly test in September 2018.  (Dkt. 230-1 ¶¶ 86–87.)  She initially provided a diluted urine sample in October 2018 (meaning the sample contained too much water to accurately measure the presence of drugs).  (Dkt. 230-1 ¶¶ 90–91.)  But she tested negative two days later when AU asked her to retest.  (Dkt. 230-1 ¶ 93.)  Plaintiff also tested negative in November 2018 (after missing a test scheduled earlier in the month while she was on vacation) and again in December 2018 (after initially claiming she could not step away from work for the test).  (Dkt. 230-1 ¶¶ 98, 101, 104–106.)  In late 2018, she was arrested and charged with driving under the influence ("DUI").  (Dkt. 229-1 ¶ 35.)

3

On January 17, 2019, Ms. Arnold left Plaintiff a voicemail and sent her an email asking her to report for a drug test within an hour. (Dkts. 189-13 at 3; 230-1 ¶¶ 108–109.)  Plaintiff did not appear for the test because she was off duty and did not see Ms. Arnold's communications until it was too late. (Dkt. 230-1 ¶ 108.)  A few days later, Plaintiff sent Ms. Arnold a response email saying she had not yet taken the test because she was "busy" with work. (Dkt. 189-13 at 2.)  She also asked to meet with Ms. Arnold and Ms. Norton "to discuss the inappropriate timing of calls/testing, the lack of flexibility and justification per [AU] policy (and state and federal laws)." (Dkt. 189-13 at 2.)  On January 31, 2019, Ms. Arnold responded that "[r]efusal to participate or failure to complete any step of the testing process results in discharge," "academic and clinical activity assigned by your department[] will not be an excuse," and "since you were unable to meet the last testing date . . . , we will extend the random drug testing [by a month]." (Dkt. 189-13 at 2.)  Plaintiff replied that AU was targeting her unfairly:

> Instead of facilitating a conversation for more reasonable arrangements, you decided [to] buckle down with a list of demands. I was postcall and asked for flexibility and you respond with punishment and extension of testing as retaliation. This forces me to question the legality of these practices you are imposing on me in the first place. It is

clearly not random and quite frankly discriminatory.  This is harassment. . . .  [Y]ou have singled me out and subjected me to prejudice. . . .  I have been cooperative and have completed what I consider to be an intrusive and excessive amount [of] testing in a setting of undue suspicions—all of which have been negative.

(Dkt. 189-13 at 1.)

At 8:30 a.m. on February 8, 2019, Ms. Arnold instructed Plaintiff to present for a drug test within four hours.  (Dkts. 186 at 30; 189-13 at 2; 226 ¶ 92.)  Plaintiff said she could not do so because she was on pager duty, all the other residents were in the operating room, and no one was available to take the pager from her.  (Dkt. 226 ¶¶ 93, 96.)  Ms. Arnold agreed to give her until 4 p.m. to complete the test.  (Dkt. 226 ¶ 96.)  Plaintiff asked another resident to take the pager from her at about 1 p.m.  (Dkt. 226 ¶ 97.)  The resident refused.  (Dkt. 226 ¶ 97.)  Plaintiff never reported for the test.  She told Ms. Arnold she did not do so because she was busy with work, one resident refused to take the pager from her, and other residents were tied up in the operating room.  (Dkt. 230-1 ¶ 135.)

On February 21, 2019, Ms. Arnold sent Dr. Phillip Coule (AUMC Chief Medical Officer) a memorandum explaining that Plaintiff missed her monthly drug tests in January and February and that HR warned

her she could be terminated for doing so.  (Dkt. 186-4.)  The letter also mentioned Plaintiff's DUI charge.    (Dkt. 186-4.)    Later that day, Dr. Coule sent Plaintiff a letter suspending her AUMC clinical privileges due to a "concern for patient safety."  (Dkt. 187-3.)  The same day, Dr. Samuel Macomson (AU Neurosurgery Residency Program Director) sent Plaintiff a letter terminating her residency employment with AU. (Dkt. 226 ¶ 114.)   The letter said her termination was due to her suspension from AUMC: "The Chief Medical Officer for the Health System has exercised his discretion and authority to revoke your ability to practice in the medical center and related facilities.  Therefore, you are not able to be trained in the health system, which is a requirement for you to be in our residency program." (Dkt. 192-4.)  AU upheld Plaintiff's termination on appeal.

In late 2019, Plaintiff filed this lawsuit in Fulton County Superior Court. (Dkt. 1-1.)  Defendants removed shortly thereafter. (Dkt. 1.)  The Court dismissed the bulk of Plaintiff's complaint at the pleading stage. (Dkt. 69.)  But four claims remain: (1) disability discrimination under the ADA and the Rehabilitation Act (Counts 8 and 12); (2) retaliation under the ADA (Count 9); (3) retaliation under the Georgia Whistleblower Act

(Count 2); and (4) breach of contract under Georgia law (Count 1). The parties move for summary judgment on all four claims. Defendants also ask the Court to exclude Plaintiff's experts and disregard two declarations on which Plaintiff relies in her summary judgment papers. The Magistrate Judge recommends granting summary judgment to Defendants on Plaintiff's federal claims, dismissing Plaintiff's state claims without prejudice, essentially excluding Plaintiff's experts, and disregarding a portion of Plaintiff's declarations. Plaintiff and AU object to the R&R.

## II.   Legal Standards

### A.   Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). But, "[w]here the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party, there is no genuine issue for trial."
*Salinero v. Johnson & Johnson*, 995 F.3d 959, 964 (11th Cir. 2021).

### B.    R&R

A district court must "make a de novo determination of those portions of [an R&R] to which objection is made."  28 U.S.C. § 636(b)(1). It need not review unobjected-to portions of an R&R.  *See Thomas v. Arn*, 474 U.S. 140, 149–152 (1985).  Whether or not objections are filed, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

## III.  The Parties' Filings

Before turning to the merits, the Court first addresses the parties' filings in this case.  In June 2022, the Court told the parties their opening summary judgment submissions were "larded up with stuff that seems distracting from the main point," "the briefing [was] too much," "so much . . . could be more targeted," "this case could be handled within the normal page limits," and the parties' remaining submissions should be "focused." (Dkt. 261 at 5–7, 64).  The parties obviously ignored this guidance because their final briefing and fact statements exceed 1,500 pages (to say nothing of their exhibits, which run thousands of pages more).  This

includes roughly 1,000 pages for the parties' summary judgment motions, 300 pages for Defendants' related requests to exclude Plaintiff's experts and declarations, and 300 pages of objections and responses to the Magistrate Judge's 181-page R&R. The result is a dizzying maze of arguments and evidence that obscures far more than it illuminates.

Perhaps the most egregious of these filings is Plaintiff's R&R objections. They are <u>240 pages</u> long—an unprecedented length in the Court's experience—and Plaintiff filed them even though the Court (1) previously identified her attorney as "the culprit of the extra pages" and (2) previously said it was inclined to impose a "page limit on any objections." (Dkt. 261 at 64.) True, the Court never formally imposed a specific page limit. And the Local Rules do not include a limit either. But Plaintiff knew the Court both wanted and expected targeted objections. And she still did the opposite without first seeking leave. She never even mentioned her intention to file such voluminous objections when she requested extra time to prepare them or when the Court held a hearing on her request. (*See* Dkts. 256; 267.) To the contrary, she said she needed extra time to "boil *down*" the issues, be "efficient[]," present "polished and appropriate work product," "be clear and cogent," and ultimately make

the Court's job "easier." (Dkt. 267 at 4–5, 11–12 (emphasis added).) Those representations—which caused the Court not to impose page limitations—are inconsistent with the objections Plaintiff ultimately filed.

Plaintiff's Local Rule 56.1 filings are also problematic. Rule 56.1 requires a non-movant to file "concise, nonargumentative responses" to a movant's statement of material facts in order to "help the court identify and organize the issues in the case." LR 56.1(B)(2)(a)(1), NDGa; *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). Plaintiff's 56.1 responses do not fit that description. (*See* Dkts. 229-1; 230-1.) They run almost 200 pages (in response to only *80* pages of facts), force the Court to "hunt and peck for the relevant undisputed facts," and are "convoluted," "argumentative," "rambling," "non-responsive," and littered with "cross-references." *Hayes v. ATL Hawks, LLC*, 844 F. App'x 171, 185 (11th Cir. 2021); *Mann*, 588 F.3d at 1303. This is true even for the most innocuous facts. For example, AU claims "Plaintiff . . . received a 'Resident Counseling Form' during a February 11, 2019, meeting with Dr. Macomson and Dr. Rahimi." (Dkt. 230-1 ¶ 81.) In response to that one-sentence assertion, Plaintiff offers four pages of commentary,

incorporates at least five other responses from elsewhere in her filing, alludes to legal arguments about "direct evidence of pretext and retaliation," and includes upwards of twenty citations to the record. (*Id.*) This kind of kitchen-sink approach makes it virtually impossible to identify what is disputed—and what is not—without spending enormous amounts of time on each alleged fact. That is not how the process is supposed to work.

To make matters worse, Plaintiff routinely mischaracterizes the evidence and the law, further hampering the Court's efforts to resolve this case in the right way. Some of these mischaracterizations may border on dishonesty. For example, Plaintiff claims AU unilaterally could have overturned Plaintiff's AUMC suspension because "[AU] has exclusive rights over privileges for resident physicians." (Dkt. 264 at 47 n.20.) Plaintiff indicates this language is a direct quote from AU attorney Chris Melcher. (*Id.*) But it is not. Mr. Melcher actually said "*AUMC and* [AU] *have exclusive authority over credentials and privileges for residents.*" (Dkt. 192-23 at 1.) The difference between the fake quote and the real one is critical: the former suggests *unilateral* AU authority (which supports Plaintiff's argument) while the latter suggests *shared*

AU/AUMC authority (which undermines Plaintiff's argument).   Maybe it is just a coincidence that Plaintiff's errors converted an unhelpful quote into a helpful one.   But the Court doubts it.   To make the point she wanted, Plaintiff not only had to omit the words "AUMC and," but she also had to change the word "have" to "has" at a later point in the quote. She did so (without indicating she had).   And that suggests a deliberate attempt to mislead.

Plaintiff also claims AUMC's Chief Medical Officer "testified that he personally reviewed" two key emails that Plaintiff sent AU in January 2019.  (Dkt. 229 at 45, 48.)   But the Chief Medical Officer never offered that testimony.   As Plaintiff's own citation shows, all he said was he reviewed a *letter* that Plaintiff *received* in January 2019.  (Dkt. 177-2 at 67; *see* Dkt. 187-2.)   He then testified expressly that he did not recall whether he reviewed Plaintiff's January 2019 emails.  (Dkt. 177-2 at 80; *see* Dkt. 187-6.)   AUMC pointed this out in its reply brief.  (Dkt. 241 at 24.)   But, undeterred, Plaintiff repeated the same misrepresentation in her R&R objections.   (Dkt. 264 at 159.)   This kind of fast and loose approach is evident throughout Plaintiff's submissions.

Given the sorry state of the record here, and in an effort to bring at least some order and manageability to the mess the parties (mainly Plaintiff) have made, the Court generally ignores (1) arguments raised in a perfunctory manner, in footnotes, or in a reply brief;[1] (2) arguments—even relevant ones—raised in connection with a different motion;[2] (3) arguments that "incorporate by reference" portions of another filing;[3]

---

[1] *See Bridges v. Morgan*, 2022 WL 342905, at *4 (11th Cir. Feb. 4, 2022) (parties cannot "raise [an] issue in a perfunctory manner without supporting arguments and authority"); *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1209 n.5 (11th Cir. 2019) ("We do not ordinarily consider arguments raised in passing in one footnote rather than the body of the brief."); *United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court.").

[2] *See Off. of Fulton Cnty. Dist. Att'y v. United States Dep't of Just.*, 2021 WL 4205666, at *2 n.3 (N.D. Ga. Sept. 16, 2021) ("[The parties] cannot rely on the Court to sua sponte comb through [other] briefs, pull out anything potentially relevant, and reapply it to the motion pending before the Court."); *Ameris Bank v. Lexington Ins. Co.*, 2016 WL 5496383, at *1 (S.D. Ga. Sept. 28, 2016) ("[A party's] motion, as well as [any] response, should be stand-alone filings that independently contain all the arguments the parties wish the Court to consider."); *Bio-Med. Applications of Georgia, Inc. v. City of Dalton, Ga.*, 685 F. Supp. 2d 1321, 1327 (N.D. Ga. 2009) ("a court must consider each motion separately on its own merits," even if there are "cross-motions for summary judgment").

[3] *See Ameris Bank*, 2016 WL 5496383, at *1 ("This Court does not accept piecemeal briefs that incorporate by reference arguments contained in other filings."); *Davis v. DeKalb Cty., Georgia*, 2005 WL 8154356, at *2 n.3 (N.D. Ga. May 31, 2005) ("[I]ncorporation by reference of arguments made in other briefs . . . circumvents the page limitations imposed by the Local Rules of this district.").

(4) arguments that could have been, but were not, squarely presented to the Magistrate Judge;[4] (5) arguments that obviously lack merit;[5] (6) facts or evidence not included in the parties' Rule 56.1 filings in the required format;[6] and (7) facts or evidence to which the parties do not specifically cite—and whose relevance and application the parties do not specifically explain—in the relevant argument section of their brief.

The Court also bypasses the parties' objections—and any objected-to portions of the R&R—and instead conducts a de novo review of the

---

[4] *See Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) ("[A] district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge."); *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.").

[5] *See Duren v. Hopper*, 161 F.3d 655, 667 n.16 (11th Cir. 1998) ("All other arguments are without merit and warrant no discussion."); *Palciauskas v. U.S. I.N.S.*, 939 F.2d 963, 966 n.4 (11th Cir. 1991) ("Petitioner presents several other arguments that are without merit and warrant no discussion.").

[6] *See* LR 56.1, NDGa.; *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (compliance with Local Rule 56.1, which the Eleventh Circuit holds in "high esteem," is "the only permissible way . . . to establish a genuine issue of material fact"); *see also Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record.").

underlying motions.[7]   The Court has the discretion to do this.   *See Williams*, 557 F.3d at 1291 (district courts have "the widest discretion on how to treat the recommendations of the magistrate" and can place "whatever reliance" they want on an R&R).   The Court exercises that discretion here because what the parties have presented is simply not consistent with how the magistrate judge process is supposed to work. The process is supposed to promote "efficiencies," "streamline" the issues, and "relieve courts of unnecessary work."[8]   None of those things happened here.   The Magistrate Judge issued a 181-page R&R, Plaintiff responded with 240 pages of scorched-earth objections challenging virtually everything in the R&R (and then some), Defendants added their own two cents, and the Court has now been left to undo a tangled mess approaching 500 pages (on top of all the underlying briefing and related filings).   Wading into this mess would frustrate, not further, the policy

---

[7] The Court adopts the limited portions of the R&R to which no party specifically objects, except for the R&R's discussion of the employment relationship between AU, AUMC, and Plaintiff.  (Dkt. 254 at 93–99.)  The Court need not resolve that issue to decide this case.

[8] *Bilus v. United States*, 2021 WL 3523922, at *6 n.12 (11th Cir. Aug. 11, 2021); *Howe v. City of Akron*, 801 F.3d 718, 757 (6th Cir. 2015); *Lavin v. Husted*, 764 F.3d 646, 652 (6th Cir. 2014); *Williams*, 557 F.3d at 1291–92; *Malone v. Pipefitters' Ass'n, Loc. Union 597*, 774 F. Supp. 490, 494 (N.D. Ill. 1991).

goals underlying the magistrate judge system.  So the Court declines to do it.

The upshot is simple.  The Court focuses on the parties' underlying motions rather than the R&R or the R&R objections.  The Court considers each motion separately because each presents different arguments and relies on different evidence (and because doing otherwise would require the Court to (1) sift through hundreds of pages to stitch together each party's overall position on every issue and then (2) determine how those positions interact with one another on a global level).[9]  And the Court focuses on contested arguments that are (1) "plainly and prominently raised," (2) "flesh[ed] out" with "sufficient detail," and (3) "supported by

---

[9] *See Design Concepts of Niagara, Ltd. v. Lippert Components Mfg., Inc.*, 2014 WL 3489568, at *4 (N.D. Ind. July 15, 2014) ("Because cross-motions for summary judgment are treated separately under the standards applicable to each, and because the parties raise different arguments relative to each motion, the Court addresses the parties' respective motions individually.").  Plaintiff appears to advocate this approach as well.  (*See* Dkts. 230 at 18 ("The court must rule on each party's motion on an individual and separate basis."); 264 at 10 (court must "consider cross motions for summary judgment separately").)

arguments and citations to the record and to relevant authority."[10]  With

these ground rules established, we turn to the merits.

## IV.    Federal Disability Discrimination Claims (Counts 8 and 12)

In Counts 8 and 12, Plaintiff claims Defendants subjected her to

disability discrimination in violation of the ADA and the Rehabilitation

Act.  (Dkt. 29 ¶¶ 229–237, 268–276.)  The ADA makes it unlawful for an

employer to "discriminate against a qualified individual on the basis of

disability in regard to . . . terms, conditions, and privileges of

employment."  42 U.S.C. § 12112(a).  The Rehabilitation Act includes a

similar prohibition against disability discrimination.  *See* 29 U.S.C. §

794(a).  A person counts as disabled under either statute if her employer

"perceive[s]" her—even erroneously—to have a "physical or mental

impairment."  42 U.S.C. §§ 12102(1), (3); *see Wolfe v. Postmaster Gen.*,

488 F. App'x 465, 467 (11th Cir. 2012).  Plaintiff claims she is disabled

under this definition because Defendants erroneously perceived her to

have a "substance abuse disorder"—that is, a drug addiction—

---

[10] *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1327 n.16
(11th Cir. 2021); *U.S. S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d
786, 811 (11th Cir. 2015); *Whitten v. Soc. Sec. Admin., Comm'r*, 778 F.
App'x 791, 793 (11th Cir. 2019).

throughout her residency.  (Dkt. 29 ¶¶ 230, 270.)  No one doubts that drug addiction constitutes an "impairment" or that perceived drug addiction constitutes a "disability."  *See Socal Recovery, LLC v. City of Costa Mesa*, 56 F.4th 802, 813 (9th Cir. 2023); *Jones v. City of Bos.*, 752 F.3d 38, 58 (1st Cir. 2014); *A Helping Hand, LLC v. Baltimore Cnty., MD*, 515 F.3d 356, 367 (4th Cir. 2008).  But Defendants say summary judgment is warranted because Plaintiff's alleged disability did not motivate them to take any of the employment actions about which she complains.  The Court agrees.

### A.    Legal Framework

The ADA and the Rehabilitation Act involve "the same standards," "the same legal framework," and "the same analysis."  *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1214 (11th Cir. 2021); *Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1315 n.3 (11th Cir. 2019).  So the Court considers them together under the rubric of the ADA.  *See Gilliard v. Georgia Dep't of Corr.*, 500 F. App'x 860, 867 (11th Cir. 2012) ("Claims brought under the Rehab Act are analyzed under the same framework as the ADA, and, thus, need not be addressed separately.").

18

An ADA discrimination claim has three elements: (1) plaintiff was disabled, (2) plaintiff was qualified, and (3) defendant took adverse employment action against plaintiff *because* she was disabled. *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016); *Jordan v. City of Union City, Ga.*, 646 F. App'x 736, 739 (11th Cir. 2016). This case turns on the third element. To prevail under that element, plaintiff must show her "disability actually motivated the employment decision" about which she complains—meaning her disability "had a determinative influence on the outcome of the employer's decision." *King v. HCA*, 825 F. App'x 733, 736 (11th Cir. 2020); *Smith v. Miami-Dade Cnty.*, 621 F. App'x 955, 959 (11th Cir. 2015). Or, put another way, plaintiff must show her employer would not have done what it did "but for" her disability. *Duckworth v. Pilgrim's Pride Corp.*, 764 F. App'x 850, 853 (11th Cir. 2019).[11] At the summary judgment stage, this requires (1) "direct evidence" of disability discrimination; (2) enough circumstantial evidence to survive the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411

---

[11] Although the ADA requires only "but-for" causation, the Rehabilitation Act requires a heightened showing of "sole" causation. *Porterfield v. Soc. Sec. Admin.*, 2021 WL 3856035, at *4 (11th Cir. Aug. 30, 2021). The Court need not explore this distinction because Plaintiff's claims fail even under the lower "but-for" standard.

U.S. 792 (1973); or (3) "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City, Georgia* ("*Lewis II*"), 934 F.3d 1169, 1185 (11th Cir. 2019); *Williams v. Hill*, 2022 WL 1715212, at *4 (N.D. Ga. Mar. 31, 2022).

"[D]irect evidence is evidence that, if believed, proves the existence of a fact without inference or presumption." *Todd*, 998 F.3d at 1215. "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of [disability,] constitute direct evidence of discrimination." *Id.* Evidence that "merely suggests" discrimination is not direct. *Id.*

"In the absence of direct evidence of discrimination, [courts] apply the burden-shifting framework established by the Supreme Court in *McDonnell*." *Jones v. Aaron's Inc.*, 748 F. App'x 907, 914 (11th Cir. 2018). Under that framework, "plaintiff has the initial burden of establishing a prima facie case of disability discrimination." *Caporicci v. Chipotle Mexican Grill, Inc.*, 729 F. App'x 812, 815 (11th Cir. 2018). The burden then "shifts to the defendant to proffer a legitimate, nondiscriminatory reason for taking the challenged employment action." *Jest v. Archbold Med. Ctr., Inc.*, 561 F. App'x 887, 889–90 (11th Cir. 2014). "Once the

defendant proffers a reason, the plaintiff must . . . demonstrate that the proffered reason was a pretext for discrimination." *Id.* at 890.

If a plaintiff cannot cite direct evidence or survive *McDonnell*, her only option is the "convincing mosaic" theory.  To prevail under that theory, plaintiff must "assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action." *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 700 (7th Cir. 2014).  "A convincing mosaic may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis II*, 934 F.3d at 1185.  "Whatever form it takes, if the circumstantial evidence is sufficient to raise a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012).

## B.     AU's Motion for Summary Judgment

Plaintiff claims AU subjected her to heightened drug testing and terminated her residency because it thought she was a drug addict, in violation of the ADA.  (Dkt. 29 ¶¶ 230, 233, 270–272; *see* Dkt. 230 at 23.) AU says summary judgment is warranted on this claim because, even if AU perceived Plaintiff to be an addict, it did not subject her to heightened testing or terminate her residency *based on* that perception (in other words, it would have done those things anyway).  (Dkt. 207-1 at 8–18.) This means Plaintiff must come forward with "specific facts" showing AU took the challenged employment actions because it thought she was an addict.  *Johnson v. Walt Disney Parks & Resorts U.S., Inc.*, 2022 WL 16915741, at *2 (11th Cir. Nov. 14, 2022).  Plaintiff has not done that.  So the Court grants AU's motion.

### 1.     Drug Testing

Plaintiff's first alleged adverse employment action is her drug testing protocol.  Plaintiff claims there is "direct evidence" AU imposed the protocol because it thought she was a drug addict.  (Dkt. 230 at 23.) But nothing she cites even approaches the "stringent" definition of direct evidence.  *Bryant v. Jones*, 696 F. Supp. 2d 1313, 1323 (N.D. Ga. 2010);

*see Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987) ("It is rare that direct evidence of discrimination exists."); (*see* Dkt. 230 at 20–23). The closest she gets is her citation to Mr. Melcher's testimony that AU imposed the protocol because it believed Plaintiff "potentially was abusing substances." (Dkt. 230 at 21; *see* Dkt. 193 at 27.) But engaging in substance abuse (drug use) is not the same thing as having a substance abuse *disorder* (drug addiction). *See Jones*, 752 F.3d at 58–59 (distinguishing "addict[ion]" from "currently using illegal drugs"); *Polak v. Sterilite Corp.*, 2021 WL 1753757, at *6 (N.D. Tex. May 4, 2021) (distinguishing "illegal drug use[]" from "having a physical or mental impairment due to . . . drug usage"). And it is impossible to conclude, "*without inference or presumption*," that Mr. Melcher was talking about the latter instead of the former. *Todd*, 998 F.3d at 1215 (emphasis added). So his statement is not "blatant" enough to prove "directly" that AU imposed the protocol based on a perception of addiction. *Id.*

With direct evidence off the table, we turn to *McDonnell*. "[W]hen a plaintiff relies on the *McDonnell Douglas* burden-shifting framework to prove an intentional-discrimination claim using circumstantial evidence, she must demonstrate—as part of her prima facie case—that she was

treated differently from other individuals with whom she was similarly situated in all material respects." *Lewis v. City of Union City, Georgia* ("*Lewis I*"), 918 F.3d 1213, 1231 (11th Cir. 2019); *see Barber v. Cellco P'ship*, 808 F. App'x 929, 935 (11th Cir. 2020) (applying this requirement to an ADA claim). Plaintiff has not even tried to do that here. She does not identify a similarly situated comparator. And she does not say how that comparator received better treatment. So *McDonnell* is a nonstarter.

That leaves the convincing mosaic theory. Plaintiff's only effort to invoke this theory appears in a generalized, one-sentence footnote. (Dkt. 230 at 23 n.5.) That is not enough to preserve the argument. *See Pinson*, 942 F.3d at 1209 n.5 ("We do not ordinarily consider arguments raised in passing in one footnote rather than the body of the brief."); *Skelton v. Birmingham Airport Auth.*, 2021 WL 4476800, at *3 (11th Cir. Sept. 30, 2021) ("[A] party forfeits a convincing mosaic argument by failing to adequately brief the issue."). But, even if it was, Plaintiff has not presented "a convincing mosaic of circumstantial evidence" from which a jury could infer the requisite causal link between her perceived drug addiction and her monthly drug testing. *Lewis II*, 934 F.3d at 1185. That

is so for many reasons, but two are particularly key.  First, AU did not perceive Plaintiff to be a drug addict when it decided to impose her testing protocol in early July 2018 or when it actually did impose her protocol on August 21, 2018.  So, even if AU later developed such a perception, it could not have *caused* the protocol or any of the drug tests required thereunder.  *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.7 (2003) ("If [defendant] were truly unaware . . . a disability existed, it would be impossible for her . . . decision to have been based, even in part, on [that] disability.").   Second, AU has presented a legitimate nondiscriminatory reason for imposing the protocol, and Plaintiff has not shown this reason was pretextual.  *See Gibson v. JetBlue Airways Corp.*, 2021 WL 5368056, at *7 (11th Cir. Nov. 18, 2021) ("[Plaintiff's] discrimination claims failed under th[e] convincing mosaic approach because she could not demonstrate pretext.").  The Court elaborates on both issues below.

*AU's Perception*.  First, there is no evidence AU viewed Plaintiff as suffering from a substance abuse disorder when it decided to adopt Plaintiff's drug testing protocol in early July 2018—before Plaintiff was even a resident—or when it communicated that protocol to Plaintiff on

August 21, 2018.  (*See* Dkts. 188-2 at 14; 194 at 104, 148–154, 187–191; 230-1 ¶¶ 25–27, 42, 44.)   As of those dates, AU knew Plaintiff's pre-employment drug test detected limited marijuana in her urine.  But it knew nothing else that suggested Plaintiff used drugs at all.  So it had no basis for believing she was an addict (which is an ADA impairment) as opposed to a "casual or recreational" user (which is not).  *Polak*, 2021 WL 1753757, at *6; (*cf.* Dkt. 188 at 75 ("You cannot assume impairment from [marijuana] levels in a urine sample.")).  Even Plaintiff concedes her test result gave Defendants "no reason to believe [she] used marijuana more than once."  (Dkt. 229 at 30.)   Using marijuana "once" hardly suggests an addiction or a disorder.  *Almond v. Westchester Cnty. Dep't of Corr.*, 425 F. Supp. 2d 394, 400 (S.D.N.Y. 2006) (defendant knew plaintiff "overdos[ed] on a prescription drug" but, "[a]t most," this suggested "defendant may have thought plaintiff was a casual user or abuser of drugs").

The limited value of a single drug test is why Mr. Melcher's testimony—which Plaintiff said was *direct* evidence of disability discrimination—does not even move the needle *circumstantially*.  Recall that Mr. Melcher said AU imposed Plaintiff's protocol because AU

believed she "potentially was abusing substances." (Dkt. 193 at 27.) Critically, though, Mr. Melcher also said this belief was based solely on Plaintiff's positive pre-employment test result. (*See* Dkt. 193 at 27 ("[T]he intent of the testing program in this case was she had failed a drug test, she therefore was someone who we believed . . . potentially was abusing substances.").) Because a single test result so obviously cannot show addiction—all it can show is one-time use—Mr. Melcher must have been talking about simple substance abuse rather than a substance abuse disorder. No reasonable jury could reach a different conclusion. After all, Mr. Melcher never characterized Plaintiff's possible substance abuse as a "disorder" or referred to any kind of chronic or compulsive misbehavior.

Plaintiff cites a grab bag of evidence in response, but none of it shows AU viewed her as an addict when it introduced her protocol. (*See* Dkt. 230 at 20–22.) Plaintiff starts with a syllogism: (1) the record shows AU applied similar drug testing protocols to Plaintiff and a 2013 resident who failed a pre-employment drug test; (2) Ms. Norton's handwritten notes say the 2013 resident was "a recovering addict"; ergo (3) AU must have thought Plaintiff was a recovering addict as well. (Dkt. 230 at 20.)

But this argument fails because Ms. Norton's notes do not actually say the 2013 resident was a "recovering addict."  The notes included that phrase initially, but the word "addict" was scratched out.  (*See* Dkt. 194-23 at 3.)  Ms. Norton testified she scratched out the word in real time— as she was writing the notes—because she concluded it was "not [an] appropriate" characterization of the resident.  (Dkt. 194 at 277, 279.) That Ms. Norton took this considered step suggests, if anything, she did *not* believe the resident was an addict.  Indeed, she testified expressly she was "not aware [the resident] had an addiction" and did not recall "treating him" as if he did.  (Dkt. 194 at 237, 282.)[12]

---

[12] This provides another example of Plaintiff's lack of fealty to the record evidence.  In her summary judgment response brief, Plaintiff fails to mention Ms. Norton's scratching out of the word "addict."  (*See* Dkt. 230 at 6, 20.)  Plaintiff also argues that Ms. Norton testified AU treated the 2013 resident as an addict when, in fact, Ms. Norton said she and others *rejected* that characterization.  (*Compare* Dkt. 230 at 6, 20, *with* Dkt. 194 at 277, 279.)   Indeed, Plaintiff cites an exchange from Ms. Norton's deposition to support her contention that Ms. Norton and AU treated the 2013 resident as a recovering addict.  But, in that very exchange, Ms. Norton rejected Plaintiff's contention.  (Dkt. 194 at 237 ("Q: So you treated [the 2013 resident] . . . . You were treating him as a recovering addict, right? A: I do not recall that.").)  There was more back and forth during the deposition, but Ms. Norton—contrary to Plaintiff's assertion— never agreed she (or AU) treated the 2013 resident as a recovering addict.

Moreover, even if AU did view the 2013 resident as an addict, it would hardly follow that AU thought Plaintiff was an addict as well.  AU could have decided to apply similar protocols to Plaintiff and the 2013 resident not because both were addicts but because both failed pre-employment drug tests, disputed their test results, and ultimately continued with their residencies.  That is an "obvious alternative explanation" for treating both residents similarly.  *Doe v. Rollins Coll.*, 2020 WL 8409325, at *9 (M.D. Fla. July 13, 2020).  And it is an explanation that finds ample support in the record.  (*See* Dkt. 194 at 62–63 (AU applied similar protocols "given [Plaintiff's] dispute[d]" test results), 148 ("[W]e were following the prior process and precedent that had been set with the [2013] resident who had also had a positive drug test."), 224 (AU applied similar protocols because Plaintiff's "pre-employment drug test [was] positive").)  Plaintiff's explanation, by contrast, finds no support.  So it is too speculative to credit.  *See Frazier v. Sec'y, Dep't of Health & Hum. Servs.*, 710 F. App'x 864, 865 (11th Cir. 2017) ("inferences based on speculation" are insufficient to survive summary judgment, as is "evidence that is merely colorable" or "not significantly probative").

Plaintiff next points to Dr. Coule's testimony that Plaintiff's testing protocol was "consistent with what has been done for faculty and other providers that have a concern about a substance abuse problem." (Dkt. 230 at 21; *see* Dkt. 223-1 at 140.) But Dr. Coule testified he was talking only about *AUMC's* approach to *non*-residents. (Dkt. 223-1 at 54, 85, 140–145.) He also said AUMC's policy was "separate" from AU's. (*Id.*) He could not speak to AU's approach to residents like Plaintiff. (*Id.*) So his testimony does not change the calculus.

Finally, Plaintiff cites evidence that (1) she told an AU administrative employee she smoked marijuana every day in medical school; (2) the administrative employee reported Plaintiff's statement to Dr. Macomson; (3) Dr. Macomson and Dr. Walter Moore (AU's Designated Institutional Officer) met with Plaintiff about the alleged statement; and (4) Dr. Moore asked Plaintiff to enroll in an outside program for medical professionals suffering from "addiction and other mental health disorders." (Dkt. 208-3 at 1; *see* Dkts. 230 at 21; 230-1 ¶¶ 37–40.) But neither the administrative employee nor Dr. Macomson was involved in AU's decision to subject Plaintiff to heightened drug testing. (*See* Dkt. 230-1 ¶¶ 59–60); *see Pride-Fort v. N. Am. Lighting*,

2020 WL 1953804, at *11 n.19 (N.D. Ala. Apr. 23, 2020) ("[T]he conduct of a non-decisionmaker generally will not be imputed to a decisionmaker."). And nothing suggests Dr. Moore (who was part of the decision) was exposed to any of these issues—that he learned about Plaintiff's alleged marijuana statement, met with Plaintiff about the statement, or referred her to an addiction program—until *after* AU initiated Plaintiff's protocol on August 21, 2018. (*See* Dkt. 230-1 ¶¶ 39–40.) So, while this evidence may suggest *some* officials viewed Plaintiff as a potential addict at *some* point, it does not involve the specific officials or dates necessary to support Plaintiff's claim here.[13]

Given the totality of the record, no reasonable jury could conclude that AU viewed Plaintiff as a drug addict when it decided to adopt Plaintiff's testing protocol or when it ultimately initiated that protocol. So, even assuming AU *later* perceived Plaintiff to be an addict, that

---

[13] Plaintiff claims that, "[o]n August 22, 2018, a meeting was held with Dr. Macomson, AUMC Counsel Clark Speese, AU Counsel Greg Bryan, and Debra Arnold where they discussed [Plaintiff's] (alleged) marijuana use and decided to require her to enroll [an addiction program]." (Dkt. 230 at 21.) But, even assuming this discussion occurred at all (which is unclear because Plaintiff's only supporting evidence is three pages of vague unauthenticated handwritten notes), it occurred *after* AU initiated Plaintiff's testing protocol on August 21, 2018. So it does not change the Court's analysis.

perception could not have caused the protocol or any of the drug tests required thereunder.  AU had already made its decision.[14]

***AU's Explanation.***   AU has also presented a legitimate nondiscriminatory reason for requiring Plaintiff to undergo heightened drug testing: (1) Plaintiff's pre-employment drug test detected marijuana in her urine; (2) this suggested *recent* drug use; so (3) AU "implemented a common sense protocol for intermittent drug screens" to ensure she was not engaged in *current* drug use "that could impact patient care or safety." (Dkt. 207-1 at 2–4, 13, 17, 24; *see* Dkt. 193 at 27–28.)  This explanation does not presuppose Plaintiff had an addiction.  It is agnostic on that point.  It simply assumes recent use makes current use more likely, and current use makes patient harm more likely.  These are lawful, common-sense assumptions.  And an employer does not violate the ADA when it acts on them.  *See Jones*, 752 F.3d at 58–59 (no ADA

---

[14] AU officials talked about applying Plaintiff's protocol for a year— rather than a shorter period—because an "addictionologist" claimed doing so would "carr[y] far more weight in the addiction/legal review arena." (Dkts. 186-14 at 13; 188 at 91.)  Plaintiff does not cite this evidence in her response to AU's motion (not in the relevant argument section, anyway).  But, even if she had, it would not change the outcome here.  The use of the word "addiction" in the email at issue did not refer, in any way, to Plaintiff or her conduct.

violation where an employer fired employees because "it believed them to be currently using illegal drugs" rather than because "it perceived they were addicts"); *Lopez v. Pac. Mar. Ass'n*, 657 F.3d 762, 764 (9th Cir. 2011) (no ADA violation where an employer rejected job applications based on the applicants' "failed drug test" rather than their "drug addiction"). Plaintiff does not really argue otherwise.  Nor has she meaningfully argued—much less shown—AU's explanation is pretextual.  (*See* Dkt. 230 at 19–30.)  That is fatal.  *See King*, 825 F. App'x at 736 ("[P]laintiff generally must introduce some evidence indicating that the employer's stated, non-discriminatory reason for its action is not credible and that the decision was actually motivated by unlawful discrimination.").

To sum up, Plaintiff has not presented a "convincing mosaic" of evidence from which a jury could infer the requisite causal link between Plaintiff's perceived addiction and her monthly drug tests.  Nor is there any other basis on which a jury could infer the requisite link because Plaintiff has also failed to present direct evidence of intentional discrimination or an adequate circumstantial case under *McDonnell*.  That being so, AU is entitled to summary judgment on Plaintiff's drug testing discrimination claim.

## 2.   Termination

Plaintiff's next alleged adverse employment action is her termination.  Plaintiff claims Dr. Coule's deposition testimony includes "direct evidence" that AU terminated her residency because it thought she was an addict.  (Dkt. 230 at 22–23.)  But there are two problems with this theory.  First, Dr. Coule simply said he "believed [Plaintiff] could potentially have a substance abuse disorder" "at the time [he] suspended [her]."  (Dkt. 223-1 at 37–38.)  This does not necessarily mean he suspended her *because* of that belief.  So the statement is not direct evidence.  Second, Dr. Coule testimony is about the suspension of Plaintiff's clinical privileges, not her termination.  Plaintiff never clearly explains why her AUMC suspension—even assuming it were discriminatory—means her AU termination was discriminatory as well.  Perhaps she has some kind of cat's paw theory in mind—that Dr. Coule suspended Plaintiff based on discriminatory animus and this animus caused AU to terminate Plaintiff's residency—but Plaintiff never fleshes out that theory with nearly enough heft to properly raise it, much less prevail on it.  (Dkt. 230 at 23); *see Shell v. AT&T Corp.*, 2021 WL 3929916, at *9 (11th Cir. Sept. 2, 2021) (the district court properly

"refus[ed] to apply a cat's paw theory" at summary judgment because plaintiff "failed to elaborate on th[e] theory" or "make specific cat's paw arguments" in his response brief).[15]   Plaintiff also invokes an agency theory—that Dr. Coule acted as an AU agent when he suspended Plaintiff's clinical privileges—but her only support for that theory is a block quotation from Dr. Coule's job description.  (Dkt. 230 at 23–24.) That, too, is insufficient.  (*See* Dkt. 242 at 4–5 (AU making the same point).)  At the end of the day, Plaintiff simply has not shown Dr. Coule's testimony is direct evidence of discriminatory action by anyone, much less discriminatory termination by AU specifically.

That leaves Plaintiff with only two methods of proving AU's discriminatory intent: the *McDonnell* framework and the convincing mosaic theory.  Unfortunately for Plaintiff, both approaches fail for the same reasons they failed before.  Plaintiff has not shown—and has not really tried to show—AU treated a similarly situated comparator more

---

[15] The Court raises this possibility based on Plaintiff's contention that AU "did not further investigate the soundness of [Dr. Coule's suspension] determination" before terminating her residency. (Dkt. 230 at 23.) Plaintiff does not, however, express her intention to invoke liability under a cat's paw theory on this issue or explain any argument for such liability.

favorably.  So *McDonnell* is out.  And Plaintiff's only effort to invoke the convincing mosaic theory appears in the same generalized, one-sentence footnote to which the Court referred earlier.  That is not enough to raise the issue.  So mosaic is out as well.

A convincing mosaic theory would also fail on the merits here because AU has presented a legitimate nondiscriminatory reason for terminating Plaintiff's residency, and Plaintiff has not shown that reason was merely a pretext for disability discrimination.  AU says it terminated Plaintiff's residency because (1) AUMC suspended her clinical privileges, (2) this meant "Plaintiff could not be trained in the hospital," and (3) that meant Plaintiff "could not be trained as a resident."  (Dkts. 207-1 at 15, 38; 230-1 ¶¶ 153–154; 242 at 6.)  This explanation is nondiscriminatory because it is "unrelated to [Plaintiff's alleged] disability."  *Forsyth v. Univ. of Alabama, Bd. of Trustees*, 2021 WL 4075728, at *5 (11th Cir. Sept. 8, 2021).  It is also legitimate because Plaintiff's inability to complete her clinical training for an indefinite period "might motivate a reasonable employer" to terminate her residency.  *Id.*; *see Rodriguez v. Cargo Airport Servs. USA, LLC*, 2015 WL 13016400, at *7 (S.D. Fla. Aug. 5, 2015) (noting this is how the Eleventh Circuit generally defines a

36

legitimate reason).  Perhaps a more patient employer would have taken a different approach.  But, even if this Court "disagree[d] with the wisdom" of AU's decision, "it is not [the Court's] role to decide how to run [AU's] business or to dictate employment criteria to [AU]."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1031 (11th Cir. 2000).

AU has met its "exceedingly light" burden to articulate a legitimate nondiscriminatory reason for terminating Plaintiff's residency.  *Forsyth*, 2021 WL 4075728, at *5.  So, to survive summary judgment, Plaintiff must "introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).  This means Plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason."  *Id.*  Plaintiff has not met that burden.

Plaintiff first claims Dr. Coule testified "he had suspended other residents' privileges in the past [and] his suspensions did not result in immediate terminations by [AU]."  (Dkt. 230 at 26.)  Plaintiff suggests the immediacy of AU's decision here was abnormal and evidence of pretext.  But Plaintiff misrepresents Dr. Coule's testimony.  Dr. Coule

said he suspended two other residents, AU then terminated both residents, and Dr. Coule did *not* know how much time passed between the suspensions and the terminations.  (Dkt. 223-1 at 96–98.)  When asked whether the residents were "immediately terminated," Dr. Coule said "I'm not certain."  (Dkt. 223-1 at 96.)  When asked again if he knew the timing of the terminations, Dr. Coule could not have clearer: "No." (Dkt. 223-1 at 98.)[16]

Plaintiff also claims AU "knew that a suspension did not require a termination" because (1) Dr. Coule testified AU has the discretion to take action other than termination after a suspension, and (2) an AU Health document supposedly says AU "[must] investigate a suspension and has the authority to reinstate hospital access."  (Dkt. 230 at 26–27.)  But, as to the first point, Plaintiff has not established a basis for imputing Dr. Coule's belief (about what discretion AU has) to AU's decisionmakers at the time of Plaintiff's termination.  And, as to the second point, the AU Health document merely *contemplates* a post-suspension investigation (it does not require one).  (Dkt. 177-3 at 4.)  Nor does it say AU can

---

[16] Given the clarity of this testimony, it is difficult to understand Plaintiff's basis for making the argument she does.

"reinstate hospital access" for a suspended resident.  (Dkt. 177-3 at 4.)[17]

Moreover, even assuming AU had the authority to reverse Plaintiff's

suspension, nothing suggests AU decisionmakers knew that at the time

of their termination decision.  To the contrary, they testified they did

not.[18]  Plaintiff, in fact, concedes that Dr. Macomson and Dr. Fernando

Vale (AU Neurosurgery Department Chair) were both unaware they had

the authority to overturn the suspension of Plaintiff's clinical privileges.

(Dkt. 230-1 at ¶ 153.)[19]  It is not discrimination to act on "erroneous facts."

*STME*, 938 F.3d at 1320.

---

[17] The document says AUMC can suspend a resident when in AUMC's "sole opinion" the resident poses a safety risk, AUMC "shall cooperate in AU's investigation" of the suspension, "AU shall have the sole right to determine whether to take any disciplinary action" against the resident, but "nothing herein shall prevent [AUMC] from taking action in compliance with its medical staff bylaws regarding medical staff privileges of physicians at [AUMC]."  (Dkt. 177-3 at 4.)  The last clause is notable because Dr. Coule testified he suspended Plaintiff's clinical privileges pursuant to AUMC's bylaws.  (Dkt. 223-1 at 22–23.)

[18] (*See* Dkts. 178-1 at 30 (Dr. Macomson as 30(b)(6) witness); 178-12 at 385 (Dr. Macomson); 192 at 180 (Dr. Macomson); 197 at 157 (Dr. Vale); *see also* Dkt. 223-1 at 140 (Dr. Coule).)

[19] Plaintiff contends "HR and in-house counsel" misled Drs. Macomson and Vale into believing they had no authority to overturn Dr. Coule's suspension of Plaintiff's clinical activities.  (Dkt. 230-1 at ¶ 153.)  But she cites no record evidence to support that contention.  Nor does she explain its legal significance.

More fundamentally, though, even if AU believed a suspension did not automatically trigger termination under its internal rules, that would not really tell us whether AU believed Plaintiff's suspension nonetheless warranted her termination (which is all that matters under the pretext inquiry). Companies terminate employees all the time for things that do not trigger *automatic* termination. When they do, the absence of an automatic-termination rule hardly casts doubt on the sincerity of their motives or suggests illicit discrimination. So too here. As Plaintiff's own citations show, AU terminated other residents after AUMC suspended them. (Dkts. 230 at 26; 223-1 at 96–98.) Plaintiff has not cited any resident whose suspension did not end in termination. AU's decisionmakers repeatedly testified they thought Plaintiff's suspension warranted her termination.[20] And, ten days *before* Plaintiff's termination, Dr. Macomson explicitly warned Plaintiff in a written counseling form that she must "uphold the expectations of [AU's] affiliates" because, "in the event [AUMC] decide[s] that you are not allowed to practice within their walls, you cannot and will not be able to

---

[20] (*See* Dkts. 178-1 at 111, 113, 116 (Dr. Macomson as 30(b)(6) witness); 192 at 50, 132–134, 141, 172 (Dr. Macomson); 197 at 144, 154–155 (Dr. Vale); *see also* Dkt. 194 at 90–91 (Ms. Norton).)

complete your residency training at [AU]." (Dkt. 192-17 at 1–2.) All of this suggests that, whether or not Plaintiff's suspension automatically *required* her termination, AU sincerely believed it *warranted* that result. That is what counts.

Plaintiff next claims AU "deviated from its policies" by failing to investigate Plaintiff's suspension, reporting Plaintiff's DUI to Dr. Coule, requiring Plaintiff to undergo heightened drug testing, and botching the internal investigation and appeal process after Plaintiff was terminated. (Dkt. 230 at 27–28.) The Court has reviewed the evidence on which Plaintiff relies for these arguments. None of it is probative enough to show intentional disability discrimination. *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus."); *Rojas v. Fla.*, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002) ("To establish pretext, a plaintiff must show that the deviation from policy occurred in a discriminatory manner."); *Connelly v. WellStar Health Sys., Inc.*, 758 F. App'x 825, 830 (11th Cir. 2019) (policy deviation did not show pretext because "there is no basis to suggest that the deviation occurred in a discriminatory manner").

To take what is probably Plaintiff's best deviation argument, Plaintiff says AU violated internal policy by failing to investigate her suspension before terminating her residency. But this argument fails because, as the Court noted a moment ago, AU policy simply contemplated an investigation, it did not require one. *See Luke v. Univ. Health Servs., Inc.*, 842 F. App'x 503, 510 (11th Cir. 2021) (policy deviation did not show pretext because, even if the policy established "optimal" practices, it was "not mandatory"). And, even if an investigation was required, Dr. Macomson testified he did not know that. (Dkt. 178-1 at 108; *see also* Dkt. 186 at 35 (same for Ms. Arnold).) AU also reviewed the facts underlying Plaintiff's suspension—and communicated with AUMC about those facts—just days before her suspension occurred. That casts doubt on the utility of another investigation, days later, into the same issues. *See Keaton v. Cobb Cnty., GA*, 2009 WL 212097, at *5 n.6 (11th Cir. Jan. 30, 2009) ("minimal" policy deviation did "not support an inference of pretext"). For all these reasons, AU's failure to conduct a post-suspension investigation does not suggest discriminatory animus based on disability. *See Hudson v. Blue Cross*

*Blue Shield of Alabama*, 431 F. App'x 868, 870 (11th Cir. 2011) (failure to investigate—in violation of company policy—did not show pretext).

Plaintiff's last pretext argument claims that AU "identified new, performance-based" reasons for Plaintiff's termination almost a year after the fact. (*See* Dkt. 230 at 29–30.)  This argument fails because, at most, it accuses AU of giving "additional but consistent reasons for [Plaintiff's] termination." *Henderson v. Lab'y Corp. of Am. Holdings*, 851 F. App'x 972, 978 (11th Cir. 2021).  That is not evidence of pretext. *Id.* Plaintiff has not established a viable mosaic here.

### 3.   Conclusion

Plaintiff cites no direct evidence of disability discrimination.  She cannot proceed under *McDonnell* because she has not shown AU treated a similarly situated comparator more favorably.  And she has failed to present a convincing mosaic.  So, however you slice it, no reasonable jury could conclude that AU subjected her to heightened drug testing and terminated her residency based on her perceived drug addiction.  And that means AU is entitled to summary judgment on Plaintiff's discrimination claims.

## C.    AUMC's Motion for Summary Judgment

Plaintiff claims AUMC suspended her clinical privileges because it thought she was a drug addict, in violation of the ADA.  (Dkts. 229 ¶¶ 230, 233, 270, 272; 229 at 35–41.)  AUMC says summary judgment is warranted on this claim because, even if AUMC perceived Plaintiff to be an addict, it did not suspend her based on that perception.  (Dkt. 199-1 at 16–18.)  The Court agrees.

Plaintiff insists "there is direct evidence [of discriminatory intent] which defeats summary judgment."  (Dkt. 229 at 35–36.)   But the only evidence she cites is Dr. Coule's testimony that (1) "at the time [he] suspended [her] privileges," he "believed [she] could potentially have a substance abuse disorder"; and (2) "there is pretty good evidence" that, "when a provider" has "an arrest for a DUI . . . or has essentially been caught in that type of activity," it is "not the first time that it's occurred." (Dkt. 229 at 35–36; *see* Dkts. 177-2 at 37–38; 187-9 at 161.)  The Court has already explained why the first statement is not direct evidence.  And the second statement falls short even more clearly than the first.  Nothing about it proves, "without inference or presumption," that AUMC

44

suspended Plaintiff *because* of any perceived addiction. *Todd*, 998 F.3d at 1215.

In the absence of direct evidence, we turn to *McDonnell*. AUMC does not challenge Plaintiff's ability to make a prima facie showing of discriminatory intent under the *McDonnell* Framework. So the burden shifts to AUMC to articulate a legitimate nondiscriminatory reason for suspending Plaintiff's clinical privileges. AUMC says it suspended Plaintiff because (1) she failed her initial pre-employment drug test, she missed other drug tests required by her protocol, and she was arrested for driving under the influence; (2) this "behavior [was] indicative either of some kind of drug and alcohol use, subversion of authority, or of severe lapses in judgment"; and (3) "*any* of [those things] raised a concern for patient safety." (Dkt. 199-1 at 16–18 (citing supporting evidence).) This reason is legitimate because it "might motivate a reasonable employer" to suspend a neurosurgery resident's clinical activities. *Forsyth*, 2021 WL 4075728, at *5. It is also nondiscriminatory because nothing about it depends on Plaintiff being a drug addict. True, AUMC refers to potential "drug and alcohol use." But, as the Court has already explained, mere use is not addiction. Nor is it a disability. So taking

action on the basis of perceived drug use—without more—is not disability discrimination. *See Jones*, 752 F.3d at 58–59 (no ADA violation where an employer fired employees because "it believed them to be currently using illegal drugs" rather than because "it perceived they were addicts"). Besides, under the plain language of AUMC's explanation, Plaintiff's drug use was not "a determinative . . . decision-making factor" in her suspension, meaning AUMC would still have suspended her even if she was not using drugs. *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999).

The burden thus shifts to Plaintiff to show AUMC's proffered reason is merely a pretext for disability discrimination. Plaintiff has not carried that burden. She offers only two pretext arguments: (1) she "took all available efforts to comply with [AU's] drug testing requirements" and (2) AUMC has offered "shifting reasons" for Plaintiff's suspension. (Dkt. 229 at 39–40.) The first argument fails because what matters is not what Plaintiff actually did but what AUMC believed. *See Todd*, 998 F.3d at 1218 ("[T]he pretext inquiry centers on the employer's beliefs, . . . not on reality as it exists outside of the decision maker's head."). And AUMC's decisionmaker, Dr. Coule, testified ad nauseum that he believed Plaintiff

had "no plausible explanation for not showing up for testing." (Dkt. 241-5 at 174; *see* Dkts. 223-1 at 82–84, 121–122; 241-5 at 165–166.) Plaintiff "presents no evidence to suggest [Dr. Coule] did not honestly believe" this. *Todd*, 998 F.3d at 1218. So whether Plaintiff actually had a good explanation for missing her drug tests is irrelevant.

Plaintiff's "shifting reasons" argument also fails for a simple reason: it is untrue. Dr. Coule has been consistent from the beginning. Just one month after Plaintiff's suspension, Dr. Coule said he suspended her for essentially the same reasons AUMC proffers now: the "combination" of events—Plaintiff's "DUI," her "positive urine drug screen on pre-employment," and her "refusal to appear for testing"— suggested potential "substance abuse," "subversive[ness]," or "error[s] in judgment," and demonstrated a "pattern of behavior and facts that . . . place[d] [AUMC's] patients in danger."[21] Even if AUMC has somehow "expand[ed]" its explanation over time—as Plaintiff suggests—that would not be dispositive because "an employer's further elaboration of a general reason is not evidence of pretext." *Davis v. City of Lake City, Fla.*,

---

[21] (Dkt. 241-5 at 156, 162, 164, 166, 171–173; *see also* Dkt. 223-1 at 55–56, 59–60, 99–100, 148 (similar testimony three years later).)

553 F. App'x 881, 886 (11th Cir. 2014).  Instead, "new reasons relied on in litigation must plainly contradict the reasons relied on at the time of the decision to be found to be pretextual." *Pate v. Chilton Cnty. Bd. of Educ.*, 853 F. Supp. 2d 1117, 1133 (M.D. Ala. 2012); *see Tidwell v. Carter Prod.*, 135 F.3d 1422, 1428 (11th Cir. 1998) ("[T]he existence of a possible additional non-discriminatory basis for Tidwell's termination does not . . . prove pretext.").

Without direct evidence or a viable case under *McDonnell*, we are left with the mosaic theory.  But Plaintiff does not invoke that theory at all against AUMC—not even in a footnote—so the argument is waived. And, even if Plaintiff had raised the argument, it would fail on the merits for the same reasons Plaintiff has not shown pretext.  *See Alsobrook v. Fannin Cnty., Georgia*, 698 F. App'x 1010, 1015 (11th Cir. 2017) ("For the same reasons [plaintiffs] failed to offer evidence establishing pretext under the burden shifting framework, they have also failed to establish a convincing mosaic"); *Mojica v. Fla. Dep't of Revenue*, 704 F. App'x 834, 837 (11th Cir. 2017) (same).

Perhaps seeing the writing on the wall, Plaintiff switches gears and argues that, even if *Dr. Coule* did not suspend her for discriminatory

reasons, *Ms. Arnold* had the requisite animus and *her* animus can be imputed to him under a cat's paw theory. (Dkt. 229 at 36–38.)  The law on cat's paw is not entirely settled.  But the parties agree that, to invoke the theory, plaintiff must show "the decisionmaker followed [a] biased recommendation without independently investigating the complaint against the employee," such that "the recommender is using the decisionmaker as a mere conduit . . . [for] the recommender's discriminatory animus." (Dkts. 229 at 36–37; 241 at 17); *see Shell*, 2021 WL 3929916, at *8 (using similar language).

Applying that standard here—at the parties' invitation and without taking any position on whether it accurately reflects the law—Plaintiff has not shown Dr. Coule suspended Plaintiff as a cat's paw for Ms. Arnold's discriminatory animus.  That is so because Plaintiff has not even shown Ms. Arnold delivered a suspension recommendation to Dr. Coule at all, much less that she did so with the requisite discriminatory animus. *Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1337 (11th Cir. 2021) ("[Plaintiff's] cat's-paw theory likewise fails, principally because she hasn't shown, or even suggested, the existence of any biased recommendations.").  Plaintiff says Ms. Arnold's February 21, 2019

memorandum to Dr. Coule was a recommendation.  But all that memorandum does is summarize Plaintiff's conduct and conclude she "failed to adhere" to her testing protocol.  (Dkt. 186-4.)  It includes no recommendation.  And Ms. Arnold only sent it because Dr. Coule asked her to.  (Dkt. 230-1 ¶ 148.)  Dr. Coule testified he made that request because he simply wanted to "document, in writing, some of the issues around what had been presented to [him] verbally."  (Dkt. 223-1 at 41; *see also id.* at 101.)

Plaintiff's cat's paw theory also fails because she has not shown Dr. Coule merely "rubber stamp[ed]" Ms. Arnold's purported recommendation without conducting any investigation of his own. *Shell*, 2021 WL 3929916, at *8.  Dr. Coule testified that, after he spoke with Ms. Arnold, (1) he reviewed "the results of [Plaintiff's] initial preemployment drug screening"; (2) he reviewed Plaintiff's "confirmatory test confirming that it was indeed [marijuana] in her urine"; (3) he asked Dr. Macomson whether Plaintiff had "performance issues" (and Dr. Macomson said there were); (4) he looked up Plaintiff's "Jail Report" online; and (5) he "kept checking the status" of Plaintiff's DUI charge before he suspended her.  (Dkts. 223-1 at 53, 74–75, 149–150; 230-1 ¶ 150; 241-5 at 156.)

50

Given these undisputed investigative actions, no reasonable jury could say Dr. Coule acted as a mere "conduit"—a rubber-stamper—for Ms. Arnold's supposedly animus-infected recommendation.

All in all, the story here is much the same as it was for AU's motion. Plaintiff has not identified direct evidence of discriminatory intent. She has not established an adequate circumstantial case under *McDonnell*. And she has not presented anything close to a convincing mosaic. This means no reasonable jury could conclude AUMC suspended Plaintiff's clinical privileges based on her alleged disability. And that means AUMC is entitled to summary judgment.[22]

---

[22] In her R&R objections, Plaintiff claims "Dr. Coule's suspension of [her] clinical duties, according to his own words, was for one overarching reason, allegedly her being a threat to patient safety due to being or being regarded as an impaired physician with a perceived substance abuse disorder." (Dkt. 264 at 16.) Plaintiff does not clearly present this theory, or the underlying evidence she cites for it, in the relevant argument section of her response brief. But, even if she had, the argument would fail on the merits for at least two reasons. First, Dr. Coule never described any "one overarching reason" for believing Plaintiff was a patient safety risk. That is a term Plaintiffs brings into the case. Second, Plaintiff's assertion "invites [the Court] to pluck a single line from [Dr. Coule's] testimony, to read that line in isolation, and to divorce that line from its context." *Todd*, 998 F.3d at 1215. "[T]he whole of [Dr. Coule's] testimony yields a different conclusion than the one [Plaintiff] advocates." *Id.* Dr. Coule was clear he suspended Plaintiff because "the totality" of her conduct suggested drug use, poor judgment,

### D.   Plaintiff's Motion for Summary Judgment

Plaintiff also moves for summary judgment on her disability discrimination claims.  It is "*extremely* rare for a plaintiff to win a motion for summary judgment in a [federal discrimination] lawsuit."  Ann C. McGinley, Laboratories of Democracy: State Law As A Partial Solution to Workplace Harassment, 30 Am. U. J. Gender Soc. Pol'y & L. 245, 259 (2022); *see Frankel v. City of New York*, 2009 WL 465645, at *4 (S.D.N.Y. Feb. 25, 2009) ("[I]n an employment discrimination case, it is virtually impossible for a plaintiff to obtain summary judgment.").   Plaintiff

---

or subversion of authority, any one of which "was sufficient to cause concern for patient safety."  (*See* Dkts. 223-1 at 37–38, 55–56, 59–60, 84, 99–100, 148; 241-5 at 156, 162–164, 166, 171–173.)  Dr. Coule did say Plaintiff's conduct suggested she could be an "impaired physician."  (Dkt. 223-1 at 59.)  But he said he was using the term "impaired" only "in the general sense" that Plaintiff "either was suffering from . . . marijuana abuse and/or alcohol abuse and/or had some extremely poor decision-making."  (Dkt. 223-1 at 60, 100, 148 (explaining he was using the term "broadly" to mean "anything that might be impairing the ability of the physician . . . to perform to the best of their abilities").)  Dr. Coule testified he never suspected Plaintiff was actually "intoxicated on the job."  (Dkt. 223-1 at 17–19.)  Given the totality of Dr. Coule's testimony—which the Court has carefully reviewed in full—no reasonable jury could conclude he suspended Plaintiff because he thought she was a drug addict.  *Cf. Todd*, 998 F.3d at 1218 (defendant testified "the risk of harm arising from [plaintiff's] mental impairment was a primary driver in [his] decision not to renew her contract"; but, "[w]hen viewed in the context of his entire deposition and his affidavit," defendant simply meant he "did not think [plaintiff] could be an effective [employee]" based on her "behavior").

presents nothing that warrants such an exceptional result here.  Even considering anything new in her motion, a reasonable jury could easily enter a verdict for Defendants.  So Plaintiff's motion is denied.

### E.    Conclusion

The Court grants Defendants' motions for summary judgment on Plaintiff's disability discrimination claims (Counts 8 and 12).  The Court denies Plaintiff's cross-motion for summary judgment on those claims.

## V.    Federal Retaliation Claims (Count 9)

In Count 9, Plaintiff claims Defendants retaliated against her in violation of the ADA.  (Dkt. 29 ¶¶ 238–247.)  The ADA makes it unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]."  42 U.S.C. § 12203(a).  To establish an ADA retaliation claim, plaintiff must show (1) she "engaged in conduct protected by the ADA"; (2) defendant took "adverse employment action" against her; and (3) defendant took that action "*because* of [plaintiff's] protected conduct."  *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1158 (11th Cir. 2005) (emphasis added).  The third element is similar to the third element of a discrimination claim: it

requires direct evidence of retaliatory intent, enough circumstantial evidence to survive the *McDonnell* framework, or a convincing mosaic of circumstantial evidence from which a jury could infer retaliatory intent. *See Hughes v. Wal-Mart Stores E., LP*, 846 F. App'x 854, 857 (11th Cir. 2021).[23]   Plaintiff did not establish any of these things for her *discrimination* claims.  And, for largely the same reasons, she has not established them for her *retaliation* claims either.

## A.    AU's Motion for Summary Judgment

Plaintiff claims AU terminated her residency because she sent AU two January 2019 emails complaining about her drug testing protocol. (Dkt. 230 at 30–37; *see* Dkt. 186-11.)  AU says summary judgment is warranted on this claim because, even if Plaintiff's emails were protected activity under the ADA, they did not cause AU to terminate her residency.  (Dkt. 207-1 at 23–25.)  The Court agrees.[24]

---

[23] The Eleventh Circuit has not yet decided whether the convincing mosaic theory is available in retaliation cases. S*ee Hampton v. Amedisys Georgia, LLC*, 2023 WL 152193, at *4 (11th Cir. Jan. 11, 2023).  But it has assumed it is.  *See id.*; *McCormick v. Se. Pers. Leasing, Inc.*, 2022 WL 4462172, at *2 (11th Cir. Sept. 26, 2022).  So the Court makes the same assumption here.

[24] Plaintiff has abandoned any theory that her drug tests were retaliatory adverse employment actions.  (Dkt. 242 at 14.)  But, even if that theory

Plaintiff does not rely on direct evidence or a convincing mosaic theory (which would both fail anyway). So the Court evaluates her claim under *McDonnell*. Assuming Plaintiff can establish a prima facie case of retaliation, the burden shifts to AU to articulate a legitimate nondiscriminatory reason for Plaintiff's termination. AU says it terminated Plaintiff because (1) AUMC suspended her clinical privileges, (2) this meant "Plaintiff could not be trained in the hospital," and (3) that meant Plaintiff "could not be trained as a resident." (Dkts. 207-1 at 4, 15, 24–25, 38; 230-1 ¶¶ 153–154; 242 at 6.) The Court has already found this is a legitimate nondiscriminatory reason. So plaintiff must show the reason "is a pretext for retaliation." *Gilliard*, 500 F. App'x at 869. Plaintiff has not made that showing.

Plaintiff cites the "close temporal proximity" between her emails (January 22, 2018 and January 31, 2018) and her termination (February 21, 2018). (Dkt. 230 at 37.) But "temporal proximity alone is insufficient" to show pretext. *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1138 n.15 (11th Cir. 2020). And there are several

---

were in play, it would fail on the merits because no reasonable jury could infer the requisite causal connection between Plaintiff's protected activity and her drug tests.

"intervening event[s]" that "undermine[] the significance of any temporal proximity" here: (1) Plaintiff missed her second drug test in a row; (2) Dr. Macomson explicitly told Plaintiff—before any suspension discussions began—that AU would terminate her residency if AUMC suspended her clinical privileges; and (3) AUMC ultimately did suspend Plaintiff's privileges.  *Id.*  This means the landscape had changed significantly between Plaintiff's emails and her termination.  And that undercuts any suggestion that the former caused the latter.

Plaintiff also cites an email from AU attorney Greg Bryan about a draft version of Plaintiff's counseling form.  (Dkt. 230 at 37.)  Mr. Bryan recommended "flesh[ing] out" Plaintiff's "problem areas . . . in more detail" because he could "already sense [AU was] headed for a rough time with [her]." (Dkt. 186-16.)  Mr. Bryan later testified he predicted a rough time based in part on Plaintiff's constant "objections to this, that, and the other thing." (Dkt. 201 at 98–99.)  Plaintiff does not explain how any of this shows the real reason for her termination was her January emails rather than her AUMC suspension.  And the Court does not really see how either.  At most, Mr. Bryan's comments suggest a possible connection between Plaintiff's January emails and a more robust documentation of

her perceived performance deficiencies. But it takes a daisy-chain of speculative inferences to go from that connection to a connection between Plaintiff's emails and her *termination*. *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1318 (11th Cir. 2011) ("evidence, consisting of one speculative inference heaped upon another, [is] entirely insufficient" at the summary judgment stage). That is especially so because Mr. Bryan was not even responsible for Plaintiff's termination. He was a non-decisionmaker. And "a non-decisionmaker employee's discriminatory remarks are not probative of a discriminatory intent." *Payne v. Goodyear Tire & Rubber Co.*, 760 F. App'x 803, 808 (11th Cir. 2019); *see, e.g.*, *Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482, 490 (11th Cir. 2020) (non-decisionmakers' discriminatory remarks insufficient to show pretext even where the ultimate decisionmakers "arguably were aware" of the remarks).

Plaintiff's last roll of the dice simply "incorporates by reference" her earlier pretext arguments about "shifting reasons" and "policy deviations." (Dkt. 230 at 37.) The Court has already rejected those arguments. So they do not save Plaintiff here.

57

Whether viewed individually or as a package, Plaintiff's pretext arguments do not show "both that [AU's proffered] reason was false, and that retaliation was the real reason." *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1298 (11th Cir. 2021). So AU is entitled to summary judgment on Plaintiff's retaliation claim.

## B.   AUMC's Motion for Summary Judgment

Plaintiff also claims AUMC suspended her clinical privileges in retaliation for her January 2019 emails. (Dkt. 229 at 41–49.) AUMC says summary judgment is warranted on this claim because Plaintiff has not established the requisite causal link between her emails and her suspension. (Dkt. 199-1 at 31–35.) The Court agrees.

We again evaluate Plaintiff's claim under the *McDonnell* framework because Plaintiff does not rely on direct evidence or a convincing mosaic theory (which would both fail anyway). To establish a prima facie case of retaliation under *McDonnell*, Plaintiff must first show "the relevant decisionmaker was aware of [her] protected conduct" at the time of the adverse employment action about which she complains. *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017). Plaintiff has not made this showing. Dr. Coule was the final

AUMC decisionmaker who suspended Plaintiff's clinical privileges.  And Plaintiff cites no evidence from which a jury could conclude he either saw Plaintiff's January 2019 emails or was otherwise aware of any ADA-protected expression in those emails.

Plaintiff says Dr. Coule "testified that he personally reviewed the January 2019 email thread."  (Dkt. 229 at 45.)  But, as the Court explained earlier, that is patently false.  Dr. Coule testified he did *not* recall seeing the emails.  (Dkt. 223-1 at 80.)  And he said, although he knew "generally" that Plaintiff was "complaining" about her drug tests, he could not recall being told anything specific about the substance of those complaints (beyond the fact "she claimed . . . she could not go across the street to test because that somehow caused a patient safety concern").  (Dkts. 229-1 ¶¶ 75–76; 223-1 at 45, 64–65, 80–82, 121–122.)  "General complaints of mistreatment," unconnected to disability, "do not constitute statutorily protected activity" under the ADA.  *Wood v. Cellco P'ship*, 2008 WL 220085, at *5 (M.D. Fla. Jan. 24, 2008); *see Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) ("A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice

constitutes unlawful employment discrimination.").   So Dr. Coule's *general* knowledge of Plaintiff's complaints does not show he was aware of any *ADA-protected* elements of those complaints.

Plaintiff counters that an AUMC attorney knew about Plaintiff's emails, Dr. Coule "talk[ed] to" that attorney when he was deciding whether to suspend Plaintiff, the attorney must have told Dr. Coule about Plaintiff's emails during those discussions, so Dr. Coule must have known about the emails when he suspended her.  (Dkt. 229 at 44–45; *see* Dkt. 223-1 at 107–108.)  But the Court cannot "credit [this] speculation" because it would require a jury to "guess or assume" too much.  *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1057 (11th Cir. 2020).  The mere fact that Dr. Coule spoke with his in-house attorney about Plaintiff's suspension "is not surprising, nor is it enough to support a reasonable inference that they discussed a specific topic, much less an inference concerning what they said about it."  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1355 (11th Cir. 1999).  "At most, the record contains evidence that [the attorney] *could* have told [Dr. Coule] about the nature of [Plaintiff's] complaints."  *Martin*, 959 F.3d at 1057.  But "'could have told' is not the same as 'did tell.'"  *Id.*  So "it would be pure speculation to

infer [the attorney] actually told" Dr. Coule about the allegedly protected elements of Plaintiff's complaints.  *Id.*

Finally, even assuming Plaintiff had established a prima facie case of retaliation, her claim would still fail because AUMC has articulated a legitimate nondiscriminatory reason for Plaintiff's suspension, and Plaintiff has not shown that reason is merely a pretext for retaliation. The Court has already explained why AUMC's safety-based reason is legitimate and nondiscriminatory.   And Plaintiff cites nothing that changes the Court's earlier rejection of her pretext arguments.

To sum up, Plaintiff has not established a viable retaliation claim against AUMC based on direct evidence, the *McDonnell* framework, or the convincing mosaic theory.  No reasonable jury could conclude that AUMC suspended Plaintiff's clinical privileges based on any ADA-protected activity.  So AUMC is entitled to summary judgment.

### C.   Plaintiff's Motion for Summary Judgment

Plaintiff also moves for summary judgment on her retaliation claims.  Even considering anything new in her motion, a reasonable jury could easily conclude Defendants did not retaliate against her in violation of the ADA.  So her motion is denied.

**D.     Conclusion**

The Court grants Defendants' motions for summary judgment on Plaintiff's federal retaliation claims (Count 9).   The Court denies Plaintiff's cross-motion for summary judgment on those claims. [25]

**VI.   State Claims (Counts 1 and 2)**

The Court has now dismissed all of Plaintiff's federal claims.  Only two state-law claims remain: a breach of contract claim (Count 1) and a

---

[25] To the extent Plaintiff's complaint asserts other discrimination and retaliation claims not addressed in this Order, all of them fail either because Plaintiff has abandoned them by not sufficiently raising/pressing them or because no reasonable jury could conclude they have merit.  To take just a few examples, Plaintiff arguably claims AU is liable for her suspension, AUMC is liable for Plaintiff's drug testing and termination, and both Defendants discriminated against her by failing to accommodate her perceived drug addiction.  But, even assuming Plaintiff has adequately invoked these theories, each fails on the merits, at least based on the arguments presented in response to Defendants' motions.  No reasonable jury could conclude AU was legally responsible for Plaintiff's suspension or—even if AU was responsible—that it acted based on Plaintiff's perceived addiction or her protected activity.  No reasonable jury could conclude AUMC was legally responsible for Plaintiff's drug testing and termination or—even if it was responsible— that it acted based on Plaintiff's perceived addiction or her protected activity.  And a reasonable accommodation theory is simply unavailable here because "an employer is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the 'regarded as' prong." *Lewis II*, 934 F.3d at 1183 n.11; *see Jordan*, 646 F. App'x at 740 n.5 ("[A] reasonable accommodation [is not] available to [an employee] based solely on a 'regarded as' theory of disability.").

whistleblowing claim (Count 2). The parties say the Court has supplemental jurisdiction over both claims. (*See* Dkts. 1 ¶ 7; 29 ¶ 13; 258; 263.) But a "district court[] may decline to exercise supplemental jurisdiction" where, as here, it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The court's discretion to do this is "broad." *Silas v. Sheriff of Broward Cnty., Fla.*, 55 F.4th 863, 866 (11th Cir. 2022) ("A district court . . . will rarely err by declining supplemental jurisdiction after the federal claims that supported its jurisdiction are dismissed.").[26]

"[C]oncerns of federalism . . . counsel in favor of dismissing state-law claims after the federal claims are dismissed." *Id.* And, "when all of the federal claims have been dismissed pretrial, Supreme Court case law

---

[26] Plaintiff has recently suggested the Court "could" have—and "likely" does have—diversity jurisdiction. (Dkt. 263 at 2–3.) But these equivocal suggestions are not enough to invoke the Court's limited jurisdiction. *See Hickerson v. Enter. Leasing Co. of Georgia, LLC*, 818 F. App'x 880, 882 (11th Cir. 2020) ("Federal courts are courts of limited jurisdiction" and "courts should remand . . . where federal subject matter jurisdiction is in doubt"); *Henry v. Examworks Inc.*, 2021 WL 3440698, at *2 (11th Cir. Aug. 6, 2021) ("Federal courts must . . . resolve *any* doubt as to jurisdiction in favor of remand to state court." (emphasis added)). That is especially so because the parties have never previously suggested diversity jurisdiction exists here. And the parties' underlying pleadings do not establish such jurisdiction either. (Dkts. 1; 1-1; 29.)

strongly encourages or even requires dismissal of the state claims." *Est. of Owens v. GEO Grp.*, Inc., 660 F. App'x 763, 775 (11th Cir. 2016); *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). That is so even where—as here—the case is at summary judgment, has been pending for years, and has consumed substantial resources. *See Est. of Owens*, 660 F. App'x at 776–77 (district court properly declined to exercise jurisdiction even though "the litigation had been pending for almost three years," "discovery had closed," and summary judgment had been granted on plaintiff's federal claims). Indeed, courts routinely decline to exercise supplemental jurisdiction after summary judgment. *See, e.g.*, *Barber v. Cellco P'ship*, 808 F. App'x 929, 937–38 (11th Cir. 2020); *Maughon v. City of Covington*, 505 F. App'x 818, 823 (11th Cir. 2013); *Linares v. Armour Corr. Health Servs., Inc.*, 385 F. App'x 926, 929 (11th Cir. 2010).

Given the caselaw in this area, and the totality of the record here, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims (Counts 1 and 2). The Court denies the parties' motions

for summary judgment on those claims, and remands both claims to the Superior Court of Fulton County where this case began. *See Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1226 (11th Cir. 2010) ("[F]ederal district courts in removal cases must remand, rather than dismiss, state claims over which they decline to exercise supplemental jurisdiction.").[27]

## VII. Plaintiff's Experts and Declarations

There is one last thing. Defendants ask the Court to exclude Plaintiff's expert submissions and two of her fact declarations. (Dkts. 227; 248.) Plaintiff does not meaningfully rely on this evidence in the argument sections of her summary judgment response briefs. And, to the limited extent she does, the evidence does not change the Court's conclusion that Defendants are entitled to summary judgment. Likewise, to the extent Plaintiff relies on the evidence in the argument sections of

---

[27] The Magistrate Judge recommended *dismissing* Plaintiff's state-law claims without prejudice, which would have let Plaintiff simply "start this case anew" in a different forum. (Dkts. 254 at 174–175; 258 at 8.) AU understandably objected to that recommendation. (Dkt. 258.) But remand—as opposed to dismissal—should limit much of the potential unfairness and prejudice about which AU is concerned. Given Plaintiff's history in this case, the Court certainly does not believe she deserves any further discovery, time extensions, page enlargements, second shots, or re-dos when her claims proceed in state court (though, of course, all of that is ultimately for another judge to decide).

her own motion-for-summary-judgment briefs, the evidence does not entitle her to summary judgment either. Because Plaintiff's challenged evidence does not affect the Court's summary judgment rulings, the Court denies as moot Defendants' request to exclude it.

## VIII. Conclusion

AUMC's Motion for Summary Judgment (Dkt. 199) is **GRANTED**. Plaintiff's Motion for Summary Judgment (Dkt. 209) is **DENIED**. AU's Motion for Summary Judgment (Dkt. 207) is **GRANTED IN PART** and **DENIED IN PART**. It is granted to the extent AU is entitled to summary judgment on Plaintiff's federal discrimination and federal retaliation claims (Counts 8–9, 12). It is otherwise denied. Plaintiff's remaining state-law claims against AU (Counts 1–2) are **REMANDED** to the Superior Court of Fulton County. Defendants' Renewed Motion to Exclude (Dkt. 248) is **DENIED AS MOOT**. AU's Notice of Objection to the Declaration of John Lott and Declaration of Michele Reed (Dkt. 227) is **OVERRULED AS MOOT**. The Court **REJECTS** any portions of the R&R (Dkt. 254) to which the parties have filed specific objections; the R&R's discussion of the employment relationship between AU, AUMC, and Plaintiff (Dkt. 254 at 93–99); and any portions of the R&R that are

inconsistent with this Order.  The Court otherwise **ADOPTS** the R&R (Dkt. 254).

**SO ORDERED** this 31st day of March, 2023.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE